# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH DAKOTA
## WESTERN DIVISION

| | | |
|---|---|---|
| AMERICAN ZURICH INSURANCE COMPANY and ZURICH AMERICAN INSURANCE COMPANY, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 20-cv-5026 |
| v. | ) ) ) | **ATTORNEY DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| J. CRISMAN PALMER and GUNDERSON, PALMER, NELSON & ASHMORE, LLP, | ) ) ) | |
| Defendants. | ) ) | |

Plaintiffs, American Zurich Insurance Company and Zurich American Insurance Company (collectively "Zurich"), have sued Defendants, J. Crisman Palmer and Gunderson, Palmer, Nelson & Ashmore, LLP (collectively "Attorney Defendants"), for breach of fiduciary duty and legal malpractice arising out of Attorney Defendants' defense of Zurich in a bad faith case in South Dakota. Both of Zurich's claims fail as a matter of law for two separate and independent reasons: (1) Zurich's claims are barred by the statute of repose; and (2) Zurich has not proffered the necessary admissible expert testimony to bear its burden of proof on breach of the applicable standard of care. As a result, this Court should grant summary judgment and dismiss Zurich's Second Amended Complaint in its entirety. Alternatively, even if Zurich's legal malpractice claim survives summary judgment, this Court should dismiss Zurich's breach of fiduciary duty claim because Zurich has not presented expert testimony that Attorney Defendants breached the duty of loyalty or confidentiality.

## I.      FACTS AND PROCEDURAL HISTORY

This legal malpractice claim arises out of Attorney Defendants' representation of Zurich in a bad faith claim, which is captioned *Leichtnam v. American Zurich Insurance Company, et al.*, No. 15-5012, United States District Court for the District of South Dakota ("the Bad Faith Claim"). The Bad Faith Claim arose out of Zurich's denial of workers' compensation benefits to Joseph Leichtnam ("Leichtnam").

### A.  Leichtnam's Workers' Compensation Claim.

Leichtnam's workers' compensation claim arose when he was injured on August 29, 2007, while working for Dakota Steel in Rapid City, South Dakota. (Palmer Depo. at p.16 (attached as Exhibit A); Exhibit 2).[1] Zurich provided workers' compensation insurance to Dakota Steel at the time. (Palmer Depo. at p.16; Exhibit 2). Leichtnam fell off a forklift and suffered injuries to his head, neck, and lower back. (Palmer Depo. at p.16; Exhibit 2). He sought medical care for his injuries and received workers' compensation benefits, including payment of his medical expenses, temporary disability benefits, and permanent disability benefits. (Palmer Depo. at p.38; Exhibit 9).

On July 17, 2008, Zurich arranged for Leichtnam to see Dr. Wayne Anderson ("Dr. Anderson"), a certified doctor in occupational medicine, for an Independent Medical Exam ("IME"). (Palmer Depo. at p.16; Exhibit 2; Abourezk Depo. at p.85 (attached as Exhibit B); Exhibit 64). Dr. Anderson determined that Leichtnam's work injury was a major contributing cause of his lower back pain, head injuries, and impairment. (Palmer Depo. at p.16; Exhibit 2; Abourezk Depo. at p.85; Exhibit 64). On September 16, 2008, Zurich retained a different doctor, Dr. Blow, to

---

[1] For the Court's ease of reference, exhibits cited with numbers are deposition exhibits, and the number refers to the exhibit number used at the depositions. Exhibits cited with letters refer to depositions taken in this case. All exhibits are attached to the Affidavit of Kristin N. Derenge Dated February 1, 2023.

perform a record review. (Palmer Depo. at p.37; Exhibit 8). Dr. Blow reviewed Leichtnam's medical records and agreed with Dr. Anderson's findings that the workplace injury was a major contributing cause of Leichtnam's impairment. (Palmer Depo. at p. 37; Exhibit 8).

On April 5, 2009, Leichtnam's employment with Dakota Steel was terminated for violation of safety protocols. (Palmer Depo. at p.82; Exhibit 28). After Leichtnam's termination, Zurich retained a third doctor, Dr. Richard Farnham ("Dr. Farnham"), to perform another IME and determine whether Leichtnam needed more medical treatment for his work injury. (Palmer Depo. at p.16; Exhibit 2; Abourezk Depo. at p.99; Exhibit 67). Dr. Farnham was not certified in occupational medication and does not treat patients. (Palmer Depo. at p.16; Exhibit 2). Dr. Farnham concluded that Leichtnam was at maximum medical improvement ("MME") and, contrary to the opinions of Dr. Anderson and Dr. Blow, Leichtnam's impairment did not arise from his work injury. (Palmer Depo. at p.16; Exhibit 2; Abourezk Depo. at p.99; Exhibit 67). Based on Dr. Farnham's report, Zurich terminated Leichtnam's medical benefits in June 2009. (Palmer Depo. at p.16; Exhibit 2).

Leichtnam filed a petition for hearing on July 15, 2009, challenging Zurich's denial of his medical benefits. (Palmer Depo. at pp.33–34; Exhibit 6). On October 28, 2009, Zurich made a settlement offer of $1,500.00 for the claim, which was rejected. (Palmer Depo. at p.16; Exhibit 2).

Zurich engaged attorney, Bill Fuller ("Fuller"), to defend the workers' compensation claim. (Fuller Depo. at p.7 (attached as Exhibit C)). In March 2012, Zurich retained Dr. Anderson to perform another IME. (Palmer Depo. at p.82; Exhibit 28; Abourezk Depo. at p.88; Exhibit 65). Dr. Anderson, after reviewing additional medical records, concurred with his earlier 2008 determination that Leichtnam's work injury was a major contributing cause of his impairment. (Palmer Depo. at p.82; Exhibit 28; Abourezk Depo. at p.88; Exhibit 65).

On March 5, 2012, Fuller wrote Zurich a letter recommending reinstatement of Leichtman's medical benefits. (Fuller Depo. at p.8; Exhibit 116). At that point, Leichtman had not received medical workers' compensation benefits for nearly three years due to Zurich's decision to terminate benefits in June 2009. (Palmer Depo. at p.82; Exhibit 28). However, Zurich's claims adjuster repeatedly argued with Fuller about whether reinstatement of medical benefits was warranted, whether future medical expenses could be settled, and whether Zurich's willingness to settle Leichtnam's permanent partial disability could be conditioned upon "closing out" future medical benefit payments. (Fuller Depo. at pp.8, 11–12, 18–19, 29; Exhibits 77, 116–19). Nonetheless, Zurich reinstated Leichtnam's medical benefits in June 2012. (Palmer Depo. at p.82; Exhibit 28). Due to his communications with Zurich, Fuller became concerned that Zurich was exposing itself to bad faith liability. (Fuller Depo. at p.25). Fuller communicated those concerns to Zurich. (Fuller Depo. at p.29; Exhibit 119).

In June 2013, Leichtnam and Zurich entered into a settlement agreement for a payment of $75,000.00 and payment of all future medical benefit payments. (Palmer Depo. at p.38; Exhibit 9). During settlement negotiations, Leichtnam's workers' compensation attorney, Dennis Finch, expressly negotiated to preclude any release of bad faith claims from the settlement agreement. (Palmer Depo. at p.62; Exhibit 16; Fuller Depo. at pp.37–38).

**B.  Leichtnam's Bad Faith Claim.**

On February 27, 2015, Leichtnam filed the Bad Faith Claim. (Palmer Depo. at p.16; Exhibit 2). Leichtnam was represented by Michael Abourezk ("Abourezk"). (Palmer Depo. at p.16; Exhibit 2). Zurich engaged Attorney Defendants to defend the Bad Faith Claim. (Palmer Depo. at pp.11–12; Exhibit 1; Wagner Depo. at p.31 (attached as Exhibit D); Exhibit 72).

Zurich's associate general counsel, Dawn Wagner ("Wagner"), was assigned to supervise the Bad Faith Claim and was Palmer's point of contact for the case. (Wagner Depo. at pp.13, 22). At the commencement of the Bad Faith Claim, Wagner only managed direct claims against Zurich in her position. (Wagner Depo. at p.21).  In a letter to Zurich in September 2015, Palmer explained that Abourezk is the "guru" of bad faith litigation in South Dakota, and that he is one of the best bad faith lawyers in the state, if not the region, regarding bad faith cases. (Wagner Depo. at p.88; Exhibit 89).

Palmer proceeded to defend the Bad Faith Claim and filed an answer on April 30, 2015. (Palmer Depo. at pp.22, 24, 25–26; Exhibit 5). Palmer sent a copy of the Answer to Wagner that same day. (Palmer Depo. at pp.22, 25–26; Wagner Depo. at pp.45–46; Exhibit 74). The Answer did not raise any affirmative defenses, as Palmer did not believe these defenses were relevant or would be successful. (Palmer Depo. at pp.22, 24–25; Exhibit 5).

On August 3, 2015, Palmer sent a letter to Wagner with a copy of Leichtnam's first set of discovery requests and stated:

> There are several Requests that may seem broad; however, my experience in this jurisdiction is the Court shows great leniency during the discovery process. The plaintiff's attorneys are very skilled in these types of cases as well, and I will certainly compare some of these Requests with Requests in previously cases to see if we can limit the scope in some areas.

(Wagner Depo. at p.51; Exhibit 76). On September 23, 2015, Palmer sent Wagner a letter listing documents that needed to be produced for discovery. (Wagner Depo. at p.70; Exhibit 82).

The next day, on September 24, 2015, Palmer sent Wagner a letter advising that Zurich would almost certainly be compelled to produce personnel files and other outstanding discovery documents. (Wagner Depo. at pp.73–74; Exhibit 84). In part, Palmer wrote:

> I am almost 100% certain that Judge Viken will make you produce personnel files. . . .  I say, with almost certainty [that Judge Viken] will issue an order requiring

you to produce the files. We can object, . . . but the judge will grant the motion and probably award [Leichtnam] attorneys' fees for being required to do so. . . . Again, I understand and respect your position. . . , but I just want to be sure I have fully advised you regarding where and how I think it will go. . . .  I know the content of this letter is not what you wanted to hear. However, I feel compelled to let you know how I think this will sort out based on my prior experience with the federal courts in South Dakota in bad faith litigation.

(Wagner Depo. at pp.73–74; Exhibit 84).

That same day, on September 24, 2015, Abourezk sent Palmer a settlement proposal for $325,000.00. (Palmer Depo. at pp.69–70; Exhibit 19). On September 25, 2015, Palmer sent Wagner that settlement proposal along with another letter strongly advising Wagner to consider settlement. (Wagner Depo. at p.88; Exhibit 89). Again, Palmer wrote that Leitchnam was going to get virtually all his discovery requests based on the law in South Dakota on bad faith claims in federal court, stating:

I suggest that you give this appropriate consideration as it is something I asked Mike to do. I am going to sojourn back to the fact that discovery in federal court in South Dakota is a very painful experience for defendants. I can virtually assure you that almost anything he asks for with regard to personnel files, newsletters, training material and things of that nature, he will get. All defendants provide those materials. . . .

(Wagner Depo. at p.88; Exhibit 89).

Further, Palmer advised that Abourezk was a highly experienced and formidable plaintiff's attorney:

I have handled many bad faith cases with Mike through the years. As I think I told you by phone, *Mike is a very good lawyer. He is without question the "guru" of bad faith in South Dakota and maybe even in this region*. He is smart, well-prepared, thorough and knows the area inside and out. He knows where to look at what to ask for.

(Wagner Depo. at p.88; Exhibit 89 (emphasis added)).

Palmer then advised that Abourezk may be amendable to settlement—but only early in the discovery process:

> [I]n the last several years in cases Mike and I have had, we have had serious discussion early on before everybody expended tremendous amounts of human resources and financial resources in the discovery process. We have been able to reach early settlements. It is my experience that Mike is willing to accept a lesser sum if they can do it early in the process. As he references in this letter, *this is not an offer that he will still be making six months from now after we have run through part of the discovery process*.
>
> I do not want to imply that it is a complete take it or leave it, but I would tell you that Mike is an interesting character to negotiate with and when he comes up with these numbers, they are pretty close to what he is going to expect. *There is always some room for negotiation and discussion, but generally speaking, not a lot.* . . . .
>
> I apologize for the length of this letter and that I am repeating some of the points I have discussed in the past, but in many cases that I have defended, the cost and human resource time as well as the time the matter drags on in dealing with discovery has driven settlements in many cases.

(Wagner Depo. at p.88; Exhibit 89 (emphasis added)).

On September 28, 2015, Wagner responded and asked for a more detailed analysis of the Bad Faith Claim to assist in settlement negotiations. (Palmer Depo. at pp.69–70; Exhibit 20). Palmer provided discovery answers by the October 2, 2015 deadline and provided Wagner a copy of those answers. (Wagner Depo. at p.83; Exhibit 88).

On November 24, 2015, Palmer sent Wagner a letter providing a recent decision from Judge Veronica Duffy on discovery in bad faith claims in South Dakota and again advising that bad faith claims are a painful process for defendants in the state:

> I just wanted you to be aware of the way these discovery disputes go here in South Dakota with bad faith. As I have told you, it doesn't work out very well for defendants and this is the most recent look at it. The thing that is particularly poignant about this one is the fact that Dr. Farnham is the one they used for the IME and Dr. Farnham is the one they used for an IME in the case I am handling for you.
>
> In trying to value these cases, it gets to be a point where in large majority, the dollar payment that you can tolerate to get rid of this thing.
>
> My experience has been that these bad faith cases do nothing but get worse with time as it just gives the plaintiffs more time and opportunity to comb through your files looking for issues. Additionally, you can tell from this the discovery process

> is very difficult, very painful and very extensive and as a result, very costly. I will give you a better analysis of my settlement proposal and some thoughts and ideas on that shortly but I just wanted to get this off to you as I was reading some recent opinions and saw this one and wanted to get it to you for your thoughts.

(Wagner Depo. at p.93; Exhibit 90).

On December 2, 2015, Abourezk sent Palmer a letter identifying the discovery responses he found insufficient. (Abourezk Depo. at p.38; Exhibit 44). On December 14, 2015, Palmer forwarded this letter to Wagner advising that the deficiencies Abourezk identified were expected due to the broad scope of discovery in bad faith cases in South Dakota. (Wagner Depo. at p.95; Exhibit 91). Wagner and Palmer then scheduled a call on December 15, 2015 to discuss discovery issues. (Palmer Depo. at p.70; Exhibit 21).

On December 18, 2015, Abourezk sent Palmer a letter stating that, unless he received discovery responses shortly, he would file a motion to compel and request for production. (Abourezk Depo. at p.41; Exhibit 45).

On December 23, 2015, Palmer sent Wagner another letter reiterating that discovery in bad faith claims would be very expensive and recommending settlement. (Palmer Depo. at pp.71–72; Exhibit 22). In that letter, Palmer enclosed another case by Judge Veronica Duffy, *Gowan v. Mid Century Ins. Co,* 309 F.R.D. 503, 506 (D.S.D. 2015), that he believed was very pertinent to Leichtnam's claims. Palmer then provided the following analysis on the merits of Leichtnam's Bad Faith Claim:

> A number of these issues [in *Gowan*] related directly to issues we are talking about in this file. I have a real concern that if we "go to the mat" with the plaintiff over this matter, there is a high likelihood they are going to succeed and we are going to have to provide the information as well as incur the plaintiff's attorneys' fees.

> I do think this is a case we should attempt to settle. To me, there is no question the benefits were improperly and incorrectly terminated based on the position taken by Dr. Farnham in his evaluation, which was contrary to the ongoing medical evidence

that the benefits should continue. I think Dr. Farnham's reputation is also taken into question in the *Gowan* matter and I think it presents some issues. . . .

Further evidence of our problem is the fact Bill Fuller, the lawyer representing the employer and you in this matter, had problems with the benefits being terminated and was routinely recommending that benefits be reinstated. . . . Obviously Bill thought there were issues with potential bad faith developing and *candidly, in the review of this case, there is clearly going to be a finding of bad faith*. . . .

(Palmer Depo. at pp.71–72; Exhibit 22 (emphasis added)).

Palmer also reiterated his concern with the expense of discovery:

The thing I can tell you with certainty is as this matter goes forward, the discovery process will be very expensive. My experience in these matters has been that the longer the discovery process goes on, generally speaking, these cases do not get any better and frequently get worse as there are more and more issues that turn up in the court of the discovery process. . . . Ultimately there is going to have to be some sort of payment to the plaintiff to settle this case or ultimately a determination of a judgment amount by a jury. . . . .

(Palmer Depo. at pp.71–72; Exhibit 22).

Palmer then cautioned Wagner that Abourezk could be difficult to negotiate with and his settlement numbers were unlikely to go down over time:

*I would tell you Mike Abourezk is a very challenging individual with whom to negotiate*. Mike will tell you early on (like he has done here) a case value that he thinks is in the realm of what the case is worth and does not stray very far from that in the course of trying to negotiate with him. I think you can see that Mike has laid out his position as to where he thinks we have problems. *As I have told you, I am not sure we don't have a significant number of problems and the deeper we get into discovery the harder it is to get him to negotiate downward*.

(Palmer Depo. at pp.71–72; Exhibit 22 (emphasis added)).

Finally, Palmer advised that he did believe Leichtnam's settlement demand was reasonable in light of what similar claims settle for in South Dakota:

Very candidly, I do not think the number [Mike Abourezk] has demanded is that far out of line. I have several bad faith cases with Mike with a better defense potential for $200,000 and up. I would tell you that I think Mike will take less than $325,000, but where he would go under $300,000 I cannot tell you. He might be willing to take $275,000; I would question whether he would take $250,000, but

that is certainly a discussion item to be had if we want to pursue that. I will tell you I do not think he is going to take anything less than $250,000 and candidly, based on what bad faith cases settle for around here, if I was him I probably wouldn't either. . . .

(Palmer Depo. at pp.71–72; Exhibit 22). Abourezk confirmed at his deposition that he would likely have accepted $300,000.00 to settle the Bad Faith Claim. (Abourezk Depo. at p.35).

On January 6, 2016, Wagner emailed Palmer advising that she would like to mediate the case but still needed more analysis on aspects of the Bad Faith Claim, listing specific points on which she wanted additional information. (Palmer Depo. at p.73; Exhibit 23).

On February 1, 2016, Palmer sent Wagner a letter responding to the points raised in her email, namely (1) providing an overview of Leichtnam's medical treatment from 2007 to 2009; (2) identifying "problematic issues" for Zurich's defense; (3) identifying Leichtnam as a likely sympathetic witness; (4) providing a damages analysis; (5) advising attorneys' fees would be at least $75,000.00 to bring the Bad Faith Claim to trial; and (6) analyzing the merits of the claim, among other things. (Palmer Depo. at pp.75–76; Exhibit 24).

In discussing "problematic issues" for Zurich's defense, Palmer identified the three-year gap in medical treatment between when Zurich cut off Leichtnam's workers' compensation benefits in 2009 and reinstatement of those benefits in 2012. (Palmer Depo. at p.75–76; Exhibit 24). Further, Leichtnam's benefits were cut off right after the medical record showed that an epidural shot relieved his pain. (Palmer Depo. at pp.75–76; Exhibit 24). As another "problematic issue," Palmer identified Zurich's reliance on Dr. Farnham's IME when Dr. Farnham's credibility was questioned by the federal court and when Dr. Farnham's opinion was in opposition to the opinions of Dr. Anderson and Dr. Blow. (Palmer Depo. at pp.75–76; Exhibit 24). Palmer explained that issues with Dr. Farnham's credibility "become[] even more concerning when you review the timing and findings of the IMEs in this matter" as two doctors, one of whom had "an excellent

reputation" in the area, recommended continuing care, but Zurich cut off medical benefits as soon as it received Dr. Farnham's opinion. (Palmer Depo. at pp.75–76; Exhibit 24). "[T]he inconsistency in the IMEs and the decision to cease benefits based on the Farnham IME is concerning," Palmer stated. (Palmer Depo. at pp.75–76; Exhibit 24). Further, Palmer reiterated his concern that the discovery process would be very expensive for Zurich. (Palmer Depo. at pp.75– 76; Exhibit 24). In conclusion, he stated: "there is no question the benefits were improperly and incorrectly terminated" in this case and recommended settlement. (Palmer Depo. at pp.75–76; Exhibit 24).

On March 24, 2016, Abourezk sent an email to Palmer advising that he would file a motion to compel unless he received discovery responses soon. (Abourezk Depo. at p.42; Exhibit 47). Palmer replied that day advising that Zurich would like to try to settle the Bad Faith Claim. (Abourezk Depo. at p.42; Exhibit 47).

On April 8, 2016, Palmer sent Wagner a letter recommending mediation. (Palmer Depo. at p.79; Exhibit 25). Wagner replied on April 11, 2016 and agreed with the recommendation. (Wagner Depo. at pp.128–29; Exhibit 96).

On June 19, 2016, Palmer sent Wagner a letter advising that, the week before, Abourezk tried a bad faith case against an insurer and returned with a $950,000.00 plaintiff's verdict and a $2,750,000.00 verdict for punitive damages. (Wagner Depo. at p.129; Exhibit 97). Palmer continued, "I understand it is a different factual scenario, I just want you to know he is coming off another win so it always makes him a little more challenging to deal with." (Wagner Depo. at p.129; Exhibit 97).

The mediation took place on October 24, 2016. (Palmer Depo. at p.82; Exhibit 28). Wagner travelled to Rapid City, South Dakota, to attend. (Wagner Depo. at p.131). At the time, she

believed the Bad Faith Claim had a reasonable settlement value of $300,000.00 and was prepared to offer that sum to resolve the case. (Wagner Depo. at p.134). Leichtnam's opening demand was for $2,000,000.00, which Zurich countered with an offer of $10,000.00. (Wagner Depo. at p.132). Leichtnam then reduced his demand to $1,995,000.00, and Zurich terminated the mediation. (Wagner Depo. at p.132).

On December 16, 2016, Palmer sent Wagner a letter advising that he expected to receive a motion to compel soon and that, consistent with his previous opinions, the motion would be granted. (Wagner Depo. at p.136; Exhibit 99). On February 27, 2017, Palmer sent Wagner a letter advising that no depositions had been taken yet, and that the deadline for depositions was July 19, 2017. (Palmer Depo. at p.91; Exhibit 31). On December 5, 2017, Abourezk sent Palmer another email again stating that he would need to file a motion to compel unless Zurich produced the outstanding discovery documents. (Abourezk Depo. at pp.49–50; Exhibit 49). On December 7, 2017, Palmer sent Wagner a letter stating that Abourezk was still seeking discovery responses and providing the names of witnesses for depositions. (Palmer Depo. at p.93; Exhibit 33).

On December 18, 2017, Leichtnam filed a motion to compel and supporting brief. (Abourezk Depo. at pp.51–52; Exhibit 51; Exhibit 52). That same day, Wagner emailed Palmer requesting a call to discuss strategy going forward. (Palmer Depo. at p.92; Exhibit 32). On January 4, 2018, Wagner emailed Palmer requesting an outline of defense strategies. (Palmer Depo. at pp.89–90; Exhibit 30). On January 5, 2018, Palmer responded by cautioning Wagner that opposition to the motion to compel would likely fail and providing a supporting memorandum with detailed legal analysis. (Wagner Depo. at pp.147–48; Exhibit 102; Exhibit 103). Palmer stated:

> I understand Zurich's hesitancy with regard to producing such an abundance of information, and simply provide the recommendation set forth in the memorandum

as guidance based on my experience with bad faith cases in South Dakota. As we have discussed, South Dakota courts allow very broad discovery in bad faith cases. . . . [W]e are currently working on a Response to the Plaintiff's Motion to Compel. However, we do not have a lot to work with from a legal standpoint because the plaintiff's counsel has been successful on these exact requests with the exact same judge in the past. We are doing what we can to limit the requests, but based on the Court's prior rulings, the likelihood of success is low.

(Wagner Depo. at p.147; Exhibit 102).

Within days, on January 8, 2018, Zurich retained the Hinshaw Culbertson Law Firm ("Hinshaw Attorneys") in Chicago to take over lead defense of the Bad Faith Claim. (Wagner Depo. at p.148; Exhibit 104). The Attorney Defendants continued in a local counsel role only. (Palmer Depo. at p.51). Hinshaw Attorneys were admitted as *pro hac vice* on February 1, 2018. (Palmer Depo. at p.51; Exhibit 13; Abourezk Depo. at pp.53–54; Exhibit 54; Exhibit 56).

Hinshaw Attorneys filed a Motion for Leave to File an Amended Answer and Affirmative Defenses on September 7, 2018. (Palmer Depo. at pp.48–49; Exhibits 10–11). On September 30, 2018, Magistrate Judge Wollman ("Judge Wollman") granted Leichtnam's motion to compel in part, and, on August 28, 2019, denied Zurich's motion to file an amended answer.[2] (Palmer Depo. at p.61; Exhibit 15; Abourezk Depo. at p.57; Exhibit 57). Judge Wollman also issued a report and recommendation denying Zurich's motion to dismiss. (Glazer Depo. at p.55 (attached as Exhibit E); Exhibit 62). Zurich filed objections to Judge Wollman's report and recommendation. (Glazer Depo. at p.57; Exhibit 50). Before those objections were ruled upon, Zurich settled the Bad Faith Claim for approximately $2,000,000.00. (Abourezk Depo. at p.128).

### C. Zurich's Legal Malpractice Claim.

Zurich filed the pending lawsuit against Attorney Defendants on April 20, 2020. (Doc. 1). The Second Amended Complaint asserts two causes of action: (1) breach of fiduciary duty; and

---

[2] Terry Westergaard replaced Palmer as local counsel in February 2019. (Abourezk Depo. at p.69; Exhibit 61).

(2) legal malpractice. (Doc. 33). Zurich retained Colin F. Campbell ("Campbell") as an expert to provide opinions on the standard of care. (Campbell Depo. at p.15 (attached as Exhibit F); Exhibit 115).

Campbell has never defended an insurance bad faith claim, although he recalled representing a plaintiff in one bad faith case in his career. (Campbell Depo. at p.8). Campbell is not licensed in South Dakota, nor has he ever appeared *pro hac vice* in the state. (Campbell Depo. at p.6).[3] In preparing his opinion, Campbell did not conduct any specific South Dakota legal research on bad faith claims and did not consult with any licensed attorneys in the state. (Campbell Depo. at pp.15–16, 20–21, 39; Exhibit 115). Nor did Campbell review Wagner's deposition transcript in preparing his opinion. (Campbell Depo. at pp.15, 30; Exhibit 115). Rather, he relied on the rules of professional conduct, bills, records, and correspondences. (Campbell Depo. at pp.15–17, 20–21; Exhibit 115). Although Campbell did not perform any South Dakota legal research in producing his opinions, he conceded that locality is an important consideration in determining the applicable standard of care. (Campbell Depo. at p.39).

Campbell's expert report does not identify a particular act or omission that he alleges breached the standard of care. Rather, Campbell opines generally that Palmer failed to adequately analyze the claim, conduct discovery, and communicate with Wagner generally, which, collectively and among other things, prevented Wagner from properly evaluating the case and assessing settlement options. (Campbell Depo. at p.15; Exhibit 115 at p.7). From his review of the record, Campbell identified the following alleged errors or omissions in support of his opinion that, when reviewed collectively, Palmer's conduct fell below the standard of care: (1) Palmer

---

[3] Campbell stated that he visited South Dakota one time in the early 1990s, during which he remembered passing through the Little House on the Prairie site in DeSmet, South Dakota, while travelling from Sioux Falls to Rapid City. (Campbell Depo. at 6).

failed to conduct his own investigation of the merits of the bad faith claim; (2) Palmer failed to serve discovery or take depositions; (3) Palmer failed to timely respond to Wagner's repeated requests for additional analysis of the Bad Faith Claim in 2015 and 2016 before the October 2016 mediation; (4) Palmer did not adequately advise Wagner on Leichtnam's mediation demand before the October 2016 mediation; and (5) Palmer failed to raise affirmative defense in answering Leichtnam's complaint, among other things. (Campbell Depo. at p.15; Exhibit 115 at pp.6–9).

In conclusion, Campbell opines that Palmer's conduct violated Rule of Professional Conduct 1.1 to "provide competent representation to a client" and Rule of Professional Conduct 1.4 to "reasonably and timely communicat[e] with a client." (Campbell Depo. at p.15; Exhibit 115 at pp.9–10). At the start of the Bad Faith Claim, Campbell opines that Palmer violated Rule 1.1 by "failing to conduct a thorough, timely review of the evidence to evaluate the facts, competently prepare [Zurich's] defenses, and analyze litigation and settlement strategy." (Campbell Depo. at 15; Exhibit 115 at p.10). As a result of this failure to adequately review the case and prepare a defense strategy, Campbell opines that Palmer provided "untimely and misguided advice regarding settlement" to Zurich in violation of Rule of Professional Conduct 1.4. (Campbell Depo. at p.15; Exhibit 115 at p.10). Based on these shortcomings, Campbell opined that Palmer breached the standard of care. (Campbell Depo. at p.15; Exhibit 115 at p.10).

Critically, Campbell also opined on causation and injury, stating that Palmer's shortcomings ultimately caused Palmer to fail to provide Zurich "with the information needed . . . to negotiate a more favorable settlement at the earliest time possible." (Campbell Depo. at p.15; Exhibit 115 at p.10). Incredibly, Campbell formed this opinion without ever reviewing Wagner's deposition. (Campbell Depo. at pp.15, 30; Exhibit 115).

In his deposition, Campbell explicitly stated that his opinion was that Palmer's alleged breach of the standard of care caused injury before the October 24, 2016 mediation. (Campbell Depo. at p.37). Campbell explained that early settlement was of "utmost urgency" in this case, and that the standard of care required Palmer to make decisions "immediately" and allow Zurich to "make good, quick decisions about an early settlement. [But] that's not what happened in this case." (Campbell Depo. at p.32). Consistent with his written opinion, Campbell then identified instances in which he believed Palmer breached the standard of care leading up to the October 2016 mediation, namely, by (1) failing to produce timely reports; (2) failing to timely communicate with Zurich in writing on developments in the case; and (3) failing to properly evaluate the case early on before the October 24, 2016 meditation, among other things. (Campbell Depo. at pp.32–37).

Campbell testified that although there may have been breaches of the standard of care that occurred after the October 24, 2016 mediation, *he was not offering any opinion suggesting that any of those alleged breaches caused any harm to Zurich*. (Campbell Depo. at p.37; Palmer Depo. at p.82; Exhibit 28).[4]  Thus, according to Campbell, the only actionable breaches of the standard of care (*i.e.*, those causing harm to Zurich) occurred before the October 24, 2016 mediation. (Campbell Depo. at p.37; Palmer Depo. at p.82; Exhibit 28).

Attorney Defendants now move for summary judgment. Attorney Defendants are entitled to summary judgment because (1) Zurich's claims are barred in full by the statute of repose; and (2) Zurich's expert's opinions should be excluded under the locality rule, and therefore, Zurich has

---

[4] In a legal malpractice case, causation is referred to as a "case within a case." *See Zhi Gang Zhang v. Rasmus*, 2019 SD 46 ¶ 27, 932 N.W.2d 153, 162; *Hamilton v. Sommers*, 2014 SD 76 ¶ 39, 855 N.W.2d 855, 867. Recognizing this, Campbell admits that he does not offer any opinion that any case within a case opinion for any alleged breach of the standard of care exists after the October 24, 2016 mediation. (Campbell Depo. at p.37; Palmer Depo. at p.82; Exhibit 28).

failed to present expert testimony on whether Palmer breached his duty of care.  Alternatively, Attorney Defendants are entitled to summary judgment dismissing the breach of fiduciary duty claim because Zurich's expert never opines there is a breach of the duty of loyalty or confidentiality.

## II.    LEGAL STANDARDS

Because this case arises under diversity jurisdiction, this Court must apply state substantive law and federal procedural law. *See Great Plains Tr. Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, 995 (8th Cir. 2007). Under the Federal Rules of Civil Procedure, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "The moving party is entitled to a judgment as a matter of law" when "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The nonmoving party is entitled to all reasonable inferences that may be drawn from the evidence but not to inferences that may only be drawn by resorting to speculation." *Culton v. Missouri Dep't of Corr.*, 515 F.3d 828, 830 (8th Cir. 2008). "A party opposing summary judgment may not rest upon mere allegations or denials contained in the pleadings, but must, by sworn affidavits and other evidence, set forth specific facts showing that there is a genuine issue for trial." *Mehrkens v. Blank*, 556 F.3d 865, 868–69 (8th Cir. 2009).

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1). Significantly, a party cannot avoid summary judgment by

asserting a better version of the facts than their prior testimony. *See Menz v. New Holland N. Am., Inc.*, 507 F.3d 1107, 1113 (8th Cir. 2007) (affirming summary judgment and stating the plaintiff could not "create a genuine issue of material fact by attempting to contradict his own testimony"); *see also Pickett v. Colonel of Spearfish*, 209 F. Supp. 2d 999, 1006 (D.S.D. 2001).

## III.    ARGUMENT

In the Second Amended Complaint, Zurich asserts two claims: Count I-Breach of Fiduciary Duty; and Count II-Legal Malpractice. (Doc. 33).[5] Both claims fail as a matter of law.

As an initial matter, claims for legal malpractice and breach of fiduciary duty involve different duties under South Dakota law. The duty in a legal malpractice claim arises from the duty of care in an attorney-client relationship, and the duty requires an attorney to "'exercise the skill and knowledge ordinarily possessed by an attorney.'" *Slota v. Imhoff & Assocs., P.C.*, 2020 SD 55, ¶ 25, 949 N.W.2d 869, 876–77. On the other hand, an attorney's fiduciary duties to a client are much narrower. *See id*. An attorney's "fiduciary obligations are twofold: (1) confidentiality; and (2) undivided loyalty." *Id.*

Although legal malpractice claims and breach of fiduciary duty claims are distinct and possess distinct elements, they share some commonalities. To bear its burden of proof and survive summary judgment on both its legal malpractice claim and breach of fiduciary duty claim, Zurich must present expert testimony on the alleged breach of the standard of care. *See Hamilton v. Sommers*, 2014 SD 76, ¶ 22, 855 N.W.2d 855, 862 (stating that expert testimony is generally required to show breach of the standard of care in a legal malpractice claim); *Sandhu v. Kanzler*,

---

[5] Zurich labels Count II as "breach of the duty of care," but Zurich's expert report confirms that this claim sounds in legal malpractice. (Doc. 33). Campbell, Zurich's expert, described the Attorney Defendants as falling below the "applicable standard of care." (Campbell Depo. at p.15; Exhibit 115 at p.10). The standard of care is a legal malpractice concept. *See Slota v. Imhoff & Assocs., P.C.*, 2020 SD 55, ¶ 25, 949 N.W.2d 869, 876–77 (describing the differences between claims for legal malpractice and breach of fiduciary duty under South Dakota law and stating that a "legal malpractice claim is premised on the duty of care existing in an attorney-client relationship").

932 F.3d 1107, 1115 (8th Cir. 2019) (stating that because legal malpractice claims "generally require expert testimony, it follows that claims for breach of an attorney-client fiduciary duty" generally require expert testimony); *Mittelstaedt v. Henney*, 969 N.W.2d 634, 640 (Minn. 2022) (holding that, as a general rule, expert testimony is required for a breach of fiduciary duty claim against an attorney).

As such, failure to present admissible expert testimony establishing breach of the standard of care requires entry of summary judgment on legal malpractice claims and breach of fiduciary duty claims. *See Zhi Gang Zhang v. Rasmus*, 2019 SD 46, ¶ 41, 932 N.W.2d 153, 165 (granting summary judgment for the attorney defendant because the plaintiff had "not established a submissible case of legal malpractice . . . because he lack[ed] critical expert testimony"); *Sandhu*, 932 F.3d at 1117 (affirming dismissal of a breach of fiduciary duty claim against an attorney when the plaintiff did not produce required expert testimony on duty and breach).

Additionally, both legal malpractice[6] and breach of fiduciary duty[7] claims require Zurich to prove that Attorney Defendants' breach of the applicable duty *caused* harm to Zurich. *See Grand State Property, Inc. v. Woods, Fuller, Shultz & Smith, P.C.*, 1996 SD 139, ¶ 18, 556 N.W.2d 84, 88 (stating that "[p]roof of damages proximately caused by the attorney's [breach] is a fundamental element" of both legal malpractice and breach of fiduciary duty claims). When the claims against an attorney arise out of litigation, this causation requirement is often referred to as the "case within a case." *See Zhi Gang Zhang* at ¶ 27, 932 N.W.2d at 162; *Hamilton* at ¶ 39, 855 N.W.2d at 867.

---

[6] Legal malpractice claims in South Dakota have four essential elements: "(1) an attorney-client relationship giving rise to a duty; (2) the attorneys, either by an act or a failure to act, violated or breached that duty; (3) the attorneys' breach of duty proximately caused injury to the client; and (4) actual injury, loss, or damage." *Yarcheski v. Reiner*, 2003 SD 108, ¶ 16, 669 N.W.2d 487, 493.

[7] Breach of fiduciary duty claims against an attorney also have four essential elements: "(1) that the defendant was acting as a fiduciary of the plaintiff; (2) that he breached a fiduciary duty to the plaintiff; (3) that the plaintiff incurred damages; and (4) that the defendant's breach of fiduciary duty was a cause of the plaintiff's damages." *Grand State Prop., Inc. v. Woods, Fuller, Shultz, & Smith, P.C.*, 1996 SD 139, ¶ 16, 556 N.W.2d 84, 88 (cleaned up).

Finally, both legal malpractice and breach of fiduciary duty claims against attorneys are subject to the three-year statute of repose imposed by SDCL 15-2-14.2. *See Slota*, 2020 SD at ¶ 26, 949 N.W.2d at 877 (stating that claims for legal malpractice and breach of fiduciary duty "are often indistinguishable" for purposes SDCL 15-2-14.2, and so SDCL 15-2-14.2 may apply to bar both legal malpractice and breach of fiduciary duty claims); *see also Zoss v. Protsch*, No. CIV 20-4211, 2021 WL 1312868, at *3 (D.S.D. Apr. 8, 2021).

In this case, the common requirements of legal malpractice and breach of fiduciary duty claims defeat Zurich's claims as a matter of law for two separate reasons. First, both Zurich's legal malpractice claim and breach of fiduciary duty claim are barred by the three-year statute of repose. Second, the opinions of Campbell, Zurich's expert, should be stricken, and, without admissibility expert testimony, Zurich cannot bear its burden of proof as a matter of law.

## IV.   ARGUMENT

**A.  Zurich's Expert Opined that All of the Attorney Defendants' Alleged Breaches of the Standard of Care that Caused Harm to Zurich Occurred Before the October 24, 2016 Mediation. As a Result, South Dakota's Three-Year Statute of Repose Governing Claims Against Attorneys Bars Zurich's Claims in this Case.**

      1. *The Alleged Breaches of the Standard of Care that Harmed Zurich All Occurred Before October 24, 2016.*

As noted above, Zurich must present expert testimony on the breach of the standard of care to bear its burden of proof and survive summary judgment. *See Hamilton*, at ¶ 22, 855 N.W.2d at 862; *Sandhu*, 932 F.3d at 1115. Zurich designated Campbell as its expert. (Campbell Depo. at p.15; Exhibit 115). Campbell opined that *any and all* alleged breaches of the standard of care *causing harm* to Zurich occurred before the October 24, 2016 mediation. (Campbell Depo. at p.37; Palmer Depo. at p.82; Exhibit 28). As discussed in his expert report, Campbell opines that Attorney Defendants breached the applicable standard of care by "failing to conduct a thorough, timely

review of the evidence to evaluate the facts, completely prepare the [Zurich]'s defenses, . . . analyze litigation and settlement strategy," and "reasonably" advise Zurich and communicate with Zurich. (Campbell Depo. at p.15; Exhibit 115 at p.10). According to Campbell's report, Attorney Defendants' alleged breach of the standard of care prevented Zurich from evaluating the settlement offer for $325,000.00 in September 2015, and, as a result, Zurich later had to pay approximately $2,000,000.00 to settle the case. (Palmer Depo. at pp.69–70; Exhibit 19; Campbell Depo. at p.15; Exhibit 115 at p.10).

Consistent with Campbell's opinion and the undisputed facts, any alleged breach of the duty of care preventing Zurich from evaluating the early settlement offer must have occurred before October 24, 2016 when that early settlement offer for $325,000.00 was revoked. It is undisputed that Leichtnam offered to settle the Bad Faith Claim for $325,000.00 on September 24, 2015. (Palmer Depo. at pp.69–70; Exhibit 19). It is further undisputed that this early settlement offer was revoked at the October 24, 2016 mediation when Leichtnam increased his settlement demand to $2,000,000.00. (Wagner Depo. at p.132). Thus, all the alleged breaches that Campbell opines caused harm to Zurich must have occurred before the October 24, 2016 mediation. (*See* Palmer Depo. at pp.69–70; Exhibit 19; Wagner Depo. at p.132).

At his deposition, Campbell confirmed that he believed our alleged breaches of the standard of care only *before the October 24, 2016 mediation* caused harm, and that he had no opinion on causation after that time:

> Q.   Now, you understand that a mediation did occur and the settlement offer from plaintiff's counsel went from $325,000 prior to the mediation to $2 million at the mediation. Do you understand those to be the facts?
>
> **A.   Yes. I believe they went – whatever the early settlement offer was that's set out in the letter had moved to $2 million or plus at the actual time of mediation, I think, in October of 2016.**

Q.     And so the failures of the standard of care that you've just testified about that prevented Zurich from properly being able to settle the case – and I understand there's a myriad of things you claim Mr. Palmer failed to do – did those all occur through the time of his engagement up through the mediation?

**A.     Well, certain things happened at particular times. For example, the failure to give a 30-day report or a 90-day report happened at a particular time.**

**I think, in general, the information the client needed to take advantage of an early settlement offer was not put in writing and communicated.**

Q.     Are you opining there is any failure of the standard of care by Attorney Palmer after the mediation?

**A.     Well, there are things that happened after the mediation that I think may bear upon is attitude toward the case or his standard of care on the case but not with respect to the case-within-the-case element with respect to early settlement, if that makes sense.**

Q.     Yeah, it does. So, I just want to make sure that I understand, because when I read your report, your opinions appear to indicate that Attorney Palmer before below the standard of care on a series of things and that then, in the case within the case, caused harm to the client because it prevented the client from taking advantage of the early settlement offer.

Is that a fair synthesis of what you are opinions are in this case?

**A.     It's a fair synthesis of my opinions with respect – in the context of the case within the case, let's just say.**

Q.     Are you opining that any other conduct by Attorney Palmer after the mediation caused any harm to Zurich?

**A.     Well, I have opinion that certain things, like not consulting with the client about affirmative defenses, fall below the standard of care. _I do not have an opinion, after the settlement conference, with respect to the case within the case._**

(Campbell Depo. at pp.35–37) (emphasis added).

The case within the case is the method for proving causation in legal malpractice claims.

*See Zhi Gang Zhang*, at ¶ 27, 932 N.W.2d at 162; *Hamilton*, at ¶ 39, 855 N.W.2d at 867. And

causation is an essential element for both legal malpractice and breach of fiduciary duty claims. *Grand State Property*, at ¶ 18, 556 N.W.2d at 88. Thus, based on Zurich's expert's testimony, all Attorney Defendants' alleged wrongful conduct causing harm to Zurich occurred before the October 24, 2016 mediation. (Campbell Depo. at pp.15, 37; Exhibit 115 at p.10).

2. *South Dakota's Statute of Repose Prevents Zurich from Recovering for Any Act or Omission Allegedly Committed by Palmer Before the October 24, 2016 Mediation.*

The South Dakota Legislature adopted a three-year statute of repose governing claims against attorneys. SDCL 15-2-14.2 states that "[a]n action against a licensed attorney, his agent or employee, for malpractice, error, mistake, or omission, *whether based upon contract or tort*, can be commenced only within three years after the alleged malpractice, error, mistake, or omission shall have occurred." SDCL 15-2-14.2 (emphasis added). "Statutes of repose effect a legislative judgment that a defendant should be free from liability after the legislatively determined period of time. They are based on considerations of the economic best interests of the public as a whole and are substantive grants of immunity based on a legislative balance of the respective rights of potential plaintiffs and defendants struck by determining a time limit beyond which liability no longer exists." *Slota*, at ¶ 22, 949 N.W.2d at 875–76. The South Dakota Supreme Court has interpreted SDCL 15-2-14.2 as a statute of repose for legal malpractice claims. *Robinson-Podoll v. Harmelink, Fox & Ravnsborg L. Off.*, 2020 SD 5, ¶ 22, 939 N.W.2d 32, 40. As a statute of repose, SDCL 15-2-14.2 follows the occurrence rule, and the three-year repose period commences when the attorney committed the alleged wrongful act or mistake. *See id.* (recognizing SDCL 15-2-14.2 as "an occurrence-based statute").

When applied to the undisputed facts of this case, SDCL 15-2-14.2's three-year statute of repose bars Zurich's breach of fiduciary duty and malpractice claims as a matter of law. As

discussed above, Zurich must present expert testimony indicating the Attorney Defendants breached their duty for both claims. *See Hamilton*, at ¶ 22, 855 N.W.2d at 862; *Sandhu*, 932 F.3d at 1115. Zurich has proffered expert testimony from Campbell. (Campbell Depo. at p.15; Exhibit 115). Critically, Campbell opined that *all alleged breaches of the standard of care that actually caused harm to Zurich occurred* before the mediation on October 24, 2016. (Campbell Depo. at pp.15, 35–37; Exhibit 115). Thus, the repose period applicable to those claims expired on October 24, 2019. *See* SDCL 15-2-14.2. Zurich did not commence this action until April 20, 2020. (Doc. 1). As a result, SDCL 15-2-14.2 bars all of Zurich's claims, and Attorney Defendants are entitled to summary judgment.

**B.   Attorney Defendants are Entitled to Summary Judgment Because Zurich has Not Presented Expert Testimony on the Standard of Care for Defense of Bad Faith Claims in South Dakota.**

Under South Dakota law, a plaintiff in a legal malpractice claim must present admissible expert testimony to establish the attorney breached the application standard of care. *Hamilton*, at ¶ 22, 855 N.W.2d at 862; *Lenius v. King*, 294 N.W.2d 912, 914–15 (S.D. 1980). "Except in certain cases, it is an expert witness who must establish the particular standard of care, i.e., the particular level of professional conduct required to meet the legal standard of care, and whether the attorney's conduct conforms to this standard of care." *Hamilton*, at ¶ 22, 855 N.W.2d at 862. The South Dakota Supreme Court has only recognized one exception to the rule requiring expert testimony to establish the applicable standard of care, namely, failure to commence a lawsuit within the applicable statute of limitations. *Zhi Gang Zhang*, at ¶ 29, 932 N.W.2d at 162. Similarly, to sustain their burden of proof, a plaintiff asserting a claim for breach of fiduciary duty against an attorney must present expert testimony about the applicable standard of care. *Sandhu*, 932 F.3d at 1115; *Mittelstaedt*, 969 N.W.2d at 640. Without *admissible* expert testimony on either a malpractice or

breach of fiduciary duty claim, a plaintiff cannot sustain its burden of proof, and the attorney is entitled to summary judgment. *See Zhi Gang Zhang*, at ¶ 41, 932 N.W.2d at 165; *Sandhu*, 932 F.3d at 1117; *Hamilton v. Bangs, McCullen, Butler, Foye, & Simmons, L.L.P.*, 2011 WL 902489, at *8 (D.S.D. 2011).

Here, Zurich designated Campbell as its expert. Campbell's opinions are subject to a motion to strike filed contemporaneously with this brief. Campbell's opinions should be stricken for the reasons stated in the brief supporting the motion to strike. Once Campbell's opinions are stricken, Zurich does not have necessary expert testimony to support its burden of proof on either its malpractice or breach of fiduciary duty claims. In turn, Attorney Defendants are entitled to summary judgment. *See Zhi Gang Zhang*, at ¶ 41, 932 N.W.2d at 165; *Sandhu*, 932 F.3d at 1117; *Hamilton v. Bangs, McCullen, Butler, Foye, & Simmons, L.L.P.*, 2011 WL 902489, at *8 (D.S.D. 2011).

**C. As an Alternative, Zurich's Breach of Fiduciary Duty Claim Fails Because Zurich's Expert Never Opines that Attorney Defendants Breached the Duty of Loyalty or the Duty of Confidentiality.**

Under South Dakota law, "[a] breach of fiduciary duty in the attorney-client relationship 'arises from the representation of a client and involves the fundamental aspects of an attorney-client relationship.'" *Behrens v. Wedmore*, 2005 SD 79, ¶ 52, 698 N.W.2d 555, 576 (quoting 2 Ronald E. Mallen & Jeffrey M. Smith, Legal Malpractice § 14.2 at 535 (5th ed. 2000)). The South Dakota Supreme Court has recognized that "'[t]he fiduciary obligations are twofold: (1) confidentiality; and (2) undivided loyalty.'" *Id*. (quoting Smith § 14.2 at 535). Consequently, "'[t]he phrase fiduciary breach . . . is no more descriptive than the phrase legal malpractice[;] [and a] cause of action for fiduciary breach requires a breach of confidence, a breach of loyalty, or

both.'" *Id*. (quoting Smith, § 14.2 at 536–37).[8] "Therefore, '[a]lthough the attorney functions in

a fiduciary relationship, a wrong by an attorney does not thereby become a fiduciary breach.'" *Id*.

(quoting Smith, § 14.2 at 537). "'[C]laims of negligence [breach of duty], which do not implicate

a duty of confidentiality or loyalty, do not support a cause of action for fiduciary breach.'" *Id*.

(quoting Smith, § 14.2 at 537).

    In this case, Campbell's report and deposition testimony set forth the Attorney Defendants'

alleged wrongful acts. Essentially, as discussed, Campbell opines that Palmer failed to properly

and timely evaluate the Bad Faith Claim, and that he failed to properly communicate with Zurich

about defense strategy. (Campbell Depo. at pp.15, 32–37; Exhibit 115, at pp.9–10). According to

Campbell, these mistakes prevented Zurich from having an opportunity to evaluate the early

settlement offer for $325,000.00 in September 2015. (Campbell Depo. at pp.15, 32–37; Exhibit

115, at pp.9–10).  The aforementioned wrongful acts are the only alleged wrongful acts of Attorney

Defendants that Campbell opined caused harm to Zurich or satisfied the "case within a case"

requirement. (Campbell Depo. at pp.15, 32–37; Exhibit 115, at pp.9–10).

    Importantly, none of these alleged wrongful acts involve an attorney's duty of loyalty or

confidentiality. (Campbell Depo. at pp.15, 32–37; Exhibit 115, at pp.9–10). Indeed, in forming his

---

[8] The cause of action for the breach of loyalty or confidentiality has been summarized and defined as follows:

> A breach of the duty of "undivided loyalty" has been found in two basic situations. The first is when an attorney obtains a personal advantage, whether consisting of an acquisition from the client, a joint venture with the client, or usurpation of an interest in, or opportunity concerning, the subject matter of the retention. Second, the duty of undivided loyalty is imperiled when there are circumstances that create adversity to the client's interest. These circumstances may consist of an existing, personal adverse interest of the attorney, an interest of a prior or subsequent client, or conflicting interests of present and multiple clients. A breach of confidentiality, outside of the context of adverse representation, has been rare and involves an unauthorized and unprivileged use or disclosure of a client's confidences. The terms of the engagement between the lawyer and client can bear on the scope of the fiduciary duties.

*Behrens*, at ¶ 52, 698 N.W.2d at 576, n.15 (quoting Smith, § 14.2 at 538).

opinion, Campbell primarily relied upon Rules of Professional Conduct 1.1 and 1.4, which do not address the duties of confidentiality and loyalty. (Campbell Depo. at p.15; Exhibit 115 at pp.9–10). Model Rule of Professional Conduct 1.1 requires an attorney to be competent in representing a client. SD ST RPC APP CH 16-18 Rule 1.1. Model Rule of Professional Conduct 1.4 requires an attorney to reasonably communicate with a client. SD ST RPC APP CH 16-18 Rule 1.4.

Further, violation of the rules of professional conduct *does not form* the basis for civil liability. As the South Dakota Supreme Court has stated, "[v]iolation of a Rule of Professional Conduct should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability." *Behrens*, at ¶ 51, 698 N.W.2d at 575. Because Zurich has not presented expert testimony that Palmer breached the duty of loyalty or confidentiality causing injury to Zurich, the Court should grant summary judgment dismissing Zurich's claim for breach of fiduciary duty. *See Zhi Gang Zhang*, at ¶ 41, 932 N.W.2d at 165; *Sandhu*, 932 F.3d at 1117; *Hamilton v. Bangs, McCullen, Butler, Foye, & Simmons, L.L.P.*, 2011 WL 902489, at \*8 (D.S.D. 2011).

## V.     CONCLUSION

Based on the foregoing, Attorney Defendants respectfully request that the Court grant summary judgment and dismiss all of Zurich's claims. In the alternative, the Court should dismiss Zurich's claim for breach of fiduciary duty.

Dated this 1st day of February, 2023.

*/s/* Kristin N. Derenge
Jason R. Sutton
Kristin N. Derenge
BOYCE LAW FIRM, LLP
300 S. Main Avenue/P.O. Box 5015
Sioux Falls, SD 57117-5015

(605) 336-2424
knderenge@boycelaw.com
jrsutton@boycelaw.com
Attorneys for Defendants