**In The Matter Of:**
*AMERICAN ZURICH INSURANCE COMPANY, ET AL v.*
*J. CRISMAN PALMER, ET AL*

*WITNESS: J. CRISMAN PALMER*
*August 31, 2022*

*PRUSS REPORTING*
*662 Enchanted Pines Drive*
*Rapid City, South Dakota  57701*
*(605) 390-3427*
*prussreporting@gmail.com*

Original File PALMER CRISMAN 08312022.txt
Min-U-Script® with Word Index

EXHIBIT
A

Page 9

1  Q   When was that?
2  A   I'm trying to differentiate. Pardon me for
3      pausing. We moved offices about 11 years ago, so
4      I was trying to think what office I was in at the
5      time. Probably 12 or 15 years ago.
6  Q   Was that a bad -- a bad faith worker's comp case?
7  A   No. It was a UIM.
8  Q   Did you give a deposition in that case?
9  A   I did.
10 Q   Prior to the case we're here to talk about, had
11     you handled worker's comp bad faith cases on
12     behalf of Zurich?
13 A   No.
14 Q   This was a -- the case we're here to talk about
15     was your first one for Zurich?
16     MR. SUTTON: First worker's comp --
17 Q   (BY MR. HOYT) First worker's comp bad faith?
18 A   I believe so. I believe I had done one bad faith
19     for Zur -- case for Zurich prior to this, but I --
20     I'm struggling to remember whether it was Zurich
21     or USF&G, but I -- we do Zurich work in our
22     office, but I didn't do any Zurich work. I only
23     was called in on the bad faith side.
24 Q   So without confining it to a bad faith worker's
25     comp, had you handled bad faith cases for Zurich

Page 10

1      prior to the claim that we're talking about?
2  A   I'm not sure. I'm not being evasive. There might
3      be one, but I'm not -- I remember an individual
4      that was I thought with Zurich at the time, but
5      now I'm not as sure. They might not have been
6      with USF&G.
7  Q   So let's broaden the scope even more. Had you
8      handled insurance defense cases for Zurich prior
9      to the claim we're here to talk about?
10 A   No. Me personally, no. Our firm, yes.
11 Q   Your firm. All right. Let's -- let's talk about
12     the case, and I'll call it the -- the Leichtnam
13     case. Is that how you pronounce that name?
14 A   I think it's Leichtnam, but --
15 Q   Leichtnam. Okay. Let's talk about that case.
16 A   Sure.
17 Q   How did that case come to you?
18 A   I got a call from somebody at Zurich which I
19     presume was Dawn Wagner, but I don't know that for
20     a fact.
21 Q   And did they say why they were calling you?
22 A   I -- I don't recall. I don't know why they were
23     calling me.
24     MR. HOYT: Let me mark as Exhibit 1 -- I'm
25     going to mark these as plaintiffs' exhibits.

Page 11

1      MR. SUTTON: What I would -- and it's up to
2      you. What I would suggest, and what's commonly
3      done, Scott, is we just continue numerically
4      numbering as we go so that we don't have multiple
5      Exhibit 1s later on in time. I don't care if you
6      do the plaintiffs or not, but --
7      MR. HOYT: Well, that's -- I like that
8      approach, but I was going to -- well, I see where
9      you're going. If we start with plaintiffs' 1 and
10     then you do defendants' 1, we got multiple 1s.
11     We'll try that. And I'm going to be -- I mean, we
12     have a deposition of Mike Ab -- I don't know how
13     to say it.
14     THE WITNESS: Abourezk.
15     MR. SUTTON: Abourezk.
16     MR. HOYT: -- Abourezk tomorrow so I'll --
17     you're going to be the court reporter for that --
18     so she can bring these exhibits to the extent I
19     need to use them then. So these are -- this is
20     not what I wanted.
21     I'm going to mark the guidelines. This is
22     Exhibit 1.
23     MR. SUTTON: Yep.
24     (Whereupon, Exhibit 1 was then marked.)
25 Q   (BY MR. HOYT) Mr. Palmer, I'll have you look at

Page 12

1      these. You are free to look at as much as you
2      want, but maybe I can direct your focus more to
3      just the question I intend to ask which is
4      generally if you recall seeing these guidelines
5      from Zurich at the beginning of your retention
6      with them on this case?
7  A   Do I remember receiving them, no. Do I -- do I
8      acknowledge I received them, yes.
9  Q   All right. Was this the first time you had seen
10     these guidelines or had you received them for
11     the -- the prior one or two cases you handled for
12     Zurich?
13 A   I don't know the answer to that question.
14 Q   And you understood in getting these that -- that
15     Zurich was providing them to you to show you what
16     they expected in terms of the guidelines they
17     wanted you to follow?
18 A   I do.
19 Q   Now, let's look at pages 2 and 3 of the actual
20     guidelines. And the -- the guidelines are
21     actually -- there is a -- there is a -- kind of an
22     overview and then there is paginated pages. And
23     I'm referring to the pages that have one and --
24     two and three at the bottom. It says, Guidelines
25     for litigation matters.

Page 13

1  A   I'm sorry.
2  Q   If you look at the bottom of the page, you need to
3      go further to get to the -- where it starts with
4      the pack page numbers.
5  A   Oh. I thought the Zurich 2 is what you were
6      talking.
7  Q   There. I think you are in the numbering sequence
8      there. So if you go to page 2 and 3 of that.
9          MR. SUTTON: I think he wants you at
10     Bates stamp 3016.
11 Q   (BY MR. HOYT) Yeah. Yeah.
12 A   Oh.
13 Q   3016 Bates stamp. I'm probably confusing you.
14     I'm referring right now to the little page number
15     at the bottom.
16 A   Oh, okay. Okay. I was going to say, they are all
17     2, but --
18 Q   Yeah. There are multiple numbers. Sorry about
19     that.
20 A   That's okay. Okay. I've got it.
21 Q   Okay. So appears a list of guidelines for
22     litigation matters. Do you see that?
23 A   I do.
24 Q   Do you recall receiving -- receiving those
25     guidelines and following those in the prior Zurich

Page 14

1      cases that you had handled?
2  A   Just so we're clear, I'm not positive I handled
3      any prior Zurich cases. I said I maybe did one.
4  Q   Okay.
5  A   I don't know whether it was Zurich or USF&G. But
6      I acknowledge receiving these, but I can't tell
7      you that I have any for a previous case.
8  Q   All right. You did review them for this case?
9  A   I'm sure I looked at them.
10 Q   All right. And so you saw the reporting
11     requirements listed under Roman Numeral II?
12 A   I see the reporting requirements.
13 Q   Do you recall within 30 days of receiving the case
14     sending the report that's outlined there?
15 A   I do not.
16 Q   And then if you go to B, initial case report
17     budget, there is another report called for 90 days
18     from receipt of the assignment. Do you recall
19     providing that report?
20 A   I do not.
21 Q   Do you believe you did or you just -- you can't
22     recall it or -- or you didn't?
23 A   I don't know one way or the other.
24 Q   So the -- the report that's called for under item
25     B says no later than 90 days calls for a number of

Page 15

1      things. And one of them in item 2, B2, is
2      identification and assessment of key issues
3      including likelihood for success on the key
4      issues. Do you recall providing -- and let me --
5      I believe you mentioned Dawn Wagner. You believe
6      she was your contact on the case?
7  A   I know that she was my contact. I didn't know if
8      she was the initial, but, yes, she was the
9      contact.
10 Q   All right. Can you remember any other contact you
11     reported to?
12 A   No, I cannot.
13 Q   All right. So do you recall within 90 days of the
14     assignment providing Dawn Wagner with your
15     identification and assessment of key issues and
16     likelihood for success?
17 A   I do not recall that.
18 Q   Item 3, a litigation plan, do you recall providing
19     her with a litigation plan that I -- identified
20     the four items, sub A through D?
21 A   I do not recall.
22 Q   Did you ever provide her with a litigation plan
23     that identified these items?
24 A   I don't know the answer to that. Whatever I did
25     is in the file.

Page 16

1  Q   All right. But as you sit here you can't recall a
2      specific litigation plan that identified
3      discovery, motions, significant activity?
4  A   I do not recall.
5          MR. HOYT: Let's mark as Exhibit 2 the
6      Leichtnam Complaint in this matter.
7          THE WITNESS: Oh, sorry.
8          MR. HOYT: She'll give you that copy.
9          (Whereupon, Exhibit 2 was then marked.)
10 Q   (BY MR. HOYT) And can you identify this as the
11     Complaint that you were retained to defend?
12 A   It would certainly appear to be.
13 Q   And did you receive this upon your retention from
14     Zurich?
15 A   I'm going to assume so.
16         MR. HOYT: Let's mark as Exhibit 3 the
17     Gunderson Palmer billing records for this.
18         (Whereupon, Exhibit 3 was then marked.)
19 Q   (BY MR. HOYT) And I'll start with the general
20     question, if you can identify these as the billing
21     records of Gunderson Palmer for this matter?
22 A   I'm going to assume they are. I haven't looked
23     through every one of them, but I -- I know that
24     they were provided to my counsel who I presume
25     provided them to you.

## Page 21

1   medical summaries as well as summaries of the
2   claim file.
3 Q (BY MR. HOYT) Okay. And do you -- is that what
4   you're recalling?
5 A Yes.
6 Q And you recall those were prepared by Beth Young
7   about the time frame we're looking at early on?
8 A I -- the time frame I don't know. I know that
9   Beth was preparing them. When she's reviewing
10  these, at the same time she's taking notes to
11  prepare the summaries. And whether they are
12  exactly contemporaneous with those dates, I don't
13  know.
14 Q All right. Now, it looks like from the time
15  records you obtained two extensions of time from
16  Michael --
17 A Abourezk.
18 Q -- Abourezk --
19 A That could be.
20 Q -- to answer it?
21 A Without looking, I wouldn't know.
22 Q Well, let's look.
23 A Okay.
24 Q So there is -- there is an entry on 3/26 on the
25  first page that says review -- receive review

## Page 22

1   email from attorney Michael Abourezk approving
2   extension of time to file an answer.
3 A Okay. I see that.
4 Q So that -- that's one. And then if you look down
5   at 4/15 at the very bottom. Correspondence to
6   attorneys Mike Simpson, Mike Abourezk, regarding
7   request for further extension of time in order to
8   file answer in order to finish review of
9   voluminous documents from clients.
10 A I see.
11 Q So two extensions it looks like --
12 A Yes.
13 Q -- correct?
14    And so with those extensions you believed you
15  had sufficient time to prepare an Answer for this?
16 A Yes.
17 Q And that you had sufficient time to identify any
18  issues to raise in that Answer?
19 A Yes.
20 Q But there was no research done during that period
21  of time into possible legal defenses, was there?
22 A Not that I see in the billings.
23 Q Well, and if we look at -- let's see -- I'm going
24  to mark this as Exhibit --
25    MR. HOYT: What are we up to, 4?

## Page 23

1     THE COURT REPORTER: 4.
2     MR. HOYT: That's responses and objections to
3   plaintiffs' second set of requests for admissions
4   to defendants.
5     (Whereupon, Exhibit 4 was then marked.)
6 Q (BY MR. HOYT) Generally can you identify these as
7   responses to requests for admissions that you
8   reviewed and approved?
9 A Yeah, I would say that's true.
10    MR. HOYT: Yeah, I don't -- did you get me
11  verification for these, because I don't have it
12  with this copy?
13    MR. SUTTON: Request for admissions wouldn't
14  require verification. Only interrogatories.
15  They're signed by counsel.
16    MR. HOYT: Well, it's general practice to
17  also have their client verify them. But, anyway,
18  he stands by them, so that's fine with me.
19 Q (BY MR. HOYT) If we look at 45 -- Request For
20  Admission 45 --
21 A Yes.
22 Q -- it asks, Admit you did not research any
23  potentially applicable defenses to assert on
24  behalf of AZIC in the bad faith action. And it
25  appears that you admitted that with an

## Page 24

1   explanation, but it does appear that you admit, if
2   you go to the response, that no research was done,
3   correct?
4 A Okay.
5 Q And so let's look at the Answer.
6     MR. HOYT: And we'll mark that as Exhibit 5.
7     (Whereupon, Exhibit 5 was then marked.)
8 A Okay.
9 Q (BY MR. HOYT) This is the Answer that was -- that
10  was filed to the Complaint we looked at, correct?
11 A Yes.
12 Q Who drafted this?
13 A I did. With input from others.
14 Q Who else had input?
15 A Jana Smoot White.
16 Q And what was her position?
17 A She was a lawyer in our office at that time.
18 Q What level of experience was she?
19 A She joined our firm -- she practiced law in
20  Kentucky for nine years and had been with us for
21  probably -- I'm not sure -- two or three years at
22  that time.
23 Q What was her -- her experience with worker's comp
24  bad faith?
25 A I don't know what her experience with worker's

Page 25

1   comp bad faith is.  I know that she had extensive
2   experience in bad faith in the state of Kentucky
3   and that's why I had enlisted Jana to assist in
4   what bad faith cases we had.
5 Q  What input did she provide on this Answer?
6 A  Specifically I don't know.  Jana and I would have
7   talked about it.  We always talked about how to
8   respond and --
9 Q  Okay.  Anybody else provide input?
10 A  Not to my knowledge.
11 Q  All right.  So you got two extensions of time and
12  had your paralegal review 1,800 plus pages of
13  documents and you filed a two-page Answer without
14  any affirmative defenses.  And so nothing that --
15  nothing that was found in that review, nothing
16  that was determined in that period of time led you
17  to believe that there were any potential defenses
18  for this matter?
19      MR. SUTTON: Object to the form of the
20  question.
21 A  At that time it did not.
22 Q  (BY MR. HOYT) You also filed this Answer without
23  providing a draft to the client for review prior
24  to filing, correct?
25 A  I don't have a recollection, but I do after the

Page 26

1   fact, yes, I think I did.
2 Q  Now, that wasn't your usual practice, was it?
3 A  Depended on the client, but probably not my usual
4   practice.
5 Q  In fact, if we look back at those guidelines,
6   Exhibit 1, if you would pull that out --
7 A  Oh, sure.  I'm sorry.
8 Q  -- and go back to those pages again, page 3 in
9   particular.  The Bates number is 3017.
10 A  3017?
11 Q  At the bottom, yeah.
12 A  Okay.
13 Q  The very last entry there says, Draft should be
14  transmitted in time for the corporate law attorney
15  to provide substantive comments and proposed
16  meaningful revisions.
17 A  It -- it does.
18 Q  And that -- you did not follow that guideline
19  here?
20 A  I did not.
21 Q  Now, let's look at the Answer.  Is there any
22  reason why you didn't?
23 A  I don't know.  I don't have a recollection of what
24  took place at the time.
25 Q  In your prior practice for Zurich had you provided

Page 27

1   drafts of answers for the client's review before
2   filing?
3 A  I don't know that I had prior cases with Zurich.
4   As I said earlier, this was the first case I know
5   I had for Zurich.  It was -- I thought there might
6   have been one before that.
7 Q  All right.  So the answer was filed -- let me look
8   at that Answer.  It looks like it was filed on
9   April 30 if you look at the Certificate of
10  Service, correct?
11 A  Yes.
12 Q  You had been retained over 30 days before that.
13  The guidelines we looked at required a report
14  within 30 days of retention to identify the
15  issues.
16      What had you done in that 30-day period, if
17  anything, to identify issues and defenses in this
18  matter?
19 A  I had reviewed the re -- the materials they had
20  provided.  I had also had a conversation with
21  Bill Fuller, the lawyer who represented Zurich in
22  the underlying work comp matter.
23 Q  When did you have that conversation?
24 A  Without looking at billing records I don't know.
25 Q  Well, let's look at them.

Page 28

1 A  Okay.  I spoke with Bill on 3/27/15.
2 Q  Okay.  And you -- what -- what do you recall of
3   that phone call?
4 A  I called Bill to advise him that we had been
5   contacted regarding this matter.  I asked Bill a
6   little bit about the general background of the
7   case.  He said, Make sure you do not assert advice
8   of counsel as a defense.  And I think we discussed
9   the fact that they had carved out the bad faith
10  when they had their work comp resolution.
11 Q  Did he tell you why you shouldn't assert advice of
12  counsel?
13 A  Because I think he -- this would be my
14  speculation.  Bill didn't believe they were
15  following his advice and that they were -- had a
16  problem with the underlying case.
17 Q  Yeah, I -- I don't want speculation.  I want what
18  you can recall Bill actually told you.
19 A  Okay.  I don't recall.
20 Q  Okay.  What did he tell you about the carve-out?
21 A  I -- I can't tell you specifically.  All I know is
22  I left the conversation with the understanding
23  that they had reserved, preserved, whatever term
24  you like, the work comp -- the bad faith case.
25 Q  Excuse me.

Page 33

1   to pay benefits starting in May of 2012, correct?
2 A What paragraph are you looking at?
3 Q Starting on -- on page 2 --
4 A Yes.
5 Q -- paragraph 14, it says Zurich discontinued
6   payments --
7 A Oh.
8 Q -- for plaintiff's medication.
9 A I see that.
10 Q And then if you go to paragraph 18, it says in May
11   of 2012 Zurich agreed to pay for a doctor's visit.
12   And what -- did -- did you do anything to -- to
13   try and ascertain what happened in the interim?
14   The three years between the discontinuance and the
15   doctor's visit with Dr. Lawlor that's alleged
16   there?
17 A I don't have a recollection of that, no.
18   MR. HOYT: Let's mark this as Exhibit 6.
19   It's the underlying petition.
20   (Whereupon, Exhibit 6 was then marked.)
21 Q (BY MR. HOYT) This is the underlying worker's comp
22   Petition for Hearing. Did you review this before
23   you filed the Answer?
24 A I don't know.
25 Q It's most likely it was in the file provided to

Page 34

1   you, correct?
2 A I don't know that. I'm going to -- if -- if you
3   say most likely, I'll agree with most likely.
4 Q All right. Is that something that you believe you
5   would have wanted to review before filing an
6   answer in a bad faith case arising out of this?
7 A Not necessarily.
8   MR. HOYT: Let's mark this Exhibit 7, the
9   Answer to the Petition for Hearing.
10   (Whereupon, Exhibit 7 was then marked.)
11 Q (BY MR. HOYT) This was -- this appears to you to be
12   the Answer filed to that Petition we just looked
13   at, correct?
14 A It would appear to be.
15 Q And do you believe you would have reviewed that
16   before filing the answer in the bad faith case?
17 A I don't know.
18 Q Is it most likely you did?
19 A I don't know.
20 Q Is it likely that it was provided to you with the
21   file materials to prepare to answer the bad faith
22   case?
23 A I don't know for a fact, but I'll go with most
24   likely, sure.
25 Q And do you -- do you recall seeing anything in it

Page 35

1   that suggested possible affirmative defenses?
2 A I don't recall reviewing it, so I don't have a
3   recollection of anything it might suggest.
4 Q If you look at the Answer, second page,
5   paragraph 4, where it says, There exists a
6   legitimate dispute as to whether claimant's
7   present condition is in any way related to the
8   work injury, isn't a legitimate dispute or a
9   reasonable dispute a defense to bad faith?
10 A It's --
11   MR. SUTTON: Objection; form of the question.
12   It's vague.
13 Q (BY MR. HOYT) You can answer.
14 A It could be a legitimate issue with regard to bad
15   faith, but this is a work comp claim that's --
16   hasn't even been litigated yet.
17 Q True. But you were preparing an answer to the bad
18   faith case, and so if there is a legitimate
19   dispute in the underlying case about whether he
20   was entitled to benefits or not, wouldn't that be
21   a valid affirmative defense to raise?
22 A The case as it existed at the time that Bill would
23   have answered this versus the case that was
24   presented to me were two different cases.
25 Q I understand that. But I'm saying, as you an

Page 36

1   attorney preparing an answer to the bad faith
2   allegations arising out of this underlying
3   worker's comp case, if there is a legitimate
4   dispute as to whether the individual was entitled
5   to benefits or not, isn't that a le -- isn't that
6   a defense -- a possible defense --
7   MR. SUTTON: Object --
8 Q (BY MR. HOYT) -- to the bad faith claim?
9   MR. SUTTON: Objection; we're now -- it's
10   compound. If. It's speculative.
11 A I would say that the -- the term legitimate
12   dispute could give rise to a bad faith defense.
13   In this instance, what I had looked at, I did not
14   think it did.
15 Q (BY MR. HOYT) So within 30 days of retention you
16   had already come to the conclusion there was no
17   legitimate dispute as to whether Leichtnam had
18   been entitled to benefits?
19 A I don't know what you mean by within 30 days.
20 Q Well, the Answer was filed approximately 30,
21   35 days after your retention.
22 A Well, I was -- if that's what the timing is, yes.
23 Q Did you tell the client that at any point in time?
24 A Well, at some point in time I did.
25 Q When?

Page 37

1  A  I don't know. I wrote them an -- a long letter
2     explaining at a certain point in time where I
3     think the problems were with regard to this case,
4     and the fact that they had committed bad faith.
5  Q  And you told them that you didn't see any
6     potential defenses?
7  A  I -- whatever I said in the letter is what I said.
8  Q  All right. We'll look at those.
9        MR. HOYT: Let's mark as Exhibit 8 -- is this
10    8? Yeah. A summary of medical exams, and this
11    may be part of what we were talking about earlier.
12       (Whereupon, Exhibit 8 was then marked.)
13 A  Oh, I'm sorry.
14 Q  (BY MR. HOYT) Does this appear to you to be one of
15    the summaries you were talking about that Beth
16    Young prepared?
17 A  It is.
18 Q  Okay. And do you recall the time frame that she
19    prepared this in?
20 A  I do not.
21 Q  Do you recall if you saw it before you filed the
22    Answer?
23 A  I do not recall.
24 Q  Do you recall that there was some disagreement
25    amongst the doctors as to the percentage of the --

Page 38

1     the disability or injury attributable to the --
2     the accident?
3        MR. SUTTON: Object to the form; it's vague
4     as to time.
5  Q  (BY MR. HOYT) You can answer.
6  A  Sure. I don't have a recollection of what the --
7     they were saying at the time. I know I've seen
8     the document, but I don't know what my thought
9     would have been at that time or don't recall what
10    my thought was at the time.
11       MR. HOYT: Let's mark as Exhibit 9 the
12    Compromise, Settlement, and Order for Approval.
13       (Whereupon, Exhibit 9 was then marked.)
14 Q  (BY MR. HOYT) The first question is, do you recall
15    receiving and reviewing this prior to filing the
16    Answer in the bad faith case?
17 A  Do I recall it, no. Do I think I did, yes.
18 Q  Okay. And if you go to page 3 --
19 A  Yes, sir.
20 Q  -- paragraph 7 contains a rather general release.
21    And if you go over to the next page, subject to
22    matters that are excepted. So it says, Fully and
23    forever releases, discharges employer and insurer
24    of and from any and all claims he may now have or
25    hereafter may have against the employer and

Page 39

1     insurer including any claim for permanent partial
2     or permanent total disability, temporary total
3     disability, temporary partial disability,
4     rehabilitation or retraining benefits, Cozine
5     benefits, benefits under the odd lot doctrine,
6     past, present medical expenses, attorneys' fees,
7     prejudgment interest, penalties, and costs. This
8     agreement shall constitute a full and final
9     release of any present and future claims the
10    claimant may have against employer and insurer
11    except those matters excepted herein.
12       And the matters that were excepted -- it
13    appears that the matters were ex -- that were
14    excepted were listed in item C and D above,
15    paragraph 7, if you look.
16 A  Okay.
17 Q  Was that how you read this?
18 A  That's what it says.
19 Q  Now, is there some reason why you didn't allege
20    this release as an affirmative defense?
21 A  Because in my conversations with both full --
22    Bill Fuller, he explained to me that he and
23    Dennis Finch had agreed to except out the bad
24    faith claim, which is very common practice.
25 Q  Did he give you any documentation of that

Page 40

1     discussion?
2  A  Subsequently I recall receiving some email
3     exchanges between Dennis and Bill.
4  Q  But before you filed the Answer you didn't have
5     that email?
6  A  I don't know. Bill Fuller told me it had been
7     done, and if Bill Fuller tells me something, it
8     happened.
9  Q  Now, if you look at the Complaint again, it's
10    Exhibit 5 -- or Exhibit 4. Wait. It's Exhibit --
11 A  I believe it's 2.
12 Q  2, yeah. And you look at what is prayed for -- or
13    is termed -- or what is claimed, his injuries,
14    that's in paragraph 27, I believe. Paragraph 27,
15    the harm alleged is delay in payment of his
16    medical expenses, delay and obstr -- and
17    obstruction of his medical care, loss and use of
18    benefits. All of those occurred before the
19    release, correct?
20 A  I don't know, but it would seem to make sense,
21    yes.
22 Q  And so regardless of whether the bad faith claim
23    was released, why didn't it occur to you that
24    there are some allegation -- alleged injuries or
25    whatever here that would be released or at least

Page 45

1  A   Let me just catch up with you.
2  Q   Sure. Go ahead and read that.
3  A   Well, that would be true. It was done by way of
4      settlement.
5  Q   So your -- your position was that because it was
6      settled and a settlement was approved, there was
7      no need for a determination of wrongful
8      withholding?
9  A   Right.
10 Q   In looking at that settlement, did you see any
11     admission in that settlement by Zurich that it had
12     wrongfully withheld benefits?
13 A   I don't remember what's in the settlement, but I
14     don't recall any such thing.
15 Q   In fact, if we look at it -- if you will look at
16     page 2, paragraph 5, it simply sates -- states
17     that disputes exist?
18 A   It does.
19 Q   And you're free to look at this, but I don't
20     believe it says anywhere in this that Zurich
21     admits that it had wrongfully withheld those
22     benefits. In other words, that there was no
23     longer a dispute.
24         MR. SUTTON: Object to the form; that's
25     compound.

Page 46

1  Q   (BY MR. HOYT) It never says in here that -- does
2      it, that Zurich withdraws its dispute or admits
3      that it was wrongful?
4  A   I would be -- I -- I don't know. I haven't read
5      the entire thing, but I would presume that they
6      did not.
7  Q   Okay. Prior to this case had you ever done
8      research of -- of what steps a claimant -- a
9      worker's comp bad faith claimant must take before
10     bringing the bad faith claim?
11 A   I have -- I don't think I did any specific
12     research in that regard. But we have several
13     people that only do work comp -- worker's
14     compensation. And we routinely and regularly
15     visit about the -- the complexities of making sure
16     in handling of work comp cases that you're
17     touching all the bases.
18 Q   Were you familiar with the requirement of
19     exhausting the administrative remedy --
20 A   I am --
21 Q   -- prior to bringing it?
22 A   I'm sorry.
23 Q   That's okay.
24 A   I am familiar with the term.
25 Q   And it was your understanding at the time you

Page 47

1      filed this answer that -- that Leichtnam had to
2      exhaust his administrative remedy with the
3      South Dakota Department of Labor?
4  A   I think that he had exhausted his remedies by the
5      settlement.
6  Q   Okay. And you were aware of no authority at that
7      time requiring an actual determination by the
8      board?
9  A   Am -- was I aware of any then nor am I aware of
10     any now. I don't know one way or the other.
11 Q   All right. You were not aware of it at the time
12     of filing the answer?
13 A   Well, it was my opinion that it had been resolved.
14 Q   What had been resolved?
15 A   The underlying work comp claim, and approved by
16     the department.
17 Q   But what -- it was your opinion at the time that
18     there was no need for him to get an actual
19     determination by the board of wrongful
20     withholding?
21 A   That would be my opinion.
22 Q   Were you aware of the South Dakota cases on that
23     point at the time of -- existing at the time you
24     filed your answer?
25         MR. SUTTON: Objection; that's vague.

Page 48

1  A   Not that I'm aware of.
2  Q   (BY MR. HOYT) Did you ask anybody who had handled
3      worker's comp at your office about it?
4  A   This is going to sound like I'm dancing around it,
5      but I don't know. This was several years ago so I
6      don't know the answer to that.
7  Q   Okay. Had you heard of the case of Hein vs.
8      Acuity?
9  A   No.
10 Q   Had you heard of the case of Zuke vs. Presentation
11     Sisters?
12 A   Not that I'm aware -- I don't rec -- recall -- or
13     I don't recognize those names. Pardon me.
14 Q   Okay. Did you have available an associate at the
15     time you could have asked to research that -- that
16     issue?
17 A   I'm sure I did.
18 Q   But you didn't?
19 A   I did not. Unless it shows in the billing
20     records. I don't know.
21         MR. HOYT: Let's mark as Exhibit 10 Zurich's
22     Motion For Leave To File Amended Answer.
23         (Whereupon, Exhibit 10 was then marked.)
24         MR. HOYT: Then I will also mark at the same
25     time Exhibit 11, Zurich's Brief in Support.

Case 5:20-cv-05026-KES   Document 55-1   Filed 02/01/23   Page 9 of 15 PageID #: 292

| AMERICAN ZURICH INSURANCE COMPANY, ET AL v. | WITNESS: J. CRISMAN PALMER |
| J. CRISMAN PALMER, ET AL | August 31, 2022 |

Page 49

1   (Whereupon, Exhibit 11 was then marked.)
2   MR. HOYT: And then I'm going to mark as
3   Exhibit 12 the Combined Reply Brief.
4   (Whereupon, Exhibit 12 was then marked.)
5 Q (BY MR. HOYT) All right. I'm going to have you
6   look briefly at these. So at some point the
7   Hinshaw Culbertson firm comes into this matter,
8   and we'll get in more detail into that, but they
9   work up Proposed Amendment to the Answer and a
10  Motion to Dismiss. And we're going to -- we're
11  looking at some of the documents, I believe, that
12  came about in that process.
13  But let me just ask you, do you recall
14  signing the -- the documents that are in front of
15  you that were the Motion to Amend and the briefing
16  that supported it?
17 A I -- I don't recall it, but I -- I know they
18  happened.
19 Q Yeah. And, well, in fact you can see your
20  signature on these documents, I believe.
21 A The electronic signature, yes.
22 Q Right.
23 A Yes, sir. I am not disputing that in any way,
24  form --
25 Q Okay. And even though Hinshaw Culbertson came in

Page 50

1   you were still counsel of record on the matter at
2   the point in time that these were signed, correct?
3 A I wouldn't consider myself counsel of record.
4   That -- I -- they had taken over the case and they
5   were calling the shots.
6 Q As far as the Court was concerned, your name was
7   still on this matter?
8 A I agree with you.
9 Q Yeah.
10 A That's why I subsequently asked them to get their
11  pro hac vice motions in so that I wouldn't be.
12 Q Now, in -- in sponsoring them pro hac, what were
13  the requirements under South Dakota law for your
14  continuation on the matter?
15 A I have to appear at proceedings and I have to sign
16  the pleadings until they are pro hac'd in. Absent
17  of a friendship, if you will, professional one, I
18  wouldn't have been local counsel.
19 Q And it looks like -- if we go to --
20  MR. HOYT: Well, mark this as Exhibit 13.
21  It's a email of February 1, 2018, referring to
22  pro hac.
23  (Whereupon, Exhibit 13 was then marked.)
24 A Thank you.
25 Q (BY MR. HOYT) And this -- this appears to be an

Page 51

1   email you received February 1, 2018, referring to
2   attached motions for the pro hac?
3 A It would appear so.
4 Q And after -- after you pro hac'd them in, did you
5   re -- remain on the file?
6 A We -- they -- well, yes. As local counsel.
7 Q Okay. Let's go back to the billing records again.
8 A Sure.
9 Q Those are Exhibit 1, I believe.
10  MR. SUTTON: 2.
11 Q (BY MR. HOYT) 3. And if you look -- going to
12  2018 -- first of all, let me -- let me ask you.
13  After the first page we drop off at April 22 and
14  we don't pick up again until June 3. Are we
15  missing May billing records or just nothing went
16  on in May?
17 A I don't know the answer to that. I'm presuming
18  nothing went on or there would be a billing
19  record. But I don't know.
20  MR. HOYT: Counsel, do you know?
21  MR. SUTTON: I -- I can tell you that the
22  Bates stamp is sequential, so this is how I
23  received them. I'm assuming this is everything.
24  MR. HOYT: All right.
25 Q (BY MR. HOYT) So let's go to 2018.

Page 52

1 A Yes, sir.
2 Q And look at -- there is a Bates page 46, GPNA --
3 A Yes, sir --
4 Q -- 46.
5 A I've got it.
6 Q Up at the top there is an entry of January 9,
7   2018. It says, Telephone conference with
8   Dawn Wagner regarding counsel replacement issues.
9   Do you recall that discussion?
10 A I do not.
11 Q Do you recall her telling you that they were
12  bringing Hinshaw & Culbertson in?
13 A Oh, I do remember that. Certainly.
14 Q Did she tell you why?
15 A If she did, I don't recall.
16 Q Okay. And then if you go down to January 17, Work
17  on lengthy response to email from Mr. Glazer
18  regarding status of the case and draft a letter to
19  Glazer. What do you recall about that letter?
20 A I don't recall anything. I didn't draft the
21  letter.
22 Q Who is KAC?
23 A Katelyn Cook.
24 Q And Beth Young also worked on the letter -- or
25  looks like she worked on the letter?

Page 61

1  Q  Were you aware of anything -- any case, Zuke or
2     otherwise, that held that it was enough of an
3     exhaustive administrative remedy if the claim had
4     reached the final stages of the administrative
5     process?
6  A  I wasn't aware of anything.
7  Q  Do you know whether Zuke even holds that?
8  A  As we sit here today, I do not.
9        MR. HOYT: Let's mark that Exhibit 15, Order
10    Denying Zurich's Motion.
11       (Whereupon, Exhibit 15 was then marked.)
12 Q  (BY MR. HOYT) Do you recall seeing this Order?
13 A  I know that I saw it, yes.
14 Q  This was the Order denying Zurich's motion to
15    dismiss and motion to amend to add the affirmative
16    defenses, correct?
17 A  This is a motion -- it's an Order Denying Zurich's
18    Motion For Leave To File An Amended Answer, yes,
19    sir.
20 Q  Okay.
21       MR. SUTTON: It's a separate order on the --
22       MR. HOYT: Right.
23 Q  (BY MR. HOYT) You understand that the Motion to
24    Dismiss also was denied?
25 A  I do.

Page 62

1  Q  And this -- this -- the Court denied the motion
2     without reaching the merits of any of the defenses
3     that were attempting to be added, correct?
4        MR. SUTTON: In Exhibit 15?
5        MR. HOYT: Yes.
6  A  I don't know without reading the entire Order.
7  Q  (BY MR. HOYT) Well, it's your understanding, isn't
8     it, that the Court held that the motion was simply
9     untimely?
10 A  I knew the Court said the motion was untimely,
11    correct.
12 Q  And that no adequate explanation had been given
13    for a three-year delay and amending?
14 A  I know that the Court denied it as not timely.
15 Q  Well, the fact is that -- that you had missed the
16    deadline to amend by some three years.
17 A  If that's what the deadline said.
18       (Whereupon, Exhibit 16 was then marked.)
19 Q  (BY MR. HOYT) Let's look at Exhibit 16. It's an
20    email of June 6, 2013. Is this the email I
21    believe you said you ultimately saw that reflected
22    the exchange between attorney Finch and
23    attorney Fuller on the bad faith release?
24 A  I don't know if this is it or not. It certainly
25    is an email that addresses that issue.

Page 63

1  Q  Okay. So Finch asked Fuller to remove language
2     that specifically releases the bad faith claim
3     and -- and Fuller/Zurich complies. Is that your
4     understanding?
5  A  That's what -- that's what Dennis is asking here.
6  Q  And -- and Zurich did remove it?
7  A  I -- I presume that they did.
8  Q  Well, we looked at the release.
9  A  Well, I don't remember what the release said. I'm
10    sorry, sir.
11 Q  Okay. Now, your understanding -- is it your
12    understanding that it's bad faith to ask for a
13    release that would include bad faith?
14 A  Yes.
15 Q  Or is it bad faith to condition payment of
16    benefits on a release of bad faith?
17 A  I view both as being bad faith.
18 Q  So simply to ask for it is bad faith in your view?
19 A  That's -- when I'm trying to settle cases, I don't
20    use those terms. I -- I use terms so that if
21    we're going to settle the case, I say we're going
22    to settle on a global basis, meaning it's a
23    complete resolution of all claims, and that global
24    basis is understood.
25 Q  But it's your understanding Zurich did not insist

Page 64

1     upon or condition the settlement with Leichtnam on
2     a release of bad faith?
3  A  I don't know what they did.
4  Q  Well, we can look at the release again.
5  A  Well, I understand they signed the release. I
6     don't -- I don't know what discussions might have
7     had regarding conditioning the release. I'm not
8     trying to be cute.
9  Q  But it's your understanding that the release that
10    was ultimately signed that we looked at did not
11    release bad faith?
12 A  Yes.
13 Q  And so Zurich did not condition that settlement
14    upon a release of bad faith?
15 A  It's been removed from the release. I don't know
16    about conditioning.
17 Q  And they didn't -- they did not insist upon that
18    release in order to settle?
19 A  They removed it from the release language.
20 Q  And so what -- what would the harm be in terms of
21    bad faith harm in Zurich asking for it but
22    removing it?
23       MR. SUTTON: Object to the form of the
24    question.
25 A  If they removed it, I mean, probably not a harm.

Case 5:20-cv-05026-KES   Document 55-1   Filed 02/01/23   Page 11 of 15 PageID #: 294

| AMERICAN ZURICH INSURANCE COMPANY, ET AL v. | WITNESS: J. CRISMAN PALMER |
| J. CRISMAN PALMER, ET AL | August 31, 2022 |

Page 69

1     (Whereupon, Exhibit 19 was then marked.)
2  Q  (BY MR. HOYT) So this was a letter that you
3     received wherein Mr. Abourezk offered to settle
4     for $325,000?
5  A  That's correct.
6  Q  And this was roughly -- let's see -- one, two --
7     four months or so after the -- the case had been
8     filed?
9  A  Sounds reasonable.
10 Q  And your -- you suggested to Dawn Wagner that she
11    consider this; is that correct?
12 A  I considered -- I suggested she consider it and
13    that I -- and I -- yes, I suggested she consider
14    it at that.
15 Q  You didn't propose any specific counter, though;
16    is that correct?
17 A  I suggested a counter-proposal to my client as to
18    what I thought the case could settle for.
19 Q  What was that?
20 A  300,000.
21    MR. HOYT: Let's mark as -- yeah, let me see
22    if I want to go there.
23    Exhibit 20 is the September 28, 2015 --
24    (Whereupon, Exhibit 20 was then marked.)
25 A  Thank you.

Page 70

1  Q  (BY MR. HOYT) So this is a response from
2     Dawn Wagner where she thanks you for passing on
3     the demand but she tells you that she's going to
4     need certain things from you before she can
5     discuss with management and seek possible
6     authority to address that -- that offer, correct?
7     MR. SUTTON: Object to the form of the
8     question.
9  A  In general, that's what she's saying.
10 Q  (BY MR. HOYT) And she's asking for, among other
11    things -- it says here your initial review of the
12    file, timeline summary, standard the plaintiff has
13    to prove, your recommendation on chance of
14    success. And so you understood she was asking for
15    those things in order for her to even be able to
16    consider that demand -- that offer?
17 A  That's what it says.
18    MR. HOYT: And let's mark as Exhibit 21 a
19    email exchange of December 15, 2015.
20    (Whereupon, Exhibit 21 was then marked.)
21 Q  (BY MR. HOYT) Actually, I want you to look at the
22    second page of that --
23 A  Okay.
24 Q  -- the email of December 15 from Dawn to you.
25 A  Okay.

Page 71

1  Q  And so the last email we looked at where she's
2     asking for details was September 28. This one is
3     in December, December 15, and it appears you still
4     have not provided the -- the items she asked for;
5     is that correct?
6     MR. SUTTON: I'm going to object to the form;
7     it's a compound question.
8  Q  (BY MR. HOYT) This is December 15. So we're
9     roughly 3 months later from the email we just
10    looked at, correct?
11 A  Yes, it -- it is.
12 Q  And she's still asking for your initial evaluation
13    in order to explore early resolution?
14 A  That's what it says.
15 Q  Any reason why you hadn't provided it before this?
16 A  I don't have a reason.
17    MR. SUTTON: Other than in the letters?
18    MR. HOYT: That's not an objection, Counsel.
19    That's testimony.
20    MR. SUTTON: Misstates the record. That's
21    the objection.
22    MR. HOYT: Well, that -- that just doesn't
23    even make any sense.
24    Anyway, let's look at Exhibit 22,
25    December 23, 2015.

Page 72

1     (Whereupon, Exhibit 22 was then marked.)
2  Q  (BY MR. HOYT) So this appears to be your response
3     to Dawn Wagner's request for the -- the items that
4     we had looked at; is that correct?
5  A  I will -- in general, probably, yes.
6  Q  And the second paragraph you say, I do think this
7     is a case we should attempt to settle. Dawn
8     Wagner had already told you she's -- she was
9     interested in that, correct?
10 A  I'm -- sure.
11 Q  She -- she told you in the emails we looked at she
12    was interested in an early -- possible early
13    resolution, correct?
14 A  I don't know that I remember early resolution. I
15    know that she wanted further information to follow
16    up on Mike's demand.
17 Q  If you'll look at the second page, one, two,
18    three, four -- four paragraphs down, you tell her,
19    I advise insurers in bad faith cases that the
20    value of the case is basically what you are
21    willing to pay to get rid of a claim. Did you
22    consider that responsive to her request for an
23    evaluation of what the case value was?
24 A  I considered it something that was my opinion on
25    having dealt with bad faith cases in South Dakota,

Page 73

1     especially with Mike Abourezk.
2 Q Did you consider that would be helpful to
3     Dawn Wagner discussing with management what they
4     should pay on this case?
5 A I thought it was.
6 Q Pay whatever you're willing?
7 A It's consideration in bad faith cases.
8 Q I don't see in here any evaluation of particular
9     strengths of the case. Were there -- did you --
10    did you ever analyze for Dawn Wagner in her --
11    response to her request any strengths to the case?
12 A Not that I recall.
13 Q And is that because you had already concluded that
14    Zurich had in fact committed bad faith?
15 A Well, I had concluded that I felt that there was a
16    bad -- would be a finding of bad faith, and I was
17    trying to find a way to help them get out as quick
18    as they could before they got into a discovery
19    morass.
20      MR. HOYT: Let's mark as Exhibit 23 email of
21    January 6, 2016.
22      (Whereupon, Exhibit 23 was then marked.)
23 Q (BY MR. HOYT) So this was a -- a response from
24    Dawn Wagner to your December 23 in which she
25    thanks you for the high-level analysis but she

Page 74

1     needs the details she asked for, a more in-depth
2     analysis, correct?
3 A It would appear that that's correct.
4 Q And item one she says an overview of the
5     plaintiff's medical timeline which includes prior
6     injuries. What did you know about that at the
7     time, any prior injuries by this plaintiff?
8 A I don't know if I knew of any.
9 Q What would the relevance of that be?
10 A I -- I'm not sure I know.
11 Q Wouldn't that go to causation in terms of what was
12    actually attributable to the accident in question
13    versus preexisting?
14 A Well, it could.
15 Q Did you take any discovery on that?
16 A No.
17 Q Item two, it says, Liability analysis, in addition
18    to any gaps or delays in treatment in -- any other
19    actions or inactions by Zurich that would be
20    problematic. Were there -- were you aware of any
21    gaps or delays in treatment that were attributable
22    to -- to Leichtnam simply not seeking treatment?
23 A I don't know.
24 Q Did you try taking any discovery on that?
25 A No.

Page 75

1 Q And then on the next page at the top she says,
2     What are the strengths of our case. You were
3     never able to identify any; is that correct?
4 A Not that I recall.
5 Q Your expert did, though, correct?
6 A Sure.
7 Q Item 4 is plaintiff's wrongful termination case.
8     What -- did you learn anything about that?
9 A No.
10 Q What would the relevance of that be?
11 A I don't know.
12 Q Could that go to his credibility?
13 A I don't know.
14 Q Or litigiousness?
15 A I don't know.
16 Q What exhibit was that one again?
17 A 23.
18 Q 23. I can't keep these straight.
19 A I'm assisting Tina here today.
20 Q Yeah.
21      MR. HOYT: Let's mark as Exhibit 24
22    February 1, 2016.
23      (Whereupon, Exhibit 24 was then marked.)
24 A Thank you.
25 Q (BY MR. HOYT) This was your -- your response to the

Page 76

1     request we just looked at for a more detailed
2     analysis to Dawn Wagner; is that correct?
3 A Yes, it would appear to be.
4 Q So if you go to the second page of this, you note
5     in the middle paragraph there was inconsistency in
6     the IMEs. Do you see that?
7 A I do.
8 Q That was not just between Farnham and the other
9     two doctors, correct? There was inconsistency
10    even between Anderson and Blow?
11      MR. SUTTON: Object to the form of the
12    question.
13 Q (BY MR. HOYT) One of them had a 10 percent and the
14    other had a 5 percent in terms of the amount
15    attributable to the accident -- disability,
16    correct?
17 A I don't remember the percentages, but they had a
18    different percentage, that's true.
19 Q You also make the observation, I don't know how
20    the claims representative will hold up in a
21    deposition regarding the decision to cease
22    benefits so abruptly. Who was that claim
23    representative?
24 A I'm sorry. Can you tell me where you're reading
25    from?

Page 77

1  Q   Yeah. It's right above the subheading, Why was
2      the offer of settlement in the amount of 1,500.
3      Go up above that, that last -- that paragraph
4      above that. You say, However, I don't know how
5      the claims representative will hold up in a
6      deposition. We're on page 2.
7  A   Right.
8  Q   It's right -- right in there (indicating).
9  A   Oh. Thank you. I -- yeah, no, as I sit here
10     today I don't know that I can tell you exactly
11     what I was thinking at the time. But there must
12     have been something that gave me some pause that
13     was in the file as to how the claims
14     representative was going to present all of that.
15 Q   Did you ever try and interview -- interview them?
16 A   Not to my knowledge.
17 Q   On page 3 --
18 A   Yes.
19 Q   -- it says -- at the top there is a question, Did
20     Bill Fuller believe Mr. Leichtnam would be
21     perceived as a sympathetic witness. You respond,
22     I have not connected with Mr. Fuller to discuss
23     his perceptions of Mr. Leichtnam during his
24     deposition. Did you ever ask Bill Fuller about
25     Leichtnam's credibility as a witness?

Page 78

1  A   I don't know. Bill and I had a num -- several
2      conversations, so I candidly don't know. Other
3      than what I recited here regarding Mr. Leichtnam.
4  Q   Where did you get that characterization of
5      Leicht -- Leichtnam's deposition? Was that in
6      claim notes?
7  A   No. Bill Fuller told me.
8  Q   Because it says, However, following
9      Mr. Leichtnam's deposition Mr. Fuller reported to
10     the claims representative that Mr. Leichtnam was
11     articulate and fairly witty?
12 A   Right.
13 Q   That wouldn't be a direct statement to you, that
14     was to the claim rep, correct?
15 A   Well, true, but Bill reported that same thing to
16     me.
17 Q   In a phone call?
18 A   Yeah.
19 Q   Down at the bottom with regard to the plaintiff's
20     wrongful termination case you say I am unaware of
21     the wrongful termination case or who is handling
22     same. I'll do some digging. Did you ever dig --
23     do the digging?
24 A   Not that I'm aware of.
25 Q   So if we look at page 4 --

Page 79

1  A   Yes.
2  Q   -- of the analysis of the demand --
3  A   Yes.
4  Q   -- second paragraph under Analysis of Demand,
5      here -- down at the bottom of that paragraph,
6      Obviously Bill thought there were issues with
7      potential bad faith developing and candidly, in
8      the review of the case, there is clearly going to
9      be a finding of bad faith. So Fuller thought
10     potentially there was bad faith, but you were
11     convinced of it?
12 A   That's what I said.
13     Pardon me.
14     MR. HOYT: Let's mark this as Exhibit 25,
15     April 8, 2016.
16     (Whereupon, Exhibit 25 was then marked.)
17 Q   (BY MR. HOYT) This is a letter you sent to
18     Dawn Wagner on April 8, 2016?
19 A   It is.
20 Q   So you say in this, I spent -- I've spent a lot of
21     time thinking about this file and how to approach
22     it. It appears that all of your focus, though, to
23     this point had been on trying to settle it; is
24     that correct?
25 A   Most certainly was a major focus.

Page 80

1  Q   I have -- I -- did you spend any time thinking
2      about discovery to take?
3  A   Oh, I'm sure I thought about it.
4  Q   But you didn't do any?
5  A   I did not.
6  Q   And what was your thinking about a defense
7      strategy?
8  A   Well, we were ready -- in my opinion we were going
9      to have to rely on Charlie Henderson to carry the
10     day with his opinions regarding the bad faith.
11 Q   Did it occur to you that it would appear to Mike
12     Abourezk that Zurich was desperate to settle with
13     all of the communications being solely focused on
14     settling?
15 A   No.
16     MR. HOYT: Let's mark as Exhibit 26,
17     April 27, 2016.
18     (Whereupon, Exhibit 26 was then marked.)
19 Q   (BY MR. HOYT) This is a letter from you to
20     Mr. Abourezk, and you said, My client would like
21     to get together and try to settle this claim. Did
22     you have any follow-up phone conversations with
23     him after this about -- about getting together to
24     talk settlement?
25 A   With Mike?

Page 81

1  Q  Right.
2  A  I'm -- I don't know.
3  Q  Did he tell you that the prior offer of 325,000
4     was off the table at this point?
5  A  At some point Mike told me he was going to
6     increase his demand.
7  Q  Well, he said it in a letter -- in the initial
8     offer letter, right? He said if it goes too
9     far --
10 A  Yeah.
11 Q  -- he's going to raise it. Did he tell you --
12    tell it to you again at some point?
13 A  I don't know.
14 Q  Did you give Dawn Wagner a timeline of when you
15    felt she needed to accept that offer if she was
16    going to accept it or risk that it was going to
17    escalate?
18 A  I didn't give her a timeline.
19        MR. HOYT: Let's mark this as Exhibit 27,
20    June 10, 2016.
21        (Whereupon, Exhibit 27 was then marked.)
22 Q  (BY MR. HOYT) It's another letter from you to
23    Mr. Abourezk June 10, 2016?
24 A  It is.
25 Q  Down near the bottom you say, I know my client

Page 82

1     would like to settle the case. So none of this
2     occurred to you as appearing to be desperation on
3     the part of Zurich that you're eager to settle?
4  A  Not in the slightest.
5  Q  Wouldn't it have been better strategy to have some
6     discovery hanging over his head when you suggest
7     that you want to get together and talk settlement?
8  A  No.
9        MR. HOYT: Let's mark as Exhibit 28,
10    Mediation Position Statement.
11       (Whereupon, Exhibit 28 was then marked.)
12 Q  (BY MR. HOYT) This was a mediation statement that
13    you submitted for the mediation in this matter?
14 A  It was.
15 Q  Did you draft this?
16 A  In -- in large measure.
17 Q  Who assisted you?
18 A  It would have been Jana Smoot White, and Beth
19    Young would have also participated.
20 Q  Okay. Is there some reason why you didn't engage
21    or recommend engaging Mr. Henderson earlier in
22    this case? For example, prior to the mediation.
23 A  I don't know.
24 Q  If you'll look at the second page of this.
25 A  Sure.

Page 83

1  Q  Second paragraph at the very end.
2  A  Yes.
3  Q  It says, Zurich denies any wrongdoing and disputes
4     the nature and extent of Leichtnam's alleged
5     damages. What -- what did you develop in
6     discovery or the evidence to challenge the extent
7     of his injuries or damages?
8  A  Where were you looking?
9  Q  Under the introduction.
10 A  Oh, under introduction. I'm sorry.
11 Q  Second paragraph. Zurich denies any wrongdoing
12    and dispute the nature and extent of Leichtnam's
13    alleged damages. The fact is you didn't take any
14    discovery to challenge his alleged damages,
15    correct?
16 A  To that point, yeah, that's right.
17 Q  And you didn't do any discovery after this point?
18 A  Not while I was in control of the case, true.
19 Q  On page 3 you note there that, this paragraph, the
20    inconsistency between Mr. Anderson's impairment
21    percentage and Dr. Blow's. Do you see that?
22 A  Are you talking about at the top of the page?
23 Q  Yes.
24 A  Okay. Yes.
25 Q  If you look at page 5 --

Page 84

1  A  Pardon me. Yes, sir.
2  Q  -- the first full paragraph there says, Zurich
3     believed Leichtnam was at MMI -- can you tell the
4     jury what that means?
5  A  Maximum medical improvement.
6  Q  -- in the spring of 2009 per his previous IME --
7     and IME refers to?
8  A  Independent medical evaluation.
9  Q  -- reports. He had not sought any physician
10    appointments for six months. It was only after
11    his employment was terminated that Leichtnam began
12    seeking additional treatment. Due to this
13    inconsistency Zurich arranged for another IME.
14    That was -- that was -- that inconsistency, that's
15    something that could have been developed in a
16    deposition of Leichtnam, correct?
17 A  Could have.
18 Q  And it could have affected his credibility?
19 A  In the concept of anything, sure.
20 Q  Did you come up with any explanation for why he
21    hadn't sought any doctors' appointments until
22    after he was terminated from employment?
23 A  I don't have any recollection of that.
24 Q  But that inconsistency you believe was a regional
25    base -- reasonable basis for Zurich to arrange for

Page 89

1  Q   We're in that same exhibit.
2  A   Oh. I'm sorry.
3  Q   Page 11.
4  A   Okay.
5  Q   This -- and this is asking about any prior
6      malpractice cases. And there is a reference to
7      some documents. And, frankly, I can't remember
8      what those documents are. What -- what was the
9      reference there? What prior malpractice claims?
10 A   I do not know.
11 Q   Have you had prior malpractice claims against you?
12 A   No.
13 Q   I think we may have covered this, but did you
14     interview any of the claim individuals identified
15     in that Interrogatory No. 1?
16 A   I did not. Let me just say this. Not that I
17     remember. I don't think I did, but I don't --
18 Q   So you don't recall actually trying to get the
19     version of the events from the claim people?
20 A   I do not.
21     MR. HOYT: Let's mark this as Exhibit 30.
22     It's a email on January 4, 2018.
23     (Whereupon, Exhibit 30 was then marked.)
24 A   Oh, thanks. Excuse me.
25 Q   (BY MR. HOYT) So this is an email you received from

Page 90

1      Dawn Wagner on January 4, 2018?
2  A   It would.
3  Q   And she's asking for an outline on your defense
4      strategy going forward with regard to our
5      discovery request, key witnesses. And she says,
6      Would like to know when you plan on deposing the
7      plaintiff and/or conducting additional
8      investigation. So to this point you still have
9      not given her an outline of a defense strategy?
10 A   Boy, I don't -- I don't know. There -- there are
11     those letters where we went back and attempted to
12     answer her questions, but based on what she's
13     saying there, it would seem that she doesn't think
14     I have done that to date.
15 Q   And she wants to know when you plan on deposing
16     the plaintiff. The truth is you never planned on
17     deposing the plaintiff, did you?
18 A   Not re -- no, I did not.
19 Q   And did you -- but you never just told her that,
20     that I'm not going to take the deposition, did
21     you?
22 A   I don't know. We had a lot of conversations.
23 Q   And she's -- she wants to know about defense
24     strategy with regard to our discovery request.
25     Did you ever tell her you didn't plan to take any

Page 91

1      discovery -- or submit any discovery requests?
2  A   Just a second. I have to read that again, please.
3      No, I did not.
4      MR. HOYT: Let's mark this as Exhibit 31.
5      It's a February 27, 2017, email.
6      (Whereupon, Exhibit 31 was then marked.)
7  Q   (BY MR. HOYT) This is an email you received from
8      Dawn Wagner on February 27, 2017?
9  A   Yep. I'm sorry. Yes.
10 Q   And down at the bottom her email says, Have we
11     taken the plaintiff's deposition yet? What is the
12     deadline for oral discovery completion? Your
13     response is, Thanks. We have not taken depo.
14     Discovery deadline is 7/19. So you knew that Dawn
15     felt it important to take the plaintiff's
16     deposition. Why didn't you just tell her that you
17     didn't intend to?
18     MR. SUTTON: Object to the form of that
19     question.
20 Q   (BY MR. HOYT) Well, you -- you could tell because
21     she made several requests about the plaintiff's
22     deposition. So it was your belief it was
23     important to her that that deposition be taken,
24     correct?
25 A   It would appear so, yes.

Page 92

1  Q   And you say, Thanks. We have not taken depo. But
2      then you say the discovery deadline. Didn't you
3      think that would suggest to her that you were
4      going to do it before the deadline?
5  A   Well, I was telling her that that opportunity
6      would exist until that time.
7  Q   But you had already decided you were not going to
8      take it?
9  A   I didn't think we needed to at that time, correct.
10 Q   But you didn't tell her, I don't think we need to?
11 A   I -- not that I can tell from what you've shown
12     me.
13 Q   Well, in anything else that you can recall?
14 A   I can -- I do not recall that many things from
15     back then.
16     MR. HOYT: This is Exhibit 32. It's a
17     December 7, 2017 --
18     (Whereupon, Exhibit 32 was then marked.)
19     THE WITNESS: Did you intend to give this to
20     Jason?
21     MR. HOYT: Oh, yes.
22     MR. SUTTON: Thank you.
23 Q   (BY MR. HOYT) It's another email from Dawn Wagner
24     to Kristi Wood at this point. I don't -- Kristi
25     Wood, again, who was that?