# In The Matter Of:

*AMERICAN ZURICH INSURANCE COMPANY, ET AL v.*
*J. CRISMAN PALMER, ET AL*

---

*WITNESS: MIKE ABOUREZK*
*September 1, 2022*

---

*PRUSS REPORTING*
*662 Enchanted Pines Drive*
*Rapid City, South Dakota 57701*
*(605) 390-3427*
*prussreporting@gmail.com*

Original File ABOUREZK MIKE 09012022.txt
Min-U-Script® with Word Index

**EXHIBIT B**

Page 33

1   involved in at least since Judge Viken has taken
2   the bench, has there been after an answer an order
3   issued requiring the parties to meet and to set
4   certain deadlines and as well the requirement that
5   the plaintiff provide a demand?
6 A Yeah, I'm having a hard time saying that it's a
7   hard and fast requirement.  I can't remember
8   exactly how it's worded, but it -- it encourages
9   settlement discussions.  And I can't say that I do
10  that in every case.  Sometimes I just forget.
11 Q Will you please turn to Exhibit 19 that was marked
12  yesterday?
13 A I have it.
14 Q Exhibit 19 is a letter from you to Cris Palmer
15  dated September 24, 2015; is that right?
16 A Yes.
17 Q And in this letter are you making a settlement
18  offer of $325,000?
19 A Correct.
20 Q How did you determine that number?
21 A Well, I look at the numbers in the case, the
22  existing numbers.  You know, how much -- how --
23  how much in benefits did the denial involve.
24  What -- what kind of consequences did that have.
25  But, in general, I just try to give a number that

Page 34

1   I think would make my client happy and a number
2   that I think defense counsel would recognize is a
3   good deal for his client, that defense counsel
4   will recognize is a deal that the client -- that
5   his client really should not pass up.
6       And then, like, if they pass it up, I don't
7   lose any sleep over it, because usually what
8   happens when they pass it up is the case explodes
9   somewhere down the line and the adjuster or people
10  involved on the insurance company side face career
11  risk.  It's like throwing a hand grenade into
12  their foxhole, an offer like this (indicating).
13  Because if they haven't got the sense to take it,
14  I know that later on they're going to be -- you
15  know -- these companies eat their own, and that's
16  what they end up doing.  They do it every time
17  that they don't take one of these settlement
18  offers.  Somebody has to pay.  Somebody has got to
19  be blamed, and it happens all the time.
20 Q The $325,000 offer in Exhibit 19, was that a
21  take-it-or-leave-it number?
22 A No, I usually leave -- I usually leave a little
23  bit of wiggle room just to make them feel like,
24  you know, they're getting something for their
25  negotiating.  Otherwise they feel like they're

Page 35

1   getting slapped in the face, if you don't let them
2   haggle a little bit.  But, you know, 300 was
3   probably the bottom.  Or something awful close.
4 Q You testified earlier that it's your practice to
5   tell opposing counsel in the offer that if it's
6   not accepted, the number is going to go up, and
7   you mean it.
8 A Right.
9 Q Did you provide that information in Exhibit 19?
10 A Yeah, I think I did, didn't I?  Let's see.
11 Q You did.
12 A Yeah.
13 Q And that's in the second paragraph, you
14  specifically said, If you don't accept this, the
15  number is going up?
16 A Right.
17 Q And then in the last line of the letter -- well,
18  third full paragraph, you wrote, quote, We reserve
19  the right to withdraw this offer at any time prior
20  to written acceptance by Zurich.  Did you write
21  that?
22 A Right.
23 Q Why did you put that in there?
24 A Well, because, you know, my whole point in -- in
25  trying to do this is to get something done

Page 36

1   relatively quickly.  That doesn't mean it has to
2   be in the next week or even the next 30 days, but
3   if they -- you know, if they sit around on it and
4   then -- and then make me do all kinds of work on
5   the case for a year or something like that, I
6   don't want them coming back and holding me to
7   something that I proposed a year earlier, because
8   the situation changes.
9       Part -- part of my rationale is if you sit
10  down and get serious and do it quickly, you're
11  entitled to a significant discount off of what I
12  think I can actually do with the case.  And I
13  don't feel bad about doing that with my clients
14  because I'm not -- this is not a quadraplegic
15  case.  It's not a case where my client is
16  financially out an awful lot of money or -- or has
17  got lifetime injuries that they're going to be
18  dealing with.  This is just a case of cheating by
19  an insurance company.  And if they sit down and
20  get serious about it quickly -- I want to resolve
21  cases.  That's why I bring them.  And if I can do
22  that without them trying to put me through the
23  obstacle course and the scorched earth tactics,
24  then they get a whopping discount.
25       (Whereupon, Exhibit 43 was then marked.)

Page 37

1  Q   (BY MR. SUTTON) Mike, I've handed you Exhibit 43
2      which is Defendants' Responses to Plaintiff's
3      Requests for Production of Documents in the
4      underlying Leichtnam bad faith case.
5  A   Right.
6  Q   Will you turn to page 7 of this document? What is
7      the date that these responses were provided?
8  A   Well, it says October 2, 2015.
9  Q   And is that consistent with when you recall in
10     early October of 2015 receiving the discovery
11     responses from Zurich?
12 A   Well, I thought I got a set of unexecuted
13     responses to start with, but I can't tell. I
14     don't dispute the date that's on here.
15 Q   In any event, even if you received an earlier
16     unexecuted -- by at least early October of 2015,
17     you're receiving an executed set of the responses;
18     is that right?
19 A   That appears to be right.
20 Q   And that's Exhibit 43, correct?
21 A   Excuse me?
22 Q   That's Exhibit 43?
23 A   Right.
24 Q   And true and accurate of what you received?
25 A   Yeah.

Page 38

1      (Whereupon, Exhibit 44 was then marked.)
2  Q   (BY MR. SUTTON) Exhibit 44 is a letter from you to
3      Cris Palmer dated December 2, 2015, Bates stamped
4      GPNA 4157 to 416 -- or, strike that. Start over.
5      Bates stamped 4157 to 4176; is that right?
6  A   Yes.
7  Q   As I'm getting older I may have to have them
8      increase the size of the print. I realize I'm
9      probably preaching to the choir, but I can't read
10     that.
11     MR. HOYT: It's called Lasix surgery.
12 Q   (BY MR. SUTTON) Do you -- Exhibit 44, is this a
13     true and accurate copy of a meet-and-confer letter
14     that you sent to Cris in December of 2015?
15 A   Yeah, I think so.
16 Q   Explain to me what caused you to write this
17     meet-and-confer letter.
18 A   Zurich's responses didn't comply with the rules.
19     Didn't -- didn't comply with -- I don't know if
20     they complied with one or two of the full set
21     of -- how many requests were there? Let's see.
22     20 some requests. And I suppose they might have
23     complied with one or two, or might have produced
24     some documents with respect to one or two.
25 Q   How did Zurich's responsiveness to the pending

Page 39

1      requests compare to what you typically see from
2      insurance companies in responding to your written
3      discovery?
4      MR. HOYT: Objection; vague, overbroad,
5      ambiguous, calls for a conclusion without
6      foundation.
7  A   It's -- it's fairly typical for them to not want
8      to comply and provide most of the documents. Some
9      of Zurich's responses were flat out false.
10 Q   (BY MR. SUTTON) What are you referring to?
11     MR. HOYT: Objection. Objection; lack of
12     foundation, characterization.
13 A   Like, what am I referring to when I say --
14 Q   (BY MR. SUTTON) Yeah, when you say flat out false,
15     what request are you referring to?
16     MR. HOYT: Same objection.
17 A   Well, Request 6, for instance, says -- it asks for
18     all documents that would reflect that the amount
19     paid in claims is or has been considered in any
20     manner when evaluating any of the compensation
21     provided to any of the personnel described in
22     Request No. 2, whether it be through average claim
23     costs, loss ratios -- and then it says -- there is
24     a typo -- mind ratios. I don't think that is an
25     accurate transcription -- but mind ratios -- it

Page 40

1      probably was supposed to be combined ratios,
2      underwriting profit, or any other metric. The
3      scope of this request is January 1, 2002, to
4      present.
5  Q   And you're reading from Bates stamp GPNA 4162 on
6      Exhibit 44; is that right?
7  A   Right.
8  Q   And why did you say that the response was false?
9      MR. HOYT: Same objections.
10 A   Because when I finally got all of their -- when I
11     finally got personnel files and other documents --
12     when the -- after the Court ordered them to comply
13     and I got personnel files and performance
14     evaluations and incentive plans, Zurich had some
15     of the most explicit documents linking the
16     evaluation of claim personnel with how much that
17     they pay out in claims that I have ever seen. A
18     lot of companies do that, but over the last
19     30 years most of them have gotten more
20     sophisticated about hiding it. Zurich, for
21     whatever reason, didn't feel the need to hide
22     anything in their -- in their performance
23     evaluations. Now, they -- they wouldn't turn them
24     over without a court order. But when they did
25     turn them over, it was clear that their response

Page 41

1  to this request -- and this is just an example --
2  they responded none. Which was a fat -- flat out
3  lie.
4 Q  (BY MR. SUTTON) Were there other discovery
5  responses that you received from Zurich that you
6  found to be inaccurate?
7 A  Oh, numerous. And if you read through this --
8  I -- Request 6 is the one that jumps out at me
9  today, years later, and I haven't sat down and
10  read through this. I -- this is the first time
11  I've seen this letter in years. Seven years. I'm
12  assuming that if you read through this letter, and
13  more importantly if you read through the brief
14  that was written in support of the Motion to
15  Compel Zurich to comply with the document request,
16  you will see more examples.
17        (Whereupon, Exhibit 45 and Exhibit 46 were
18  then marked.)
19 Q  (BY MR. SUTTON) Mike, you've been handed Exhibit 45
20  which is a letter from you to Cris Palmer dated
21  December 18, 2015, and Bates stamped GPNA 4154; is
22  that right?
23 A  Yes.
24 Q  Did you write this letter to Cris on December 18,
25  2015?

Page 42

1 A  Yes.
2 Q  And is this a true and accurate copy of the letter
3  you wrote?
4 A  Yes.
5 Q  This is the follow-up to the December 2
6  meet-and-confer letter; is that right?
7 A  Yes.
8 Q  And then will you turn to Exhibit 46?
9 A  Yes.
10 Q  Is Exhibit 46 Cris's response to your December 18,
11  2015, letter?
12 A  Appears to be.
13 Q  And is that a true and accurate copy of the letter
14  you received?
15 A  Yes.
16        (Whereupon, Exhibit 47 was then marked.)
17 Q  (BY MR. SUTTON) Exhibit 47 is an email chain Bates
18  stamped GPNA 4299 and 4300. Looking at the
19  bottom email -- or the oldest email, that's an
20  email from you to Cris Palmer on March 24, 2016;
21  is that right?
22 A  Yes. From Cris to me, yes.
23 Q  Well, let's look at the bottom one first.
24 A  Oh. The bottom one.
25 Q  Because with emails we've always got to read from

Page 43

1  the bottom up. So the first email in the chain is
2  you emailing Cris on March 24; is that right,
3  Mike?
4 A  Yes.
5 Q  And on the second page of that you indicate that
6  you're going to be starting to put together a
7  motion to compel if Zurich doesn't get back to you
8  on their discovery deficiencies; is that right?
9 A  Right.
10 Q  Then when we go back to the first page of
11  Exhibit 47, did Cris respond to you on March 24,
12  2016, at 3:36 p.m.?
13 A  Yes.
14 Q  And in his email he indicated that he's talking
15  with his client about settlement and that he'll
16  get back to you; is that right?
17 A  Right.
18 Q  Will you please turn to Exhibit 26 that was marked
19  yesterday? Exhibit 26 is a letter dated April 27,
20  2016, from Cris Palmer to you; is that right?
21 A  Yes.
22 Q  And in this email -- or excuse me -- in this
23  letter Cris indicates that he and Zurich would
24  like to try and mediate the case; is that right?
25 A  Yes.

Page 44

1 Q  Did you ultimately agree to mediate the case?
2 A  Yes.
3 Q  Do you recall having any discussions with Cris,
4  Mike, before the mediation about whether the
5  settlement value -- or the demand that you were
6  going to make was going to go up at the mediation?
7 A  I don't remember having conversations with him.
8  That doesn't mean that we didn't have some. But I
9  don't have any recollection of conversations.
10 Q  Did a mediation ultimately occur?
11 A  Yes.
12 Q  And who was the mediator?
13 A  Lon Kouri.
14 Q  Do you remember who attended the mediation? Let's
15  start on -- in your caucus.
16 A  Joe Leichtnam, Mike Simpson, and myself.
17 Q  Do you know who was in the caucus for Zurich?
18 A  I know that Dawn Wagner -- and I had forgotten her
19  last name, but there it is on my computer screen.
20  Dawn Wagner was there from Zurich.
21 Q  Did you have any discussions with Ms. Wagner
22  during that?
23 A  Said hello and how are you and that was about the
24  extent of it.
25        (Whereupon, Exhibit 48 was then marked.)

Page 49

1  Q  (BY MR. SUTTON) He objected there wasn't a question
2     pending. I'm just posing the question back to
3     you, Mike.
4  A  Right. Everything about the way Cris Palmer
5     negotiates softens my settlement position because
6     it's consistent with my philosophy, that if
7     somebody is interested in getting something
8     resolved, I'm going to work with them. And Cris
9     expresses a good faith approach to trying to
10    resolve things as opposed to just dragging them
11    out so he can turn the file into a major billing
12    event which is what happens with a lot of the
13    firms. Everything about the way he negotiates
14    makes me -- draws me into the process and makes me
15    want to resolve something rather than fighting.
16        Everything that Zurich did here, filing
17    responses to discovery requests that are false, I
18    mean, patently false. I've seen enough of these
19    files -- when they tell me there is no documents
20    of the sort that are requested in Request 6, I
21    know better. And everything about the way Zurich
22    negotiated, which was in a word stonewalling,
23    hardened my settlement position.
24 Q  Mike, will you look at Exhibit 49, please? That's
25    an email from you to Cris Palmer on December 5,

Page 50

1     2017; is that right?
2  A  Yes.
3  Q  And is that a true and accurate copy of the email
4     that you sent to Cris?
5  A  Yes.
6  Q  And I note in the first sentence you indicate at
7     the end of the first sentence, quote, We need to
8     either get Zurich to comply with the doc requests
9     or get a motion filed, closed quote. First of
10    all, did I read that correctly?
11 A  Which sentence is that? First? Last? What?
12 Q  It's the end of the first sentence of the first
13    paragraph.
14 A  Yes, that's accurate.
15 Q  So I'm gathering from this email -- I mean, do you
16    recall whether you had received any supplemental
17    documents in response to your meet-and-confer
18    letter?
19 A  Well, I don't know if I had received any
20    supplemental documents, but I know that they
21    hadn't complied. They hadn't complied. They
22    hadn't even substantially complied. I don't even
23    know that they had minimally complied, but they
24    had provided -- I'm -- I'm not sure. I think that
25    they had probably provided a claim file somewhere

Page 51

1     along the line here, or maybe not. I know that
2     the claim file was one of the first documents they
3     actually did provide, and I don't remember if that
4     was part of the initial disclosures under Rule 26
5     or if that was in response to my document request.
6     But they gave a claim file and then it seems like
7     I had to fight for a long time for anything
8     more -- or much more.
9        (Whereupon, Exhibit 50 was then marked.)
10       MR. SUTTON: Let's take a break.
11       (A recess was taken from 10:17 to 10:30 a.m.)
12 Q  (BY MR. SUTTON) Okay. Mike, you've been handed
13    Exhibit 50 which I'll represent to you is a
14    printout as of this morning of the entire docket
15    sheet for the Leichtnam vs. Zurich bad faith case
16    in which you were counsel. Does this appear
17    accurate to the best of your knowledge?
18 A  Yeah, I mean -- let's see -- yeah. It looks
19    right.
20       (Whereupon, Exhibit 51 and Exhibit 52 were
21    then marked.)
22 Q  (BY MR. SUTTON) Mike, you have also been handed
23    Exhibit 51 and 52. Exhibit 51, is this a true and
24    accurate copy of the Motion to Compel that you
25    filed on behalf of your client in the bad faith

Page 52

1     case?
2  A  Yeah, it looks like the first Motion to Compel.
3  Q  What is the date of this filing?
4  A  It says filed 12/18 on the motion and then it says
5     filed 12/19 on the brief.
6  Q  And Exhibit 52 is the supporting brief; is that
7     right?
8  A  Right. And this is a redacted copy.
9  Q  Correct. The -- and I'll represent the reason for
10    that is the unredacted copy is not available on
11    the court system.
12 A  PACER?
13 Q  PACER, correct. That's where I pulled it from.
14 A  Okay. You don't have a copy of the actual brief?
15 Q  I suspect we do, but I just -- in fact, I'm sure
16    we do. It's just this is the one I marked.
17       (Whereupon, Exhibit 53 was then marked.)
18 Q  (BY MR. SUTTON) And before we get to 53,
19    Exhibit 52, will you turn to the last page of
20    that?
21 A  Talking about the Certificate of Service or the
22    page before that?
23 Q  Let's go to the page before. Who signed this
24    brief?
25 A  I did.

Page 53

1  Q  Did you write it?
2  A  Yes.
3  Q  Was everything accurate in it to the best of your
4     knowledge when you wrote it?
5  A  Yes.
6  Q  Exhibit 53 then, I just want you to confirm that
7     this is the response brief in opposition to the
8     Motion to Compel which was filed in the bad faith
9     case?
10 A  Yes.
11         (Whereupon, Exhibit 54 and Exhibit 55 were
12    then marked.)
13 Q  (BY MR. SUTTON) Mike, you've been handed three
14    exhibits. The -- what is the first of the
15    three -- Exhibit 53, can you please find that for
16    me, Mike?
17 A  Yeah, I got it.
18 Q  And in Exhibit 53, can you tell me what the title
19    of that pleading is?
20 A  Defendants' Response to Plaintiff's Motion to
21    Compel.
22 Q  Exhibit 54, what is Exhibit 54?
23 A  Motion For Admission of Non-Resident Attorney.
24 Q  And which non-resident attorney is subject to that
25    motion?

Page 54

1  A  Conrad Nowak.
2  Q  Okay. And Exhibit 55, is that the Motion For
3     Admission of Non-Resident Attorney for Paris
4     Glazer?
5  A  No. This is an Order Granting Extension.
6  Q  I'm missing one. Hold on.
7         (Whereupon, Exhibit 56 was then marked.)
8  Q  (BY MR. SUTTON) Okay. So let's go back on --
9     Exhibit 56, is that the Motion for Admission of
10    Non-Resident Attorney of Paris Glazer?
11 A  Yes.
12 Q  And what are the dates on both Exhibit 54 and 56?
13 A  February 1, 2018.
14 Q  Before this case had you ever worked with either
15    attorneys Glazer or Conrad Nowak?
16 A  I had worked with Conrad Nowak.
17 Q  Do you recall how long ago that was?
18 A  2008 and 2009.
19 Q  What was the nature of the case?
20 A  It was a case called McElgunn vs. Cuna Mutual.
21 Q  Was that a bad faith case?
22 A  Yes.
23 Q  What was Mr. Nowak's role in the defense of that
24    case as you recall?
25 A  He was an associate at the Hinshaw firm. And the

Page 55

1     senior partner that was lead counsel on the case
2     was Jim Hofert. And I met Conrad Nowak because we
3     tried the case in 2009. And Conrad was at counsel
4     table during trial.
5  Q  What was the outcome of that trial?
6  A  A 6.27 million verdict.
7  Q  What did Mr. Hofert tell you before the trial?
8  A  He said, You're going to get a big verdict and I'm
9     going to get fired.
10 Q  Any other time that you recall having any cases
11    with either Mr. Nowak or Mr. Glazer?
12 A  No.
13 Q  Now, in February -- shortly after these motions
14    for admission of non-resident attorney, do you
15    recall that the Court entered an order admitting
16    both Mr. Glazer and Mr. Nowak as pro hac into the
17    District of South Dakota?
18 A  Did the Court enter an order admitting them?
19 Q  Yes.
20 A  Yes.
21 Q  Once they were admitted, who did you primarily
22    communicate with regarding the matters in the bad
23    faith case?
24 A  Well, the first contact I had was with Jim Hofert.
25    I remember he called me and said, I'm getting into

Page 56

1     this case. After -- I don't remember if it was
2     before or after this motion for admission, but
3     somewhere around that time frame he called me.
4     Then as the case proceeded, most of my contacts
5     were with Paris Glazer, although I also had
6     contacts with Conrad.
7  Q  After the admission of Mr. Glazer and Mr. Nowak,
8     did you have -- do you recall having any
9     substantive discussions about the bad faith case
10    with Cris Palmer?
11 A  I don't think so. I don't recall. I do not
12    recall having any conversations with him. I don't
13    recall him really being involved very much. At
14    least all the day-to-day business was with the
15    Hinshaw firm.
16 Q  And then will you turn to Exhibit 55, please?
17 A  Okay. The Order Granting Extension?
18 Q  Correct. What's the date on Exhibit 55?
19 A  December 21, 2017.
20 Q  In the first paragraph on the order, when does it
21    indicate that the discovery deadline is?
22 A  Within 60 days of the Court's disposition of
23    plaintiff's Motion to Compel discovery.
24 Q  And the Motion to Compel discovery referenced in
25    that order is the Motion to Compel that we

Page 57

1  previously talked about as Exhibit 51, right?
2  A  Right.
3  Q  So at least at the time of Exhibit 55, discovery
4     remained open; is that correct?
5  A  Right.
6        (Whereupon, Exhibit 57 was then marked.)
7  Q  (BY MR. SUTTON) Is that Exhibit 57, Mike?
8  A  Yes.
9  Q  Exhibit 57, for the record, is the Order Granting
10    In Part and Denying In Part Plaintiff's Motion to
11    Compel which is Bates stamped GPNA 633 to 655; is
12    that right?
13 A  Yes.
14 Q  What's the date that this order was issued?
15 A  Filed September 30, 2018.
16 Q  And this is the order, when you look at the
17    introductory paragraph, ruling on your Motion to
18    Compel doc 38?
19 A  Yeah, I don't remember it being doc 38. Maybe
20    there was a filing error or something. I thought
21    it was something like docket 34, but I -- I don't
22    know.
23 Q  And in 51 it says that it's document 31, you're
24    right. Do you recall whether Exhibit 57 is the
25    Order Ruling on the Motion to Compel that we've

Page 58

1     been talking about?
2  A  Yeah. Plaintiff's first Motion to Compel, I'm
3     sure.
4  Q  Will you please turn to GPNA 640?
5  A  Okay.
6  Q  And here is what I'm going to do with this. I
7     just want to confirm -- and there is two ways we
8     can do it, Mike. Either we can walk through each
9     one or let me ask the question generally if you
10    remember what it was, and if not we'll walk
11    through each one.
12       Do you recall that other than limiting the
13    date scope, the Court granted all of your requests
14    in the Motion to Compel in Exhibit 57?
15       MR. HOYT: I'll object. The document is the
16    best evidence of that. It says, Granted in part,
17    denied in part.
18 Q  (BY MR. SUTTON) That's fine. We'll walk through
19    it.
20 A  Well, the Court either granted all of them with
21    the exception of making some kind of adjustments.
22    For the most part -- I mean, I would say 90 some
23    percent of the motion was granted.
24 Q  Did you consider the Motion to Compel to have been
25    successful from your perspective?

Page 59

1  A  Sure. And not unexpected because there is --
2     there is hoards of case law on all of these
3     requests. I could probably pull up verbatim
4     requests that the Court had approved a half a
5     dozen times in previous cases.
6        (Whereupon, Exhibit 58 was then marked.)
7  Q  (BY MR. SUTTON) Exhibit 58, for the record, is
8     Zurich's motion for leave to file an amended
9     answer and affirmative defenses, which was filed
10    on September 7, 2018; is that right?
11 A  Yes.
12 Q  What's the docket number at the top of -- or the
13    document number -- let me start over -- at the top
14    of Exhibit 58?
15       MR. HOYT: This one has already been marked
16    yesterday.
17       MR. SUTTON: Okay. What number? I knew you
18    marked the brief. I didn't know you marked the
19    motion.
20       MR. HOYT: Yeah, I think I did. It would be
21    Exhibit 10.
22       MR. SUTTON: Okay. Let's do this on the
23    record. Hand that back, Mike.
24 Q  (BY MR. SUTTON) Will you find Exhibit 10 in the
25    stack that was there?

Page 60

1  A  Got it.
2  Q  Exhibit 10, is that the Motion to Amend -- strike
3     that. Is that Zurich's Motion For Leave To File
4     Amended Answer and Affirmative Defenses?
5  A  Correct.
6  Q  What is the document number at the top of
7     Exhibit 10?
8  A  Document 56.
9        (Whereupon, Exhibit 58 was then remarked.)
10 Q  (BY MR. SUTTON) Exhibit 58. Can you indicate at
11    the top of Exhibit 58 what the document number is
12    from the federal court filing system?
13 A  Document 56-1.
14 Q  And is that a 13-page document as indicated in the
15    filing system?
16 A  Yes.
17 Q  Is it -- is Exhibit 58 the proposed amended answer
18    that was attached to Exhibit 10?
19 A  Yes.
20 Q  Did you review Exhibit 56 -- strike that.
21       Did you review Exhibit 58, the proposed
22    amended answer, when the motion was filed?
23 A  Yeah.
24 Q  Will you please go to page 10 of that document?
25 A  Okay. I'm there.

Page 69

1    (indicating) under the heading Roman Numeral II.
2    He never obtained a final decision from the
3    South Dakota Department of Labor establishing that
4    he was denied worker's compensation benefits to
5    which he was entitled.
6  Q  And does that encapsulate the basis for their
7    request for dismissal as you understood it?
8  A  That's the most succinct statement of their -- of
9    this brief. I think it's the most succinct.
10   Yeah, that's what I understood was their basis for
11   the Motion to Dismiss.
12       (Whereupon, Exhibit 61 was then marked.)
13 Q  (BY MR. SUTTON) Exhibit 61 is a Notice of
14   Withdrawal and Substitution of Counsel that was
15   filed in the bad faith case; is that right, Mike?
16 A  Correct.
17 Q  What's the date of this filing?
18 A  February 20, 2019.
19 Q  And who is withdrawing as counsel in Exhibit 61?
20 A  It says, Attorney Westergaard informs the Court
21   that Cris Palmer is withdrawing.
22 Q  At some point was it your understanding that
23   Attorney Westergaard took over as local counsel
24   rather than Mr. Palmer?
25 A  Right. Right at this point in time is my

Page 70

1    understanding.
2        (Whereupon, Exhibit 62 was then marked.)
3  Q  (BY MR. SUTTON) Mike, you've been handed Exhibit 62
4    which is the Report and Recommendation Regarding
5    Defendant's Motion to Dismiss, docket 58; is that
6    correct?
7  A  Correct.
8  Q  And is this the order that was entered by
9    Magistrate Judge Wollmann -- or at least the
10   report and recommendation from her denying
11   Zurich's Motion to Dismiss?
12 A  Yes.
13 Q  Will you please turn to GPNA 766?
14 A  Okay. I'm there.
15 Q  On the pages GPNA 766 through 772, are those the
16   pages of the order in which Judge Wollmann or
17   Magistrate Judge Wollmann addresses the Motion to
18   Dismiss?
19 A  Well, she certainly does address it on those
20   pages.
21 Q  Did she reach the merits of -- in Exhibit 62 of
22   whether Leichtnam, your client, in fact exhausted
23   his administrative remedies?
24       MR. HOYT: Objection; the document will speak
25   for itself, best evidence.

Page 71

1  A  Yes, she did.
2  Q  (BY MR. SUTTON) And what did she rule?
3        MR. HOYT: Same objection.
4  A  That Leichtnam exhausted his administrative
5    remedies because there is a settlement which was
6    approved by the division of labor -- Department of
7    Labor.
8  Q  (BY MR. SUTTON) And that's consistent with the back
9    letter law that you testified about earlier?
10 A  That's consistent with numerous cases saying that
11   by the South Dakota Supreme Court.
12 Q  Will you please turn to the last page of the
13   report and recommendation?
14 A  Okay. I'm there.
15 Q  And do you see the portion where it says, Notice
16   to parties?
17 A  Yes.
18 Q  And does that indicate that either party could
19   object to the report and recommendation provided
20   by the Magistrate?
21 A  Right.
22 Q  And what's your understanding that occurs -- or
23   let me ask you, do you have an understanding about
24   what occurs if a party objects to the report and
25   recommendation?

Page 72

1  A  Are you asking what generally is the procedure --
2  Q  Yes.
3  A  -- or are you asking what happened here?
4  Q  Generally what the procedure is. What happens?
5  A  Well, on a recommendation for a dispositive motion
6    they can file objections to the -- and Judge Viken
7    or the district court judge will review and
8    determine if the -- if he wants to accept the
9    Magistrate's recommendation.
10 Q  And is that a de novo review on dispositive
11   motions?
12 A  Yeah, in this circumstance. I mean, it can vary,
13   but I think in this circumstance it's a de novo.
14 Q  Do you recall in this case whether Zurich did file
15   an objection to the report and recommendation from
16   Magistrate Judge Wollmann?
17 A  It's my -- I think they did.
18 Q  And if you look at Exhibit 50, Mike, the docket
19   sheet --
20 A  Okay.
21 Q  So Exhibit 50 is the -- on page 13 there is a
22   docket entry 120.
23 A  Okay.
24 Q  Docket 120 is the Report and Recommendation
25   Regarding Motion to Dismiss; is that right?

Page 85

1  A   In discovery from Zurich's IME procedures.
2  Q   And that was in discovery produced in this bad
3      faith case?
4  A   Which I had to drag out of them, yeah.
5  Q   Let's go to Exhibit 64 then.  Exhibit 64 is the
6      IME report by Dr. Wayne Anderson; is that right?
7  A   Yes.
8  Q   Had you had previous cases in which Dr. Anderson
9      provided an IME?
10 A   Have I had previous -- had I seen previous --
11 Q   Yes.
12 A   Probably several, yeah.
13 Q   At the time that you received this report, had you
14     formed an opinion -- strike that.  Let me ask it
15     this way.
16         Were you aware of any reputation in the legal
17     community about Dr. Anderson and his work as an
18     IME?
19 A   Yes.
20 Q   What was your understanding of his reputation?
21     MR. HOYT: Objection; lack of foundation.
22 A   That he was pretty credible.  And I will give you
23     some foundation because I think in -- I mean, I'd
24     had a number of cases where I had seen his IMEs,
25     but also -- I think the first time I was ever

Page 86

1      involved with him, I actually cross-examined him
2      in front of a jury probably in -- somewhere in
3      1990.  But he did a lot of IME work.  And, you
4      know, for a while it kind of looked like he was
5      the employer's guy, but then he got pretty
6      even-handed.  And that was his reputation by this
7      time, that he was pretty even-handed.
8  Q   (BY MR. SUTTON) Had you discussed his reputation
9      with other lawyers in the Rapid City legal
10     community?
11 A   Oh, yeah.
12 Q   How frequently?
13 A   Well, I wouldn't say every week, but, you know,
14     usually his name would come up several times a
15     year at a minimum because he was out there doing
16     IMEs.  And, you know, I mean, I was
17     cross-examining him when I examined him in a jury
18     trial when I first met him.  And so I was trying
19     to -- in that particular case I was trying to
20     undermine his credibility so I -- you know, I had
21     some interest in learning about him.
22 Q   In Exhibit 64 on page 7 of the IME report through
23     page 10 there are a series of questions posed by
24     Julie Bradford and responses by Dr. Anderson; is
25     that right?

Page 87

1  A   Yes.
2  Q   Based upon your work in this case, review of the
3      claims file and prior experience with bad faith
4      and work comp, did you believe that
5      Mr. (sic) Anderson's IMEs supported terminating
6      benefits?
7  A   No, not at all.
8  Q   Why do you say that?
9  A   Well, first of all, he -- he confirms the
10     injuries.  And without going through these one by
11     one, he also confirmed work relatedness and
12     confirmed the need for treatment.  I think the
13     only thing that he didn't quite agree with
14     Drs. Lawlor and Wisniewski was as to some
15     relatively minor aspect of the treatment, which
16     maybe it was having something to do with opioid
17     painkillers or something.  I'm not sure.  But
18     there was some part of the treatment that he
19     didn't -- at some point -- maybe not in this
20     report.  Maybe it was in a supplemental report or
21     something.  But I just remember the one thing that
22     he didn't agree with was some minor aspect of the
23     treatment that had been recommended.  But he went
24     along with pretty much all of the treatment of
25     what the previous doctors had recommended.

Page 88

1      So as far as, you know, who did this favor,
2      totally favored Joe Leichtnam.
3      (Whereupon, Exhibit 65 was then marked.)
4  Q   (BY MR. SUTTON) Before we switch to the next
5      exhibit, can you tell me what the date of this
6      report is?
7  A   Well, the date of the examination is July 17.
8      Let's see if there is a date at the end.  It says,
9      Dictated July 17.  Transcribed July 18.  Is there
10     another date?
11 Q   I don't know that there is.  So, I mean, you -- at
12     least the examination occurred on July 17, 2008;
13     is that right?
14 A   Yes.
15 Q   Will you turn to Exhibit 65, which you need to be
16     handed.
17 A   Okay.
18 Q   Exhibit 65 is a addendum to Dr. Anderson's IME
19     report; is that right?
20 A   Yes.
21 Q   And you were testifying earlier you thought that
22     there might have been a document indicating there
23     was a portion of the treatment Dr. Anderson did
24     not agree with.  Is Exhibit 65 what you were
25     referring to?

Case 5:20-cv-05026-KES   Document 55-2   Filed 02/01/23   Page 10 of 11 PageID #: 308

| AMERICAN ZURICH INSURANCE COMPANY, ET AL v. | WITNESS: MIKE ABOUREZK |
| J. CRISMAN PALMER, ET AL | September 1, 2022 |

Page 97

1  significant to you in prosecuting the case as part
2  of the underlying comp claim?  Strike that.
3  That's a bad question.  Let me reword it.
4     In your work in prosecuting the bad faith
5  case, what's the next significant event that
6  occurred in the handling of the claim?
7 A  In handling the claim?  I believe that somewhere
8  along in about April of 2009, maybe it was March,
9  Rommesmo, which was the employer, they fired
10  Joe Leichtnam.  Terminated him for cause.  Said
11  that he had -- he had been involved in too many
12  work accidents and terminated him for cause.  And
13  what had happened -- this arose out of a fender
14  bender that happened in the parking lot of the
15  employer.  Evidently he -- there had been a
16  blizzard.  He was out on a front end loader moving
17  snow.  Somebody in one of the company vehicles, a
18  pickup, came behind him.  And he's going forwards
19  and backwards moving snow.  And he backed into a
20  pickup that was passing behind him.
21 Q  Why was his termination significant from your
22  perspective in the claim file?
23 A  Well, because if you connected the dots Zurich had
24  been conducting these, I'll call them seminars,
25  for employers at Raffles.  We haven't talked about

Page 98

1  Raffles yet.  Zurich was teaching that
2  terminations for cause can assist -- or can be
3  used as a -- as a basis to deny comp benefits.
4 Q  And how do you know that Zurich was teaching that
5  information?
6 A  Because I saw educational materials that they were
7  giving to employers through Raffles.  I take it
8  that they had some sort of a, you know, seminar or
9  something, but they had these power points and so
10  on and they -- one of the -- some of the materials
11  that they handed out to these employers, including
12  Rommesmo, Joe's employer, included examples about
13  how if an employee was terminated for cause, then
14  they could make arguments that his loss of income
15  or loss of -- lost time claims under worker's
16  compensation could be denied as not caused by the
17  work injury, but caused by the fact that he is out
18  of work for cause.
19     So -- and then also I said you have to
20  connect the dots.  Well, the day -- those
21  materials were given to Rommesmo earlier.
22  Rommesmo then terminates Joe for cause after his
23  supervisor had said -- the supervisor did up an
24  incident report saying it wasn't his fault.  It
25  was the fault of the guy that drove behind him

Page 99

1  because they evidently have a rule that you don't
2  drive behind heavy machinery operating in the
3  yard.  And the other employee had done that.
4  Didn't find any fault with Joe.  But about three
5  or four days later the head office -- home office
6  where the risk control guy is located, they
7  terminate Joe for cause.  All of a sudden now
8  changing their position saying it was his fault
9  although his supervisor never did say it was his
10  fault.  They terminate him.  And that same morning
11  they call Zurich and tells Zurich, We just fired
12  this guy for cause.  So then the claim handler
13  puts it in his claim notes he's been fired for
14  cause, I'm going to set up an IME with
15  Dr. Farnham.
16     So that termination for cause spurred them
17  into action practically in the same breath that
18  they were going to get Dr. Farnham to do the IME.
19     (Whereupon, Exhibit 67 was then marked.)
20 Q  (BY MR. SUTTON) Exhibit 67 is Dr. Farnham's IME
21  report; is that right?
22 A  Right.
23 Q  Now, before the -- this case, had you had other
24  cases in which Dr. Farnham had provided an IME?
25 A  Yes.

Page 100

1 Q  Have you ever had opportunities to take his
2  deposition?
3 A  I never took his deposition.  I had filed bad
4  faith suits based on his reports previous to that.
5 Q  Had you had opportunities to discuss Dr. Farnham
6  with other lawyers in the legal community?
7 A  Plenty of opportunities.
8 Q  Have you had cases with Dr. Farnham since this
9  proceeding?
10 A  When you say this proceeding, we're talking about
11  Joe Leichtnam?
12 Q  Correct.
13 A  No.  I think he's finally got basically removed
14  from the -- from the business.
15 Q  What do you know about Dr. Leichtnam's (sic) --
16  excuse me.  Let me start over.
17     What do you know about Dr. Farnham's
18  certification process and the examinations he's
19  taken and failed?
20     MR. HOYT: Objection; foundation.
21 A  Yeah, I -- I know what his background is because I
22  read sworn testimony from him on that very
23  subject.  So is your question, what do I know?
24 Q  (BY MR. SUTTON) Yes.
25 A  He -- like Dr. Blow, he had flunked the

Page 125

1  thousand.  But, in general, the concept was if
2  they didn't pay out a -- if they pay out
3  everything that Rommesmo had paid in, Rommesmo
4  would get a refund.
5  Q  (BY MR. SUTTON) How did you learn that information?
6  A  How did I learn it?
7  Q  Yeah.
8  A  By looking at documents that Raffles gave to
9     Rommesmo.  And it might say it in this particular
10    document, but I haven't read through to see if it
11    says it here.
12 Q  Yeah --
13 A  But I know there is a number of documents that
14    said that.
15 Q  Is Exhibit 68 a true and accurate copy of a
16    document that was produced in discovery in the bad
17    faith case?
18 A  Yes.
19 Q  And then the same with Exhibit 69 and Exhibit 70.
20    I just want you to confirm that those were
21    documents that are true and accurate that you
22    received in the bad faith case.
23 A  69, yeah.
24 Q  How about 70?  It's right there (indicating).
25    It's the Negotiation Quick Reference.  Is that a

Page 126

1  document that you received as part of discovery in
2  the bad faith case?
3  A  Yes.
4  Q  Now, as part of the discovery in the bad faith
5     case, were there any depositions taken by Zurich?
6  A  Yeah, they took two depositions.
7  Q  Who did they depose?
8  A  Dr. Juel, the chiropractor, and Joe Leichtnam.
9  Q  Did you have any discussions with Conrad Nowak
10    regarding the deposition of your client after the
11    fact?
12 A  Yes.
13 Q  What did he say to you?
14 A  Well, the one thing I remember was he said that
15    Joe made a nice impression.
16 Q  Now, ultimately was the bad faith case settled?
17 A  Yes.
18 Q  And the -- do you recall having a phone call with
19    Conrad Nowak in which there was the discussion of
20    settlement?
21 A  Yeah.
22 Q  Do you know how long that call was before the
23    actual settlement?
24 A  It wasn't -- it wasn't too long before we reached
25    an agreement.  However, the -- once we reached an

Page 127

1  agreement as to the dollar amount, it took -- it
2  took us a while on our end to get things in place
3  for the client because we didn't want to -- we
4  wanted him to have the opportunity to do some
5  planning as to what he was going to do with that
6  money.  We didn't want him to have constructive
7  receipt of it until we accomplished that.  So we
8  put off collecting the money for, I don't know,
9  might have been two or three months.
10 Q  The phone call that you had with Mr. Nowak, what
11    do you recall being -- strike that.  Let me start
12    over.
13        The phone call regarding settlement that you
14    had with Mr. Nowak, what do you recall being
15    discussed?
16 A  Well, I know that he opened the discussion about
17    settlement, about wanting to explore settlement.
18    I know that he said that -- I don't -- I can't --
19    I won't pretend to know the exact words.  I can
20    just tell you the substance.  I know that he
21    basically said that we had a strong case and they
22    didn't have much to work with.
23 Q  Did you also have an opportunity to have a
24    discussion with Terry Westergaard regarding
25    settlement?

Page 128

1  A  Yeah.  Terry came to my office.  This was a short
2     time after -- I think it was a short time after
3     the conversation with Conrad.  And I don't think
4     it took us more than about five minutes.
5  Q  What did Terry say to you?
6  A  I only remember -- I only remember one thing, and
7     that is he -- I believe that he asked -- I don't
8     know if I had already told him what I wanted or if
9     he came over and we had that conversation.  But,
10    anyway, I said 2 million and it didn't take long
11    for us to wrap it up.
12        MR. SUTTON:  I want to mark this.  Do me a
13    favor, put it over this sticker.
14        And at this point we need to designate this
15    portion of the transcript as confidential and seal
16    it for -- let's put on the record, pursuant to the
17    protective order, this portion of the transcript
18    needs to be separately designated as confidential
19    and separately bound.  It doesn't need to be
20    sealed.
21        (Pursuant to the protective order, this
22    portion of the transcript has been separately
23    designated as confidential and separately bound in
24    a separate transcript.)
25        MR. SUTTON:  I don't have any other -- any