*American Zurich Ins. Co. and Zurich American Ins. Co. v.*
*J. Crisman Palmer and GPNA*

*William P. Fuller*
*December 20, 2022*

*Audrey M. Barbush, RPR*
*audrey@paramountreporting.com*
*605.321.3539*



Min-U-Script® with Word Index



EXHIBIT
C

Page 5

1   Susan then became a circuit court judge, and I
2   added additional people; and now it's Fuller,
3   Williamson, Nelsen & Preheim.
4 Q  Since you've been -- we'll just use the period of time
5   since you and Judge Sabers left the Woods firm. How
6   would you generally describe the nature of your
7   practice?
8 A  Primarily, insurance defense.
9 Q  As part of that insurance defense work, have you
10   appeared on behalf of employers and insurance companies
11   in workers' compensation defense matters?
12 A  I have. I'm not doing that type of work presently, but
13   I have in the past, correct.
14 Q  How about defending bad faith cases? Has that been a
15   component of your practice?
16 A  It is.
17 Q  Have you tried any bad faith cases? Let's start there.
18 A  I have not tried them to conclusions, but I have tried
19   bad faith cases that have settled during the course of
20   trial.
21 Q  As part of your work in defending bad faith cases, can
22   you give me an estimate of what percentage of your work
23   is attributed to defending bad faith?
24 A  I would say probably 60 percent of my workload is bad
25   faith. I think I have six pending bad faith cases

Page 6

1   right now.
2 Q  Within the bad faith practice that you have, is any
3   portion of that bad faith cases arising out of workers'
4   compensation benefits?
5 A  One pending case presently is a work comp bad faith
6   case, and I think I've had several in the past.
7 Q  The bad faith cases that you've defended, where have
8   those cases typically been venued, federal or district
9   [sic] court?
10 A  Most often, federal court.
11 Q  Based on your experience in defending bad faith cases
12   in federal district court in South Dakota, what's the
13   general tenor of our federal district court regarding
14   the scope of institutional discovery in bad faith?
15   MR. HOYT: Objection. Vague.
16   THE WITNESS: They are -- both the magistrates and
17   the sitting federal judges are very aggressive in
18   compelling insurance companies to fully respond to
19   broad discovery, and objections like undue burden or
20   boilerplate objections are not viewed with favor by our
21   federal judges.
22   BY MR. SUTTON:
23 Q  In your work in the bad faith arena, have you had cases
24   that you've defended in which Mike Abourezk was the
25   plaintiffs counsel?

Page 7

1 A  I've had, perhaps, two. Two that I can think of.
2 Q  Are you aware of Mr. Abourezk's reputation within the
3   State Bar of South Dakota regarding his abilities as a
4   plaintiffs bad faith lawyer?
5 A  I am.
6 Q  What is that reputation?
7 A  He's extremely good. He has had numerous
8   million-dollar verdicts. He knows what he's doing. I
9   certainly respect his ability.
10 Q  Now, as I understand it, you were hired by Rommesmo and
11   Zurich to defend a workers' compensation case involving
12   Richard [sic] Leichtnam; is that right?
13 A  That's correct.
14 Q  There's a stack of exhibits there. Will you find
15   Exhibit 6.
16 A  Am I supposed to be looking at the exhibit number on
17   the bottom of the --
18 Q  Here, I'll just hand you another copy, Bill.
19 A  All right.
20 Q  I have one here. Let's do it that way.
21   I've handed you what previously has been marked as
22   Exhibit 6, Petition for Hearing, and I just would like
23   you to confirm that this is the pleading filed by
24   Dennis Finch on the workers' compensation case that you
25   defended.

Page 8

1 A  It is.
2 Q  I'm going to hand you what's been marked as Exhibit 7.
3   Will you please just confirm that that is the answer
4   that you filed in the workers' compensation proceeding?
5 A  It is.
6 Q  Now, I want to start by handing you what the court
7   reporter has marked as Exhibit 116.
8   MR. SUTTON: Scott, this is the March 5, 2012,
9   letter I sent to you yesterday.
10   MR. HOYT: Okay.
11   BY MR. SUTTON:
12 Q  Mr. Fuller, have you had a chance to look at
13   Exhibit 116?
14 A  Yes, I have.
15 Q  Is this a letter that you wrote to Kimberly Duncan at
16   Zurich on March 5, 2012?
17 A  It is.
18 Q  When we turn to Zurich 564, the Bates stamp, is that
19   your signature on page 3 of that letter?
20 A  It is.
21 Q  Who was Ms. Duncan?
22 A  She was the claims handler on the Leichtnam work comp
23   claim. I think there were several, but she came in
24   near the second half of the proceeding.
25 Q  Now, will you please turn to Bates stamp Zurich 563.

Page 9

1  In the third paragraph where it says "I believe we
2  should reinstate medical on this claim," do you see
3  that paragraph?
4  A  I do.
5  Q  I want to start with the last sentence in that
6  paragraph. You wrote "Accordingly, I think we would be
7  best served to reinstate the medical coverage for the
8  residuals stemming from Mr. Leichtnam's neck, low back,
9  and head injury."
10    First, is that what you wrote?
11 A  That's what I wrote.
12 Q  At this point in time on March 5, 2012, what was the
13 status on whether Zurich was paying or reimbursing
14 Mr. Leichtnam for medical treatment for his injuries?
15 A  They were not being paid.
16 Q  And were you making any recommendations at this time
17 regarding the reinstatement of the medical benefits?
18 A  I was.
19 Q  Why were you doing that?
20 A  It seemed to me -- it seemed clear to me that medical
21 benefits should be paid based upon, primarily, the
22 opinions of treating doctors and, as well, our IME
23 doctor, Dr. Anderson. So I thought the medical support
24 was compelling. I thought the benefits were owing and
25 should be paid.

Page 10

1  Q  In that same paragraph, about four or five lines up,
2  you indicate that "Dr. Farnham does not have the best
3  reputation before the Department of Labor."
4     Did I read that correctly?
5  A  You did.
6  Q  In March of 2012, were you familiar with Dr. Farnham's
7  reputation before the Department of Labor?
8  A  Generally familiar.
9  Q  How did you obtain that familiarity?
10 A  I think I actually did some research and perhaps looked
11 at some Department of Labor decisions, and, just
12 generally, I think I was vaguely familiar with him
13 otherwise. But I think I made a point to look into his
14 credentials and his background further.
15 Q  What was your opinion regarding Dr. Farnham's
16 reputation?
17    MR. HOYT: Objection. Lack of foundation.
18 Objection. Lack of foundation.
19    THE WITNESS: I don't think his reputation was
20 good before the Department of Labor.
21 BY MR. SUTTON:
22 Q  Do you know why?
23    MR. HOYT: Same objection.
24    THE WITNESS: Well, I think the Department of
25 Labor rejected his opinions and probably was familiar

Page 11

1  with his lack of credentials. I think he made three
2  attempts to get board certification and failed all
3  attempts.
4  BY MR. SUTTON:
5  Q  When you wrote the letter on March 5, 2012, were you
6  comfortable enough with your knowledge about
7  Dr. Farnham's reputation to be providing that
8  information to your client?
9  A  I was.
10 Q  Next I'm going to hand you what's been marked as
11 Exhibit 117.
12    MR. SUTTON: Exhibit 117 is the April 13, 2012,
13 letter, Scott.
14    MR. HOYT: Okay.
15 BY MR. SUTTON:
16 Q  Bill, have you had a chance to review Exhibit 117?
17 A  I have.
18 Q  Is this another letter that you wrote to Kim Duncan?
19 A  It is.
20 Q  What's the date on this letter?
21 A  April 13, 2012.
22 Q  And when you turn to Zurich 544, is that your signature
23 on the letter?
24 A  It is.
25 Q  When we look at page 544 of Exhibit 117, the last

Page 12

1  paragraph, are you again recommending reopening the
2  medical on this claim?
3  A  I am.
4  Q  What do you mean by "reopening medical"?
5  A  That we -- by "we," I mean Zurich -- should resume
6  paying medical benefits or payment for medical
7  treatment for Mr. Leichtnam.
8  Q  Explain -- I mean, what types of benefits are
9  recoverable under the workers' compensation scheme?
10 That's a pretty broad question. Here's what I'm
11 getting at. What's the difference between medical
12 benefits and indemnity benefits?
13 A  Well, indemnity benefits are paid for impairment, paid
14 to, theoretically, replace lost wage or reduced wage;
15 can also provide retraining or rehab benefits. Medical
16 benefits are just as you would think: paying for
17 medical treatment for the work injury.
18 Q  I'm going to hand you what's been marked as
19 Exhibit 118.
20    MR. SUTTON: That's the May 11, 2012, letter, for
21 your benefit, Scott.
22    MR. HOYT: Okay.
23 BY MR. SUTTON:
24 Q  Mr. Fuller, do you recognize this letter?
25 A  I do.

Page 17

1  right-hand corner -- GPNA 8228 through 8235. Could you
2  confirm that's what you have, Bill.
3  A  That's what I have.
4  Q  I'll represent to you these are claim notes from your
5    communications with Kimberly Duncan that have been
6    produced as part of the discovery in this case. So
7    what I'd like you to do is please start by turning to
8    Zurich 46, which is also GPNA 8234.
9  A  Okay. I'm there.
10 Q  Now, there are two email exchanges, an email and a
11   reply, on May 16, 2012, between you and Kim Duncan. Do
12   you see that?
13 A  I do.
14 Q  And I will represent to you -- and if you get into
15   this, you think I'm wrong, please correct me. But as I
16   reviewed these notes, it appears that the email above
17   is the original email, and then below the line is the
18   reply. That's how they read logically.
19      Looking at the email that you drafted to Kim at
20   12:50 p.m. on May 16th, you're reminding her that the
21   demand of $107,500 expired at 5:00 p.m. that day; is
22   that right?
23 A  Correct.
24 Q  You're also reminding her that you had recommended an
25   $80,000 settlement for the indemnity benefits; is that

Page 18

1  right?
2  A  That's correct.
3  Q  Do you recall whether Ms. Duncan had gotten back to you
4    on your recommendation in Exhibit 118, the May 11,
5    letter, between then and May 16 when you sent this
6    email?
7  A  Based on the email, she apparently did not get back to
8    me.
9  Q  Down below she writes a responsive email to you in
10   which she writes "Hi, Bill. I will be pricing the
11   claim up to $80K on the stipulation that this will need
12   to close out indemnity and" -- all caps -- "FULL
13   medical." Did I read that correctly?
14 A  You did.
15 Q  And then she writes "I am not agreeing to send claimant
16   back to Lawlor for ongoing treatment. This is based on
17   our IMEs that both placed the claimant at MMI"; is that
18   right?
19 A  You read that correctly.
20 Q  Now, when you go back to Exhibit 118, your May 11,
21   2012, letter, on Zurich 536, the second page of the
22   letter -- will you turn to that, Bill. You told her
23   that MMI did not foreclose future medical, didn't you?
24 A  I did, correct.
25 Q  So then let's go back to Exhibit 77, and let's go to

Page 19

1  GPNA 8233.
2  A  What's the Zurich number on that?
3  Q  45.
4  A  I'm there.
5  Q  There is another email from you to Kim Duncan on
6    May 17, 2012; is that right?
7  A  That's correct.
8  Q  And you write in the first sentence of that email "Kim,
9    MMI does not close out medical in South Dakota."
10      I want to stop there. Why did you write that?
11 A  Because she was under the belief that MMI did close out
12   medical, and she apparently thought that applied to
13   South Dakota.
14 Q  You then write in the next sentence "We agreed at
15   mediation to have Dr. Lawlor assess him, and we can't
16   back out on that." Did I read that correctly?
17 A  Correctly.
18 Q  Why did you write that sentence?
19 A  Apparently she was backtracking on that and didn't want
20   Dr. Lawlor to examine him again.
21 Q  Was it concerning for you as defense counsel if you
22   were backing up on terms you had agreed to at the
23   mediation?
24 A  Very. Very concerning.
25 Q  Why?

Page 20

1  A  Well, because we gave the mediator and claimant's
2    counsel our word that Dr. Lawlor could reexamine him.
3  Q  I want you to go on to Zurich 46, and the email
4    continues. You write "Dr. Lawlor thought he needed
5    additional treatment for the pain. Dr. Anderson didn't
6    specifically address that question in his initial
7    report but did state that further testing may indicate
8    the need for further treatment. We need to get him
9    examined by his own doctor to address the medical
10   question. We're asking for trouble if we don't."
11      Did I read that correctly?
12 A  You did.
13 Q  What did you mean by "We are asking for trouble if we
14   don't"?
15 A  Well, number one, we previously agreed that Dr. Lawlor
16   could examine him; and number two, it could be
17   construed as we're running away from the issue of
18   continued medical treatment.
19 Q  And why would running away from continued medical
20   treatment be concerning, from your perspective?
21 A  Well, I was confident, and probably concerned, that
22   medical treatment, medical benefits were owing. It
23   seemed clear to me that they were owing.
24 Q  And from a perspective of defending Zurich, what type
25   of additional exposure can arise if Zurich, as you

Page 25

1  box in the email, you wrote "Kim, the big exposure on
2  this claim isn't work comp but bad faith.  There are
3  two pending bad faith cases in South Dakota where the
4  medical was cut off on Farnham's IME or record review.
5  I don't want us to be the third."
6      First of all, did I read that correctly?
7  A  You did.
8  Q  Why were you telling Ms. Duncan on May 22, 2012, that
9  the exposure for Zurich was not the work comp claim but
10  bad faith?
11  A  Because I thought the biggest exposure was bad faith
12  and not work comp, and bad faith in South Dakota has
13  resulted in very large verdicts.  And so I was
14  concerned that we were exposing Zurich to bad faith.
15  Q  In May of 2012, May 22nd at that time, had you
16  developed concerns about whether there was bad faith
17  exposure for Zurich based on its conduct?
18  A  Yes.  I was concerned.
19  Q  Looking at the bottom paragraph, you write "There were
20  grumblings of bad faith at the mediation.  The claimant
21  made it clear he was not going to release any bad faith
22  claim."  Did I read that correctly?
23  A  You did.
24  Q  Do you recall what the discussions were at the
25  mediation regarding the bad faith issues?

Page 26

1  A  Well, that statement that I wrote came from the
2  mediator.  Mike McKnight told me maybe near the end of
3  the mediation -- I think these were exactly his
4  words -- that they were grumbling in the other room
5  about bad faith and they weren't going to release any
6  bad faith claim.
7  Q  And you and I are familiar with Mr. McKnight, but our
8  jury wouldn't be.  Are you aware of Mr. McKnight's
9  reputation for knowledge of the work comp law in
10  South Dakota?
11  A  I am aware of his reputation.  His practice at that
12  time -- I think he was both practicing law and
13  mediating, both.  Now he exclusively mediates.  But his
14  practice was virtually all work comp, so he was very
15  well versed in work comp.
16  Q  Do you have a rough idea of how long that had been the
17  nature of his practice at that point in time?
18  A  Forever, as far as I know.
19  Q  Why did you write to Ms. Duncan on May 22nd that it was
20  clear that the claimant was not going to be releasing
21  the bad faith claim?
22  A  Well, just to make it clear that a potential bad faith
23  claim is not going to be released as part of this
24  proceeding, as far as settling the work comp; and in
25  addition to that, the other side apparently was looking

Page 27

1  at bad faith.
2  Q  Now, will you please turn to Zurich 41 on Exhibit 77.
3  Zurich 41 is an email from Kim Duncan to you copying
4  Rick Springer on May 22nd; is that right?
5  A  We're on, what, 41?
6  Q  Yes.
7  A  Yes.
8  Q  In the email to you, Ms. Duncan writes in the first
9  paragraph "I understand that South Dakota is a bad
10  faith state.  Are you recommending I authorize ongoing
11  treatment because there --" and then she puts in
12  quotes -- "'might' be the possibility that he files bad
13  faith?"  Is that what she wrote?
14  A  Correct, she did.
15  Q  Was your recommendation for reopening medical based
16  upon the fact that they might later file a bad faith
17  case?
18  A  I recommended reopening medical because, based on my
19  review of the medical information from various doctors,
20  it was my belief he was entitled to continued medical
21  benefit; and in addition to that, I could see that
22  there was exposure for bad faith.
23  Q  Now, down in the middle of that paragraph, Ms. Duncan
24  writes "Dr. Anderson did place the employee at MMI for
25  all his work injuries.  Therefore, it was not

Page 28

1  inappropriate for me to deny ongoing treatment as not
2  related to the work comp claim."  Did I read correctly
3  what she wrote?
4  A  You did.
5  Q  And, I mean, you had told her multiple times before
6  this that MMI didn't affect whether benefits needed to
7  be paid for ongoing medical treatment, correct?
8  A  Correct.
9  Q  Do you agree with her statement that it was, quote, not
10  inappropriate, closed quote, to deny the benefits based
11  on MMI?
12  A  No, I don't agree with her statement.
13  Q  Will you please turn to Zurich 42.  In the second full
14  paragraph, she wrote "Regarding settlement, please
15  provide me with your clear recommendations and
16  reasoning as to why these are your recommendations.  I
17  understand you previously recommended $45K to settle.
18  However, now we have the mediator's recommendation of
19  $80K and opposing counsel's demand of $100K.  Please
20  let me know what will get this case settled and closed
21  out and why.  I will also like an explanation as to why
22  you feel we cannot close out the future medical.  I
23  still haven't received a very good explanation from you
24  as to why you feel this is not an option.  For me to
25  recommend settling a claim with open future medical to

Page 29

1  the insured, I need to know why closing medical cannot
2  be accomplished." First of all, did I read that
3  correctly?
4  A  You did.
5  Q  Before receiving this email from Ms. Duncan, did you
6     think you had explained to her why medical couldn't be
7     closed out?
8  A  I thought I did, correct.
9  Q  Had you explained to her how you came to the
10    recommendation of $80,000?
11 A  I did.
12 Q  I'm going to hand you what's been marked as
13    Exhibit 119.
14       MR. SUTTON: That's the June 1, 2012, letter,
15    Scott.
16       MR. HOYT: Yep.
17 BY MR. SUTTON:
18 Q  Bill, is this a letter that you wrote to Kim Duncan?
19 A  It is.
20 Q  Did the email on May 22nd cause you to write this
21    letter?
22 A  It did.
23 Q  Will you turn to the last page of the letter and
24    confirm that that's your signature?
25 A  It is.

Page 30

1  Q  Now, in this letter, on the first page, you write "Kim,
2     this letter is privileged as an attorney-client
3     communication. Your activity log is not and is
4     discoverable in a bad faith suit. Bear that in mind as
5     we work through these issues."
6        Did I read that correctly?
7  A  You did.
8  Q  Why did you write that?
9  A  I wrote that because I was concerned that there would
10    be a bad faith lawsuit and the claim notes, her claim
11    notes would be discoverable, and I was providing her
12    very sensitive information which, at least at that
13    point in time, wanted to be protected.
14 Q  Now, in the second paragraph of the letter on the first
15    page, starting Zurich 562 and continuing on to 563 --
16 A  I've got a different number.
17       MR. HOYT: Yeah.
18 BY MR. SUTTON:
19 Q  Excuse me. Wrong -- I flipped through the letters.
20    I'm sorry. 523, continuing on to 524. Sorry, guys.
21       So on the first paragraph of the letter,
22    continuing through the second full paragraph on
23    Zurich 524, are you again explaining why you
24    recommended $80,000 to settle the indemnity?
25 A  I did.

Page 31

1  Q  Then, starting on the third full paragraph, do you
2     switch to the issue of closing out the medicals?
3        (Pause.)
4  Q  Did you answer? I'm sorry. I didn't hear you Bill.
5  A  Where are you looking?
6  Q  Where it says "The medical issue is problematic."
7  A  I see it. I'm there.
8  Q  At this point in the letter, up through the remaining
9     aspect of the letter, are you addressing your concerns
10    about efforts to close out the medical?
11 A  I did.
12 Q  Will you please turn to Zurich 525. You write in the
13    first full paragraph "It will do us absolutely no good
14    to argue that he's at MMI and therefore treatment is
15    not warranted when that is not the law in South Dakota.
16    In fact, it would be dangerous to make that argument."
17       Did I read that correctly?
18 A  You did.
19 Q  When you wrote "In fact, it would be dangerous to make
20    that argument," what did you mean by that?
21 A  I thought that could be used against Zurich in a
22    subsequent bad faith lawsuit as trying to eliminate
23    further payment of medical benefits when medical
24    benefits were clearly owing.
25 Q  In the next paragraph of the letter, the last

Page 32

1  paragraph, you write at the beginning "Any settlement
2  in this case will not extinguish a potential bad faith
3  suit." Did I read that correctly?
4  A  You did.
5  Q  And at this point in time you still had not settled the
6     workers' compensation case, correct?
7  A  That's correct.
8  Q  So you knew at that point that the bad faith case
9     wasn't going to be released.
10 A  Correct.
11 Q  Why did you put that sentence in this letter to
12    Ms. Duncan?
13 A  Just to make it clear to her that we were not going to
14    be settling a bad faith lawsuit, or potential bad faith
15    lawsuit, as part of the work comp settlement.
16 Q  The next sentence, you write "If Drs. Lawlor and
17    Anderson believe that continued treatment is warranted,
18    then we do not want to attempt to negotiate a
19    settlement to close out the medical."
20       Why did you write that sentence?
21 A  Well, because I thought it was dangerous to do that,
22    and further on in the letter, I explain some of my
23    reasoning.
24 Q  I want to talk about that reasoning. Did you identify
25    three reasons why you thought it would be problematic

Page 37

1  A   Correct.
2  Q   In that email you're forwarding an email from
3      Dennis Finch to you; is that right?
4  A   That's right.
5  Q   Dennis Finch's email discusses his comments on the
6      draft settlement agreement arising from the comp claim;
7      is that right?
8  A   That's correct.
9  Q   Now, will you look down, about the sixth or seventh
10     line from the bottom of Dennis Finch's email where he
11     writes "The other part of paragraph 7 is the language
12     that reads: 'claims related to the handling and
13     processing of her claim for benefits.' We never
14     discussed that and there is no claim pending for that.
15     The case of Issac vs. State Farm, 522 NW 2nd 752, says
16     you cannot condition an offer to settle on release of
17     any bad faith claim."
18        First of all, did I read that correctly?
19 A   You did.
20 Q   Was Mr. Finch requesting changes in the language of the
21     settlement agreement to remove any release of claims
22     relating to handling or processing of claim for bad
23     faith?
24 A   He was.
25 Q   Did you agree to that change?

Page 38

1  A   Yes, I did.
2  Q   Why did you agree with it?
3  A   Because I never had any intention that the settlement
4      of the work comp would also settle or bar a subsequent
5      bad faith lawsuit.
6  Q   You forwarded that communication directly to
7      Cheryl Tague in its entirety, correct?
8  A   Correct.
9  Q   In that stack I believe there is an Exhibit 9. Will
10     you see if you can find that, please.
11 A   I have it.
12 Q   Do you recognize Exhibit 9?
13 A   I do.
14 Q   What is it?
15 A   It is the Compromise and Settlement Agreement settling
16     the work comp, approved by the Department of Labor.
17 Q   Will you turn to the page Bates-stamped Zurich 282.
18 A   I'm there.
19 Q   Is that your signature on the Compromise and Settlement
20     Agreement and Order of Approval?
21 A   It is.
22 Q   What is the date of your signature?
23 A   June 19, 2013.
24 Q   When we go back to Exhibit 16, the email that you had
25     with Cheryl Tague, what was the date of that email that

Page 39

1      you sent to Cheryl?
2  A   Where would I be looking?
3  Q   The top gray box.
4  A   June --
5  Q   I think it says June 15, 2013. Is that what you see,
6      Bill?
7  A   You're going to have to point that out to me.
8  Q   Right up here (indicating).
9  A   Okay. My hearing is going, and so is my eyesight.
10     Yes, June 15, 2013.
11 Q   So you sent this email to Ms. Tague forwarding Dennis
12     Finch's request that the language be changed before you
13     signed the settlement agreement, correct?
14 A   Correct.
15 Q   Do you know whether you had additional communications
16     with Ms. Tague between the time of that email and your
17     signing of the settlement agreement?
18 A   I don't think I had additional communication.
19 Q   When you signed this settlement agreement, did you
20     believe that you were authorized to do so by Zurich?
21 A   Right.
22 Q   What was your understanding about whether the agreement
23     reached by you on behalf of Zurich and Dennis Finch on
24     behalf of his client, the claimant, was intended to
25     apply to any future bad faith case?

Page 40

1  A   It was not intended to apply to any future bad faith
2      case.
3  Q   And if you had been subpoenaed to testify in any bad
4      faith trial and asked that question, would that have
5      been the testimony you would have provided?
6  A   It would have.
7  Q   In negotiating the terms of the release in the workers'
8      compensation case, were you intending to extinguish any
9      of the potential damages that may arise in the bad
10     faith proceedings?
11 A   No.
12        MR. HOYT: Objection. Vague.
13        THE WITNESS: No, I was not intending that.
14 BY MR. SUTTON:
15 Q   From your perspective and understanding what the terms
16     of the agreement was, was there any negotiation about
17     that certain elements of damage and bad faith were also
18     being released and extinguished in the settlement of
19     the comp case?
20        MR. HOYT: Same objection.
21        THE WITNESS: There was no discussion, and there
22     was certainly no intention on my part.
23 BY MR. SUTTON:
24 Q   Now, Bill, I want to switch gears a little bit and ask
25     you about some of your experience in defending bad