```
 1        IN THE UNITED STATES DISTRICT COURT
 2            DISTRICT OF SOUTH DAKOTA
 3                WESTERN DIVISION
 4   AMERICAN ZURICH              )
 5   INSURANCE COMPANY and         )
 6   ZURICH AMERICAN               )  5:20-CV-05026-KES
 7   INSURANCE COMPANY,            )
 8            Plaintiffs,          )
 9     vs.                         )
10   J. CRISMAN PALMER and         )
11   GUNDERSON, PALMER,            )
12   NELSON & ASHMORE, LLP,        )
13            Defendants.          )
14        The Video Recorded deposition of DAWN
15   WAGNER, called for examination pursuant to the
16   Rules of Civil Procedure for the United States
17   District Courts pertaining to the taking of
18   depositions, taken before Wendi L. Mirshak, for
19   the County of McHenry and State of Illinois, at
20   1800 East Golf Road, Schaumburg, Illinois, on
21   September 21, 2022, at the hour of
22   9:00 o'clock a.m.
23   Wendi L. Mirshak
24   License No:  084-003960
                                                1
```

```
 1   APPEARANCES:
 2
 3        PIA HOYT, LLC
 4        BY:  MR. SCOTT HOYT
 5        136 East South Temple
 6        Suite 1900
 7        Salt Lake City, Utah  84111
 8        (801)  350-9022
 9        shoyt@piohoyt.com
10             Representing the Plaintiffs;
11
12        BOYCE LAW FIRM, LLP
13        MR. JASON R. SUTTON
14        300 South Main Avenue
15        Sioux Falls, South Dakota  57104
16        (605)  336-2424
17        jrsutton@boycelaw.com
18             Representing the Defendants.
19
20
21   ALSO PRESENT:
22        Mr. John D'Andrea - videographer
23
24
                                                2
```

```
 1                  I N D E X
 2   WITNESS                         EXAMINATION
 3   DAWN WAGNER
 4     By MR. Sutton                      9
 5
 6
 7
 8
 9                E X H I B I T S
10   NUMBER                          MARKED FOR ID
11   Wagner Deposition
12
13     Exhibit No. 72                    31
14     Exhibit No. 73                    42
15     Exhibit No. 74                    45
16     Exhibit No. 75                    50
17     Exhibit No. 76                    51
18     Exhibit No. 77                    55
19     Exhibit No. 78                    64
20     Exhibit No. 79                    64
21     Exhibit No. 80                    64
22     Exhibit No. 81                    69
23     Exhibit No. 82                    69
24     Exhibit No. 83                    70
                                                3
```

```
 1                E X H I B I T S
 2   NUMBER                          MARKED FOR ID
 3   Wagner Deposition
 4
 5     Exhibit No. 84                    73
 6     Exhibit No. 85                    76
 7     Exhibit No. 86                    79
 8     Exhibit No. 87                    81
 9     Exhibit No. 88                    83
10     Exhibit No. 89                    88
11     Exhibit No. 90                    93
12     Exhibit No. 91                    95
13     Exhibit No. 92                   113
14     Exhibit No. 93                   119
15     Exhibit No. 94                   119
16     Exhibit No. 95                   125
17     Exhibit No. 96                   128
18     Exhibit No. 97                   128
19     Exhibit No. 98                   135
20     Exhibit No. 99                   136
21     Exhibit No. 100                  137
22     Exhibit No. 101                  138
23     Exhibit No. 102                  147
24     Exhibit No. 103                  147
                                                4
```

```
 1    Q.   Anything else you recall reviewing?
 2    A.   I may have looked at some
 3  correspondence that I received from Cris Palmer.
 4    Q.   Do you recall any of the specific
 5  correspondence that you looked at?
 6    A.   Just generally, our exchanges leading
 7  up to the mediation.
 8    Q.   Anything else you recall looking at in
 9  preparation for your deposition here today?
10    A.   Nothing more I can recall at this time.
11    Q.   Other than your attorney have you
12  spoken with anyone about being deposed here
13  today?
14    A.   No.
15    Q.   Are you the person within Zurich that
16  is the primary contact person for Mr. Hoyt in
17  handling the malpractice case against Cris
18  Palmer?
19    A.   Yes.
20    Q.   I want to switch gears just a little
21  bit, ask some questions about your background.
22    A.   Okay.
23    Q.   I know you are a lawyer, so I know you
24  graduated high school, but can you tell me where
                                                 13
```

```
 1  and when?
 2    A.   High school?
 3    Q.   Yeah.
 4    A.   I went --
 5    Q.   Just habit.
 6    A.   I went to James B. Conant High School
 7  in Hoffman Estates, Illinois.
 8    Q.   What's your undergraduate degree in?
 9    A.   Communications.
10    Q.   Where did you go to school?
11    A.   Western Illinois University.
12    Q.   Any other degree other than your law
13  degree that you obtained?
14    A.   No.
15    Q.   When did you attend law school?
16    A.   1993 through 1996.
17    Q.   What law school did you attend?
18    A.   Northern Illinois University College of
19  Law.
20    Q.   As we go along, I'm going to refer to
21  Zurich just generically instead of the -- the
22  specific entities.  So, if some reason it
23  matters whether it's, for instance, Zurich
24  America or any of the specific entities, let me
                                                 14
```

```
 1  know.  But my intent is just to refer
 2  generically as Zurich as the plaintiffs.
 3         Do you understand that?
 4    A.   Sounds good.
 5    Q.   When did you first start working for
 6  Zurich?
 7    A.   2002.
 8    Q.   Walk me through generally your
 9  employment history from when you graduated law
10  school in '96 up until when you started at
11  Zurich in 2002?
12    A.   Sure.  After graduation, but prior to
13  passing the bar, I got a position with John
14  Biestek and Associates in Arlington Heights,
15  Illinois.  I worked there for approximately a
16  year.  And then, I got a job downtown Chicago
17  for a firm by the name of Galvin, Lowery and
18  Meade.  I worked there for approximately a year.
19  And then, I worked for a law firm by the name of
20  Corbin and Matthews in Chicago, Illinois.
21  Again, for approximately a year.
22         And then, I joined a law firm by the
23  name of Querrey and Harrow.  That's
24  Q-U-E-R-R-E-Y and Harrow, H-R -- A-R-R-O-W.
                                                 15
```

```
 1  That was also in downtown Chicago.  And I worked
 2  there up until I began working for Zurich.
 3    Q.   During your time in private practice
 4  with those law firms, what was the nature of
 5  your practice?
 6    A.   John Biestek and Associates was a
 7  general practice, personal injury, family law,
 8  real estate.  Galvin, Lowery and Meade was
 9  in-house counsel for Warrior insurance company,
10  which is an automobile insurance carrier.
11  Corbin and Matthews was a plaintiff's personal
12  injury firm.  And Querrey and Harrow was an
13  insurance defense firm.
14    Q.   At the insurance defense firm Querrey
15  and Harrow, what types of files were you
16  handling?
17    A.   I was handling insurance defense work
18  for basically automobile defense.  Also did some
19  dental malpractice defense, medical malpractice
20  defense.
21    Q.   Before starting at Zurich, had you ever
22  appeared as counsel in a bad faith case?
23    A.   No.
24    Q.   Before starting at Zurich, have you --
                                                 16
```

```
 1    A.   Up until the year 2013.
 2    Q.   What was your next position within
 3  Zurich?
 4    A.   It was assistant general counsel in the
 5  corporate law department.
 6    Q.   How did your duties and
 7  responsibilities change in that position?
 8    A.   It changed because I left the claims
 9  department for corporate law.
10    Q.   And what types -- when you entered the
11  corporate law department, what were you doing on
12  a general day to day basis?
13    A.   When I first started in corporate law?
14    Q.   Sure.
15    A.   Handling cases that have been filed
16  against the company.
17    Q.   And that would be the company direct
18  Zurich rather than a claim against Zurich's
19  insureds; is that right?
20    A.   Correct.
21    Q.   Has your position within Zurich changed
22  since 2013?
23    A.   Yes.
24    Q.   When did it change next?
                                                  21
```

```
 1    A.   I think approximately the year 2017.
 2  I'm not positive, but I was promoted to
 3  vice-president, senior assistant general
 4  counsel.
 5    Q.   Did your duties and responsibilities
 6  change at that time?
 7    A.   That was mostly a -- a title change
 8  promotion.
 9    Q.   Are there any other times your position
10  has changed with Zurich up through today?
11    A.   Last year.
12    Q.   What was the change that occurred last
13  year?
14    A.   I was promoted to manager of a team of
15  paralegals.
16    Q.   Did your duties and responsibilities
17  within the company change?
18    A.   They -- it was added on to my current
19  responsibilities and now I have the oversight
20  function of managing paralegals that respond to
21  subpoenas that are issued to the company.
22    Q.   Now, based -- let me ask.  Strike that.
23  Let me start over.
24         Were you involved directly at any time
                                                  22
```

```
 1  with the workers' compensation claim that
 2  Mr. Leichtnam asserted that formed the basis for
 3  the bad faith case?
 4    A.   At any time?
 5    Q.   Let me ask it this way.
 6         Prior to the commencement of the bad
 7  faith case, were you involved?
 8    A.   No.
 9    Q.   And the bad faith case, so we are on
10  the same page, you and I both know is the -- the
11  bad faith case that Mr. Leichtnam asserted
12  against Zurich in which Cris Palmer is
13  defending, at least initially; is that right?
14    A.   Yes.
15    Q.   Would you agree that that's -- that's
16  what I'm referring to when I say the bad faith
17  case.
18         How about we say it that way?
19    A.   Okay.
20    Q.   During the bad faith case, although
21  your title may have changed, did your duties and
22  responsibilities within Zurich, were they
23  always, as you described them, in from
24  the assistant general counsel and corporate law
                                                  23
```

```
 1  department, the handling of the direct claims, I
 2  guess?
 3    A.   Yeah, that's remained the same.
 4    Q.   Originally I'll represent to you that
 5  the bad faith case was commenced in this case --
 6  or it was commenced in South Dakota in March
 7  of 2015.
 8         At that time do you recall to whom you
 9  reported?
10    A.   Yes.
11    Q.   Who was that?
12    A.   Bill Peterson.
13    Q.   What was Mr. Peterson's position?
14    A.   I don't recall his title.  Maybe
15  associate general counsel.  I don't recall.
16    Q.   In 2015 do you know how many lawyers
17  there were within the general counsel office of
18  Zurich?  Give me an estimate.
19    A.   Approximately between 20 and 30.
20    Q.   And can you give me an estimate on how
21  many of those corporate law attorneys directly
22  handled claims against the company?
23    A.   Four.
24    Q.   The four that were involved, were all
                                                  24
```

**Page 29**

1   A.  No.
2   Q.  From 2015 to 2020 did you personally
3   believe that there were any limits on your
4   authority to resolve a claim against the
5   company, I mean, dollar limits?
6   A.  I would need to have that discussion
7   with the internal stakeholder for authority.
8   Q.  Why would you have to have that
9   discussion with the internal stakeholder for
10  authority?
11  A.  That was the process.
12  Q.  Do you know, for -- for instance,
13  budgeting or reporting purposes, if those claims
14  affected in our example the workers'
15  compensation division of Zurich?  Do you know
16  how that's reported internally?
17  A.  I don't know.
18  MR. HOYT:  Objection.  Vague as to affected.
19  THE WITNESS:  Sorry.  I don't know.
20  BY MR. SUTTON:
21  Q.  Do you have any understanding as to why
22  the process required you to get authority from
23  the stakeholders as you described it?
24  A.  Why?

**Page 30**

1   Q.  Yeah.
2   A.  That was just the process.
3   Q.  So, ultimately, who made the decision
4   on whether to authorize a settlement in that
5   2015 to 2020 time frame?
6   A.  On the Leichtnam case?
7   Q.  Sure.  We will use that as an example.
8       Whose call is that?
9   A.  The chief claims officer.
10  Q.  Do you know who that was at the time?
11  A.  Steve Hatch.
12  Q.  Is he still employed with Zurich, if
13  you know?
14  A.  No, he's not.
15  Q.  Do you know when he left?
16  A.  I don't know.
17  Q.  Do you have any idea where he is,
18  either employed or retired now, do you know
19  where he is?
20  A.  I have no idea.
21  MR. SUTTON:  I've got 72 as our next one.
22  Yeah, that's right.  Next to the witness, you're
23  the most important person in the room.
24

**Page 31**

1       (Whereupon, Wagner Deposition
2        Exhibit No. 72 was marked for
3        identification.)
4   BY MR. SUTTON:
5   Q.  Ms. Wagner, I've handed you Exhibit 72,
6   which for the record is Zurich 2.  And then a
7   separate Bates No. 2990.
8       Do you see that?
9   A.  I do.
10  Q.  Looking at this e-mail, is this the
11  e-mail that originally assigned the bad faith
12  case to Cris Palmer and the Gunderson Palmer law
13  firm?
14  A.  I believe so.
15  Q.  Looking at the bottom of Zurich 2990,
16  the e-mail is originally from a Demetrius Rush.
17      Do you know who Mr. Rush was?
18  A.  It's my co-worker.
19  Q.  And then, you indicate up above that
20  you are going to be handling this case instead
21  of Demetrius as indicated in the e-mail on
22  March 20th at 3:22 p.m.; is that right?
23  A.  Yes.
24  Q.  Do you know why it was reassigned from

**Page 32**

1   Mr. Rush to you?
2   A.  I don't know if it was reassigned.
3   Q.  Do you know why Mr. Rush sent out the
4   original engagement request?
5   A.  I think because he knew Cris Palmer.
6   Q.  Before this engagement had you ever had
7   any experience with Mr. Palmer?
8   A.  No.
9   Q.  Before this engagement had you any
10  experience with the Gunderson Palmer law firm?
11  A.  No.
12  Q.  Had you any experience with any lawyers
13  in South Dakota?
14  A.  I think I had maybe one other case in
15  South Dakota, but I don't recall the name of the
16  firm or the attorney.
17  Q.  Do you know whether that case was a bad
18  faith case?
19  A.  I think it was.
20  Q.  Do you recall who plaintiff's counsel
21  was?
22  A.  No.
23  Q.  Okay.  Before this bad faith case did
24  you ever have any opportunity to have any

**Page 45**

1 developments that you are relying on to indicate
2 that you needed to be provided a draft of the
3 answer ahead of time?
4  A. Those drafts should be transmitted in
5 time for a corporate law attorney to provide
6 substantive comments and purpose -- and propose
7 meaningful revisions.
8  Q. Is that the only language in any
9 document that you are aware of in which you
10 requested that a draft to the answer be provided
11 to you prior to its filing?
12  A. Well, I think there's general
13 references in the paragraph above regarding
14 timely notifying of new pleadings and motions.
15  Q. Other than the billing guidelines, are
16 you aware of any communication to the Gunderson
17 Palmer law firm requesting that you be provided
18 a draft of the answer prior to its filing?
19  A. Not that I recall.
20       (Whereupon, Wagner Deposition
21        Exhibit No. 74 was marked for
22        identification.)
23 BY MR. SUTTON:
24  Q. Ms. Wagner, you've been handed --

**Page 46**

1 handed -- excuse me -- Exhibit 74, which is
2 Bates stamped GPNA 4227.
3       This is an e-mail from Kristi Wood to
4 you on April 30, 2015; is that right?
5  A. Yes.
6  Q. And did you receive this e-mail?
7  A. I believe so.
8  Q. Any reason to dispute you received it?
9  A. No.
10  Q. Now, looking at the e-mail, Ms. Wood
11 indicates, attached is a copy of Cris Palmer's
12 correspondence to plaintiff's counsel regarding
13 inquiry on stipulating to dismiss Zurich NA, is
14 the first sentence; is that right?
15  A. Yes.
16  Q. And then, it also says, also attached
17 is a copy of the answer we filed this afternoon;
18 is this right?
19  A. Yes.
20  Q. And when you look up at the attachment
21 section, there's a -- in the first line at the
22 end, there's an answer, dot, PDF; is that right?
23  A. Yes.
24  Q. Did you review the answer when you

**Page 47**

1 received this e-mail?
2  A. I don't recall.
3  Q. Would it have been your standard
4 practice to review the pleadings when you
5 received them?
6  A. It depends.
7  Q. What does it depend on?
8  A. Depends on prior discussions, e-mail
9 exchanges.
10  Q. Do you recall whether there were any
11 discussions or e-mail exchanges in the
12 Leitchtnam case that would have caused you to
13 not review the answer?
14  A. Because my general practice is that I
15 expect my attorneys to follow our guidelines and
16 send me drafts before they are filed.
17  Q. You understood you had not reviewed a
18 draft of this before it was filed, correct?
19  A. I didn't recall if I did or not at this
20 time.
21  Q. How many files were you handling at
22 that time?
23  A. I don't recall.
24  Q. Can you give me an estimate?

**Page 48**

1  A. Forty to 50.
2  Q. Based upon your time as a private
3 practice lawyer, did you understand that there
4 was a period of time in which the answer could
5 be amended even without leave of court or
6 agreement of the parties?
7  A. I think it depends on jurisdiction.
8  Q. This case was pending in federal court;
9 is that right?
10  A. Yes, I believe so.
11  Q. And did you understand that at that
12 time under the Federal Rules of Civil Procedure
13 that the answer could be amended for 21 days
14 automatically regardless of whether there was
15 leave of court or permission of the other party?
16  A. I mean the rules say what they are.
17  Q. Do you remember if you ever reviewed
18 the answer in this case?
19  A. I remember reviewing the answer after
20 retaining Hinshaw.
21  Q. Before that do you believe you ever
22 reviewed the answer?
23  A. I don't recall.
24  Q. Before the engagement of the Hinshaw

**Page 49**

1  firm in this case, did you ever have a
2  discussion with Cris Palmer in which you
3  inquired why he had not asserted a duty for
4  affirmative defenses in the answer?
5      A.   I don't recall having that discussion.
6      Q.   Would that be something you would
7  expect you would recall?
8      A.   Not necessarily.
9      Q.   Have you ever been to South Dakota?
10     A.   Yes.
11     Q.   When?
12     A.   For the mediation in this case.
13     Q.   Other than the mediation in this case,
14  have you ever been there?
15     A.   No.
16     Q.   And I meant to ask this at the
17  beginning, I forgot, so I apologize.
18          What states are you licensed?
19     A.   Illinois.
20     Q.   Have you ever been licensed in any
21  other jurisdictions other than Illinois?
22     A.   No.
23     Q.   Are you licensed -- have you been
24  licensed in federal court?

**Page 50**

1      A.   Yes.
2      Q.   I assume in the district of Illinois?
3      A.   Yes.
4      Q.   I won't break them down.
5      THE REPORTER:  Seventy-five.
6          (Whereupon, Wagner Deposition
7          Exhibit No. 75 was marked for
8          identification.)
9  BY MR. SUTTON:
10     Q.   Ms. Wagner, you've been handed
11  Exhibit 75.
12     A.   Yes.
13     Q.   And this is an e-mail from Beth Young
14  to you dated Monday, August 3, 2015; is that
15  right?
16     A.   Yes.
17     Q.   And do you understand that Beth Young
18  is a paralegal in the Gunderson Palmer law firm?
19     A.   That's what it says, yes.
20     Q.   In this e-mail, Ms. Young indicates to
21  you that attached is a letter from Cris and a
22  copy of plaintiff's first set of requests for
23  production of documents; is that right?
24     A.   Yes.

**Page 51**

1      MR. SUTTON:  Look at that airmail.
2      THE REPORTER:  Seventy-six.
3      MR. SUTTON:  Thank you.
4      MR. HOYT:  Seventy-six.
5      THE WITNESS:  Yeah, thank you.
6          (Whereupon, Wagner Deposition
7          Exhibit No. 76 was marked for
8          identification.)
9  BY MR. SUTTON:
10     Q.   And Ms. Wagner, if you look at
11  Exhibit 76, that letter is dated August 3, 2015,
12  from Cris Palmer to you; is that right?
13     A.   Yes.
14     Q.   So, Exhibit 76 is the attachment to
15  Exhibit 75.
16          Do you agree with that?
17     A.   Yes.
18     Q.   Looking at Exhibit 76, in the second
19  sentence of the first paragraph Cris Palmer
20  writes, there's several requests that may seem
21  broad.  However, my experience in this
22  jurisdiction is that the court shows great
23  leniency during the discovery process.
24          Did you -- or did I read that

**Page 52**

1  correctly?
2      A.   You read that correctly.
3      Q.   And in fairness, I mean throughout the
4  time that Cris was representing Zurich he was
5  telling you repeatedly that South Dakota law --
6  allows incredibly broad scope of discovery in
7  bad faith proceedings?
8      A.   He -- he mentioned that, yes.
9      Q.   From your perspective in handling
10  claims against the company, what is the
11  significance of a court allowing very broad
12  discovery?
13     MR. HOYT:  Objection.  Overbroad.  Vague.
14  Incomplete.
15     THE WITNESS:  It depends.
16  BY MR. SUTTON:
17     Q.   Is it significant to you?
18     A.   It could be.
19     Q.   In the Leichtnam case was it
20  significant to you?
21     A.   It was.
22     Q.   And why was it significant?
23     A.   Because I paid a lot in defense costs
24  due to the liberal discovery process.

**Page 69**

1 protective order; is that right?
2    A.   Yes.
3    Q.   Would you please turn to Exhibit 80.
4 Exhibit 80 is a letter from Mike Abourezk to
5 Cris Palmer dated September 23, 2015. Is this
6 right?
7    A.   Yes.
8    Q.   And it is Bates stamped Zurich 3168,
9 which means that it came from your files in this
10 malpractice action, that's what the Zurich two
11 means, rather than produced in the underlying
12 bad faith case.
13         Do you know how you received a copy of
14 this letter?
15    A.   I don't know.
16    Q.   Do you know whether you reviewed it?
17    A.   I don't recall.
18    Q.   Okay.
19 MR. SUTTON: What number are we at?
20 THE REPORTER: Eighty-one.
21         (Whereupon, Wagner Deposition
22          Exhibit Nos. 81-82 were marked
23          for identification.)
24

**Page 70**

1 BY MR. SUTTON:
2    Q.   Ms. Wagner, you've been handed
3 Exhibit 81, which is an e-mail from Beth Young
4 to you dated September 23, 2015; is that right?
5    A.   Yes.
6    Q.   And in the e-mail Ms. Young indicates
7 that she is -- that, quote, attached is a letter
8 from Cris outlining what discovery items are
9 still needed, close quote.
10         Did I read that correctly?
11    A.   Yes.
12    Q.   And will you look at Exhibit 82,
13 please.
14         Is this a letter from Cris Palmer to
15 you dated September 23, 2015?
16    A.   Yes.
17    Q.   Will you just confirm that Exhibit 82
18 is a true and accurate copy of the attachment in
19 Exhibit 81?
20    A.   Yes.
21         (Whereupon, Wagner Deposition
22          Exhibit No. 83 was marked for
23          identification.)
24

**Page 71**

1 BY MR. SUTTON:
2    Q.   Exhibit 83, when we look at Zurich
3 3176, the second page, that's the original
4 e-mail from Beth Young to you, which was
5 Exhibit 81 we just looked at; is that right?
6    A.   Yes.
7    Q.   And Exhibit 83, is this your responsive
8 e-mail on the first page?
9    A.   Yes.
10    Q.   Looking at your responsive e-mail, you
11 write, quote, I am unable to provide the
12 personnel files absent a court order, therefore,
13 we should be objecting to number two, number
14 four and number five.
15         Did I read that correctly?
16    A.   Yes.
17    Q.   What was your basis for saying that you
18 could not provide those personnel files without
19 a court order?
20    A.   Privacy concerns.
21    Q.   Were those privacy concerns -- was that
22 based upon internal Zurich policy or is that a
23 separate independent legal basis you are
24 referring to?

**Page 72**

1    A.   I mean, I need to protect information
2 about our employees, so we have privacy concerns
3 and I'm sure we have protocols within Zurich
4 that protect against that.
5    Q.   Do you recall whether you went back and
6 looked at those specific protocols?
7    A.   I think I already knew them.
8    Q.   Is there a formal written policy within
9 Zurich that prohibits the production of those
10 files without a court order at that time?
11    A.   Not related to litigation.
12    Q.   The formal policy prohibiting
13 disclosure of those orders, when is it -- or
14 strike that. Let me start over.
15         The policy -- what does the policy say
16 as to when personnel files could not be produced
17 without a court order?
18    A.   It's not related to litigation. It's
19 just general privacy concerns about personal
20 identifying information about our employees.
21    Q.   Was it Zurich's practice at that time
22 that it would not produce personnel files in
23 litigation without a court order?
24    A.   I don't know if it was -- there was --

**Page 73**

1  I don't think there was a policy.
2     Q.   Was it your practice at that time?
3     A.   I -- I don't know if I describe it as a
4  practice because each case is different.
5     Q.   So, when you say, I'm unable to provide
6  the personnel files absent a court order, is
7  that just based on general privacy concerns?
8     A.   Yes and the discovery request that were
9  sent on this case.
10    Q.   Can you identify for me any specific
11 legal basis that would prohibit the disclosure
12 of that information in litigation?
13    A.   Yes, there's lots of case law that
14 protects personnel files being produced in
15 litigation.
16    THE REPORTER: Eighty-four.
17    THE WITNESS: Thank you.
18            (Whereupon, Wagner Deposition
19            Exhibit No. 84 was marked for
20            identification.)
21 BY MR. SUTTON:
22    Q.   Exhibit 84 is Bates stamped Zurich 3185
23 through 3200; is that correct?
24    A.   Yes.

**Page 74**

1     Q.   And this is a letter from Cris Palmer
2  to you dated September 24, 2015?
3     A.   Yes.
4     Q.   This letter in the first sentence of
5  the paragraph Cris writes, thank you for your
6  sent e-mail; is that right?
7     A.   Yes.
8     Q.   So, is this letter, Exhibit 84, the
9  responsive letter to your e-mail, which is
10 Exhibit 83, written on the same day?
11    A.   I assume.
12    Q.   In the first paragraph, the second
13 sentence, Cris writes, quote, the one thing I do
14 want to express my concern about is with regard
15 to the personnel files. I am almost a hundred
16 percent certain that Judge Viken will make you
17 produce those personnel files, close quote.
18            Did I read that correctly?
19    A.   You did.
20    Q.   Before the Leichtnam case, had you
21 handled any other cases that you can recall that
22 were pending before District Court Judge Viken
23 in Rapid City?
24    A.   Not that I recall.

**Page 75**

1     Q.   Looking down at the third paragraph
2  Cris writes, I've been involved in many bad
3  faith cases in South Dakota's federal courts and
4  all of our judges based on the history of bad
5  faith cases here routinely make carriers produce
6  the personnel files.
7             Did I read that correctly?
8     A.   You read that correctly.
9     Q.   And then at the end of that paragraph
10 Cris writes, quote, as I think I have expressed
11 to you in the past, and if I have, I apologize,
12 I'm going to do it again, that I hate to have
13 cases start out with discovery disputes knowing
14 we are not going to prevail. It can set a bad
15 tone for the case.
16            Did I read that correctly?
17    A.   You read that correctly.
18    Q.   Based upon your handling of litigation
19 files against Zurich, do you disagree with
20 Attorney Palmer's -- well, strike that. Never
21 mind. Withdraw the question.
22            If you turn to Zurich 3186. With
23 regard to Request 16, we will certainly follow
24 up on your thoughts here. The other thing I

**Page 76**

1  want to do -- want to share with you with regard
2  to newsletters and bad faith litigation with
3  other carriers, we have sometimes had upwards of
4  10,000 pages of newsletters produced so we may
5  have to work to show it is burdensome.
6             Is that what Mr. Palmer told you
7  regarding the production of the newsletters?
8     A.   That's what this says.
9     Q.   And I realize there's a copying error
10 on at least my version of Exhibit 84. 84 should
11 be two pages, Zurich 381 [sic] to 3816.
12            The original exhibits that you have,
13 Ms. Wagner, do they continue past 3816?
14    A.   Yes.
15    Q.   Will you please remove the back pages
16 of that exhibit.
17    THE REPORTER: Eighty-five.
18            (Whereupon, Wagner Deposition
19            Exhibit No. 85 was marked for
20            identification.)
21 BY MR. SUTTON:
22    Q.   Ms. Wagner, you've been handed
23 Exhibit 85, which is Zurich 3217 through 3220.
24            Looking at the bottom of Page 85,

**Page 81**

1 leave in the objections.
2    Is that what she wrote to you?
3    A.   That's what she wrote, yes.
4    Q.   And then, in the next sentence, she
5 advises you that she expects that, quote,
6 plaintiff's counsel will very likely respond
7 immediately with a request to confer, which
8 precedes a motion to compel if the parties
9 remain at odds, close quote.
10    Did I read that correctly?
11    A.   You did, yes.
12    Q.   And so, you understood that if you
13 remain on those objections, your lawyers were
14 anticipating a motion to compel would be
15 possible?
16    A.   That's what she said. If they couldn't
17 come to some other agreement, it looks like.
18        (Whereupon, Wagner Deposition
19        Exhibit No. 87 was marked for
20        identification.)
21 BY MR. SUTTON:
22    Q.   Exhibit 87 is an e-mail chain. The
23 oldest e-mail of which is an e-mail from Beth
24 Young to you copying Jennifer Hover on

**Page 82**

1 October 1st, 2015 at 8:53 a.m.; is that right?
2    A.   Yes.
3    Q.   And in that e-mail from Ms. Young,
4 she's providing you a draft of the responses to
5 the written discovery; is that right?
6    A.   Yes.
7    Q.   Do you -- you write a responsive e-mail
8 on October 1 at 9:52 a.m.; is that right?
9    A.   Yes.
10    Q.   And you indicate, quote, I've had a
11 chance to review the personnel files of Jason
12 Suttler, Kim Duncan, and Amy Mueller, who were
13 the claims handlers and supervisor at the time
14 of the allegations contained in the plaintiff's
15 complaint, open paren, 2009 and 2012, close
16 paren. Perhaps we could include partial
17 personnel files which include performance
18 evaluations.
19    Is that what you wrote?
20    A.   That's what I wrote.
21    Q.   At this time on October 1st of 2015,
22 were you in agreement providing at least
23 portions of the personnel files to plaintiff's
24 counsel in response to discovery?

**Page 83**

1    A.   I believe so.
2    Q.   And no court had ordered the production
3 of those documents at that time, correct?
4    A.   That's correct.
5        (Whereupon, Wagner Deposition
6        Exhibit No. 88 was marked for
7        identification.)
8 BY MR. SUTTON:
9    Q.   Exhibit 88 is a letter from Jana Smoot
10 White to Mike Abourezk and Mike Simpson dated
11 October 2, 2015, that you received a copy of; is
12 that right, Ms. Wagner?
13    A.   Yes.
14    Q.   And with this letter Ms. Smoot White is
15 serving the responses to the written discovery
16 along with some discovery documents; is that
17 right?
18    A.   Yes.
19    Q.   And she writes that those documents,
20 quote, are being produced under the cover of the
21 protective order, which I have signed, close
22 quote.
23    Did I read that correctly?
24    A.   Yes, you read that correctly.

**Page 84**

1    Q.   Are you aware of any evidence
2 indicating that any of the confidential
3 documents produced by Zurich in the bad faith
4 case were ever used in contravention of the
5 protective order that was entered?
6    A.   Can you repeat that?
7    MR. SUTTON: Can you read it back.
8        (Whereupon, the record was read
9        as requested.)
10    THE WITNESS: I don't know.
11 BY MR. SUTTON:
12    Q.   As part of this malpractice action, is
13 Zurich alleging that the Gunderson Palmer law
14 firm made a mistake in producing documents prior
15 to the entry of protective order?
16    A.   I believe there's allegations of
17 general breach of fiduciary duty.
18    Q.   And as part of those allegations of
19 breach of fiduciary duty, is Zurich claiming
20 that the Gunderson Palmer law firm breached its
21 duty by producing documents prior to the entry
22 of a protective order?
23    A.   I'm not sure if I understand that
24 question.

**Page 85**

1  Q. Do you understand what the allegations
2  are that Zurich is using to form the basis for
3  its breach of fiduciary duty claims?
4  A. I do.
5  Q. And do those include a claim that
6  Gunderson Palmer should not have produced any
7  documents until after the judge entered the
8  protective order?
9  A. That would be covered under the general
10 allegations that we assert under breach of
11 fiduciary duty.
12 Q. So, that is a claim that you are
13 asserting in this case -- Zurich is asserting,
14 correct?
15 A. It could be.
16 Q. All right. Is it a claim that Zurich
17 is asserting in this case?
18 MR. HOYT: Well, Counsel, the pleadings will
19 speak to what the claim is.
20 THE WITNESS: Yeah.
21 BY MR. SUTTON:
22 Q. Do you know whether that form -- that
23 factual basis forms any aspect of what Zurich is
24 in fact claiming in this case?

**Page 86**

1  A. I don't understand that question.
2  Q. As part of the lawsuit that Zurich has
3  brought against Gunderson Palmer, are one of the
4  allegations of breach of fiduciary duty that
5  Gunderson Palmer was -- made a mistake in
6  producing documents before the protective order
7  was entered? Is that a claim or not?
8  A. As I stated before, there's general
9  allegations of breach of fiduciary duty
10 contained in the complaint that could encompass
11 those types of acts.
12 Q. Do you know whether they encompass
13 that -- that factual basis forms part of your
14 claim for breach of fiduciary duty?
15 A. I recall that Cris Palmer did turn over
16 a document during discovery that I believe
17 Abourezk flagged as confidential.
18 Q. Are you referring to the production of
19 the document that contained some attorney-client
20 privilege information?
21 A. I believe so.
22 Q. And so -- and I want to make sure that
23 I understand. So, are there any other documents
24 that you are aware of that were produced that

**Page 87**

1  form the factual basis for your claims of breach
2  fiduciary duty in this case?
3  A. That's a broad question. I can't
4  answer that the way that's -- that's asked.
5  Q. Other than the production of documents
6  that contained potential attorney-client
7  privilege information, is there any other aspect
8  of the production of the discovery that forms a
9  factual basis for Zurich's breach of fiduciary
10 duty claims?
11 MR. HOYT: Can I hear that back?
12         (Whereupon, the record was read
13         as requested.)
14 MR. HOYT: I'm going to object as vague,
15 overbroad, and incomplete.
16 THE WITNESS: I can't think of anything right
17 now.
18 BY MR. SUTTON:
19 Q. Is there anyone else within Zurich that
20 would be in a better position than you to
21 articulate the factual basis for the allegations
22 against the Gunderson Palmer law firm in this
23 case?
24 A. My attorney.

**Page 88**

1  Q. Within Zurich as an entity, rather than
2  your attorney?
3  A. No.
4         (Whereupon, Wagner Deposition
5         Exhibit No. 89 was marked for
6         identification.)
7  BY MR. SUTTON:
8  Q. Ms. Wagner, do you have Exhibit 89 in
9  front of you?
10 A. I do.
11 Q. Exhibit 89 is a letter from Cris Palmer
12 to you dated September 25, 2015; is that right?
13 A. Yes.
14 Q. And this is the same time that you are
15 also working with the Gunderson Palmer law firm
16 and responding to the written discovery; is that
17 right?
18 A. Yes.
19 Q. In Exhibit 89, attorney Palmer
20 references a, enclosed please find a letter that
21 I received from Mike Abourezk; is that right?
22 A. Yes.
23 Q. I'm going to hand you, maybe, what was
24 previously marked as Exhibit 19.

**Page 93**

1  when to just summarize the recommendation for
2  the management?
3     A.   If it was requested.
4     Q.   Before the Leichtnam case, had you
5  handled other bad faith cases with the head of
6  claims at that point in time?
7     A.   I'm not sure.
8     Q.   Do you know whether he would be --
9  whether he had in the past requested that the
10 actual summary letter from the lawyer be
11 forwarded?
12    A.   I'm not sure.
13 THE REPORTER: Ninety.
14 MR. SUTTON: Thank you.
15       (Whereupon, Wagner Deposition
16       Exhibit No. 90 was marked for
17       identification.)
18 BY MR. SUTTON:
19    Q.   Ms. Wagner, I've handed you Exhibit 90,
20 which is Bates stamped Zurich 3318 to 3319.
21       Is this a letter that -- from attorney
22 Palmer to you on November 24, 2015?
23    A.   Yes.
24    Q.   And in this letter in the first

**Page 94**

1  sentence, attorney Palmer encloses a copy of a
2  decision from Judge Duffy regarding recent
3  discovery disputes in a bad faith case, correct?
4     A.   Correct.
5     Q.   Do you recall -- did you -- did you
6  read this letter when you received it?
7     A.   I'm sure I did.
8     Q.   Would you have read the decision that
9  was provided with it?
10    A.   Perhaps. I'm sure I over viewed it.
11    Q.   In the first paragraph, attorney Palmer
12 says, quote, as I've told you, it doesn't work
13 out well for defendants and this is just the
14 recent look at it.
15       Is that what he wrote?
16    A.   That's what he wrote.
17    Q.   And he's talking about the scope of
18 discovery in South Dakota, correct?
19    A.   Yes.
20    Q.   He then indicates in the second
21 paragraph, quote, in trying to value these
22 cases, it gets to be a point where there is a
23 large major, the dollar payment that you can
24 tolerate to get rid of the thing, close quote.

**Page 95**

1        Did I read that correctly?
2     A.   You read that correctly.
3     Q.   And the last paragraph, he's reminding,
4  again, discovery is going to be painful and
5  expensive; isn't he?
6     A.   You are, again, reading that correctly.
7        (Whereupon, Wagner Deposition
8        Exhibit No. 91 was marked for
9        identification.)
10 BY MR. SUTTON:
11    Q.   Ms. Wagner, you've been handed
12 Exhibit 91, which is a letter dated December 14,
13 2015, from Cris Palmer to you; is that right?
14    A.   Yes.
15    Q.   And in that letter, Mr. Palmer
16 indicates that he is enclosing a, quote,
17 lengthy, close quote, response I received from
18 Mike Abourezk regarding our discovery responses;
19 is that right?
20    A.   Yes.
21    Q.   And he indicates that that's a meet and
22 confer letter that was anticipated?
23    A.   Is that how he categorized? If
24 that's --

**Page 96**

1     Q.   He didn't. Let me --
2     A.   -- what it says, then I'm sure that's
3  what --
4     Q.   Here is exactly what he said. Quote,
5  this would be the equivalent of what I would
6  call a true and meet confer, close quote.
7        Did I read correctly?
8     A.   Yes.
9     Q.   And you understand as a lawyer that
10 meet and confer is the first step for pursuing a
11 motion to compel, correct?
12    A.   It's a step in the discovery process,
13 correct.
14    Q.   And a motion to compel would be when a
15 party goes to the court and asks that the other
16 side be required to provide information that
17 they have not yet provided; is that a fair
18 summary?
19    A.   Yes.
20    Q.   Now, will you please -- I'm going to
21 hand you -- excuse me, what was previously
22 marked as Exhibit 44.
23 THE VIDEOGRAPHER: Counsel, your microphone
24 is falling.

**Page 125**

1   Q.   I'm sorry.
2   A.   The one that we --
3   Q.   Exhibit 92.
4   A.   The one that we called back?
5   Q.   Yes.
6        Is that the same meeting?
7   A.   Yes.
8   Q.   Okay.
9            (Whereupon, Wagner Deposition
10               Exhibit No. 95 was marked for
11               identification.)
12  BY MR. SUTTON:
13  Q.   Exhibit 95 is a letter from Cris Palmer
14  to you dated March 15, 2016; is that right,
15  Ms. Wagner?
16  A.   It is.
17  Q.   And in this letter, in the first
18  sentence, Cris writes, I'd like to visit with
19  you about settling this case and how to approach
20  the settlement offer?
21  A.   Yes.
22  Q.   Did you receive that letter?
23  A.   Yes.
24  Q.   And did you read it when you received

**Page 126**

1   it?
2   A.   I'm sure I did.
3   Q.   I'm going to hand you what's previously
4   been marked as Exhibit 25. This is a letter
5   from Cris Palmer to you dated April 6 [sic],
6   2016; is that right?
7   A.   No.
8   Q.   And did you receive this letter?
9   A.   Yes.
10  Q.   And I assume you read it when you
11  received it?
12  A.   Yes.
13  Q.   Now, in the second sentence of this
14  letter, Cris writes, although I have had the
15  best success in the past dealing with Mike
16  Abourezk on a one-on-one basis, based on our
17  discussions and your thoughts with regard to
18  evaluating the claim, I'm thinking maybe it
19  makes more sense in this setting to see if he's
20  willing to mediate this matter.
21       Did I read that correctly?
22  A.   Yes.
23  Q.   And then in the second paragraph, he
24  says, I sense from our conversations that you

**Page 127**

1   would be more comfortable in a mediation setting
2   and I can certainly live with that.
3        Did I read that correctly?
4   A.   Yes.
5   Q.   Now, a minute ago you testified that
6   you thought that it was attorney Palmer that had
7   recommended mediation.
8        Does Exhibit 25 refresh your
9   recollection as to who was -- or whether you
10  preferred mediation versus a direct counteroffer
11  approach to resolution?
12  A.   So based upon this letter, it looks
13  like we talked about different approaches and in
14  the first paragraph is where he's recommending
15  the mediation setting and the second paragraph,
16  he's referencing that during our conversation
17  that I was leaning towards a mediation setting
18  as well.
19  Q.   One of the approaches that you could
20  have taken in response to attorney Abourezk is
21  to just make a direct counteroffer rather than
22  in a mediation setting; is that right?
23  A.   That's an option, yes.
24  Q.   Do you recall as you sitting here

**Page 128**

1   whether you personally had a preference for
2   negotiating through a mediation versus making a
3   direct counteroffer?
4   A.   I was relying on Cris Palmer's
5   recommendations and our discussions, but more
6   typically in cases most attorneys prefer a
7   mediation setting.
8   Q.   Do -- did you have a preference?
9   A.   I'm open to any options to try and
10  resolve a case.
11           (Whereupon, Wagner Deposition
12               Exhibit Nos. 96-97 were marked
13               for identification.)
14
15  BY MR. SUTTON:
16  Q.   Ms. Wagner, you've been handed
17  Exhibit 96, which is an e-mail exchange Bates
18  stamped Zurich 3494, 3495. Looking at the
19  bottom e-mail, which is from Kristi Wood to you,
20  dated April 8, 2016, will you just please
21  confirm that that's the e-mail that attaches
22  Exhibit 25?
23  A.   Twenty-five, yes.
24  Q.   And then on April 11, 2016, you write

```
 1  back indicating you agree with the plan,
 2  correct?
 3     A.   Yes.
 4     Q.   Will you look at Exhibit 97, please.
 5     A.   Yes.
 6     Q.   Exhibit 97 is a letter from attorney
 7  Palmer to you dated June 10, 2016; is this
 8  right?
 9     A.   Yes.
10     Q.   And he indicates in the first paragraph
11  he's going to follow up about getting the
12  mediation scheduled, correct?
13     A.   Yes.
14     Q.   And then in the second paragraph, he
15  writes, quote, I do want you to know that he
16  just tried a bad faith case against Travelers
17  last week, and got an underlying verdict of
18  950,000 and 2.75 in punitive damages; is that
19  correct?
20     A.   You read that correct.
21     Q.   And did you understand the 2.75 to be
22  2.75 million?
23     A.   Yes.
24     Q.   Now, there was a mediation that
                                                129
```

```
 1  occurred; is that right?
 2     A.   Eventually.
 3     Q.   And -- and that was in October of 2016,
 4  correct?
 5     A.   Yes.
 6     Q.   Did you travel to Rapid City for that
 7  mediation?
 8     A.   I did.
 9     Q.   At any time prior to the mediation, did
10  you instruct attorney Palmer to send discovery
11  to Mr. Leichtnam?
12     A.   Outside of the guidelines, I don't
13  recall a specific e-mail.
14     Q.   Do you recall having any discussions
15  with attorney Palmer that it would be helpful to
16  have pending discovery for leverage purposes at
17  the mediation?
18     A.   To be honest, I assumed he had sent
19  them.
20     Q.   In other instances, have you had
21  conversation with defense counsel that you want
22  to send discovery in order to apply pressure on
23  mediation?
24     A.   Typically, attorneys defending cases of
                                                130
```

```
 1  mine always send discovery and it's not
 2  something I need to instruct them to do.
 3     Q.   When you traveled to Sioux Falls, did
 4  you have settlement authority?
 5     A.   I didn't travel to Sioux Falls.
 6     Q.   Excuse me.  I'm sorry, bad question.
 7  Thank you.
 8          When you traveled to Rapid City for the
 9  mediation, did you have settlement authority?
10     A.   I did.
11     Q.   How much was the authority that you
12  had?
13     A.   Two hundred thousand.
14     Q.   And that authority was based upon --
15  well, never mind.  I -- I'll withdraw the
16  question.
17          MR. HOYT:  You know, it just occurs to me.
18  Do we need to check out?
19          MR. SUTTON:  Probably.  I did.  Do you want
20  to do that?
21          MR. HOYT:  I better go.
22          MR. SUTTON:  Let's take a break.
23          THE WITNESS:  You don't want to get charged
24  another night here.
                                                131
```

```
 1          THE VIDEOGRAPHER:  The time is 12:16 and we
 2  are off the record.
 3                  (Whereupon, a discussion was had
 4                  off the record.)
 5          THE VIDEOGRAPHER:  All right.  We are back on
 6  the record and the time is 12:23.
 7  BY MR. SUTTON:
 8     Q.   Ms. Wagner, right before we broke we
 9  were talking about the mediation.
10          Do you recall that the first offer made
11  by Mike Abourezk at the mediation to settle was
12  $2 million?
13     A.   I recall that his opening demand at the
14  mediation was 2 million, yes.
15     Q.   And Zurich countered with $10,000 as an
16  offer, correct?
17     A.   That was our first offer.
18     Q.   And then, the demand was reduced to
19  $1,995,000; is that right?
20     A.   It was.
21     Q.   And then that was the end of the
22  mediation, correct?
23     A.   Yes, those were the last numbers
24  discussed.
                                                132
```

**Page 133**

1  Q. Do you recall having any discussions
2  with attorney Palmer during the mediation about
3  next steps in the defense of the case?
4  A. I don't recall if we did or not.
5  Q. After the mediation there was no
6  further settlement discussions with Mike
7  Abourezk in the bad faith case until the Hinshaw
8  firm effectively had taken over, correct?
9  A. I believe so, yes.
10 Q. As part of this malpractice case, is
11 Zurich alleging that attorney Palmer's mistakes
12 in handling the defense of the case may --
13 weakened your negotiating position at the
14 mediation?
15 A. Absolutely.
16 Q. And at any time after the mediation,
17 did you instruct attorney Palmer to reinitiate
18 settlement discussions?
19 A. I don't recall.
20 Q. What was your reaction when you left
21 the mediation?
22 A. Shocked. Disappointed.
23 Q. What was causing your disappointment?
24 A. The fact that the demand was higher

**Page 134**

1  when I arrived versus what I thought it was when
2  I was flying out there.
3  Q. At the mediation would you have paid
4  $300,000?
5  A. Possibly.
6  Q. What steps would you have needed to
7  take at the mediation in order to obtain that
8  authority?
9  A. Make a phone call.
10 Q. And that phone call would be to whom?
11 A. Steve Hatch.
12 Q. When you arrived at the mediation, had
13 you determined what your walk away number was
14 going to be?
15 A. No.
16 Q. Based on what you knew at the time, did
17 you believe that $300,000 was a reasonable
18 settlement value for the case?
19 A. I did.
20 Q. And were you prepared to recommend a
21 settlement of $300,000 at the mediation if it
22 would have resolved the case?
23 A. I would have.
24 Q. Do you recall any discussions that you

**Page 135**

1  had with attorney Palmer while in Rapid City for
2  the mediation regarding the plan for handling
3  the case after the settlement mediation was
4  unsuccessful?
5  A. I don't remember.
6  THE REPORTER: Ninety-eight.
7  THE WITNESS: Thank you.
8            (Whereupon, Wagner Exhibit
9            No. 98 was marked for
10           identification.)
11 BY MR. SUTTON:
12 Q. Ms. Wagner, you've been handed
13 Exhibit 98, which is a letter from attorney Cris
14 Palmer to you dated December 2, 2016; is that
15 right?
16 A. Yes.
17 Q. And in that letter, Mr. Palmer provided
18 to you a copy of the plaintiff's expert, Elliott
19 Flood; is that right?
20 A. Yes.
21 Q. And Mr. Palmer writes, after you have
22 had a chance to review this, we should talk
23 about what we want to do with regard to the
24 retention of our own expert; is that right?

**Page 136**

1  A. You read that correct, yes.
2  Q. Did you review Mr. Flood's report when
3  it was provided?
4  A. I believe I did.
5            (Whereupon, Wagner Deposition
6            Exhibit No. 99 was marked for
7            identification.)
8  BY MR. SUTTON:
9  Q. Exhibit 99 is a letter from Cris Palmer
10 to you dated December 16, 2016; is that right,
11 Ms. Wagner?
12 A. Yes.
13 Q. And in this letter at the third
14 paragraph, attorney Palmer indicates, as the
15 mediation on October 24 was not successful, I
16 anticipate plaintiff's counsel will now pursue
17 responses to the discovery, including the likely
18 motion to compel; is that right?
19 A. You read that correctly.
20 Q. And just so that, I mean it's clear, at
21 least up through the mediation, the meet and
22 confer letter and the discovery deficiencies
23 that were out there, plaintiff's counsel wasn't
24 pushing on those, correct?

```
 1     A.   Not that I was aware.
 2     Q.   Attorney Palmer says in the bottom
 3  paragraph on Zurich 3654, therefore, I want to
 4  provide you the enclosed detailed analysis of
 5  plaintiff's request and the likely ruling if the
 6  request were to go to court on a motion to
 7  compel and my advice how to proceed.
 8          Did I read that correctly?
 9     A.   Yes.
10               (Whereupon, Wagner Deposition
11                Exhibit No. 100 was marked for
12                identification.)
13  BY MR. SUTTON:
14     Q.   And then, will you please turn to
15  Exhibit 100.  And Ms. Wagner, I'll represent to
16  you that Exhibit 100 is this memorandum that
17  goes from Zurich 3656 to 3666, is next in the
18  sequential Bates stamp of the documents produced
19  by Zurich from Exhibit 99.
20          Do you know whether Exhibit 100 is the
21  enclosure that was provided to you with
22  Exhibit 99?
23     A.   I believe it was.
24     Q.   Did you review Exhibit 100 when you
                                                137
```

```
 1  received it?
 2     A.   I did.
 3               (Whereupon, Wagner Deposition
 4                Exhibit No. 101 was marked for
 5                identification.)
 6  BY MR. SUTTON:
 7     Q.   Exhibit 101, if you turn to the oldest
 8  e-mail in the chain on Zurich 3818, it indicates
 9  that there is a letter -- or Kristi Wood is
10  sending you an e-mail on December 16, 2016,
11  attaching a letter; is that right?
12     A.   Yes.
13     Q.   We'll look back at Exhibit 99, that's
14  the same date, December 16, 2016, correct?
15     A.   Yes.
16     Q.   So, the e-mail on Zurich 3818, would
17  you agree that that's the transmission of the
18  letter that is Exhibit 99?
19     A.   I believe so, yes.
20     Q.   So, then we look at Exhibit 101, is
21  this your responsive e-mail on the first page,
22  Zurich 3817?
23     A.   It looks like it, yes.
24     Q.   And did you prepare this after
                                                138
```

```
 1  reviewing the memo that was provided to you by
 2  attorney Palmer?
 3     A.   I believe so, yes.
 4     Q.   I'm going to hand you what has
 5  previously been marked as Exhibit 17.  Will you
 6  please turn to Zurich 3701 within Exhibit 17.
 7          Are you with me, Ms. Wagner?
 8     A.   I am.
 9     Q.   Thank you.
10          That's a letter dated January 12, 2017,
11  to you signed by Cris Palmer; is that right?
12     A.   Yes.
13     Q.   And Mr. Palmer is recommending that
14  Zurich engage a defense expert by the name of
15  Charlie Henderson, correct?
16     A.   Correct.
17     Q.   And ultimately you agree with
18  proceeding to engage Mr. Henderson, correct?
19     A.   I did.
20     Q.   Here is what's previously been marked
21  as Exhibit 18.  Will you just please confirm
22  that you received the letter and draft report
23  that was provided by attorney Palmer as part of
24  Exhibit 18.  I'm sorry, let me -- did you
                                                139
```

```
 1  receive Exhibit 18?
 2     A.   I did.
 3     Q.   And did you review the draft report
 4  when it was provided to you?
 5     A.   I did.
 6     Q.   Did you have any concerns with --
 7  regarding the opinions being promulgated by
 8  Mr. Henderson in defense of this case?
 9     A.   Not that I recall.
10     Q.   Did you ever request that attorney
11  Palmer engage any other experts other than
12  Mr. Henderson as part of the defense of the
13  case?
14     A.   Not that I recall.
15     Q.   I'm going to hand you what's previously
16  been marked as Exhibit 33.
17          This is a letter dated December 7,
18  2017, from Cris Palmer to you; is that right?
19     A.   Yes.
20     Q.   So, that's -- the mediation was in
21  October of 2016, correct?
22     A.   I believe so, yes.
23     Q.   Looking at the second paragraph,
24  attorney Palmer writes, we are going to need to
                                                140
```

**Page 145**

1  A. Just his lack of effort all the way
2  through up to that point.
3  Q. You would agree with me that after
4  the -- well, do you agree with me that after the
5  Hinshaw firm took over the defense of the case,
6  they were primarily making all strategic
7  decisions on the defense?
8  A. I requested that they take the lead.
9  Q. And as part of that, you expected that
10 they were making the strategic decisions,
11 correct?
12 A. I expected them to take the lead in
13 those decisions.
14 Q. At any time do you recall Mr. Palmer
15 communicating to you that he thought he had made
16 a mistake in handling the defense of the case?
17 A. He did not.
18 Q. Have you told me everything that
19 contributed to your decision to replace
20 Mr. Palmer with the Hinshaw law firm in defense
21 of the underlying bad faith case?
22 A. I mean, as I said, the list is long.
23 Q. Well, what's in that list?
24 A. Um, like I said, it's complete lack of

**Page 146**

1  effort. Huge delays of being unresponsive. Not
2  providing me with answers to questions that I
3  articulated. Dragging his feet when it came to
4  scheduling the mediation. Missing the
5  opportunity to settle the case for lower
6  amounts. Blind siding me at the mediation.
7  Q. How did Mr. Palmer blind side you at
8  the mediation?
9  A. When I arrived, there was already
10 conversations taking place between plaintiff's
11 counsel and the mediator and Cris Palmer.
12 Q. Did Mr. Palmer share with you what
13 those -- those discussions were?
14 A. He said that they had discussed the
15 fact that the demand had been increased.
16 Q. Did he tell you when he learned that
17 information?
18 A. That morning.
19 Q. Is there anything else that forms the
20 basis for why you claim Mr. Palmer blindsided
21 you at the mediation?
22 A. He never indicated that the demand was
23 anything other than the 325,000 beforehand and
24 that Mr. Abourezk was going to withdraw it

**Page 147**

1  before I arrived there.
2  Q. Are you aware of any information
3  indicating that Mr. Palmer had that information
4  prior to the morning of the mediation?
5  A. I don't know.
6     (Whereupon, Wagner Deposition
7     Exhibit Nos. 102-103 were
8     marked for identification.)
9  BY MR. SUTTON:
10 Q. Exhibit 102, Ms. Wagner, is a letter to
11 you dated January 5, 2018, from attorney Palmer;
12 is that right?
13 A. Yes.
14 Q. And in the third paragraph, attorney
15 Palmer represents an updated memorandum
16 regarding discovery; is that right?
17 A. That's correct.
18 Q. And when you look at -- you can't see
19 it because of the printing on the first page of
20 Exhibit 102, but the second page, there's a
21 Bates stamp Zurich 3909; is that right?
22 A. Yes.
23 Q. And actually, it's not sequential, that
24 means I'm wrong. So, will you turn to

**Page 148**

1  Exhibit 103.
2  A. Okay.
3  Q. What's the date of the memo that is
4  referenced in Exhibit 103?
5  A. January 4th, 2018.
6  Q. And what is the date of the letter that
7  is Exhibit 102?
8  A. January 5th, 2018.
9  Q. Do you know was Exhibit 103 the
10 enclosure that was provided to you in
11 conjunction with Exhibit 103?
12 A. I believe so.
13 Q. Did you review that when you received
14 it?
15 A. Yes.
16    (Whereupon, Wagner Deposition
17    Exhibit No. 104 was marked for
18    identification.)
19 BY MR. SUTTON:
20 Q. Exhibit 104 is an e-mail chain, which
21 is Zurich 3947 through 3950; is that right?
22 A. Yes.
23 Q. And is this e-mail chain the initial
24 contact that you sent out to a Mike Marick,