*American Zurich Ins. Co. and Zurich American Ins. Co. v. J. Crisman Palmer and GPNA*

*Paris Glazer*
*October 5, 2022*

*Audrey M. Barbush, RPR*
*audrey@paramountreporting.com*
*605.321.3539*



Min-U-Script® with Word Index



EXHIBIT E

Page 41

1  goofy how this was pled because the contracts at issue
2  were only between certain Zurich entities, and it was
3  just odd that that hadn't gotten fettered out earlier
4  as to what Zurich entities were actually involved in
5  this from a contractual perspective.
6 Q  Let me ask you this: Based upon your work in defending
7  the case for two years, did you believe that at
8  least -- well, I'll withdraw the question and reask it
9  differently.
10  Would you agree with me that one of the
11  defendants, at least one, was a proper party defendant
12  in this bad faith case?
13 A  I believe so, yes. I just can't remember which of
14  them. And I think that there were other answers or
15  discovery responses that I did in which I said, you
16  know, I'm answering on behalf of whatever we thought
17  the proper defendant was, but to the extent, you know,
18  answers are needed on behalf of these other defendants,
19  you can deem them to be on behalf of them as well.
20 Q  Did you have any information during your time defending
21  Zurich that that proper party defendant did not have
22  the resources to pay whatever judgment was levied
23  against it?
24 A  I don't remember ever being concerned about that.
25 Q  So as a practical matter, although the judgment may

Page 42

1  have been against three entities versus one, when it
2  comes back to the check being written, does the
3  existence of an improper -- or additionally pled
4  plaintiffs make any difference?
5  MR. HOYT: Objection. Calls for legal conclusion,
6  incomplete, calls for speculation.
7  THE WITNESS: Yeah. So subject to that objection,
8  as I sit here today, I can't remember exactly what
9  significance there was. But I will say, as a general
10  matter, you know, when you have different affiliates
11  within an insurance company family, it can be important
12  to keep the affiliates separate in terms of discovery
13  issues and in terms of -- you know, if you had, like,
14  regulatory issues in terms of some -- an affiliate who
15  shouldn't be involved now having to report that it was
16  involved in a bad faith case even though it wasn't, you
17  know, involved with that, then, you know, with
18  different insurance companies buying and selling
19  different affiliates and divisions and such, you know,
20  it's -- it's not some pedantic thing. I can't remember
21  what the significance of it is to this case. But, you
22  know, it's something I think is important.
23 BY MR. SUTTON:
24 Q  And as you sit here today, you don't recall one way or
25  the other whether any of those concerns that you just

Page 43

1  identified were applicable in this case, correct?
2 A  That is correct.
3 Q  Will you please look at Exhibit --
4 A  Can I amend that for one second? I would say that is
5  correct except, you know, in discovery, as you pointed
6  out, there was a -- there was an ongoing dispute, and
7  depending on how high up in the chain of command or
8  whatever Abourezk was trying to seek depositions from
9  people, I think the issue of, you know, what Zurich
10  entities were proper parties would have mattered.
11  Depending on, you know, if Abourezk wanted to get a
12  sea-level deposition from somebody at an entity that
13  wasn't even supposed to be involved in this case, I
14  think that would have been an issue.
15 Q  Do you recall that ever being a specific issue here?
16 A  I can't recall. But I remember apex discovery being a
17  specific issue here.
18 Q  What do you mean by "apex discovery"?
19 A  Abourezk wanting to get higher-level depositions from
20  people higher up in the chain of command at Zurich in a
21  manner that I thought was, you know, harassing and,
22  you know, unnecessary. But, you know, he was very
23  interested in getting, you know, information about
24  different people who were very far removed from the
25  primary claims handling responsibility for this claim.

Page 44

1 Q  As you sit here, do you have any knowledge that the
2  identification of Zurich North America as a defendant,
3  being a trade name, had any impact on whether those
4  depositions were going to proceed or not?
5 A  I can't say one way or the other specific to that.
6 Q  What you do know, though, is that Attorney Abourezk
7  was -- and the courts in South Dakota were giving him
8  very broad scope of discovery in this case, weren't
9  they?
10  MR. HOYT: Objection. That assumes facts not
11  established. Lack of foundation.
12  THE WITNESS: I would say that in this case,
13  subject to that objection, the scope of discovery
14  seemed very broad, to me, that he was being allowed to
15  pursue.
16 BY MR. SUTTON:
17 Q  And you were the primary lawyer within the Hinshaw firm
18  that was responsible for responding to the written
19  discovery, weren't you?
20 A  Yeah. I mean, I had some help from, like, a junior
21  associate, but when it came down to, you know, issuing
22  the answers and, you know, working with Abourezk to
23  have meet-and-confers, and I did this whole sort of
24  alternative meet-and-confer thing, yeah, you know, I
25  was primary.

American Zurich Ins. Co. and Zurich American Ins. Co. v.
J. Crisman Palmer and GPNA

Paris Glazer
October 5, 2022

### Page 53

```
 1  A   Yep.
 2  Q   There is an entry, August 30, 2018, for you in the
 3      amount -- or for 2.6 hours, which says, quote,
 4      "Research alternative local counsel in South Dakota
 5      using Lex Machina and PACER (researched approximately
 6      17 firms, approximately 45 pages)."
 7      Did I read that entry correctly?
 8  A   Correct.
 9  Q   What is Lex Machina?
10  A   It was, like, a LexisNexis product that's available
11      that allows you to, like, look up cases by, like, law
12      firm, and you can, like, look at judges, and it
13      purports to give you, like, a breakdown of, you know,
14      what percentage of their cases are employment law cases
15      versus what percentage of their cases are construction
16      law or insurance law.
17  Q   And I assume you have no personal knowledge about the
18      validity of any of that information as it relates to
19      South Dakota law firms.
20  A   Correct.
21      MR. HOYT: Can we take a short break, Jason?
22      MR. SUTTON: Yeah.  If you give me two minutes,
23      I'll be done with this exhibit, and then I don't have
24      to remember where I stopped, if that's okay.
25      MR. HOYT: Sounds good.  That's fine.
```

### Page 54

```
 1  BY MR. SUTTON:
 2  Q   Do you, Paris, recall what, in August of 2018, caused
 3      you to start researching alternative local counsel?
 4  A   I believe at some point around that time there had been
 5      a discussion with Dawn about potentially getting
 6      somebody else involved besides the Gunderson Palmer
 7      firm, but I can't really remember the specifics of it.
 8      But, you know, I know that I started looking into
 9      different firms around the time that that discussion
10      had happened with Dawn.
11  Q   And at least as part of your entry in your time sheet,
12      there were 17 law firms in the state that you reviewed
13      information based on; is that right?
14  A   Yeah, or 17 hits came up and then they had, you know,
15      varying amounts of information for each one.
16  Q   Do you know why the decision was made not to remove
17      Gunderson Palmer as local counsel at that time?
18  A   No.
19  Q   Whose decision was that?
20  A   I think that would have been Dawn's decision.  It
21      certainly wasn't my decision.
22  Q   Did you make any recommendations, that you recall?
23  A   I think made -- I provided -- I remember providing
24      Dawn some potential names for new firms, if that's what
25      they were interested in.
```

### Page 55

```
 1      MR. SUTTON: Now is the perfect time for a break.
 2      MR. HOYT: Just five minutes is fine for me,
 3      unless you want to take more.
 4      MR. SUTTON: No.  I'm -- unless Audrey or Paris
 5      needs more -- we're off the record.
 6      (Recess taken from 12:50 p.m. to 12:58 p.m.)
 7  BY MR. SUTTON:
 8  Q   Okay.  Paris, we're back on the record.  Will you
 9      please look at Exhibit 62.
10  A   I'm looking at Exhibit 62, which says it's a report and
11      a recommendation regarding defendants' motion to
12      dismiss.
13  Q   And you've reviewed this document previously, although
14      maybe not in preparation for your deposition; is that
15      right?
16  A   Yeah, I reviewed this document in the course of my
17      representation of Zurich in this case, but I don't
18      believe I looked at this in preparation for my
19      deposition today.
20  Q   And do you understand that this is the report and
21      recommendation issued by Magistrate Judge Wollmann
22      denying the motion to dismiss based on failure to
23      exhaust?
24  A   I believe so, yes.
25  Q   And will you please turn to page 9 of Exhibit 62.
```

### Page 56

```
 1      Looking at the last sentence of the paragraph
 2      above the little ii, did Judge -- Magistrate Judge
 3      Wollmann write, quote, "Therefore, the 2013 Settlement
 4      Agreement constituted the final stages of the
 5      administrative process, as such, Leichtnam exhausted
 6      his administrative remedies and this court has proper
 7      jurisdiction"?
 8      Is that what she wrote?
 9  A   That's what appears in the order, so that would have
10      been, yeah, what she wrote or her clerk and she
11      approved it.
12  Q   Will you please turn to page 13 of Exhibit 62.
13  A   I'm there.
14  Q   On the Notice to Parties, there's an indication that
15      either party can file objections to the report and
16      recommendation issued by Magistrate Judge Wollmann; is
17      that right?
18  A   That's right.
19  Q   And did you understand that if objections were filed,
20      because this was a legal issue, the District Court
21      Judge Viken would review the issue de novo?
22  A   I can't remember what the standard of review by the
23      district judge was for this.  Oh, but I guess I'm
24      reading it right here.  It says "Objections must be
25      timely and specific in order to require de novo review
```

Page 57

1   by the District Court."
2       So now that I'm reading that, yes.
3 Q You beat me to my next question.
4       Do you recall that Zurich did, in fact, file
5   objections to this report and recommendation?
6 A I can't actually remember whether we did, but --
7 Q Look at Exhibit 50.
8 A Exhibit 50. Yep.
9 Q On Exhibit 50, if you look at -- actually, we have to
10  start by looking at 62 and then refer to 50.
11      So in 62, what is the docket number at the top of
12  that --
13 A Document 120.
14 Q Okay. So then if you look at Exhibit 50, on Docket
15  Entry Number 126 on page 14 --
16 A I see that, yep. 9-26, "Objection to Report and
17  Recommendation by American Zurich Insurance Company,"
18  filed 9-26-2019.
19 Q And look at, from Docket Number 126 through 144, which
20  is ultimately the dismissal of the case after the
21  judgment, I want you to confirm for me that the
22  district court never ruled on that objection to the
23  report and recommendation before the case was settled.
24 A I mean, it's a little hard for me to quickly read all
25  this, but I don't remember a ruling on the objections;

Page 58

1   and if there was one, I assume it would be -- that
2   would appear on this docket, which is marked as
3   Exhibit 50.
4 Q And I'd represent to you, Paris, I mean, it didn't
5   happen. So it was still pending at the time that the
6   Leichtnam bad faith case was settled.
7       Do you recall forming any opinions regarding your
8   belief of the likelihood of success that Judge Viken
9   would overrule the report and recommendations denying
10  the motion to dismiss?
11 A I don't remember forming any opinions on that
12  likelihood.
13 Q Did you ever have any -- do you recall having any
14  discussions with Dawn Wagner at Zurich about whether
15  Zurich should wait for Judge Viken to rule on those
16  objections before settling the case?
17 A I don't remember one way or the other.
18 Q Will you please look at Exhibit 107. That was in the
19  group sent yesterday.
20 A Exhibit 107. Give me a minute.
21 Q Yep.
22      MS. MONDSCHEAN: That was yesterday --
23      THE WITNESS: Yes.
24      MS. MONDSCHEAN: Yesterday's, Jason?
25      MR. SUTTON: Yes. Correct.

Page 59

1       THE WITNESS: I have Exhibit 107 in front of me,
2   Jason.
3 BY MR. SUTTON:
4 Q Thank you, Paris. I was trying to -- I'm juggling too
5   much paper.
6       On Exhibit 107, will you please turn to Zurich
7   4718. And --
8 A Yep.
9 Q -- there's a timekeeper entry for Joshua Vincent on
10  September 6, 2019. Do you see that entry?
11 A Yes.
12 Q Can you tell me who Mr. Vincent is?
13 A Yeah. He is a very experienced appellate court
14  attorney in our firm.
15 Q As part of your defense of Zurich in the bad faith
16  case, I'm gathering you consulted with Mr. Vincent to
17  evaluate potential appellate issues. Is that right?
18 A Yeah. I can't remember specifically, but, I mean, I'm
19  seeing his name right here, and that -- that certainly
20  would be consistent with my practice, to reach out to
21  Josh about questions like that.
22 Q Do you recall -- or does the review of Exhibit 107
23  refresh your recollection of whether there was
24  discussion with -- amongst your defense team about
25  whether to seek a interlocutory appeal of

Page 60

1   Judge Wollmann's decisions?
2 A I just can't remember one way or the other, you know,
3   what we discussed or didn't discuss in that regard. I
4   mean, it would be probably a reasonable thing to
5   discuss, but I just can't remember, you know, any
6   specifics of it.
7 Q Now, the motion to dismiss that was denied by
8   Magistrate Judge Wollmann, we've talked that there was
9   an appeal -- or objections to that report and
10  recommendation that were pending as part of the
11  settlement, but I want to talk through with you some
12  other avenues that may have existed for further review
13  of that decision.
14      Based upon your work in handling other cases, do
15  you agree that if Zurich would have gone to trial and
16  it was not successful at trial, that it could have
17  appealed Judge Viken's decision on the motion to
18  dismiss and the objections to the Eighth Circuit?
19 A Like, appeal as a matter of right after a final
20  decision, yes.
21 Q Say it again, please, Paris.
22 A Sorry. Appeal as a matter of right after a final
23  decision, yes.
24 Q Additionally, do you understand that there are
25  mechanisms that exist in the law that may allow for a

Page 81

1  don't have the exhibit number off the top of my head.
2      But, yeah, there was a -- you know, a balance and
3  a tension in this case with the fact that, you know,
4  there was this body of case law in South Dakota that
5  Abourezk was relying on to demand just extremely broad
6  discovery from Zurich, and his discovery requests were
7  very hard to comply with for a number of reasons. And
8  so you had to sort of negotiate with him and be mindful
9  of his attitudes when you were propounding discovery to
10 him, because if you pushed in an uncomfortable manner,
11 then he might push back even harder on you.
12 Q From what you saw in the file, had there been any
13 attempt whatsoever by Palmer to get documents before --
14 either before Abourezk moved for documents or made
15 motions?
16 A I don't remember -- well, I do remember I issued
17 written discovery to Abourezk, and I think those were
18 the first sets that had gone to him, I mean, beyond
19 what you would -- one would produce as an initial
20 disclosure in the, you know, the -- what is it, Rule 26
21 initial disclosures in federal court?
22 Q Did you see any effort to notice the plaintiff's
23 deposition before Mr. Abourezk started making motions
24 to compel?
25 A I can't remember one way or the other.

Page 82

1 Q Did you have any communications with Mr. Fuller,
2  Bill Fuller, about your motion to dismiss or the
3  defenses that were raised in the proposed amendment?
4 A I generally remember that at some point there was a
5  conversation with Bill Fuller, maybe even more than
6  one, in connection with our defense of Zurich, and I
7  think it also had to do with the motion to dismiss,
8  but, like, because it's been such a long time, I just
9  can't remember when or the specifics of it.
10 Q Do you recall him telling you that he felt like those
11 defenses lacked merit or had no chance of success?
12 A No, I don't remember him saying anything like that. I
13 think that would be something that might stick out to
14 me, especially coming from, you know, out of state.
15 Q Did you -- did Palmer ever tell you -- give you that
16 opinion, that he felt like the motion to dismiss or the
17 affirmative defenses lacked merit?
18 A Again, I don't remember that happening. I think it
19 would be something that would stick out to me, again,
20 for that similar reason, you know, especially coming as
21 an out-of-state attorney.
22 Q You were asked about what impact, if any, it would have
23 that the wrong Zurich entity was named. Do you recall
24 that?
25 A I do, yep.

Page 83

1 Q Would it be significant in a jury trial if more than
2  one entity were named and there was an admission that
3  they had aided and abetted in the wrongful conduct with
4  each other?
5     MR. SUTTON: Objection. It's compound.
6     THE WITNESS: You know, again, it's hard --
7     MR. SUTTON: Also foundation. Sorry.
8     THE WITNESS: It's hard -- I've never -- I've
9  never tried a jury trial, so it's hard for me to say.
10 But, you know, now that you mentioned it, one thing I
11 remember from my punitive damages days -- which is
12 something I had to, unfortunately, think about more
13 than most attorneys -- is when you're facing punitive
14 damages, sometimes the assets or, you know, dollar
15 value of the company can be put up by the plaintiff's
16 attorney, and then the jury can take that into account
17 when they are assessing punitive damages.
18    So from that perspective, it actually can be
19 pretty nice to have a case pared down so that you're
20 not putting up in front of a jury the assets of, like,
21 two companies or three companies. You're just putting
22 up, you know, the assets of one.
23    MR. HOYT: That's all I have. Thank you.
24
25

Page 84

1           FURTHER EXAMINATION
2  BY MR. SUTTON:
3 Q Paris, I have a couple of follow-ups. I want to start
4  where you just stopped.
5     In this case, do you know whether the inclusion of
6  Zurich North America as a trade name, not a separate
7  entity, would have resulted in a larger amount of
8  assets being shown to the jury at punitive damages.
9 A I don't know one way or the other as I'm sitting here
10 right now. Yeah.
11 Q And it would be nothing but speculation, from your
12 perspective, that that was actually a concern in this
13 case at this time, correct?
14 A I don't know if I'd use the term "speculation," but I'm
15 just sort of listing out, you know, considerations from
16 a generalist perspective, you know.
17 Q And that's fair. I mean, these are -- you're
18 identifying potential problems without linking those
19 problems to this specific case, correct?
20    MR. HOYT: Object. That mischaracterizes.
21    THE WITNESS: Yeah. I mean, I've linked them --
22 I've linked general considerations to this specific
23 case, but I haven't, like, sat here and said, oh, this
24 definitely would have happened or this wouldn't have
25 happened or this definitely would have been important