*American Zurich Ins. Co. and Zurich American Ins. Co. v.*
*J. Crisman Palmer and GPNA*

*Colin F. Campbell*
*December 19, 2022*

*Audrey M. Barbush, RPR*
*audrey@paramountreporting.com*
*605.321.3539*



Min-U-Script® with Word Index



EXHIBIT
F

Page 5

1  contains, I believe, all the materials that are listed
2  in my report.  So I have a section on the billing
3  records, pleadings of the bad faith case, pleadings of
4  the malpractice case, discovery in the bad faith case,
5  discovery in the malpractice case; and I have somewhat
6  in chronological order, although not entirely in
7  chronological order, emails and correspondence.  I
8  think I have the expert reports, mine and your expert,
9  the Hinshaw invoices, and I think I have the
10 depositions of Mr. -- if I pronounce his name
11 incorrectly, please correct me -- Asberick?
12 Q  Abourezk.
13 A  Abourezk.  And Mr. Palmer.
14 Q  Other than the materials that you just referenced, will
15    you agree that, at least during this deposition, you
16    will not reference any other materials without telling
17    me?
18 A  Yes.
19 Q  And perhaps it's natural -- well, bad question.  Would
20    you also agree not to access your phone or your
21    computer other than for purposes of using the screen
22    for Zoom during this deposition without telling me?
23 A  Yes.
24 Q  Now, as I understand it, you're currently a practicing
25    attorney.  Is that right?

Page 6

1  A  I am.
2  Q  In what states are you licensed?
3  A  I'm licensed in states -- in Arizona and in California.
4     I'm licensed in different federal courts.
5  Q  Have you ever appeared in any proceedings in
6     South Dakota pro hac vice?
7  A  No.
8  Q  Have you ever been licensed in the state of
9     South Dakota?
10 A  No.
11 Q  Have you ever been to South Dakota?
12 A  Yes.  I've been through Sioux Falls.
13 Q  What brought you to Sioux Falls?
14 A  My wife and I have several children, and my wife, on
15    one of our vacations, wanted to bring our girls to the
16    Little House on the Prairie sites, and one of those
17    sites is in South Dakota.  I think we drove across
18    South Dakota from Sioux Falls in the east all the way
19    over to Pierre and Rapid City on the west.  And I can't
20    remember the particular name of the town, somewhere in
21    the middle of the state we went to, which had the
22    particular Little House on the Prairie site she was
23    interested in.
24 Q  Approximately how long ago was that?
25 A  Oh, gosh.  That would have been between 1990 and 1995.

Page 7

1     I was a judge at the time I took the trip.
2  Q  Any other times that you recall visiting South Dakota?
3  A  Not that I can recall.
4  Q  During your time in private practice, both before you
5     took the bench and since you've returned to private
6     practice, have you ever represented Zurich directly as
7     a defendant?  I'll start there before we talk about
8     their insureds.
9  A  Represented Zurich in a lawsuit or --
10 Q  Correct.
11 A  You know, I've practiced 45 years.  Nothing in
12    particular comes to mind, although I was certainly
13    familiar with Zurich before this case, and I don't know
14    whether because they may have been a carrier on a case
15    I had or -- or they could have appeared in front of me
16    as a judge.  I just don't recall.
17 Q  So I asked about Zurich direct.  Do you recall, during
18    your time in private practice, ever having a
19    significant portion of your practice representing
20    Zurich's insureds?
21 A  No.
22 Q  What is the name of the law firm that you currently
23    work for?
24 A  I work for the firm of Osborn & Maledon.
25 Q  Do you know whether other lawyers in your law firm

Page 8

1     represent Zurich in claims direct to them over the last
2     couple years?
3  A  No, I don't.
4  Q  Would you consider Zurich to be a client of the law
5     firm?
6  A  No.  I could run a conflict check if you would like,
7     but I don't -- to my knowledge -- I mean, if something
8     came across the board on a conflict, I wouldn't think
9     we'd have a conflict.  And I don't think we've
10    represented them.
11 Q  As part of your experience in private practice, have
12    you appeared as counsel of record defending any bad
13    faith cases?
14 A  You have to understand that in most all contract cases,
15    there's an allegation of breach of the duty of good
16    faith and fair dealing, and I have done contract
17    defense cases.  So I'm sure there's some allegations of
18    bad faith and fair dealing in contract cases.  In terms
19    of insurance bad faith, I can recall suing an insurance
20    company for bad faith and fair dealing.  But I do both
21    plaintiff and defense work, and nothing else comes to
22    mind.
23 Q  The plaintiffs case which you were referring to, do you
24    recall approximately when that was?
25 A  Within the last three years.

Page 13

1  bench trial or an arbitration involving the standard of
2  care governing attorneys?
3  A  The one I testified in arbitration had to do with the
4  reasonableness of attorneys' fees that were being
5  charged, and the case I testified to over Zoom at a
6  bench trial had to do with the reasonableness of the
7  settlement.
8  Q  How about at deposition? Do you recall being deposed
9  in any cases in which you offered opinions regarding
10  the standard of care of an attorney?
11  A  Nothing comes to mind right now, but I'd have to go
12  back and review my file.
13  Q  Other than this case and then the other case involving
14  Mr. Hoyt, have you been engaged by a lawyer
15  representing Zurich to be an expert in any other
16  matters?
17  A  Those are the only two matters I've been retained by
18  Zurich. You know, I have -- I'm involved in a case
19  right now where I'm an expert witness on the standard
20  of care for an attorney -- actually, for a law firm,
21  but their case is -- I've given a preliminary affidavit
22  as required by Arizona law. I think the case is in
23  discovery right now.
24  Q  Does Arizona law require that an affidavit be provided
25  in conjunction with filing of the complaint to

Page 14

1  establish failure to comply with the applicable
2  standard of care?
3  A  Not with the filing of the complaint, but under Arizona
4  state law, we have a rule, Rule 26.1, which is initial
5  disclosure of evidence. It's a little more rigorous
6  than the federal rule. But the preliminary affidavit
7  has to be filed with the Rule 26.1.
8  Q  Now, as I understand it, you're being compensated for
9  your work here today, correct, or in this case?
10  A  Correct.
11  Q  And your report indicates that you're charging $775 an
12  hour. Is that right?
13  A  Yes. That's my regular hourly rate.
14  Q  Can you give me an estimate as to the total amount
15  you've incurred in fees to date on your work in this
16  matter?
17  A  No, I really can't. I could pull the billings and get
18  you that information, but I don't have it off the top
19  of my head.
20  Q  Do you have a copy of your report with you or before
21  you, Colin?
22  A  I do. Let me turn to it. It's in this three-ring
23  notebook I was telling you about.
24      I have it in front of me.
25  Q  In your report -- first of all, let's mark that as

Page 15

1  Exhibit 115.
2     (Exhibit 115 is marked for identification.)
3     MR. SUTTON: Have you got it, Scott?
4     MR. HOYT: Yes.
5  BY MR. SUTTON:
6  Q  Does Exhibit 115 contain all of the opinions that
7  you're proffering in this case?
8  A  I believe so. I may articulate them more clearly in a
9  conversation, but I believe so.
10  Q  Generally explain to me the work that you did in
11  forming your opinions in this matter.
12  A  Well, I worked with a younger partner in the firm on
13  this case, Mr. Molinar. So we were sent materials. We
14  reviewed the materials, we drafted an opinion, and you
15  got a copy of the final draft.
16  Q  What was the division of responsibility between you and
17  Mr. Molinar in the work that was performed in forming
18  the opinions in this case?
19  A  Well, we discussed the case. He would have done the
20  first draft of the opinion. I would have reviewed and
21  revised it.
22      So that was sort of the division of
23  responsibility. He would have been the first one to
24  review the records. I would have been the second one
25  to review the records.

Page 16

1  Q  Looking at page 2 of your report, continuing through
2  page 6, there are 79 individual documents that are
3  referenced as having been reviewed.
4     My first question is, do you recall reviewing
5  anything else in forming your opinions other than those
6  items?
7  A  There are 79 items listed here. I don't recall
8  reviewing anything else, but I haven't sat down and
9  compared this list with everything I have in this
10  notebook in front of me.
11  Q  And in fairness, I'll acknowledge that this list does
12  not include Mr. Hieb's expert disclosure because that
13  was provided after your report. I assume you've
14  reviewed that.
15  A  Yes, I have.
16  Q  Other than Mr. Hieb's expert disclosure, do you recall
17  reviewing any other documents after you prepared your
18  report in this case?
19  A  I just don't recall if anything came in after we did
20  our report. I don't think so.
21  Q  The 79 individual documents, or groupings of documents,
22  on pages 2 to 6, have you personally reviewed all of
23  those documents?
24  A  I'm pretty sure most of them I have reviewed or
25  skimmed. I put more emphasis on some rather than

Page 17

1   others. So, for example, I probably spent more time
2   with the billing records because the billing records
3   give a chronological summary, really, of what the
4   attorneys did on a case. So Mr. Palmer's billing
5   records I spent time -- probably more time there. I
6   also spent more time with the emails and correspondence
7   with the client. I also probably spent more time on
8   the depositions of Mr. Palmer and Mr. Abourezk.
9       So I gave less emphasis on -- you know, for
10  example, the Hinshaw invoices really aren't
11  particularly relevant to the opinion I have. Although
12  there's a lot of background with respect to the
13  workmen's comp case, that's not necessarily informative
14  to my opinions.
15 Q  I think you testified earlier that Mr. Molinar reviewed
16  all of the documents and did the first draft of the
17  report. Is that right?
18 A  Correct.
19 Q  And I assume he would have billed for his time. Is
20  that correct?
21 A  That's our normal course.
22 Q  And I don't blame you. I would have expected him to.
23 A  Well, he also has a lower hourly rate than mine, and we
24  try, when we can, to use people with lower hourly
25  rates, as you can imagine.

Page 18

1 Q  I can appreciate that as well.
2       Would you anticipate that your billing entries
3   would capture when he reviewed those documents?
4 A  The normal practice in the firm is to do daily billing
5   records and then they're inputted, and then at the end
6   of the month, the billing records are reviewed and
7   determination is made of whether to write off anything
8   for billing judgment.
9       So the billing records, I would anticipate, would
10  let you know what's done on any particular day.
11 Q  How about your entries? I know that there's -- we all
12  have different levels of detail that we provide in the
13  narrative description of our entries. Sometimes it
14  matters even client to client.
15      Would you anticipate that your billing entries
16  would show the dates in which you reviewed the actual
17  documents which are contained on paragraphs [sic]
18  2 through 6 of your report?
19 A  My practice is to do daily billing records, and they're
20  inputted. So I would anticipate my daily billing
21  records would say what I did.
22 Q  Did you rely on Mr. Molinar to identify for you what he
23  perceived to be the key documents as part of the
24  review?
25 A  I don't know if I would rely upon Mr. Molinar as to

Page 19

1   what the key documents are as opposed to forming my own
2   opinions based on his draft and my review of the
3   records.
4 Q  Will you please turn to page 6 of your report.
5 A  I'm there.
6 Q  There's an "undated chronology of underlying case"
7   identified as Item Number 78. Do you see that?
8 A  I see it.
9 Q  Do you know who prepared the chronology that's
10  referenced in that item?
11 A  My recollection from the billing records is that
12  Palmer's law firm did a chronology or timeline. There
13  was an associate or a paralegal who worked on it, and
14  my recollection is, among the materials, we were
15  provided that chronology. It seems to have been worked
16  on several times within the firm. And I only say that
17  because my recollection is, of the billing records,
18  someone is working on a chronology, then he goes to it
19  and works on it again. In particular, I think when the
20  adjuster asked for more detail from the firm about the
21  case, I think that chronology was updated.
22 Q  So I want to make sure that I've covered what you've
23  done in forming your opinions. You reviewed the
24  documents we've identified in your report. There was a
25  draft of the report created in which you worked with

Page 20

1   Mr. Molinar in finalizing it. Is there any other work
2   that you performed in forming the opinions contained
3   within Exhibit 115?
4 A  Well, I've been through the report several times. You
5   know, things take place over time, and if there was --
6   something comes up, I'd need to review the materials to
7   refresh my recollection.
8       I went back through all these materials in
9   preparation for my deposition. If we had meetings
10  where I was going to be talking with the client, I
11  would have gone through materials to refresh my
12  recollection again.
13      So I haven't just looked at them one time, is what
14  I'm suggesting.
15 Q  Is there any other work you recall performing in order
16  to form your opinions in this matter?
17 A  I don't know what you mean by "any other work."
18 Q  You cite some legal resources in your opinion,
19  specifically the Rules of Professional Conduct as well
20  as the Restatement (Third) of Lawyers; is that right?
21 A  Correct.
22 Q  Is there any legal research that you performed other
23  than the reference to the Rules of Professional Conduct
24  and the Third Restatement of Lawyers?
25 A  I don't think in terms of legal research. However, I

Page 21

1  have practiced for 45 years, and I have a great deal of
2  experience with respect to a wide variety of cases.
3  So, you know, I bring all of that into the opinions
4  that I form, and work I've done in the past involves
5  research with respect to the conduct of lawyers and
6  what's expected of lawyers. I sat on the State Bar
7  Ethics Committee, the State Bar here in Arizona, in the
8  1980s. I was the chair of that committee. When I was
9  a judge, I believe I also sat on the judicial ethics
10 committee and taught judicial ethics. I have a lot of
11 training and experience in what I believe goes into the
12 concept of the standard of care.
13 Q  The Rules of Professional Conduct that you cite in
14 those reports, is that the model rule of professional
15 conduct or is that the South Dakota specifically
16 adopted rule?
17 A  I would have to ask Mr. Molinar. I didn't -- he
18 didn't -- I'm not aware of any substantial difference
19 with respect to the standard of care rules he's citing
20 between South Dakota and the rest of the country.
21 Q  Did you perform any South Dakota-specific research in
22 forming your opinions in this case?
23 A  No, I don't think so. I've certainly read your
24 expert's report.
25 Q  Let's turn to page 6 of your report, please.

Page 22

1  A  All right.
2  Q  On page 6 through page 9 of the report, there are 22
3  specific key facts that you have identified; is that
4  right?
5  A  Yes.
6  Q  I recognize that Item 13's got a bunch of subparts, but
7  at least there's 22 specific paragraphs, correct?
8  A  On the report there's 22 specific paragraphs, correct.
9  Q  What were you trying to memorialize in those 22
10 specific paragraphs, or at least in that section of the
11 report?
12 A  Well, as it says at the beginning -- it says "Key
13 Facts." So these are facts that -- I said it's my
14 understanding these facts are or will be supported by
15 competent evidence in the litigation, and then I've
16 identified and relied upon the following facts. So I
17 was trying to set forth key facts to the opinions I
18 reached.
19 Q  Are there any facts -- I'm sorry. I thought you had
20 finished. Go ahead. I'm sorry.
21 A  Well, I was just going to say, there may be additional
22 facts I relied upon, also. But, you know, we'd have to
23 talk about a particular subject, I guess.
24 Q  Was it your intent in the Key Facts section to
25 memorialize the most important facts that form the

Page 23

1  factual basis for your opinions?
2  A  Well, it's exactly what it says: It was just to state
3  the key facts with respect to the opinion.
4  Q  How did you decide which facts to include in that
5  section and which ones not to include?
6  A  Well, my opinion in the case is that Mr. Palmer did not
7  meet the standard of care with respect to his
8  representation of Zurich, and these are facts that bear
9  upon that opinion.
10 Q  Are you aware of any other facts that you're relying
11 upon to form the basis for that opinion that are not
12 identified in pages 6 through 9 of your report?
13 A  As I told you, I relied primarily upon the billing
14 records and the emails and correspondence. You know,
15 there may be certain -- you know, when you're looking
16 at the course of events, you can look at the billing
17 records and see when certain things happened. You can
18 look at the billing records when the correspondence was
19 done and then go to the correspondence. I mean, I'm
20 sort of relying on everything I was given. These were
21 key facts. That's all I'm trying to express.
22 Q  Are you assuming, in forming your opinions in this
23 case, that all 22 of the facts that you've identified
24 are proven to be true?
25 A  Well, we haven't had a trial in the case, of course.

Page 24

1  So I'm relying on emails, correspondence, billing
2  records, depositions. There's some source for most all
3  of these facts.
4  Q  And I appreciate that. So in forming your opinions,
5  you're assuming that the jury will agree with you that
6  the evidence at trial proves all 22 of those facts,
7  correct?
8  A  I don't think they need to find all 22 of those facts.
9  I mean, I haven't sat down and done a flowchart.
10 Q  Was it your assumption that those facts will be proven
11 to be true when you formed your opinions?
12 A  Well, take an example. I see here we have Fact
13 Number 19, which is that AZIC decided to retain Hinshaw
14 Culbertson as primary counsel in the suit. I mean,
15 that fact, whether it exists or not, doesn't affect my
16 opinions in the case. As I think I told you earlier
17 on, what Hinshaw did in the case doesn't really inform
18 my opinions.
19 Q  Can you tell me, as you're sitting here today, whether
20 you assumed that all of the items within Number 1
21 through 22 were, in fact, true as you describe them?
22 A  This sets forth sort of an outline of what happened in
23 the case, and in terms of being a chronological
24 outline, I think it's an accurate chronological outline
25 of the case.

Page 29

1   better position to opine on that issue than you? You
2   sat through his deposition --
3 A He would be in a better position to opine on the
4   application of the parol evidence rule in South Dakota
5   than I would.
6 Q Yes. Would you agree with that?
7 A Like I said, yes, he would be in a better position to
8   opine as to the application of the parol evidence rule
9   in South Dakota than I would.
10 Q Will you please turn to page 7 of your report.
11 A Yes.
12 Q Item Number 11.
13 A Yes.
14 Q There's a statement that says, at the second sentence,
15   "Given the number of files she was monitoring, when she
16   received an Answer, she assumed she had already
17   previously received it and approved it before it was
18   filed."
19       Do you recall what the evidence is that you were
20   relying upon in making that statement?
21 A No.
22 Q Can you identify any evidence that indicates that?
23 A You know, I don't -- I do not believe I have a copy of
24   Ms. Wagner's deposition, and I don't know if we were
25   advised about this or whether it comes from another

Page 30

1   source.
2 Q What other source could it be?
3 A I don't know.
4 Q Were you told to assume that fact from counsel?
5 A I do not have that recollection.
6 Q Do you know where that statement came from at all?
7 A I do not.
8 Q And you have not reviewed Ms. Wagner's deposition,
9   correct?
10 A I have not.
11 Q Will you look at Item (k) on page 8 of your report,
12   please.
13 A Did you say (k)?
14 Q Yeah. It'd be 13(k).
15 A I'm with you.
16 Q I just want to make sure I understand what you're
17   writing here. So it says "Palmer never told Wagner
18   that he had already concluded that there would be a
19   finding of bad faith, to which Zurich had no defenses,
20   preventing her from using that conclusion in her
21   analysis or deciding whether to change counsel."
22       First of all, did I read that correctly?
23 A You read it correctly.
24 Q Is it your understanding of the facts in this case that
25   Attorney Palmer never told Dawn Wagner that there will

Page 31

1   be a determination Zurich committed bad faith in the
2   Leichtnam case?
3 A My opinion in this case is that Mr. Palmer, at the
4   inception of the case, when he was asked to do a 30-day
5   report and a 90-day report -- he had formed his
6   opinions, as I understand from his deposition, very
7   early on in the case, and he did not provide the report
8   to the adjuster, either on a 30-day report or a 90-day
9   report, that he thought the case was essentially
10   hopeless.
11       The one time we have a -- I think the adjuster
12   calls it a high-level analysis of the case, happens in
13   December of the year the case was filed, and then I
14   believe he files it sort of like right before
15   Christmas. It's a letter. The adjuster writes back in
16   early January asking for further information with
17   respect to it, which is provided, I think, on or about
18   the end of the month or February 1st, and then the
19   adjuster goes to seek settlement authority. I think
20   all of that should have been done early on in the case.
21 Q As I reviewed your report in this case, it appears to
22   me that -- and correct me if I'm wrong -- that your
23   opinions are that Attorney Palmer failed to comply with
24   the applicable standard of care in handling the defense
25   of the case to allow Ms. Wagner to consider the early

Page 32

1   settlement offer. Is that right?
2 A I'm not sure that completely captures my opinion.
3 Q What else am I missing?
4 A My opinion in this case -- I understand your expert
5   wants to talk about the local culture, and I don't
6   disagree with that. Adjusters hire local attorneys to
7   find out about the local culture. But there's also an
8   obligation that a counsel has to the adjuster and the
9   insurance company itself.
10       If this is a case, as your expert suggests, as
11   Mr. Palmer suggests, is that it is of the utmost
12   urgency that we consider settlement early in the case,
13   which is not inconsistent with the guidelines that
14   Zurich gave him -- I think it says in two different
15   places in the guidelines Zurich is interested in early
16   settlements -- I think the standard of care required
17   Mr. Palmer to get on this case immediately to make
18   decisions with respect to it and advise the adjuster,
19   to give written communications to the adjuster so that
20   Zurich can make good, quick decisions about an early
21   settlement. That's not what happened in this case.
22       I think Mr. Palmer fell below the standard of care
23   by his failure to analyze the case early on and give
24   adequate information to the carrier in writing --
25   because an adjuster has to have a written file that the

Page 33

1 adjuster can bring to the higher-ups to get settlement
2 authority -- and my impression is that Mr. Palmer just
3 didn't see any urgency in doing that and didn't comply
4 with the client's directions.
5 Q Is there any other manner in which you're opining that
6 Attorney Palmer failed to comply with the applicable
7 standard of care?
8 A Well, we can go through it.
9 So, for example, when he didn't do a 30-day
10 report, that didn't comply with the standard of care.
11 When he didn't do a 90-day report, that didn't
12 comply with the standard of care.
13 When he filed an answer without showing it to the
14 client, when the client said they wanted to see it,
15 that didn't comply with the standard of care.
16 When he didn't document to the insurance adjuster
17 why he was filing no affirmative defenses or why he
18 thought the case, at an early stage, was hopeless and
19 he didn't communicate that, that didn't comply with the
20 standard of care.
21 We can go through different parts of the case --
22 you know, they get the early settlement offer in
23 September, and he says it's important, you know, with
24 Michael, to deal with these early settlements, and in
25 the same letter I think he also says we don't have to

Page 34

1 respond right away. As far as I can tell, nothing
2 really happens between September of the year it's filed
3 and December before he finally writes an evaluation of
4 the case that the adjuster can look at and bring to her
5 superiors. You know, why mediation gets pushed off as
6 long as it does...
7 But when I read Mr. -- when I read your expert's
8 report and I read Mr. Abourezk's deposition, it seems
9 that competent counsel in South Dakota know that you
10 need to respond to these things very quickly and very
11 early, and I don't see, really, that happening where
12 the actions of Mr. Palmer are being communicated to the
13 adjuster.
14 Q The failures of standard of care that you've just
15 identified -- I just want to make sure that I know
16 everything that you intend to opine. Are there any
17 other opinions of the failure of the standard of care
18 that you have formed and are offering in this case?
19 A Well, I mean, listening to your expert this morning
20 saying that he doesn't like to do mediation, and
21 actually, the inference I drew from your expert's
22 opinion was that you do not want to go to him and ask
23 for mediation, that's disastrous, I don't see that in
24 Mr. Palmer's advice to the client.
25 With respect to the idea that if you have

Page 35

1 discovery disputes ongoing and those discovery disputes
2 can take an early settlement offer off the table, I
3 don't see Mr. Palmer recommending that we -- you know,
4 maybe we enter into a stipulation to stay discovery for
5 three months and do an intensive look at settling this
6 case before things get out of whack.
7 I mean, I guess what I -- what I feel falls below
8 the standard of care in this case is, what I hear
9 people are supposed to in South Dakota with respect to
10 this particular plaintiffs attorney I don't see
11 Mr. Palmer doing.
12 Q And so -- I'm sorry. Go ahead.
13 A He may, on a high level, say it's a difficult attorney
14 to work with, but he's not evaluating the case early;
15 he's not giving written documents to the adjuster so
16 the adjuster could get settlement authority early. It
17 seems like at every turn he sort of pushes it down the
18 road.
19 Q Now, you understand that a mediation did occur and the
20 settlement offer from plaintiff's counsel went from
21 $325,000 prior to the mediation to $2 million at the
22 mediation. Do you understand that to be the facts?
23 A Yes. I believe when they went -- whatever the early
24 settlement offer was that's set out in the letter had
25 moved to $2 million or plus at the actual time of

Page 36

1 mediation, I think, in October of 2016.
2 Q And so the failures of standard of care that you've
3 just testified about that prevented Zurich from
4 properly being able to settle the case -- and I
5 understand there's a myriad of things that you claim
6 Mr. Palmer failed to do -- did those all occur through
7 the time of his engagement up through the mediation?
8 A Well, certain things happened at particular times. For
9 example, the failure to give a 30-day report or a
10 90-day report happened at particular times.
11 I think, in general, the information the client
12 needed to take advantage of an early settlement offer
13 was not put in writing and communicated.
14 Q Are you opining that there was any failure of the
15 standard of care by Attorney Palmer after the
16 mediation?
17 A Well, there are things that happened after the
18 mediation that I think may bear upon his attitude
19 toward the case or his standard of care on the case but
20 not with respect to the case-within-the-case element
21 with respect to early settlement, if that makes sense.
22 Q Yeah, it does. So I just want to make sure that I
23 understand, because when I read your report, your
24 opinions appear to indicate to me that Attorney Palmer
25 fell below the standard of care on a series of things

Case 5:20-cv-05026-KES   Document 55-6   Filed 02/01/23   Page 8 of 8 PageID #: 345

| American Zurich Ins. Co. and Zurich American Ins. Co. v. J. Crisman Palmer and GPNA | Colin F. Campbell December 19, 2022 |
|---|---|

Page 37

1   and that then, in the case within the case, caused harm
2   to the client because it prevented the client from
3   taking advantage of the early settlement offer.
4       Is that a fair synthesis of what your opinions are
5   in this case?
6 A It's a fair synthesis of my opinions with respect -- in
7   the context of the case within the case, let's just
8   say.
9 Q Are you opining that any of the other conduct by
10  Attorney Palmer after the mediation caused any harm to
11  Zurich?
12 A Well, I have the opinion that certain things, like not
13  consulting with the client about affirmative defenses,
14  fall below the standard of care. I do not have an
15  opinion, after the settlement conference, with respect
16  to the case within the case.
17 Q Tell me what things you are claiming Attorney Palmer
18  did after the mediation that form the basis for your
19  opinions he failed to comply with the applicable
20  standard of care.
21 A Well, it's sort of like the whole issue of affirmative
22  defenses, which are eventually -- as some of them are
23  determined waived; I think the magistrate ruled on one
24  of them -- again, I think it violates the standard of
25  care to not discuss with the client and present to the

Page 38

1   client written documentation regarding the answer and
2   your opinion with respect to raising certain
3   affirmative defenses.
4 Q Any other opinions that you have regarding the
5   affirmative defenses in which you claim Attorney Palmer
6   failed to comply with the applicable standard of care?
7 A Well, I think, you know, he could have initiated -- the
8   plaintiff initiated discovery requests. He certainly
9   could have initiated discovery requests at the
10  beginning of the case, but it's my understanding that
11  you would want to squelch those or put them on hold if
12  you wanted to take advantage of an early settlement
13  offer from this particular attorney.
14 Q Are there any other opinions that you have that
15  Attorney Palmer failed to comply with the applicable
16  standard of care after the mediation?
17 A Nothing comes to mind right now, but you may ask a
18  question that will jog my memory.
19 Q And will you let me know if I do?
20 A I'll try to.
21 Q Now, as I reviewed Sections 9 and 10 of your report --
22  let me ask it this way: In forming your opinions in
23  this case, what did you determine to be the appropriate
24  standard of care?
25 A I think the standard of care is that you have to act

Page 39

1   reasonably, you have to prepare the case, you have to
2   research the case, you have to keep your client
3   informed of the case, all within the context of the
4   particular circumstances of the case.
5 Q Are you considering whether there are any
6   South Dakota-specific aspects of the applicable
7   standard of care in this case?
8 A Well, the circumstances of every case are important,
9   and from what I understand the particular South Dakota
10  aspects, the locality, as your expert refers to it, has
11  to do with this particular lawyer and how he practices.
12 Q Would you agree with me that that's an appropriate
13  consideration in evaluating the standard of care in
14  this case?
15 A Yes, I would.
16 Q Did you speak with any South Dakota lawyers in
17  preparation of your opinions in this matter?
18 A No.
19 Q Now, as I understand it, one of your opinions is that
20  Attorney Palmer fell below the standard of care in
21  failing to plead certain affirmative defenses in this
22  case. Is that true?
23 A I think you misstated it.
24 Q Okay. Correct me.
25 A My opinion -- I'm sorry?

Page 40

1 Q Correct me, please.
2 A I think he had a duty to review the file for
3   affirmative defenses and identify possible affirmative
4   defenses. He then had a duty to decide whether he
5   thought it would be appropriate to plead them or not
6   plead them, and he had a responsibility to discuss that
7   with the client because ultimately it's going to be the
8   client's decision whether to assert the affirmative
9   defense or not.
10      So, for example, if he were to look at the file,
11  look at the affirmative defenses, and reach the
12  conclusions that Mr. -- again, if I'm mispronouncing
13  his name, tell me -- Mr. Heit, your expert --
14 Q Hieb.
15 A -- he has a duty to -- Heath -- he has a duty to
16  communicate that information to his client so that his
17  client can make a decision.
18      To file an answer without communicating with your
19  client when your client has told you to "Run the answer
20  by me" and to file an answer without affirmative
21  defenses without having a chance to talk to your client
22  about it and discuss it with your client, it falls
23  below the standard of care.
24 Q Are you offering any opinions whether the failure to
25  include the proffered affirmative defense in this case