# GUNDERSON, PALMER, NELSON & ASHMORE, LLP

ATTORNEYS AT LAW
506 SIXTH STREET
POST OFFICE BOX 8045
RAPID CITY, SOUTH DAKOTA 57709-8045

TELEPHONE (605) 342-1078
www.gundersonpalmer.com
ATTORNEYS LICENSED TO PRACTICE IN
SOUTH DAKOTA, NORTH DAKOTA,
NEBRASKA, WYOMING, MONTANA,
MINNESOTA, KENTUCKY, AND PENNSYLVANIA

J. CRISMAN PALMER
JAMES S. NELSON
DANIEL E. ASHMORE
DONALD P. KNUDSEN
PATRICK G. GOETZINGER
TALBOT J. WIECZOREK
DAVID E. LUST
TERRI LEE WILLIAMS
SARA FRANKENSTEIN
JASON M. SMILEY
QUENTIN L. RIGGINS

RONALD G. SCHMIDT
JEFFREY R. CONNOLLY
REBECCA L. MANN
ANDREW J. KNUTSON
KYLE L. WIESE
JANA SMOOT WHITE
TYLER C. WETERING
NATHAN R. CHICOINE
KATELYN A. COOK

WYNN A. GUNDERSON
Of Counsel

Writer's E-mail Address: cpalmer@gpnalaw.com
Writer's Fax No.: (605) 342-0480

February 1, 2016

Dawn M. Wagner
Zurich North America
1400 American Lane
Schaumburg, IL 60196

Re:   Joseph E. Leichtnam v. Zurich American Insurance Company, et al.
      GPNA File No. 04580.0067

Dear Dawn:

I have further analyzed this matter, including medical records and the claim file and I am prepared to answer the questions you posed in your January 6, 2016 email.

**You asked for an overview of Mr. Leichtnam's medical treatment prior to and at the time of the Dr. Farnham IME.**

Mr. Leichtnam was injured on August 29, 2007 when he fell from a forklift at work. At his initial doctor's visit he complains of a cut to his scalp, pain in his sacral area and left shoulder discomfort. His initial treatment plan was stitched to the scalp and ice 3-4 times a day to the shoulder and sacral area. A week later, Mr. Leichtnam begins complaining of pain in the upper back and was diagnosed with a hematoma and contusion and was prescribed physical therapy. He then complains of headaches and is evaluated for closed head trauma which included an MRI that revealed no abnormality.

Mr. Leichtnam continued with physical therapy and pain medications through January of 2008, when he receives his first nerve block. He then begins facet injections in February of 2008 and again in March of 2008. He has his first medial branch block in May of 2008 and begins a home traction program. He receives another medial branch block in July of 2008. He then receives his first epidural in April of 2009 which he stated provided a lot of relief from his pain.

Dr. Farnham performs an IME of Mr. Leichtnam on May 16, 2009 wherein he determines the patient is at MMI.



EXHIBIT 24

ZURICH(2) 003412

## GUNDERSON, PALMER, NELSON & ASHMORE, LLP

February 1, 2016
Page - 2 -

Workers' compensation discontinues payment of medicals on June 4, 2009. He continues taking Cymbalta, but discontinues all other treatment.

Workers' compensation picks up payment of medicals in June of 2012 (three year lapse) and Mr. Leichtnam begins PT and continues his prescription medications. In April of 2013 he begins epidural injections again, which he repeats in August of 2014.

**You asked for identification of items in the file which I find "problematic."**

As you stated previously the gap of three years in treatment is significant. The medical records immediately prior to the cut off of workers' compensation indicate Mr. Leichtnam was finding some relief from his pain with the epidural shot. Further, the medical records after workers' compensation began paying medicals again indicate he had a set-back in care as they had him begin physical therapy again.

Of course you know the reputation of Dr. Farnham is a concern, but it becomes even more concerning when you review the timing and findings of the IMEs in this matter. IME in July of 2008 by Dr. Anderson (who enjoys an excellent reputation in this area) finding the injury and a portion of impairment is related to the work injury. Two months later, a second IME by Dr. Jerry Blow in September of 2008 supports Dr. Anderson's findings, only lessening the percentage of impairment. Neither Dr. Anderson or Dr. Blow recommend ceasing treatment for Mr. Leichtnam. Then in May of 2009, Dr. Farnham is retained and he finds in his IME that Mr. Leitchnam is at MMI, that his impairment lower than Dr. Anderson or Dr. Blow and recommends no further treatment. The inconsistency in the IMEs and the decision to cease benefits based on the Farnham IME is concerning.

There is nothing in the discovery so far or the personnel files that I find concerning at the moment. However, I don't know how the claims representative will hold up in a deposition regarding the decision to cease benefits so abruptly.

**Why was the offer of settlement in the amount of $1,500 improper given the timing in the file and was the offer ever rejected?**

Mr. Leichtnam was offered $1,500 in settlement on October 28, 2009 after he had filed a petition with the Department of Labor. A settlement was reached on June 12, 2013 for $75,000. There is nothing in the medical records in the lapse in time that would support such a large increase in the valuation of the case. Mr. Leichtnam continues with pain medication, injections and physical therapy. No surgeries were recommended. There is no indication of a significant increase in pain. Further, the claim notes, which have been produced, label the $1,500 as a "cost of defense" offer. This creates an appearance of an improper valuation of the claim.

The offer of $1,500 was rejected when a demand was made on November 9, 2010 for $175,000.

## GUNDERSON, PALMER, NELSON & ASHMORE, LLP

February 1, 2016
Page - 3 -

**Did Bill Fuller believe Mr. Leichtnam would be perceived as a sympathetic witness?**

I have not connected with Mr. Fuller to discuss his perceptions of Mr. Leitchnam during his deposition. However, following Mr. Leichtnam's deposition, Mr. Fuller reported to the claims representative that Mr. Leichtnam was "articulate and fairly witty" and came across better than expected. I think his argument that he had to live in pain for three years while Zurich denied medical treatment due to the opinion of an non-board certified doctor will garner some sympathy from any jury.

**Damages Analysis**

Unfortunately, our jurisdiction has no repository for jury verdicts so I cannot provide any insight beyond my experience and what I know through word on the street. As we have discussed, the Plaintiff's attorney in this matter has had great success in the bad faith arena here in South Dakota. He takes very few cases a year and thoroughly evaluates cases before he ever agrees to representation. Because of this, he also very rarely moves far from his initial demands when it comes to settlement.

As we have discussed, judges in South Dakota err on the side of allowing liberal discovery in these types of bad faith matters, but the judges control what is admissible and can be used at trial. Although the discovery process can be painful, it is my belief our judges, on the whole, make the right decisions when it comes admissibility.

Juries in South Dakota tend to be fair. We don't see "run away juries" often if at all. However, if a Plaintiff is entitled to damages, South Dakota jurors aren't afraid to make awards – no matter how big.

In order to recover punitive damages in a bad faith action in South Dakota, a plaintiff must demonstrate that the claim was denied with knowledge of the absence of a reasonable basis for the denial or a reckless disregard of whether a reasonable basis existed. If this is proven, the Plaintiff can recover compensatory damages. In order to recover punitive damages, there must be a showing of actual or presumed malice. In order to recover attorneys' fees as damages, a party must show, by a preponderance of the evidence, that the refusal to pay was vexatious or without reasonable cause.

**The Plaintiff's Wrongful Termination Case**

I am unaware of the wrongful termination case or who is handling same. I'll do some digging to get this information for you.

ZURICH(2)  003414

## GUNDERSON, PALMER, NELSON & ASHMORE, LLP

February 1, 2016
Page - 4 -

**Projected Budget**

The legal costs in Bad Faith cases can be significant in our jurisdiction. As you are now well aware, discovery itself is a costly endeavor. I anticipate there will be at least ten deposition taken – if not more, plus the retention of one if not two experts in this matter. Due to the volume of documents and information involved and the specialty of Bad Faith cases, my partner Jana Smoot White and I are both working the file. Although we do our best to not duplicate efforts, the two of us will need to attend any trial, major discovery or pre-trial motions. Because of the time and specialty involved, it would be reasonable to estimate at least $75,000 in attorneys' fees plus the costs of experts to take this case through trial.

**Analysis of Demand**

I do think this is a case we should attempt to settle. To me, there is no question the benefits were improperly and incorrectly terminated based on the position taken by Dr. Farnham in his evaluation, which was contrary to the ongoing medical evidence that the benefits should continue. I think Dr. Farnham's reputation is also taken into question in the *Gowan* matter and I think it presents some serious issues. This tells you why the plaintiff is asking about the IME taken by Dr. Farnham in the discovery requests here.

Further evidence of our problem is the fact that Bill Fuller, the lawyer representing the employer and you in this matter, had problems with the benefits being terminated and was routinely recommending that benefits be reinstated. Further, if you will recall, when this case first came to light, Bill Fuller called me to make sure we did not assert "advice of counsel" as a defense because it would create a problem for us. Obviously Bill thought there were issues with potential bad faith developing and candidly, in the review of this case, there is clearly going to be a finding of bad faith.

The challenge in all of these cases, especially one like this, is that the benefits were ultimately reinstated and the case resolved and medical benefits are still being paid I believe. Trying to determine the damages is very difficult. There is no particular way to look at these cases and determine what the damages could be because they are so nebulous, if you will.

The thing I can tell you with certainty is as this matter goes forward, the discovery process will be very expensive. My experience in these matters has been that the longer the discovery process goes on, generally speaking, these cases do not get any better and frequently get worse as there are more and more issues that turn up in the course of the discovery process. It is expensive in attorneys' fees and it is expensive in human resource time spent by your people dealing with these ongoing discovery issues and disruption of their work schedules with discovery responses, depositions and the like. Ultimately there is going to have to be some sort of payment to the plaintiff to settle this case or ultimately a determination of a judgment amount by a jury.

ZURICH(2)  003415

## GUNDERSON, PALMER, NELSON & ASHMORE, LLP

February 1, 2016
Page - 5 -

In trying to determine value for cases like this, I would have to tell you that frequently I advise insurers in bad faith cases that the value of the case is basically what you are willing to pay to get rid of the claim. I know that sounds somewhat irresponsible and sounds like it does not have much analysis to it, but frankly, it is based on handling many bad faith cases and watching how they develop and the costs associated. I think the "get rid of it" factor is not a bad way to approach these.

I would tell you Mike Abourezk is a very challenging individual with whom to negotiate. Mike will tell you early on (like he has done here) a case value that he thinks is in the realm of what the case is worth and does not stray very far from that in the course of trying to negotiate with him. I think you can see that Mike has laid out his position as to where he thinks we have problems. As I have told you, I am not sure we don't have a significant number of problems and the deeper we get into discovery the harder it is to get him to negotiate downward.

Very candidly, I do not think the number he has demanded is that far out of line. I have settled several bad faith cases with Mike with a better defense potential for $200,000 and up. I would tell you that I think Mike will take less than $325,000, but where he would go under $300,000 I cannot tell you. He might be willing to take $275,000; I would question whether he would take $250,000, but that is certainly a discussion item to be had if we want to pursue that. I will tell you I do not think he is going to take anything less than $250,000 and candidly, based on what bad faith cases settle for around here, if I was him I probably wouldn't either.

**Closing**

Please give me a call to discuss this matter at your earliest convenience. If we are going to attempt settlement, I would like to do so before we get much further into discovery.

Sincerely,

J. Crisman Palmer

JCP:jsw

ZURICH(2)  003416