# RICHARDSON LAW FIRM
### RICHARDSON, WYLY, WISE, SAUCK & HIEB, LLP

ONE COURT STREET
POST OFFICE BOX 1030
ABERDEEN, SD 57402-1030

E-MAIL: jhieb@rwwsh.com

www.rwwsh.com

ROY A. WISE
JACK H. HIEB
ZACHARY W. PETERSON
KIMBERLY A. DORSETT
STACY M. JOHNSON
JOSHUA K. FINER
RYAN S. VOGEL
CHRISTI M. WEIDEMAN

DWIGHT CAMPBELL (1887-1984)
STANLEY R. VOAS (1909-1972)
JAMES A. WYLY (1939-2009)
LLOYD C RICHARDSON, JR. (1924-2012)
RICHARD L. RUSSMAN (1957-2014)
WILLIAM K. SAUCK, JR. (RETIRED)

TELEPHONE (605) 225-6310
FACSIMILE (605) 225-2743

October 28, 2022

VIA E-MAIL
(jrsutton@boycelaw.com)

Mr. Jason R. Sutton
Boyce Law Firm
Post Office Box 5015
Sioux Falls, SD 57117-5015

Dear Mr. Sutton:

      Re: American Zurich Insurance Company v.
          J. Crisman Palmer, et al.

This letter will serve as my written report prepared at your request regarding the allegations of breach of fiduciary duty and malpractice leveled against J. Crisman Palmer ("Palmer") by American Zurich Insurance Company ("Zurich"). When I reference a document as ("Ex.") in this letter, I am referring to the deposition exhibit designation of that document.

### GENERAL BACKGROUND

I grew up in rural South Dakota and graduated from Delmont High School in 1985. I attended Augustana University (f/k/a Augustana College) in Sioux Falls, South Dakota, and graduated in 1989 with a Bachelor of Arts degree. From 1992 to 1995, I attended the University of South Dakota School of Law and earned a Juris Doctorate in May, 1995.

00597677.WPD / 1


EXHIBIT 114
12·19·22

LAW OFFICES-RICHARDSON, WYLY, WISE, SAUCK & HIEB, LLP

Pg. 2            To:  Jason Sutton            Date: 10/28/22

Upon graduation, I practiced law with Lee Schoenbeck in Webster, South Dakota. The focus of my practice was almost exclusively civil litigation. In the same timeframe (1996 to 2000), I served as the Day County State's Attorney and handled, on a part-time basis, all of the criminal prosecutions in Day County.

At some point in 1999, I left Webster and Mr. Schoenbeck's firm and joined the Richardson Law Firm in Aberdeen. I have practiced in the firm since then and my practice has focused exclusively on civil litigation, with much of that practice involving insurance-related matters.

I am licensed to practice law in the State of South Dakota's courts, the Federal District Court of South Dakota, the Eighth Circuit Court of Appeals, and have been licensed in various Tribal Courts throughout my career. Other than a case that was venued in the Standing Rock Sioux Tribal Court and tried in Ft. Yates, North Dakota, I have never tried a case outside of South Dakota.

**SPECIFIC BACKGROUND RELATED TO THIS CASE AND QUALIFICATIONS**

I have been involved in numerous bad faith cases over the course of my career. Most of my involvement has been as a defense attorney hired to defend insurers, self-insureds, or TPAs. I have also represented numerous plaintiffs in bad faith cases and have acted as a mediator a number of times, assisting with the settlement of bad faith claims.

I have tried bad faith cases to a jury in both Federal and State court. Additionally, I have handled numerous cases in which Mike Abourezk ("Abourezk") was representing an adverse party. I have tried at least one case where Abourezk was opposing counsel and have acted as co-counsel with Abourezk on at least one bad faith matter. My involvement with Abourezk stretches back about twenty years, and during that time I have negotiated numerous settlements with him while acting as opposing counsel for insurers or similarly situated parties. I have not authored any publications relevant to my qualifications.

**FRCP 26(a)(2)(B)(v) disclosure of prior testimony**

I have not, in the previous four (4) years, testified as an expert at trial or deposition.

00597677.WPD / 1

LAW OFFICES-RICHARDSON, WYLY, WISE, SAUCK & HIEB, LLP

Pg. 3          To: Jason Sutton          Date: 10/28/22

### FRCP 26(a)(2)(B)(vi) statement regarding compensation

I am being compensated for the time spent on this matter at the rate of $300 per hour. In addition, I will be reimbursed for any out-of-pocket expenses I incur and will collect 6.5% sales tax on any fees charged.

### DOCUMENTS REVIEWED

I was retained by Jason Sutton, counsel for Palmer,[1] to express opinions about the relevant standard of care, the efficacy of Palmer's representation of Zurich, and the opinions expressed by Mr. Colin Campbell on behalf of Zurich. Other than relevant case law, statutes, or rules, the documents I reviewed related to the preparation of this report consist of the following:

1. Documents marked GPNA 1 - GPNA 12834

2. Documents marked Zurich 1 - Zurich 4580

3. Deposition Transcripts of Conrad Nowak, Paris Glazer, Dawn Wagner, Mike Abourezk and J. Crisman Palmer and associated exhibits

4. The following captioned documents from the lawsuit: Complaint, Answer, First Amended Complaint, Answer to Amended Complaint, Second Amended Complaint, Answer to Second Amended Complaint, Plaintiffs' Initial Disclosures, Defendants' Initial Disclosures, Plaintiffs' Responses to Requests for Admission, Defendants' Responses and Objections to 1st Set of Interrogatories, Defendants' Responses and Objections to 2nd Set of Interrogatories, Plaintiffs' Responses to Requests for Production, Plaintiffs' Supplemental Responses to Palmer's Request No. 7, and Plaintiffs' Supplemental Answer to Interrogatory No. 13 (which includes within it the initial answer to that interrogatory)

5. Opinion Letter of Colin F. Campbell dated September 30, 2022

---

[1] The case in which Sutton represents Palmer is captioned *American Zurich Insurance Company, et. al. Plaintiffs v. J. Crisman Palmer, et. al. Defendants*, 5:20-CV-05026-KES, District Court for the District of South Dakota.

00597677.WPD / 1

LAW OFFICES-RICHARDSON, WYLY, WISE, SAUCK & HIEB, LLP

Pg. 4                    To: Jason Sutton                Date: 10/28/22

## OPINIONS RELATED TO ALLEGATIONS MADE BY PLAINTIFFS IDENTIFIED IN THEIR ANSWER TO INTERROGATORY 13

Palmer's counsel served an interrogatory on plaintiffs requesting they identify each and every "act, error, or omission [they] contend [Palmer or his firm] committed that is breach of fiduciary duty or violation of the applicable standard of care." The interrogatory goes on to request, to the extent Zurich is claiming a breach or violation is based upon "failure to include an affirmative defense in the answer", it identify which defense(s) should have been pled and all facts that would have supported the pleading of such defense(s). Since this interrogatory appears to comprehensively seek all allegations of wrongdoing, I am using Zurich's responses as a template for my opinions.

A) **Failing to Assert Applicable or Potentially Applicable Affirmative Defenses Including the Underlying Settlement's Release, Failure to Exhaust the Administrative Remedy, Res Judicata and Statute of Limitations.**

Zurich's first allegation is that Palmer breached the standard of care by failing to assert affirmative defenses in the Answer he filed on behalf of Zurich. They identify four defenses. In my opinion, none of the defenses should have been asserted by Palmer. In fact, asserting at least one of them would have created the potential for Abourezk to enhance his chance of a significant verdict at trial.

1. <u>Failure to Assert Release</u>

Release is an affirmative defense that must be pled, if applicable to a case. In this case, it appears that Zurich is taking the position that Palmer's failure to plead it violated the standard of care and harmed Zurich. The "release" Zurich is referring to appears to be the settlement agreement entitled Compromise and Settlement Agreement and Order for Approval that was executed by the parties to the Worker's Compensation proceeding and approved by the South Dakota Department of Labor on June 21, 2013. (Ex. 9).

It appears even Zurich and its expert agree that nothing in that document expresses an intent by the parties to release the bad faith claims that formed the basis of the lawsuit that Palmer defended. As a result, even Mr. Campbell believes

00597677.WPD / 1

LAW OFFICES-RICHARDSON, WYLY, WISE, SAUCK & HIEB, LLP

Pg. 5　　　　　　To: Jason Sutton　　　　　　Date: 10/28/22

that, at best, it is "unclear whether the release encompassed all or most of the damages asserted in the subsequent bad faith action." (Campbell Opinion Letter, p. 6). In other words, at best, the agreement is ambiguous on the question of whether the parties intended to release the claims ultimately made in the bad faith lawsuit.

It is a fundamental tenet of contract law that when a writing is uncertain or ambiguous, parol or extrinsic evidence may be admitted to explain the instrument. See, e.g., *Jensen v. Pure Plant Food Int'l*, 274 N.W.2d 261 (S.D. 1979). Early in the case Palmer talked to Bill Fuller ("Fuller") who represented Zurich in the Worker's Compensation matter. Fuller told Palmer that he had attempted to place language in the settlement agreement which would have released the bad faith claim but Dennis Finch ("Finch"), who represented the injured worker, insisted it be removed. (Palmer Depo., p. 28). This is borne out by the documents produced in discovery. An e-mail exchange between Fuller and Finch over the proposed language of the settlement agreement shows an unmistakable intent by the parties to remove language that would have released the bad faith claim. (Ex. 16).

First, an attorney should have a good reason for pleading something before they do it. In this case, based on Palmer's conversation with Fuller and the fact that the settlement agreement was a captioned settlement in a proceeding where the adjudicative authority had no jurisdiction to hear claims of bad faith, pleading release as a defense would have defied reason.

Second, and maybe more important, pleading "Release" as an affirmative defense with the knowledge that counsel for Zurich had agreed to remove any mention of bad faith from the agreement would have been extremely inadvisable. As indicated previously, even Mr. Campbell admits that the language of the release, at best, is ambiguous on the relevant issue. As a result, Zurich could not have prevailed on a dispositive motion on this issue. The issue would have gone to the jury and Abourezk would have been free to call Fuller to the stand where the exchange might have gone something like this:

Q.　Mr. Fuller, who did you represent in the underlying proceeding?

A.　Zurich and their insured.

00597677.WPD / 1

LAW OFFICES-RICHARDSON, WYLY, WISE, SAUCK & HIEB, LLP

Pg. 6　　　　　　　To:　Jason Sutton　　　　　Date: 10/28/22

Q. When Mr. Finch and you reached an agreement to settle the case, who took the first crack at drafting the settlement agreement?

A. I did.

Q. In your initial draft, did you include language that would have released any claims of bad faith against Zurich?

A. Yes.

Q. Did Mr. Leichtman sign the agreement in that form and with that language in it?

A. No.

Q. Why not?

A. Because his attorney, Mr. Finch, objected to me including any language that would have released the bad faith claims.

Q. Does Ex. 16 include the e-mail exchange the two of you had as you were negotiating the terms of the settlement agreement?

A. Yes.

Q. When Mr. Finch objected to including language that would have released the bad faith claims, did you remove that language from the draft agreement?

A. Yes.

Q. Look at Ex. 9. Is that the agreement that you ultimately signed on behalf of Zurich?

A. Yes.

Q. Did Zurich authorize you to sign that agreement on their behalf?

A. Yes.

00597677.WPD / 1

LAW OFFICES-RICHARDSON, WYLY, WISE, SAUCK & HIEB, LLP

Pg. 7          To: Jason Sutton          Date: 10/28/22

Q. Did you make Zurich aware that you were removing the language that would have released bad faith claims prior to them authorizing you to sign it?

A. Yes.

Q. Did you believe, as Zurich's attorney in that proceeding, that the settlement agreement you ultimately signed released any of the bad faith claims my client may have had against Zurich?

A. No.

Q. Do you have any idea what the basis would be for your former client to claim that Joe somehow agreed to release his bad faith claims in that document?

A. No.

    Since Mike Abourezk is a far better trial attorney than I am, the exchange would have likely been even more effective than what is illustrated above. The point is, if Palmer would have pled "release" he would have been pleading a defense that he would have known had no chance of success and, more importantly, he would have given Mike Abourezk the chance to use Zurich's own former counsel to make them look like they were trying to renege on the deal they made with his client. Not only was failing to plead "release" not a violation of the standard of care, it would have been a very poor idea to raise it.

    2. <u>Failure to Plead Exhaustion of Remedies</u>

    Candidly, it is somewhat unclear why Zurich maintains that Palmer committed malpractice by failing to plead that Leichtman failed to exhaust his administrative remedies. Zurich was actually allowed to put this issue squarely before the Court when it filed a dispositive motion. (Ex. 59). Unlike the motion to amend, ultimately Magistrate Wollman addressed the issue about whether a failure to exhaust had occurred on the merits. (Ex. 62). If Zurich somehow believes that Magistrate Wollman got it wrong, they should have waited for Judge Viken to sustain their objections to the report instead of paying Mike Abourezk $2,000,000 to settle the case. Furthermore, if they believed Judge Viken would get it wrong, they should have simply tried the case and appealed the issue to the Eighth Circuit Court of Appeals.

00597677.WPD / 1

LAW OFFICES-RICHARDSON, WYLY, WISE, SAUCK & HIEB, LLP

Pg. 8                To:   Jason Sutton              Date: 10/28/22

In point of fact, I do not believe Magistrate Wollman got it wrong nor do I believe that there was any good argument that Leichtman failed to exhaust his administrative remedies. As Magistrate Wollman pointed out, the South Dakota Supreme Court has decided this issue and has made it clear that a bad faith plaintiff in the worker's compensation setting may bring their suit for bad faith when the claim has "reached the final stages of the administrative process." (Ex. 62, p. 7). This requirement may be met by "agreement or adjudication." (Id.) This is black letter law in South Dakota and is, or should be, widely known to those of us defending bad faith cases in South Dakota. Palmer's failure to plead "exhaustion" is not an act that deviates from the standard of care or any duty he owed to Zurich. There was no basis for such a defense in the case.

3.   Failure to Plead Res Judicata

The allegation that Palmer's failure to plead res judicata somehow evidences substandard lawyering is baffling at best. Simply put, in order for res judicata to apply, the wrong sought to be redressed in both actions must be the same. The reason why res judicata should not have been pled is due to the fact that the prior proceeding was a Worker's Compensation proceeding before the South Dakota Department of Labor. The Department of Labor has no jurisdiction to award damages for bad faith or any other theory. The Department of Labor's jurisdiction in Worker's Compensation matters allows it to award statutorily scheduled benefits. As a result, not only were the claims for bad faith and resulting damages not made in the prior action, they could not have been made.[2] Failing to plead res judicata would not have provided any benefit to Zurich and would only have served to suggest to Abourezk and the Court that counsel for Zurich either did not know what they were doing or were not complying with Rule 11. Neither is a good way to start a case.

4.   Failure to Plead Statute of Limitations

This allegation is almost as puzzling as the allegation about failure to plead res judicata. Any attorney who defends bad faith cases in South Dakota should know that the applicable statute of limitations is six (6) years. Further, there is

---

[2] This means there is no legitimate argument for claim or issue preclusion.

00597677.WPD / 1

LAW OFFICES-RICHARDSON, WYLY, WISE, SAUCK & HIEB, LLP

Pg. 9　　　　　　To:　Jason Sutton　　　　　　Date: 10/28/22

authority from the Federal District Courts of South Dakota, which clearly indicates that a claim for bad faith denial of workers compensation benefits does not accrue until after the workers compensation proceedings are complete or final. See *Brennan v. Western Nat'l Mut. Ins. Co.*, 125 F.Supp.2d 1152 (D.S.D. 2001). Much like the previous allegation, failing to plead statute of limitations would not have helped Zurich and certainly does not constitute a failure to adhere to the appropriate standard of care.

### B) Failure to do any Research on Defenses

None of the defenses that Zurich claims Palmer should have raised would have necessarily required Palmer to conduct research. Palmer had plenty of experience defending worker's compensation bad faith cases. An attorney should not bill his client to do "research" if he or she already knows the answer to a question. The four defenses that Zurich faults Palmer for not asserting are not complicated principles. Contrary to Zurich's assertion, any type of extensive research by Palmer to determine the state of the law in South Dakota on: 1) Release, 2) Exhaustion of Remedies, 3) Res Judicata, or 4) Statute of Limitations would cause me to question whether Palmer had the requisite knowledge or experience to defend a bad faith case.

The fact that Palmer did not do research on these issues is not evidence of a breach of his duties to his client. The fact that he did not do research (or have associates do it) when he already knew what the law was shows that he does not unnecessarily bill for services that are not needed. Further, based upon the analysis above, even if Palmer did not know the state of the law relating to the defenses described above, his failure to "research" them caused no harm to Zurich because none of them should have been pled.

### C) Failure to Propound Written Discovery or Take Depositions

Palmer's failure to serve written discovery or take depositions did not harm Zurich nor does the failure constitute any type of malfeasance. I have defended numerous bad faith cases in which I have not served any discovery or taken any depositions. First, this case was filed in Federal District court. As a result, the parties are obligated to make Initial Disclosures and, in South Dakota, the parties customarily provide copies of all documents that are identified as relevant to their

00597677.WPD / 1

LAW OFFICES-RICHARDSON, WYLY, WISE, SAUCK & HIEB, LLP

Pg. 10        To: Jason Sutton        Date: 10/28/22

claims or defenses when those disclosures occur. It appears Abourezk produced a number of documents as part of this process. As a result, there was no need for Palmer to serve Requests for Production asking the plaintiff to produce documents that were already produced. As for interrogatories, it is unclear what information could be obtained from interrogatories that would have assisted Zurich in determining how to get this case settled early? Finally, there is no indication that a deposition of the plaintiff would have produced any information that would have helped Zurich better evaluate its exposure.

Zurich appears to take the position that discovery could have been used to "challenge the claimed injuries" in various ways or whether they could have been barred by the statute of limitations. Generally speaking, in the worker's compensation bad faith cases I have defended, the defendant is prohibited from questioning whether the underlying injury is actually work related. That issue is deemed resolved by virtue of the settlement and the insurer's agreement to pay future medical or other benefits to the Claimant. It is barred because of the very principles of res judicata that I explained earlier. If that is the type of evidence Zurich was hoping to uncover, it probably wouldn't have been admitted anyway.

If Zurich is claiming they wanted Palmer to do discovery to see if Leichtman was being compensated twice for the same damages, that would be impossible. Abourezk was not making any claim for medical benefits; rather, he was making a claim for the mental anguish, pain and suffering, loss of enjoyment of life, etc., his client suffered during the lengthy period of time Zurich wrongly refused to pay for treatment to help him cope with his pain. None of those damages can be obtained in a worker's compensation proceeding. As a result, no amount of discovery would have helped identify a potential double recovery or damages that could have been compensated in the worker's compensation proceeding. Abourezk clearly was not seeking them.

Further, doing discovery to determine whether some of his claimed injuries "could have been barred by the statute of limitations" shows a fundamental misunderstanding of when a claim for worker's compensation bad faith accrues and the damages being sought by Abourezk in the case. Abourezk did not hide anything with respect to his claims. He laid it out in his Complaint and in his settlement demand letter. (Ex. 19). Suggesting that Palmer should have done discovery to see if some of the damages being claimed by Leichtman were barred by the statute of

00597677.WPD / 1

LAW OFFICES-RICHARDSON, WYLY, WISE, SAUCK & HIEB, LLP

Pg. 11          To:    Jason Sutton          Date: 10/28/22

limitations makes no sense.

Finally, Zurich claiming Palmer's failure to conduct discovery somehow harmed it is belied by the fact that Palmer was removed from the case as lead counsel over a year before the discovery deadline expired and the Hinshaw attorneys presumably served all of the written discovery and took all of the depositions they needed to take to help Zurich get whatever information Zurich claimed to need.[3]

Discovery should be done when an attorney believes he or she needs information to assist in the defense or prosecution of their clients' claims. To suggest that it must be done in every case turns the process into a rote exercise designed to create work and needless expense for the client. In any event, the Hinshaw firm did all of the discovery Zurich claims Palmer should have done and none of it produced any information that appears to have been relevant to the settlement of the case.

D)    **Failure to Make and Motions to Defend or Defeat the Claim**

Much like the affirmative defenses that Zurich faults Palmer for not pleading, failing to make specious motions with no basis for them would not have benefitted Zurich. Zurich made a dispositive motion relating to the failure to exhaust defense and, predicably, that motion failed. There were no motions Palmer could have filed in good faith that would have "defeated" the bad faith claim.

E)    **Failure to Provide Requested Evaluations to the Client or Otherwise Inform them Sufficiently to Consider the Settlement Offer**

Palmer did not fail to provide the information sought by Dawn Wagner ("Wagner"). To the contrary, Palmer repeatedly tried to provide Wagner with the information she should have needed to get this case settled early and for an amount far lower than what was ultimately paid.

Abourezk sent a demand letter to Palmer on 9/24/15 offering to settle the case for $325,000, with a warning that

---

[3] I make this assumption since Zurich, to my knowledge, did not sue the Hinshaw firm.

00597677.WPD / 1

LAW OFFICES-RICHARDSON, WYLY, WISE, SAUCK & HIEB, LLP

Pg. 12　　　　　To:　Jason Sutton　　　　　Date: 10/28/22

settlement at that number would not be available later if the case did not settle quickly. (Ex. 19). Palmer forwarded that letter to Wagner the next day. In a letter he informs Wagner about Abourezk's credentials, how Judge Viken will likely rule in Abourezk's favor on the likely Motion to Compel that Wagner was inviting, and most importantly, about Palmer's recent history of getting early settlements done with Abourezk and that the offer won't likely be around "six months from now." (Ex. 89) In response to receiving this information, Wagner sends an e-mail to Palmer asking him to talk to her further. According to Palmer's billing records, both he and Attorney White had an hour long phone call with Wagner two days later on December 17, 2015. (Ex. 3, p. 13). If Wagner did not get the information she needed from Palmer to help her evaluate early settlement from his letter (ex. 89), presumably she was able to ask any questions she wanted to ask during the hour long phone call she had with Palmer and Attorney White two days later.

Only six (6) days later, Palmer sends another letter to Wagner and encloses a copy of a discovery decision handed down by Magistrate Duffy relating to many of the same discovery issues that Wagner and Zurich were resisting. (Ex. 22). In that same letter, Palmer once again reiterates his belief that Wagner should allow him to try to get the case settled, provides more information about how Mike Abourezk approaches settlement, and even provides an estimate of what he thinks the case can be settled for if he is allow to negotiate it. (Id.)

Instead of accepting Palmer's advice and allowing him to engage in settlement discussions within the parameters suggested by Palmer, Wagner sends a reply e-mail on January 6, 2016, calling Palmer's information "high level analysis" and asking him to provide her with five (5) additional categories of information. (Ex. 23). On February 1, 2016, Palmer responds to Wagner's request with a detailed analysis in a five (5) page letter. (Ex. 24).

What makes the allegation that Palmer did not provide Wagner with information she needed to evaluate the early settlement demand by Abourezk absurd is that Zurich seems to be intimating that, in addition to providing the information he was equipped to provide, Palmer should have somehow provided additional information that Zurich should have and already did know. Only twelve (12) days, after Palmer drafts the letter to Wagner addressing the requests for information about strengths and weaknesses of the case, Wagner has an internal meeting at Zurich

00597677.WPD / 1

LAW OFFICES-RICHARDSON, WYLY, WISE, SAUCK & HIEB, LLP

Pg. 13  　　　　　To:   Jason Sutton　　　　　Date: 10/28/22

with Arnold D'Angelo. The purpose of the meeting appears to be concerns that Wagner has about certain internal performance metrics she has reviewed. (Ex. 92). This is information that Palmer may not have even had at that point but it is clearly information that Palmer has told Wagner Abourezk will get (if it exists). Whether those metrics had been produced by that point or would have to be produced later, Wagner clearly knows the metrics exist and understands they may be problematic.[4]

　　　　What Palmer knows (and Zurich arguably doesn't) as the South Dakota attorney hired to defend Zurich is: 1) how the pending discovery disputes will likely be resolved; 2) how Mike Abourezk will approach discovery and settlement; and 3) what Mike Abourezk's track record is when it comes to litigating these cases. Palmer provided Wagner with all of this information more than once and made himself available to speak with her if she was somehow unclear about anything. Virtually everything else relevant to deciding whether to settle the case at that point is either known or should be known by Zurich. In point of fact, it turns out that some of what was known by Zurich that proved to be extremely damaging evidence was known only to Zurich.

　　　　By February 17, 2016, Palmer is once again contacting Wagner and asking her for something because he would "really like to try and get some proposal to Abourezk" regarding settlement. (Ex. 93). Eight (8) days later Wagner e-mails Palmer and updates him on her efforts to pull together documents responsive to discovery requests and informs him that she met with "senior management to try and obtain some settlement authority." (Ex. 94). She then tells Palmer to reach out and try to get mediation scheduled. (Id.) Wagner does not indicate she does not have enough information or request any further advice from Palmer.

　　　　There appears to be no basis for the suggestion that Palmer failed to provide any information that Zurich needed or wouldn't have already had to evaluate the settlement offer made on September 24, 2015.

F)　　**Failure, "despite repeated requests/suggestions by Zurich/Dawn Wagner, to set up a timely mediation to take advantage of Plaintiff's $325,000 case offer."**

---

[4] Wagner's concerns about the problem those metrics may have created for Zurich is borne out by the testimony of Abourezk. (Abourezk Depo., pp. 110 - 125)

00597677.WPD / 1

LAW OFFICES-RICHARDSON, WYLY, WISE, SAUCK & HIEB, LLP

Pg. 14        To: Jason Sutton        Date: 10/28/22

      The allegation made about Palmer's alleged dilatory behavior as it related to scheduling mediation does not appear to be consistent with the record of communications. Nothing Palmer did with regard to scheduling the mediation or trying to help Zurich settle the case violated the standard of care. The allegation accuses Palmer of delaying for over "9 months" to set up a mediation and "lost the opportunity to settle in the $300,000 range that Zurich was prepared to pay." (Plaintiffs' Supplemental Answer to Interrogatory No. 13).

      At no point prior to February 25, 2016, did Wagner or anyone at Zurich authorize Palmer to set up a mediation. As a result, to the extent the nine (9) month number is relevant, the first five (5) months of delay were occasioned by Wagner failing to authorize Palmer to make any response to Abourezk's settlement demand.

      In point of fact, Palmer had already suggested, very early, that Abourezk would not likely knock much off the $325,000 demand and the lowest Abourezk might go was $250,000.[5] Nothing about Palmer's advice about how to get this case settled early suggested mediation would be a good idea. In fact, it clearly implied the opposite.

      On March 15, 2016, Palmer sent a letter to Wagner and directly tells her that "Mike Abourezk is an interesting character and challenging to deal with in mediation." (Ex. 95). Over the course of the next month, Palmer speaks to Lon Kouri (widely regarded as the best mediator in South Dakota), arranges for Wagner to speak with Kouri and Palmer, and they work on a "strategy" for proposing mediation to Abourezk. (Ex. 3, pp. 21-24). Ultimately, it appears that a strategy was agreed upon by early April, 2016 and Palmer sends the proposal to Abourezk. (Ex. 3, p. 23). Before that happens, Palmer sends another letter to Wagner on April 8, 2016, where he actually suggests letting him just deal "one on one" with Abourezk, but then goes on to indicate that he will set a mediation since it seems like Wagner is more comfortable in that setting. (Ex. 25). It is apparent

---

[5] The author sincerely questions whether Abourezk would have reduced his demand to $250,000 at that point. From my experience in dealing with Abourezk, Palmer would have likely gotten him to accept $300,000 if he approached him quickly after the letter was sent, but anything below $300,000 seems unlikely.

00597677.WPD / 1

LAW OFFICES-RICHARDSON, WYLY, WISE, SAUCK & HIEB, LLP

Pg. 15          To: Jason Sutton          Date: 10/28/22

that Wagner was not interested in following Palmer's advice. Had she done so, Zurich would have provided Palmer with the $300,000 in authority and allowed him to approach Abourezk months earlier or even in March. Instead, Wagner insisting on using a mediation conference to try and achieve a settlement.

It appears it is sometime in June, 2016, when Abourezk finally agrees to mediation and a date gets set with Lon Kouri to act as a mediator. The mediation conference is scheduled for October 24, 2016. (Ex. 99).

The allegation that Palmer somehow breached a duty by not getting the case to mediation sooner is inconsistent with the facts and presupposes that this case could have been settled at mediation for "something in the $300,000 range."

Palmer gave Wagner exactly the advice that an experienced bad faith defense attorney in South Dakota should have given her. When Abourezk makes an early settlement offer that is reasonable, he will not knock much, if anything, off of it and he won't agree to mediate. If he does agree to mediate, it is likely that the number has gone up. Palmer told Wagner immediately that Abourezk's low settlement offer would not likely be around six (6) months later. He told her to give him the authority and let him settle the case. She rejected both notions and now Zurich is blaming Palmer when the number went up significantly a year later. Zurich's criticism on this point defies logic and continues to misapprehend how Mike Abourezk handles his cases.

G) **Palmer's Failure to advise Zurich/Dawn Wagner of Plaintiff's attorney's multiple previous jury verdicts to better inform her for settlement consideration.**

One day after receiving Abourezk's settlement demand that Zurich claims Wagner was trying to "evaluate," Palmer sent a letter to Wagner with that demand that included the following excerpts:

-- "As I think I told you by phone, Mike is a very good lawyer. He is without question the 'guru' of bad faith in South Dakota and maybe even in this region."

-- "He is smart, well-prepared, thorough and knows the area inside and out. He knows where to look and what to ask for."

00597677.WPD / 1

LAW OFFICES-RICHARDSON, WYLY, WISE, SAUCK & HIEB, LLP

Pg. 16　　　　　　To: Jason Sutton　　　　　Date: 10/28/22

(Ex. 89).

On June 10, 2016, Palmer sends a letter to Wagner and mentions in it that Abourezk just finished a trial where he got a $3,750,000 verdict against Travelers. (Ex. 97). Palmer went out of his way to try and convince Wagner that Abourezk knew what he was doing and was one of the best attorneys in the bad faith business. To suggest that Palmer had to give Wagner a rundown of Abourezk's trial results as part of his obligation as Zurich's attorney is unsupported. In fact, it simply suggests that Wagner was either ignoring Palmer or thought she knew better. In point of fact, if Wagner truly thought she needed to know more about Abourezk, she could have simply typed his name into the search engine on her computer. Most of his trial results are right on his webpage. (Ex. 35).

H) **Palmer's failure to bring an early motion to dismiss on the legal issue of exhaustion in order to find out early if Zurich could succeed which would have better informed settlement discussions.**

Once again, this allegation completely ignores what Abourezk and Palmer were telling Zurich. The ability to settle this case for "something in the $300,000 range" would not have been available if Palmer would have filed such a motion. From my experience with Abourezk, bringing a specious motion like the one suggested above and forcing him to brief and argue the issue would have insured that the demand would have gone up significantly.[6]

I) **Palmer's "concealment" of his decision to take no discovery keeping Wagner from hiring new counsel sooner so new counsel could take discovery and file motions to aid in "consideration [of] the early settlement opportunities**

---

[6] Abourezk has repeatedly told me in cases I'm defending against him that if my client is going to "jerk him around and make him respond to b*#*#&*t motions, he's not interested in letting them off the hook for a bargain." Based on my prior experience with Abourezk and what Judge Wollman properly characterized as the settled nature of this issue, Abourezk would not have been willing to keep the $325,000 demand on the table if such a motion had been filed.

00597677.WPD / 1

LAW OFFICES-RICHARDSON, WYLY, WISE, SAUCK & HIEB, LLP

Pg. 17                    To:   Jason Sutton                    Date: 10/28/22

Once again, Zurich refuses to acknowledge what Palmer and I both know from experience – you cannot do discovery, file motions AND still get the benefit of settling a case like this one for $300,000 with Abourezk. There is no evidence Palmer "concealed" anything and had Wagner fired Palmer sooner and done all of the things this allegation claims she would have done, she still would have paid $2,000,000 to settle the case because, from my experience, I do not believe Abourezk would have kept the offer on the table.

## RESPONSE TO OPINIONS OF COLLIN CAMPBELL

Collin Campbell ("Campbell") submitted an opinion letter opining that Palmer violated numerous ethical rules which he claims could have caused Zurich "to pay $1,500,000 less." Campbell's opinions start by indicating that South Dakota law and ethical rules govern Palmer's conduct; however, he never cites any South Dakota law in his opinion.

In *Hamilton v. Sommers*, the South Dakota Supreme Court made the following statement:

> In applying a standard of care [in attorney malpractice cases], locality can also be considered as a factor or special circumstance when determining whether an attorney has met the standard, in an appropriate case, such as where local rules, practices or customs are relevant to claimed breach of duty."

2014 SD 76, ¶ 28; 855 N.W.2d 855, 864.

The largest overall criticism I have of Campbell's opinion relates to the same criticism I have of Zurich's many claims about Palmer – none of them have ever dealt with Mike Abourezk before. Palmer had dealt with him. Palmer was the local attorney who had the foundation to understand how to get the case settled and Wagner (or her superiors) refused to listen to him or simply let him do his job. Campbell's recitation of the various ethical rules he claims Palmer violated is flawed by the same lack of foundation that Zurich suffered from.

First, Campbell accuses Palmer of violating "ER 1.1" by failing to conduct a thorough, timely review of the evidence to evaluate the facts, competently prepare Zurich's defenses, and analyze litigation and settlement strategy. Although he makes the allegation, he does not actually indicate what "facts" Palmer failed to evaluate that would have been relevant to anything. He

00597677.WPD / 1

LAW OFFICES-RICHARDSON, WYLY, WISE, SAUCK & HIEB, LLP

Pg. 18　　　　　　To:　Jason Sutton　　　　　Date: 10/28/22

also does not identify what "defenses" could have been prepared. As indicated previously in this opinion, Zurich had no real defenses. Damage control and early settlement were its only viable ways of keeping the number they would pay to a minimum. Nor does Campbell spell out what "litigation" or "settlement strategy" he thinks Palmer failed to "analyze." As stated previously in this opinion, Palmer repeatedly told Wagner that he wanted to try and get the case settled and provided Wagner with all of the information he had and she did not (some of it more than once).

    Wagner refused to give Palmer all of the information he needed even after he repeatedly told her that Abourezk would be successful with a motion to compel. Perhaps most important, during the timeframe when Wagner claims Palmer did not give her enough information, the piece of information relating to Zurich's metrics was being discussed by her and others at Zurich and Palmer didn't even know about it!

    Abourezk demanded $325,000. Palmer immediately told Wagner about the demand and also told her that the offer would not be left open for long. Palmer told her that he thought he could get Abourezk to knock something off the number but not much. Zurich is now claiming it was willing to pay something in the $300,000 range, but gave Palmer zero authority even after he informed Wagner that he felt like he could get the case settled if he was allowed to negotiate with Abourezk "one on one." Everything Palmer told his client mirrors what I have told clients when I am defending cases against Abourezk.

    Second, Campbell accuses Palmer of violating "ER 1.4" by failing to timely and thoroughly review the documents and understand the facts which led to untimely and misguided advice regarding settlement. Once again, Campbell fails to identify what documents Palmer failed to review, what facts he failed to understand, or what was "untimely" about any of it. Further, the conclusion that Palmer gave "misguided advice" regarding settlement is ridiculous. Had Wagner taken Palmer's advice the case would have settled for $300,000 or maybe even less.

    Suggesting that Palmer failing to know the weaknesses of Zurich's case and further failing to advise Zurich of those weaknesses is completely inconsistent with the facts. The most significant weakness of the case related to the metrics that Zurich was using to evaluate its adjusters coupled with how those

00597677.WPD / 1

LAW OFFICES-RICHARDSON, WYLY, WISE, SAUCK & HIEB, LLP

Pg. 19　　　　To:　Jason Sutton　　　　Date: 10/28/22

metrics worked into the bigger picture[7] and Wagner already knew about the metrics and should have known about the rest of it. Palmer advised Wagner early on about all of the reasons why he was recommending settlement and told her how to best go about settling the case. Campbell seems to suggest there was some magic bullet hidden in the file that Palmer should have discovered that would have allowed Zurich to pay Abourezk significantly less than the $325,000 he was demanding. The problem with this suggestion is that Campbell never explains what that bullet was nor does he explain why it would not have been just as effective at the point when the Hinshaw lawyers and Wagner were "pleased" to settle the case for $2,000,000. (Glazer Depo., p. 73).

Finally, Campbell opines that if Palmer had done his job properly, Zurich "could have" decreased their eventual payment by more than $1,500,000. Nothing Palmer did caused Zurich to pay more than it might have if Zurich would have listened to Palmer early on. In fact, if Wagner would have trusted the attorney she hired to do the job and listened to what both Palmer and Fuller were saying about the issues with the case, Zurich would have saved well in excess of $1,500,000. It appears that Zurich paid the Hinshaw firm about $750,000 to defend the case. Zurich also paid Abourezk $2,000,000 to settle the case. If Wagner had listened to Palmer and trusted his advice, it would have saved well over $2,500,000 on this case.

## CONCLUSION

As indicated previously, I have tried cases against Mike Abourezk, handled cases as his co-counsel, and defended cases against him that have settled. He is, in my opinion, the most accomplished bad faith plaintiff's attorney in South Dakota and likely beyond.

The following is a list of things that any defense attorney should know if they are going to defend bad faith cases in South Dakota:

---

[7] Once again, whether Abourezk's entire theory about the metrics, STIP and the relationship between Zurich and certain captive companies in the Caymans is correct, this was the part of the case that would potentially drive the damages way up. See (Abourezk Depo., pp. 110-125) and associated exhibits discussed in that testimony.
00597677.WPD / 1

LAW OFFICES-RICHARDSON, WYLY, WISE, SAUCK & HIEB, LLP

Pg. 20  To: Jason Sutton  Date: 10/28/22

-- Mike Abourezk does not make many mistakes when he takes cases. He generally knows enough about the case from his previous experiences, his knowledge of the industry, and the trade groups he belongs to make sure he has a winner before he agrees to take it on.

-- Mike Abourezk understands what most good bad faith attorneys understand (plaintiff and defense) – to have a good bad faith case you need some bad faith in the handling of the subject claim and to get a big verdict something on the institutional side to show your client isn't the only one who has been effected.

-- Mike Abourezk is extremely honest and protects his reputation for "keeping his word" zealously. That includes not backing off of a settlement demand that he's made in a case.

-- Mike Abourezk dislikes mediation and is very difficult to deal with in that setting.[8]

Palmer knew all of this and told Wagner all of this information, sometimes repeatedly. Wagner did not listen to Palmer and it ended up costing her company over $2,500,000. Palmer did not breach the relevant standard of care nor did he violate any ethical rules. Unfortunately, Wagner (or her superiors) simply assumed that she/they knew more than Palmer about how to deal with this case and they paid for it. As the adage goes, "you make the bed and you get to lay in it." Wagner made the bed, not Palmer.

Sincerely,

Jack H. Hieb

JHH/kkt

---

[8] One story that I got first hand from a defense attorney goes like this: Mike showed up for the mediation. He walked in the door and told the defense attorney and the mediator, "the number is X. The number will not go down from X and you've got until the end of the day to pay it." Mike then drove across the street to pick up some things he needed at a retail store and left town. Much like Zurich ultimately did in this case, the insurance company decided to pay what he demanded.

00597677.WPD / 1