UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

_____ )
                                  )
AMERICAN ZURICH INSURANCE         )    5:20-CV-05026-KES
COMPANY and ZURICH AMERICAN       )
INSURANCE COMPANY,                )
                                  )
            Plaintiff(s),         )
                                  )
      vs.                         )
                                  )    VIDEO DEPOSITION OF:
J. CRISMAN PALMER and             )
GUNDERSON, PALMER, NELSON &       )
ASHMORE, LLP,                     )    J. CRISMAN PALMER
                                  )
            Defendant(s).         )
_____ )


                  PLACE:     HILTON GARDEN INN
                             815 E. Mall Drive
                             Rapid City, South Dakota

                  DATE:      AUGUST 31, 2022 @ 1:00 P.M.

                  BEFORE:    Tina Rae Pruss
                             Court Reporter and Notary Public
                             Rapid City, South Dakota


PRUSS REPORTING   (605)390-3427

**EXHIBIT 1**

```
APPEARANCES:

Representing          SCOTT R. HOYT
the Plaintiff(s):    Pia Hoyt, LLC
                     136 E. South Temple, Suite 1900
                     Salt Lake City, UT  84111

Representing          JASON P. SUTTON
the Defendant(s):    Boyce Law Firm
                     300 S. Main Avenue
                     Sioux Falls, SD  57117

ALSO PRESENT:         Dawn Wagner (Appearing via Zoom)
```

**EXHIBIT 1**

```
 1              MR. SUTTON:  What I would -- and it's up to
 2       you.  What I would suggest, and what's commonly
 3       done, Scott, is we just continue numerically
 4       numbering as we go so that we don't have multiple
 5       Exhibit 1s later on in time.  I don't care if you
 6       do the plaintiffs or not, but --
 7              MR. HOYT:  Well, that's -- I like that
 8       approach, but I was going to -- well, I see where
 9       you're going.  If we start with plaintiffs' 1 and
10       then you do defendants' 1, we got multiple 1s.
11       We'll try that.  And I'm going to be -- I mean, we
12       have a deposition of Mike Ab -- I don't know how
13       to say it.
14              THE WITNESS:  Abourezk.
15              MR. SUTTON:  Abourezk.
16              MR. HOYT:  -- Abourezk tomorrow so I'll --
17       you're going to be the court reporter for that --
18       so she can bring these exhibits to the extent I
19       need to use them then.  So these are -- this is
20       not what I wanted.
21              I'm going to mark the guidelines.  This is
22       Exhibit 1.
23              MR. SUTTON:  Yep.
24              (Whereupon, Exhibit 1 was then marked.)
25    Q   (BY MR. HOYT)  Mr. Palmer, I'll have you look at
```

PRUSS REPORTING   (605)390-3427

**EXHIBIT 1**

1    these.  You are free to look at as much as you

2    want, but maybe I can direct your focus more to

3    just the question I intend to ask which is

4    generally if you recall seeing these guidelines

5    from Zurich at the beginning of your retention

6    with them on this case?

7  A  Do I remember receiving them, no.  Do I -- do I

8    acknowledge I received them, yes.

9  Q  All right.  Was this the first time you had seen

10   these guidelines or had you received them for

11   the -- the prior one or two cases you handled for

12   Zurich?

13 A  I don't know the answer to that question.

14 Q  And you understood in getting these that -- that

15   Zurich was providing them to you to show you what

16   they expected in terms of the guidelines they

17   wanted you to follow?

18 A  I do.

19 Q  Now, let's look at pages 2 and 3 of the actual

20   guidelines.  And the -- the guidelines are

21   actually -- there is a -- there is a -- kind of an

22   overview and then there is paginated pages.  And

23   I'm referring to the pages that have one and --

24   two and three at the bottom.  It says, Guidelines

25   for litigation matters.

**EXHIBIT 1**

| | | |
|---|---|---|
| 1 | | things.  And one of them in item 2, B2, is |
| 2 | | identification and assessment of key issues |
| 3 | | including likelihood for success on the key |
| 4 | | issues.  Do you recall providing -- and let me -- |
| 5 | | I believe you mentioned Dawn Wagner.  You believe |
| 6 | | she was your contact on the case? |
| 7 | A | I know that she was my contact.  I didn't know if |
| 8 | | she was the initial, but, yes, she was the |
| 9 | | contact. |
| 10 | Q | All right.  Can you remember any other contact you |
| 11 | | reported to? |
| 12 | A | No, I cannot. |
| 13 | Q | All right.  So do you recall within 90 days of the |
| 14 | | assignment providing Dawn Wagner with your |
| 15 | | identification and assessment of key issues and |
| 16 | | likelihood for success? |
| 17 | A | I do not recall that. |
| 18 | Q | Item 3, a litigation plan, do you recall providing |
| 19 | | her with a litigation plan that I -- identified |
| 20 | | the four items, sub A through D? |
| 21 | A | I do not recall. |
| 22 | Q | Did you ever provide her with a litigation plan |
| 23 | | that identified these items? |
| 24 | A | I don't know the answer to that.  Whatever I did |
| 25 | | is in the file. |

**EXHIBIT 1**

```
 1   Q    All right.  But as you sit here you can't recall a
 2        specific litigation plan that identified
 3        discovery, motions, significant activity?
 4   A    I do not recall.
 5             MR. HOYT:  Let's mark as Exhibit 2 the
 6        Leichtnam Complaint in this matter.
 7             THE WITNESS:  Oh, sorry.
 8             MR. HOYT:  She'll give you that copy.
 9             (Whereupon, Exhibit 2 was then marked.)
10   Q    (BY MR. HOYT) And can you identify this as the
11        Complaint that you were retained to defend?
12   A    It would certainly appear to be.
13   Q    And did you receive this upon your retention from
14        Zurich?
15   A    I'm going to assume so.
16             MR. HOYT:  Let's mark as Exhibit 3 the
17        Gunderson Palmer billing records for this.
18             (Whereupon, Exhibit 3 was then marked.)
19   Q    (BY MR. HOYT) And I'll start with the general
20        question, if you can identify these as the billing
21        records of Gunderson Palmer for this matter?
22   A    I'm going to assume they are.  I haven't looked
23        through every one of them, but I -- I know that
24        they were provided to my counsel who I presume
25        provided them to you.
```

**EXHIBIT 1**

```
1              THE COURT REPORTER:  4.

2              MR. HOYT:  That's responses and objections to

3         plaintiffs' second set of requests for admissions

4         to defendants.

5              (Whereupon, Exhibit 4 was then marked.)

6    Q    (BY MR. HOYT) Generally can you identify these as

7         responses to requests for admissions that you

8         reviewed and approved?

9    A    Yeah, I would say that's true.

10             MR. HOYT:  Yeah, I don't -- did you get me

11        verification for these, because I don't have it

12        with this copy?

13             MR. SUTTON:  Request for admissions wouldn't

14        require verification.  Only interrogatories.

15        They're signed by counsel.

16             MR. HOYT:  Well, it's general practice to

17        also have their client verify them.  But, anyway,

18        he stands by them, so that's fine with me.

19   Q    (BY MR. HOYT) If we look at 45 -- Request For

20        Admission 45 --

21   A    Yes.

22   Q    -- it asks, Admit you did not research any

23        potentially applicable defenses to assert on

24        behalf of AZIC in the bad faith action.  And it

25        appears that you admitted that with an
```

**EXHIBIT 1**

24

```
 1        explanation, but it does appear that you admit, if
 2        you go to the response, that no research was done,
 3        correct?
 4   A    Okay.
 5   Q    And so let's look at the Answer.
 6             MR. HOYT:  And we'll mark that as Exhibit 5.
 7             (Whereupon, Exhibit 5 was then marked.)
 8   A    Okay.
 9   Q    (BY MR. HOYT) This is the Answer that was -- that
10        was filed to the Complaint we looked at, correct?
11   A    Yes.
12   Q    Who drafted this?
13   A    I did.  With input from others.
14   Q    Who else had input?
15   A    Jana Smoot White.
16   Q    And what was her position?
17   A    She was a lawyer in our office at that time.
18   Q    What level of experience was she?
19   A    She joined our firm -- she practiced law in
20        Kentucky for nine years and had been with us for
21        probably -- I'm not sure -- two or three years at
22        that time.
23   Q    What was her -- her experience with worker's comp
24        bad faith?
25   A    I don't know what her experience with worker's
```

PRUSS REPORTING   (605)390-3427

**EXHIBIT 1**

```
 1        comp bad faith is.  I know that she had extensive
 2        experience in bad faith in the state of Kentucky
 3        and that's why I had enlisted Jana to assist in
 4        what bad faith cases we had.
 5   Q    What input did she provide on this Answer?
 6   A    Specifically I don't know.  Jana and I would have
 7        talked about it.  We always talked about how to
 8        respond and --
 9   Q    Okay.  Anybody else provide input?
10   A    Not to my knowledge.
11   Q    All right.  So you got two extensions of time and
12        had your paralegal review 1,800 plus pages of
13        documents and you filed a two-page Answer without
14        any affirmative defenses.  And so nothing that --
15        nothing that was found in that review, nothing
16        that was determined in that period of time led you
17        to believe that there were any potential defenses
18        for this matter?
19             MR. SUTTON:  Object to the form of the
20        question.
21   A    At that time it did not.
22   Q    (BY MR. HOYT) You also filed this Answer without
23        providing a draft to the client for review prior
24        to filing, correct?
25   A    I don't have a recollection, but I do after the
```

PRUSS REPORTING   (605)390-3427

**EXHIBIT 1**

| | | |
|---|---|---|
| 1 | Q | From the release? |
| 2 | A | From the work comp claim, yes. |
| 3 | Q | Did Bill Fuller tell you that his view of the case |
| 4 | | was not defensible?  There were no valid defenses? |
| 5 | A | I don't know that we had that discussion. |
| 6 | Q | All right.  Anything else that you re -- can -- or |
| 7 | | you can recall that you did to evaluate the issues |
| 8 | | and probable defenses prior to filing that Answer? |
| 9 | A | Not right now. |
| 10 | Q | Now, in that Answer, if you go to the first |
| 11 | | paragraph of the Answer it says, Defendants admit |
| 12 | | paragraph 1, 2, and 3.  Do you see that? |
| 13 | A | I see that. |
| 14 | Q | Then if we go to the Complaint, paragraph 3 of the |
| 15 | | Complaint is, Defendants, hereinafter Zurich, are |
| 16 | | alternate egos or instrumentalities of each other |
| 17 | | and either committed or aided and abetted the acts |
| 18 | | hereinafter alleged. |
| 19 | | Now, did you consciously admit that Zurich -- |
| 20 | | that Zurich defendants were alter egos of each |
| 21 | | other and aided and abetted each other in the bad |
| 22 | | acts alleged? |
| 23 | A | Well, it's in the acts alleged -- I did -- I did |
| 24 | | at that time. |
| 25 | Q | And that was your intent? |

EXHIBIT 1

```
 1   A    Well, I would have to say it would have been
 2        because I prepared the Answer and signed it.
 3   Q    All right.  That's rather remarkable, isn't it, to
 4        admit that your multiple clients aided and abetted
 5        acts of bad faith that are alleged in a complaint?
 6             MR. SUTTON:  Objection; argumentative.
 7   Q    (BY MR. HOYT) You can answer.
 8   A    Probably.
 9   Q    And you -- you obviously did not have the client's
10        approval to admit that because she had never seen
11        a draft of this, correct?
12   A    Correct.
13   Q    And if you go over to the next page of the
14        Complaint, paragraph 12, there is a description of
15        Dr. Farnham here.  That's not board certified,
16        having failed the exam, doesn't treat patients,
17        wildly -- widely known as regularly routinely
18        providing opinions to insurance companies that
19        reduce the insurer's claim payments.  So those are
20        the allegations.  Then if you go to the Answer,
21        paragraph 6, what you say is with regard to
22        paragraph 12, Defendants admit they arranged for
23        plaintiff to see Dr. Farnham.
24   A    Correct.
25   Q    Is there any reason why you didn't deny the
```

EXHIBIT 1

```
 1      please?
 2  Q   I'll repeat it.
 3  A   Okay.
 4  Q   Did you look at all at the issue of whether
 5      Bill Fuller's oral agreement with counsel was
 6      sufficient to override a written release?
 7  A   I felt it was.
 8  Q   Did you do any research on that?
 9  A   Not that I recall.
10  Q   And you hadn't seen actually what had been said
11      between those two attorneys until after the
12      Answer?
13          MR. SUTTON:  Objection; asked and answered.
14      He said he didn't recall one way or the other.
15  A   Fair.  I did not.
16  Q   (BY MR. HOYT) Now, let's go back to Exhibit 4 --
17  A   Okay.
18  Q   -- and Requests for Admission.
19          By the way, let me know whenever you want to
20      take a break.
21  A   Sure.  Thank you.
22  Q   Let's go to Request for Admission 45 again in
23      that.
24  A   Okay.
25  Q   And here you state that you didn't do any research
```

**EXHIBIT 1**

```
 1      because there were no meritorious affirmative

 2      defenses.  And if you continue down, it says

 3      that -- you came to that conclusion based on your

 4      decades of experience including defending bad

 5      faith cases.

 6              MR. SUTTON:  I'm sorry, Counsel.  Which

 7      number are you on?

 8              MR. HOYT:  45.

 9              MR. SUTTON:  Thank you.

10  Q   (BY MR. HOYT) Prior to this case how many bad faith

11      cases had you filed an answer in without a single

12      affirmative defense?

13  A   I don't know the answer to that.

14  Q   Would that be rare?

15  A   I don't know.  It would depend on the case.

16  Q   Isn't it usual practice that you assert

17      affirmative defenses with an answer?

18  A   If there is a factual basis for doing so at the

19      time and if it's appropriate, yes.

20  Q   Let's look at Request for Admission No. 67.

21  A   Okay.

22  Q   And here you admit that Leichtnam had never --

23      never obtained a determination from the

24      Department of Labor that his benefits had been

25      wrongfully denied or withheld, correct?
```

**EXHIBIT 1**

```
 1              (Whereupon, Exhibit 11 was then marked.)
 2              MR. HOYT:  And then I'm going to mark as
 3         Exhibit 12 the Combined Reply Brief.
 4              (Whereupon, Exhibit 12 was then marked.)
 5   Q   (BY MR. HOYT) All right.  I'm going to have you
 6         look briefly at these.  So at some point the
 7         Hinshaw Culbertson firm comes into this matter,
 8         and we'll get in more detail into that, but they
 9         work up Proposed Amendment to the Answer and a
10         Motion to Dismiss.  And we're going to -- we're
11         looking at some of the documents, I believe, that
12         came about in that process.
13              But let me just ask you, do you recall
14         signing the -- the documents that are in front of
15         you that were the Motion to Amend and the briefing
16         that supported it?
17   A     I -- I don't recall it, but I -- I know they
18         happened.
19   Q     Yeah.  And, well, in fact you can see your
20         signature on these documents, I believe.
21   A     The electronic signature, yes.
22   Q     Right.
23   A     Yes, sir.  I am not disputing that in any way,
24         form --
25   Q     Okay.  And even though Hinshaw Culbertson came in
```

**EXHIBIT 1**

```
 1        regarding subpoena to South Dakota Department of
 2        Human Services.  What do you recall about what was
 3        being subpoenaed?
 4   A    I have no recollection.  Katie was handling that.
 5   Q    All right.
 6   A    I know that Mike Shaw would have been -- he's a
 7        lawyer in Pierre -- would have shown up for the
 8        Department of Social Services.
 9   Q    All right.  So at this point, 2000 -- 2018, there
10        were some efforts to obtain some discovery?
11   A    I -- I don't know.  I -- I don't know.  I wasn't
12        involved.
13   Q    Well, while you were involved, you propounded no
14        discovery, correct?
15   A    That's correct.
16   Q    And so Hinshaw comes in in 2018 and discovery
17        starts either being asked for or sent out.  Do you
18        recall that?
19             MR. SUTTON:  Objection; it's vague.
20   A    I don't recall that.
21   Q    (BY MR. HOYT) Okay.  If you go over to -- to
22        March 15, Correspondence to attorneys Paris Glazer
23        and Conrad Nowak regarding thought on moving to
24        get some medical testimony and related items.  And
25        while you were in charge, you had obtained no
```

**EXHIBIT 1**

```
 1       medical testimony, correct?
 2   A   At that point, that's correct.
 3   Q   All right.  Let's look at exhibit --
 4           MR. SUTTON:  Are you at a break, Scott?
 5           MR. HOYT:  Yeah, let's take a break.
 6           THE VIDEOGRAPHER:  We are off the record.
 7           (A recess was taken from 2:26 to 2:34 p.m.)
 8           THE VIDEOGRAPHER:  We are back on the record.
 9   Q   (BY MR. HOYT) So, Mr. Palmer, I'll have you look at
10       Exhibit 12.
11   A   Okay.
12   Q   And this is a reply brief that you reviewed and
13       signed; is that correct?
14   A   Yes, I did.
15   Q   Did Hinshaw draft this?
16   A   Yes.
17   Q   Did you express any disagreement with it to them
18       after reviewing it?
19   A   Not that I recall.
20   Q   Did you tell them that you found no merit to the
21       defenses that they were seeking to add?
22   A   Well, we had discussions about that prior to our
23       being engaged and requested to stay on as local
24       counsel, but I told them they were calling the
25       shots and we would follow with them.
```

**EXHIBIT 1**

```
 1   Q   Okay.  But you were signing this.  And in signing
 2       that you were warranting to the Court that -- that
 3       there was potential merit to the positions stated,
 4       correct?
 5   A   I was signing at -- out of deference to assisting
 6       the client in putting forth a position they want
 7       the Court to address.
 8   Q   Well, you're familiar with the rules in federal,
 9       including Rule 11?
10   A   Sure.
11   Q   And under Rule 11 you're not to sign anything
12       that -- that is not meritorious or doesn't --
13       isn't warranted by existing or law; is that
14       correct?
15           MR. SUTTON:  Objection; that misstates the
16       rule.
17   A   Yes, I don't think that is -- what Rule 11 says.
18   Q   (BY MR. HOYT) What is your -- what is your
19       understanding of the rule?
20   A   Well, I think that you want to feel that you have
21       a good faith basis for doing so.  The client felt
22       they had a good faith basis for doing so.  My
23       opinion that they didn't -- they had outside
24       counsel that was in control of the case.  They
25       wanted to file this.  They felt it was
```

**EXHIBIT 1**

```
 1   Q    And this -- this -- the Court denied the motion

 2        without reaching the merits of any of the defenses

 3        that were attempting to be added, correct?

 4             MR. SUTTON:  In Exhibit 15?

 5             MR. HOYT:  Yes.

 6   A    I don't know without reading the entire Order.

 7   Q    (BY MR. HOYT) Well, it's your understanding, isn't

 8        it, that the Court held that the motion was simply

 9        untimely?

10   A    I knew the Court said the motion was untimely,

11        correct.

12   Q    And that no adequate explanation had been given

13        for a three-year delay and amending?

14   A    I know that the Court denied it as not timely.

15   Q    Well, the fact is that -- that you had missed the

16        deadline to amend by some three years.

17   A    If that's what the deadline said.

18             (Whereupon, Exhibit 16 was then marked.)

19   Q    (BY MR. HOYT) Let's look at Exhibit 16.  It's an

20        email of June 6, 2013.  Is this the email I

21        believe you said you ultimately saw that reflected

22        the exchange between attorney Finch and

23        attorney Fuller on the bad faith release?

24   A    I don't know if this is it or not.  It certainly

25        is an email that addresses that issue.
```

PRUSS REPORTING   (605)390-3427

**EXHIBIT 1**

```
 1   A     If Charlie drafted something it is certainly a
 2         reasonable opinion.
 3   Q     Okay.  But yet you -- you told us early in the
 4         deposition that within 30 days you concluded that
 5         Zurich had acted in bad faith.
 6   A     That was my opinion.
 7   Q     Did you not consider the potential by taking
 8         plaintiff's -- first of all, you did not notice or
 9         take the plaintiff's deposition, correct?
10   A     I did not.
11   Q     Did you consider that you might be able to
12         challenge his credibility through deposition
13         testimony?
14   A     I -- I didn't consider that, no.
15   Q     Did you consider establishing that he was a
16         possible malingerer?
17   A     I did not.
18   Q     Those are certainly avenues that can be explored
19         in a deposition of a plaintiff like this, correct?
20   A     Think certainly could be explored.
21             MR. HOYT:  Let's mark as Exhibit 20 --
22             THE COURT REPORTER:  19.
23             THE WITNESS:  19.
24             MR. HOYT:  -- 19 the September 24, 2015,
25         letter.
```

**EXHIBIT 1**

```
 1              (Whereupon, Exhibit 19 was then marked.)
 2    Q   (BY MR. HOYT) So this was a letter that you
 3        received wherein Mr. Abourezk offered to settle
 4        for $325,000?
 5    A   That's correct.
 6    Q   And this was roughly -- let's see -- one, two --
 7        four months or so after the -- the case had been
 8        filed?
 9    A   Sounds reasonable.
10    Q   And your -- you suggested to Dawn Wagner that she
11        consider this; is that correct?
12    A   I considered -- I suggested she consider it and
13        that I -- and I -- yes, I suggested she consider
14        it at that.
15    Q   You didn't propose any specific counter, though;
16        is that correct?
17    A   I suggested a counter-proposal to my client as to
18        what I thought the case could settle for.
19    Q   What was that?
20    A   300,000.
21            MR. HOYT:  Let's mark as -- yeah, let me see
22        if I want to go there.
23            Exhibit 20 is the September 28, 2015 --
24            (Whereupon, Exhibit 20 was then marked.)
25    A   Thank you.
```

**EXHIBIT 1**

1   Q   (BY MR. HOYT) So this is a response from

2       Dawn Wagner where she thanks you for passing on

3       the demand but she tells you that she's going to

4       need certain things from you before she can

5       discuss with management and seek possible

6       authority to address that -- that offer, correct?

7           MR. SUTTON:  Object to the form of the

8       question.

9   A   In general, that's what she's saying.

10  Q   (BY MR. HOYT) And she's asking for, among other

11      things -- it says here your initial review of the

12      file, timeline summary, standard the plaintiff has

13      to prove, your recommendation on chance of

14      success.  And so you understood she was asking for

15      those things in order for her to even be able to

16      consider that demand -- that offer?

17  A   That's what it says.

18          MR. HOYT:  And let's mark as Exhibit 21 a

19      email exchange of December 15, 2015.

20          (Whereupon, Exhibit 21 was then marked.)

21  Q   (BY MR. HOYT) Actually, I want you to look at the

22      second page of that --

23  A   Okay.

24  Q   -- the email of December 15 from Dawn to you.

25  A   Okay.

**EXHIBIT 1**

```
 1   Q    Yeah.  It's right above the subheading, Why was
 2        the offer of settlement in the amount of 1,500.
 3        Go up above that, that last -- that paragraph
 4        above that.  You say, However, I don't know how
 5        the claims representative will hold up in a
 6        deposition.  We're on page 2.
 7   A    Right.
 8   Q    It's right -- right in there (indicating).
 9   A    Oh.  Thank you.  I -- yeah, no, as I sit here
10        today I don't know that I can tell you exactly
11        what I was thinking at the time.  But there must
12        have been something that gave me some pause that
13        was in the file as to how the claims
14        representative was going to present all of that.
15   Q    Did you ever try and interview -- interview them?
16   A    Not to my knowledge.
17   Q    On page 3 --
18   A    Yes.
19   Q    -- it says -- at the top there is a question, Did
20        Bill Fuller believe Mr. Leichtnam would be
21        perceived as a sympathetic witness.  You respond,
22        I have not connected with Mr. Fuller to discuss
23        his perceptions of Mr. Leichtnam during his
24        deposition.  Did you ever ask Bill Fuller about
25        Leichtnam's credibility as a witness?
```

**EXHIBIT 1**

| | | |
|---|---|---|
| 1 | Q | Second paragraph at the very end. |
| 2 | A | Yes. |
| 3 | Q | It says, Zurich denies any wrongdoing and disputes |
| 4 | | the nature and extent of Leichtnam's alleged |
| 5 | | damages.  What -- what did you develop in |
| 6 | | discovery or the evidence to challenge the extent |
| 7 | | of his injuries or damages? |
| 8 | A | Where were you looking? |
| 9 | Q | Under the introduction. |
| 10 | A | Oh, under introduction.  I'm sorry. |
| 11 | Q | Second paragraph.  Zurich denies any wrongdoing |
| 12 | | and dispute the nature and extent of Leichtnam's |
| 13 | | alleged damages.  The fact is you didn't take any |
| 14 | | discovery to challenge his alleged damages, |
| 15 | | correct? |
| 16 | A | To that point, yeah, that's right. |
| 17 | Q | And you didn't do any discovery after this point? |
| 18 | A | Not while I was in control of the case, true. |
| 19 | Q | On page 3 you note there that, this paragraph, the |
| 20 | | inconsistency between Mr. Anderson's impairment |
| 21 | | percentage and Dr. Blow's.  Do you see that? |
| 22 | A | Are you talking about at the top of the page? |
| 23 | Q | Yes. |
| 24 | A | Okay.  Yes. |
| 25 | Q | If you look at page 5 -- |

**EXHIBIT 1**

```
1    Q    We're in that same exhibit.

2    A    Oh.  I'm sorry.

3    Q    Page 11.

4    A    Okay.

5    Q    This -- and this is asking about any prior

6         malpractice cases.  And there is a reference to

7         some documents.  And, frankly, I can't remember

8         what those documents are.  What -- what was the

9         reference there?  What prior malpractice claims?

10   A    I do not know.

11   Q    Have you had prior malpractice claims against you?

12   A    No.

13   Q    I think we may have covered this, but did you

14        interview any of the claim individuals identified

15        in that Interrogatory No. 1?

16   A    I did not.  Let me just say this.  Not that I

17        remember.  I don't think I did, but I don't --

18   Q    So you don't recall actually trying to get the

19        version of the events from the claim people?

20   A    I do not.

21             MR. HOYT:  Let's mark this as Exhibit 30.

22        It's a email on January 4, 2018.

23             (Whereupon, Exhibit 30 was then marked.)

24   A    Oh, thanks.  Excuse me.

25   Q    (BY MR. HOYT) So this is an email you received from
```

PRUSS REPORTING   (605)390-3427

**EXHIBIT 1**

```
 1        Dawn Wagner on January 4, 2018?
 2   A    It would.
 3   Q    And she's asking for an outline on your defense
 4        strategy going forward with regard to our
 5        discovery request, key witnesses.  And she says,
 6        Would like to know when you plan on deposing the
 7        plaintiff and/or conducting additional
 8        investigation.  So to this point you still have
 9        not given her an outline of a defense strategy?
10   A    Boy, I don't -- I don't know.  There -- there are
11        those letters where we went back and attempted to
12        answer her questions, but based on what she's
13        saying there, it would seem that she doesn't think
14        I have done that to date.
15   Q    And she wants to know when you plan on deposing
16        the plaintiff.  The truth is you never planned on
17        deposing the plaintiff, did you?
18   A    Not re -- no, I did not.
19   Q    And did you -- but you never just told her that,
20        that I'm not going to take the deposition, did
21        you?
22   A    I don't know.  We had a lot of conversations.
23   Q    And she's -- she wants to know about defense
24        strategy with regard to our discovery request.
25        Did you ever tell her you didn't plan to take any
```

PRUSS REPORTING   (605)390-3427

**EXHIBIT 1**

```
 1        discovery -- or submit any discovery requests?
 2    A   Just a second.  I have to read that again, please.
 3        No, I did not.
 4            MR. HOYT:  Let's mark this as Exhibit 31.
 5        It's a February 27, 2017, email.
 6            (Whereupon, Exhibit 31 was then marked.)
 7    Q   (BY MR. HOYT) This is an email you received from
 8        Dawn Wagner on February 27, 2017?
 9    A   Yep.  I'm sorry.  Yes.
10    Q   And down at the bottom her email says, Have we
11        taken the plaintiff's deposition yet?  What is the
12        deadline for oral discovery completion?  Your
13        response is, Thanks.  We have not taken depo.
14        Discovery deadline is 7/19.  So you knew that Dawn
15        felt it important to take the plaintiff's
16        deposition.  Why didn't you just tell her that you
17        didn't intend to?
18            MR. SUTTON:  Object to the form of that
19        question.
20    Q   (BY MR. HOYT) Well, you -- you could tell because
21        she made several requests about the plaintiff's
22        deposition.  So it was your belief it was
23        important to her that that deposition be taken,
24        correct?
25    A   It would appear so, yes.
```

**EXHIBIT 1**

92

1  Q   And you say, Thanks.  We have not taken depo.  But

2      then you say the discovery deadline.  Didn't you

3      think that would suggest to her that you were

4      going to do it before the deadline?

5  A   Well, I was telling her that that opportunity

6      would exist until that time.

7  Q   But you had already decided you were not going to

8      take it?

9  A   I didn't think we needed to at that time, correct.

10 Q   But you didn't tell her, I don't think we need to?

11 A   I -- not that I can tell from what you've shown

12     me.

13 Q   Well, in anything else that you can recall?

14 A   I can -- I do not recall that many things from

15     back then.

16         MR. HOYT:  This is Exhibit 32.  It's a

17     December 7, 2017 --

18         (Whereupon, Exhibit 32 was then marked.)

19         THE WITNESS:  Did you intend to give this to

20     Jason?

21         MR. HOYT:  Oh, yes.

22         MR. SUTTON:  Thank you.

23 Q   (BY MR. HOYT) It's another email from Dawn Wagner

24     to Kristi Wood at this point.  I don't -- Kristi

25     Wood, again, who was that?

**EXHIBIT 1**

| From: | Cris Palmer |
| --- | --- |
| To: | Kristi Wood; Karen Fonseca |
| Subject: | Fwd: Retention: Joseph E. Leichtnam v. American Zurich Insurance Company |
| Date: | Thursday, March 26, 2015 8:28:14 AM |
| Attachments: | EXTERNAL GUIDELINES_2014.06.10.pdf |
| | ATT00001.htm |
| | REVISED CSC Instructions for External Counsel_2013.08.01.pdf |
| | ATT00002.htm |
| | NEW Zurich Corporate Law Merrill Scheduling Info and FAQ_V2_2013.05.17.pdf |
| | ATT00003.htm |
| | W-9.pdf |
| | ATT00004.htm |

Sent from my iPhone

Begin forwarded message:

**From:** USZ_Corporate_Law_Billinginquiries <corporate.law.billinginquiries@zurichna.com>
**Date:** March 26, 2015 at 9:10:58 AM CDT
**To:** <CPalmer@gpnalaw.com>
**Cc:** USZ_Corporate_Law_Billinginquiries <corporate.law.billinginquiries@zurichna.com>, "Lynn L. Goucher" <lynn.goucher@zurichna.com>, <dawn.wagner@zurichna.com>
**Subject: Retention:  Joseph E. Leichtnam v. American Zurich Insurance Company**

This email contains important information for both Zurich's external counsel and their billing department.  Please forward this email to the billing manager at your firm.

Zurich Corporate Law Attorney: Dawn Wagner
Zurich Matter Name: Joseph E. Leichtnam v. American Zurich Insurance Company
Zurich Matter (CSC) ID: 5775794
External Counsel Name:  Cris Palmer of Gunderson, Palmer, Nelson, Ashmore

Thank you for agreeing to represent one or more of the member companies of Zurich North America in the above referenced matter.  This email shall confirm your retention by Zurich Corporate Law.

In conducting your representation, please ensure that you follow the attached ZNA Corporate Law Guidelines for External Counsel.  The Guidelines describe the terms governing our engagement of your services and detail our billing requirements, including monthly invoicing and expense reimbursement.  Zurich expects its external counsel to use good judgment in managing the number of hours charged to Zurich engagements by each attorney



ZURICH(2)  003009

**EXHIBIT 1**

or legal assistant.  Zurich expects the time charged for professional services not to exceed what is reasonable and appropriate for the engagement, consistent with the complexity and size of the engagement and Zurich's objectives.  Lean staffing on legal matters, to the extent appropriate, is strongly encouraged.  Duplicative attendance at depositions, hearings, meetings, etc. should be avoided whenever reasonably possible and consultations with others in the firm should be limited to those instances in which increased efficiencies result.

Corporate Law generally prefers that written communications with its external counsel be electronic, as we are making a concerted effort to reduce our use of paper.

Please note Corporate Law requires e-billing and electronic file management through Corporate Service Company (CSC) for this matter.  We also request that you use our preferred providers Merrill for court reporting and/or EPIQ Systems and/or Huron Legal for eDiscovery services.  Instructions for all are provided below.

Zurich Corporate Law's requirements will differ from any requirements you may have been given by Zurich Claims or Claims Legal for cases you may be handling with those Zurich business units.

We appreciate your assistance in this effort and we look forward to working with you on this matter.

Merrill Court Reporting Service:
Corporate Law has a preferred provider relationship for court reporting services offered through Merrill Legal Solutions (Merrill), which you should use for deposition related services on this case. Merrill is the largest court reporting and litigation support company in the world, and will provide case-by-case pricing in restrictive contracting states so you will not have to be concerned with anti-contracting legislation, unless case-by-case bids are not acceptable in your state. The attached Merrill Court Reporting Scheduling Information and FAQ document may answer many of
your questions. We expect this relationship with Merrill to continue to help Corporate Law enhance efficiency and reduce overall litigation costs.

To Schedule a Deposition, please use one of the following methods:

  Online:   scheduling.merrillcorp.com/zurichcorporatelaw (Preferred
    Method)
  EMail:   zurichcorporatelaw@merrillcorp.com
  Telephone: 1-855-434-4076

To ensure the preferred rate structure is applied, you must mention Zurich Corporate Law when scheduling services.  Should you have any questions, please contact Cassandra Maloney at 312-386-2261 or via email at cassandra.maloney@merrillcorp.com.  For questions regarding scheduling or

ZURICH(2) 003010

**EXHIBIT 1**

utilizing the online scheduling page, please contact Paula Brown at
312-386-2230 or via email at paula.brown@merrillcorp.com.

eDiscovery Preferred Vendor Panel
Corporate Law has preferred provider relationships for eDiscovery services
with both EPIQ Systems and Huron Legal, which you should use for eDiscovery
and document review services on this case, if warranted.  Zurich North
America has negotiated competitive rates with our preferred vendors, and
you must provide a reasonable justification and obtain prior approval
before using a service not on the preferred panel list. The contact
information for Corporate Law's preferred vendors are:

> EPIQ Systems
> Contact:       Sandy Bast, Director
> Phone:         216-396-0707
> EMail:             sbast@epiqsystems.com

To ensure the preferred rate structure is applied, you should mention
Zurich Corporate Law when scheduling services, and provide the matter name
and responsible Corporate Law attorney.

CSC Matter Management System:
Corporate Law also utilizes the CSC's electronic file management, called
Matter Management, to which we will grant your firm access.  If you have
used the system previously for Corporate Law, then your firm will be
granted access to the CSC Matter shown above.

First-time users of CSC Matter Management will need to be set-up to access
the system and should take a short training session. The CSC Matter
Management Instructions for External Counsel are attached and explain
procedures and how to access the CSC system.

CSC Electronic Billing Instructions:
Zurich Corporate Law requires electronic billing through CSC.  The Matter
Name, Zurich Matter ID, and Corporate Law Attorney referenced above will
enable you to process the invoices related to this matter.

First Time Users Only: In order for CSC to verify we have the correct
information and assign login IDs, first time users need to email Corporate
Law's Central Billing Administrator (CBA) at
corporate.law.billinginquiries@zurichna.com with (1) a completed W-9 for
the firm (A blank W-9 form is provided for your convenience), and (2) all
applicable timekeepers and their associated rates in the following format:

First Name:
Last Name:
Timekeeper Code:
Timekeeper Level:

**ZURICH(2)  003011**

**EXHIBIT 1**

Timekeeper Rate:

The CBA will enter this information into Zurich's CSC electronic billing system and you will receive notification once the timekeeper rates have been approved.

After receiving this notification, you will then need to email Corporate Law's CBA at corporate.law.billinginquiries@zurichna.com with the following information:

1. Include the following items:
   Tax ID:
   Firm/Vendor Name:
   Firm Billing Contact First Name:
   Firm Billing Contact Last Name:
   Firm Billing Contact Email:

2. Please also provide the following information for each additional user who will need access to upload invoices within the system:
   First Name:
   Last name:
   Email:

Upon receipt/verification of this information you will receive an email from CSCMatterManagement@cscinfo.com with your login id.  You may then log
into the system and follow the directions below for invoice submission.

Please note that CSC E-billing utilizes the LEDES standard and accepts both LEDES 1998B and LEDES 2000 files. If you are unable to produce a LEDES file, there is a manual option available which CSC can walk you through.

1. Include the following REQUIRED VALUES in your LEDES file:
   * CLIENT_ID: 6508752
   * CLIENT_MATTER_ID (Zurich Matter ID) located at the top of this message.  If you do not have the matter i.d., the Corporate Law Attorney or our CBA (corporate.law.billinginquiries@zurichna.com) can provide this to you.  Your invoice will not be accepted without the Client Matter ID.

2. Export any new invoices in LEDES 1998b (.txt) or LEDES 2000 (.xml) format using the export method available in your respective billing system and save this file to your local local drive and/or network.

3. Once you have saved this file, log into the system using the URL: https://cscglobal.com/pbng and the login information sent to you by CSCMatterManagement@cscinfo.com.

   Upon initial login, you will be prompted to key in your contact information and set up your preferences.

**ZURICH(2)  003012**

**EXHIBIT 1**

4.  Once this is complete, you may follow these steps to upload an invoice:

- Click "Invoices" from the top Matters menu (The blue bar)
- Click the Invoice Actions menu and choose Upload Invoice(s)
- Browse and attach the .txt or .XML invoice file you downloaded from your billing system
- Choose the appropriate Currency type
- Click "Upload"

If you receive any message other than "Upload Successful", please email the file you are uploading and the following information to CSC Matter Management Support at MMSUPPORT@cscinfo.com or call 800-490-9035.

Organization Name:  Zurich
Law Firm/Vendor Name:
User Name:
User ID:
Error Message (or screenshot):

If you should require technical assistance or instructions for submitting an invoice please contact CSC at 800-927-9800 or via email at MMSUPPORT@cscinfo.com.  If you have a question regarding a bill you have already submitted please contact our billing team via email at corporate.law.billinginquiries@zurichna.com.
(See attached file: EXTERNAL GUIDELINES_2014.06.10.pdf)
(See attached file: REVISED CSC Instructions for External Counsel_2013.08.01.pdf)(See attached file: NEW Zurich Corporate Law Merrill Scheduling Info and FAQ_V2_2013.05.17.pdf)

 (See attached file: W-9.pdf)


******************* PLEASE NOTE *******************
This E-Mail/telefax message and any documents accompanying this transmission may contain privileged and/or confidential information and is intended solely for the addressee(s) named above.  If you are not the intended addressee/recipient, you are hereby notified that any use of, disclosure, copying, distribution, or reliance on the contents of this E-Mail/telefax information is strictly prohibited and may result in legal action against you. Please reply to the sender advising of the error in transmission and immediately delete/destroy the message and any accompanying documents.  Thank you.

ZURICH(2)  003013

**EXHIBIT 1**



Zurich North America and Corporate Law believe that a strong relationship with our external counsel will lead to a successful conclusion of each matter.

These Guidelines serve our external counsel partners by ensuring consistency in expectations. They assist our attorneys by ensuring that external counsel possesses an awareness of our expectations.

Ultimately, the Guidelines create a more closely aligned partnership between external counsel and our attorneys.

We have also included an Addendum that specifies our business policies relative to reimbursement of expenses, payment of professional fees and other administrative matters. Please familiarize yourself with the Guidelines and the Addendum. Communicate them to all other counsel and staff in your office who may be involved in the handling, billing or administration of our matters.

We look forward to partnering with your firm. Please feel free to contact one of our Corporate Law attorneys with any questions you may have.

ZURICH(2)  003014

**EXHIBIT 1**



## ZNA Corporate Law - Guidelines for External Counsel Representing ZNA Companies

### General Philosophy

Zurich North America (hereinafter referred to as "ZNA") expects to work with external counsel to achieve the best result in all matters in an efficient and cost-conscious manner.

The first section of these Guidelines governs representation of ZNA in litigation and arbitration proceedings. This section also governs more limited litigation-related representations on subpoenas, non-party depositions and the like, although budgets and case plans generally are not required for very limited engagements.

The second section of these Guidelines governs retentions for transactional matters, regulatory work, general advice, and other non-litigation engagements.

The third and fourth sections contain the Billing Guidelines and the Professional Fee and Expense Addendum which are generally applicable to all engagements.

We reserve the right to modify these Guidelines and the Addendum from time to time.

ZNA's name, logo, etc. should not be included in any of your marketing material, including listing ZNA as a client on your website, without express prior written consent.

### Staffing Philosophy

Your law firm should designate one attorney to have primary responsibility for the matter on which your services are requested. The matter should be staffed economically and effectively. Obviously, a balance must be struck between the efficiency a more experienced lawyer at your firm brings to a given task and the advantages of having the task performed by a junior lawyer or a paralegal. Duplication of effort within the firm should be avoided. To achieve the best efficiency and value, the roles and responsibilities of all lawyers should be clearly defined and appropriate to each individual's qualifications, level of experience and billing rate. External counsel should delegate work to subordinates wherever possible to achieve efficiency and cost-effectiveness without compromising quality. ZNA will not pay for "ramp up time" due to personnel changes.

### Personally Identifiable Information

"Personally Identifiable Information" includes any information that can be associated with or traced to any individual, including but not limited to an individual's name, address, telephone number, e-mail address, credit card information, social security number, or other similar specific factual information, regardless of the media on which such information is stored (e.g., on paper or electronically) and includes such information that is generated, collected, stored or obtained by external counsel in connection with its representation of ZNA.

External counsel will comply with all applicable privacy and other laws and regulations relating to protection, collection, use, and distribution of Personally Identifiable Information.

External counsel will not, without the prior written consent of an authorized representative of ZNA, use Personally Identifiable Information for any purpose other than to provide legal services for ZNA.

1

ZNA Corporate Law-Guidelines for External Counsel
Revised 6/10/2014

**ZURICH(2)  003015**





Without limiting its other obligations under these Guidelines, external counsel agrees that all Personally Identifiable Information under its control will be secured from unauthorized access, use, disclosure and loss using industry standard security practices and technologies.

If there is a suspected or actual breach of security involving Personally Identifiable Information, external counsel will notify ZNA at Privacy.Office@zurichna.com within 24 hours of becoming aware of such occurrence.

External counsel shall provide ZNA with access to Personally Identifiable Information at any time as ZNA may request.

## GUIDELINES FOR LITIGATION MATTERS

I. Case Development

An effective and strategically sound litigation plan is the responsibility of external counsel and the Corporate Law attorney and should be developed in a timely manner.

A. One of our principal goals is to identify timely those cases for which there is the potential for exposure, and to consider the possibility for early settlement of the dispute. Each case should have a customized disposition objective. A sound litigation plan should include consideration of the best strategic options to bring the case to satisfactory resolution.

The activities necessary to defend or prosecute a given case and bring it to appropriate resolution should be addressed early and the steps necessary to achieve that resolution must be jointly agreed upon with the external counsel and the Corporate Law attorney.

B. An early resolution of litigation is desirable and the use of alternative dispute resolution may be discussed with the Corporate Law attorney as appropriate.

C. If external counsel is involved in settlement negotiations, settlement authority must be obtained from the Corporate Law attorney and requests for authority should be made timely.

D. External counsel should consult with the Corporate Law attorney before undertaking a legal research project requiring over three hours of research. Copies of all research memoranda shall be provided to Corporate Law upon request.

II. Reporting Requirements

Reports - Unless otherwise requested, reporting is required as follows:

A. Acknowledgement (30-day report)

Within 30 days from receipt of a new case, external counsel shall send a report to the responsible Corporate Law attorney designating the legal team assigned to the case. The report should briefly describe the allegations set forth in the pleadings and the claims for relief. External counsel should provide an initial identification of likely issues and action items requiring immediate consideration. Any matters of immediate concern or information that may result in early resolution of the case should be addressed in the 30-day report.

2

ZNA Corporate Law-Guidelines for External Counsel
Revised 6/10/2014

**ZURICH(2) 003016**

**EXHIBIT 1**



B.  Initial Case Report and Budget

No later than 90 days from receipt of the assignment, external counsel shall send a report to the Corporate Law attorney responsible for the case with the following information, to the extent applicable to the case:

1.  A summary of the allegations in the complaint, description of the underlying claim and summary of the claims handling history;

2.  Identification and assessment of key issues, including likelihood for success on the key issues based upon presently available information.  If available information is insufficient for an assessment of the issue, provide an explanation of what is needed and the efforts underway to obtain the necessary information, along with anticipated timelines; and

3.  A litigation plan which briefly discusses the litigation goals and the proposed strategies to achieve the stated goals, including:

    a)  Identify each significant activity external counsel proposes to initiate and how such activity will support the litigation strategy (e.g., investigation, motion, practice, discovery, legal research, etc.).

    b)  Identify discovery and motions that have been or are likely to be initiated by other parties.

    c)  Discussion of the potential for early disposition of the case by settlement, and recommendations with respect to arbitration, mediation or direct settlement negotiations.

    d)  Budget for anticipated litigation activities which are reasonably foreseeable.  The budget should generally track those activities outlined in the litigation plan and should not include estimates for activities that are not reasonably foreseeable at the time the budget is prepared.  For example, a budget during the early life of a case should not include an estimate for activities relating to trial or post-trial appellate work since those activities are generally not foreseeable during the early stages of a case.  The budget should provide a detailed estimate broken down by categories of activities  (e.g., pleadings, discovery, motion practice, etc.) description of anticipated activities within each category of activity, estimate of  attorney/paraprofessional hours required per activity and related hourly charges.  The budget should also provide a detailed estimate of anticipated expenses.

C.  Significant Developments

External counsel should communicate promptly with the responsible Corporate Law attorney on all significant developments in the case.  This includes timely new pleading and motion filings, case rulings, discovery rulings, case management issues, and settlement or mediation options.  Moreover, copies of pleadings, discovery and motions, briefs, research memorandum and expert reports and other significant litigation documents must be provided to the Corporate Law attorney for review.   All litigation activities must be approved by the Corporate Law attorney so you should coordinate with Corporate Law on a regular basis to ensure there is agreement on litigation strategies and activities.

Drafts should be transmitted in time for the Corporate Law attorney to provide substantive comments and propose meaningful revisions.  In addition, drafts prepared by associates must be reviewed and approved by the supervising partner or other senior attorney on the matter before they are transmitted to the Corporate Law attorney.

ZNA Corporate Law-Guidelines for External Counsel
Revised  6/10/2014

**ZURICH(2)  003017**

**EXHIBIT 1**



D. Trial Report

A trial report shall be submitted at least 60 days before the scheduled date for trial.  The trial report should describe  the facts relating to the claim, the policies at issue, the significant issues  to be adjudicated at trial, an assessment of the chances for success and the exposures faced at trial, the proposed trial plan (e.g., witnesses, experts, trial motions),  proposed trial staffing and estimated trial budget.

E. Appeals

All requests to file an appeal must be approved by Corporate Law.

III. Discovery and eDiscovery Management

ZNA's approach to discovery is to manage all aspects of the eDiscovery process in a defensible, cost effective and efficient manner.  To that end, ZNA has implemented a preferred panel of approved eDiscovery vendors, thoroughly vetted by ZNA, who will handle all eDiscovery.

External Counsel's upfront planning of the discovery process and delineation of a discovery plan at the outset of a matter is critical to the success of the discovery process.  To ensure a standardized process is followed for all ZNA matters, the Matter Discovery Plan should address key decisions for the areas below:

A. Discovery Planning

- Consider early retention of eDiscovery vendor to assist in formulating an eDiscovery plan
- Delineation of responsibilities
- Project budget and volume estimates
- Discovery calendar/key due dates and deadlines

B. Electronic Data Collection

- Collection specifications/considerations
- Work with eDiscovery vendor to determine cost effective and best method for collecting custodial data

C. Electronic Data Processing

- De-duplication and culling methodologies
- Exception handling protocol/work with eDiscovery vendor to develop protocol

D. Early Case Assessment
- Search term analytics/data analysis
- Determine appropriate techniques to capture responsive ESI with eDiscovery vendor

E. Document Review

- Utilize contract attorneys for first pass review when appropriate
- Work with eDiscovery vendor on review protocols
- Utilize eDiscovery vendor for privilege log generation and redaction work

ZNA Corporate Law-Guidelines for External Counsel
Revised  6/10/2014

**ZURICH(2)  003018**

EXHIBIT 1



F. Production

- Delivery specifications
- External counsel can work with eDiscovery vendor to ensure production formats and specifications are compliant with all party agreements

## GUIDELINES FOR NON-LITIGATION MATTERS

I. Role of Corporate Law

A. A Corporate Law attorney will be responsible for managing every matter assigned to external counsel. All strategic or tactical decisions must be approved by the responsible Corporate Law attorney. External counsel must also provide the Corporate Law attorney with timely updates, the format and frequency of which should be discussed and agreed to at the onset of the matter.

B. External counsel and the Corporate Law attorney must discuss and agree upon the tasks to be performed and who will perform them. Corporate Law performs many tasks in-house, such as fact gathering, conducting preliminary interviews, determining the legal issues, and collecting the pertinent documents. Corporate Law's role will be established on a matter-by-matter basis.

C. External counsel and the Corporate Law attorney must discuss and agree on all legal research to be performed and the scope of any formal research memoranda to be prepared. Zurich will not pay for basic research.

D. The Corporate Law attorney will coordinate all contacts between external counsel and Zurich's personnel unless otherwise agreed. External counsel should not contact non-Corporate Law personnel for decisions. The Corporate Law attorney will work with external counsel and Zurich personnel in arriving at any necessary decisions.

E. The Corporate Law attorney will be responsible for collecting facts or documents from within Zurich as agreed to by external counsel and the Corporate Law attorney.

II. Initial Plan and Budget

External counsel should submit to the Corporate Law attorney a Strategic Plan and Budget by the date agreed to by the Corporate Law attorney and the external counsel. The Strategic Plan and Budget should include:

- A description of the matter
- Factual and legal issues to be addressed including required fact gathering
- Specific action steps and estimated dates for completion
- A listing of external counsel personnel that will be working on the matter and their hourly rates
- An estimate of total time and cost broken down by external counsel personnel time for the entire matter

The Corporate Law attorney must approve the Plan and Budget before external counsel begins work if possible, or as agreed. Should the scope of the matter change, the Corporate Law attorney must approve the adjusted Plan and Budget.

ZNA Corporate Law-Guidelines for External Counsel
Revised 6/10/2014

**ZURICH(2) 003019**

EXHIBIT 1



**BILLING GUIDELINES**

I. Billing Procedure

    A. Frequency of Billing – Bills should be submitted monthly.

    B. Invoices must be submitted in the calendar year in which services were rendered, December excepted.

    C. Non Electronic Billing Format

        a) Heading - The first page of the bill must state: (a) the firm's IRS number; (b) the caption of the case or matter; and (c) the name of the customer.  Unlike matters handled under the supervision of Zurich's Claims or Claims Legal personnel, invoices for Corporate Law matters should only set forth a claim number if the responsible Corporate Law attorney has specifically instructed that a claim number be used for billing.

        b) Body - The bill must be prepared with entries showing: (a) the date the work was performed; (b) the initials of the person providing the service; (c) a description of the work performed (single activities); and (d) the actual time in tenths of an hour.

        c) End of Bill Summary - The bill must include: (a) the full name of each attorney/paralegal; (b) the level of each timekeeper (i.e., partner, associate, paralegal); (c) the hourly rate of each timekeeper; and (d) the total hours and total amount charged for each timekeeper during the billing period.

        d) Task Codes - Task coding is not required, unless requested. Where requested, the uniform billing codes as currently endorsed by the American Bar Association shall be used.

II. Charges for Service

    A. Time Charges – All Charges - All charges for services by attorneys and paralegals must be recorded daily based upon their actual time in one-tenth hour increments.

    B. Single Entry Timekeeping - The time for each activity should be separately stated.  Grouping multiple activities under a single time charge greater than one-tenth of an hour ("block billing") is not acceptable absent authorization from Corporate Law.

    C. Information Descriptions of Services - Descriptions of services should inform of the nature, purpose or subject of the work performed and the specific activity or project to which it relates.

    D. Compensation - Timekeeper rates should be fixed for the life of the matter, unless the matter lifetime is excessive, in which event rates may be discussed in good faith.  Notwithstanding the foregoing, the firm may not increase rates more than once in any 24 month period.  In no circumstances should any rate be retroactive. External counsel must consult with the Corporate Law attorney regarding any increase in the rate of compensation.

    E. In-Firm Conferences - Typically only one timekeeper may charge for in-firm conferences unless approved by the Corporate Law attorney.  Where external counsel consults with another attorney in the firm to obtain specific advice or counsel on substantive or procedural aspects of the case that result in a more effective litigation plan, said reasonable and necessary conference time will be reimbursed, provided that sufficient detail of the subject of the communication is set forth to demonstrate its relevance and value.

ZNA Corporate Law-Guidelines for External Counsel
Revised  6/10/2014

**ZURICH(2)  003020**

**EXHIBIT 1**



F. Multiple Attendance - External counsel should consult with Corporate Law where it is anticipated that more than one attorney's attendance is necessary at trial, court appearances, meetings, depositions, witness interviews, inspections and other functions.

G. Depositions - External counsel should consult with the Corporate Law attorney before initiating and attending depositions other than those depositions already approved in the initial litigation plan or supplement thereto.

H. Revising Standardized Forms/Pleadings - Only the actual time spent in customizing standardized pleadings, documents, discovery responses or requests to the case at hand should be billed, rather than the time originally spent drafting standard language.

I. Administrative and clerical activities - Administrative and clerical work is not billable. As examples and not as a complete list, administrative and clerical work includes receipt and distribution of mail, new file set-up, docketing, maintenance of office and attorney calendars, transcribing, copying, scanning and uploading of documents, posting, faxing, e-mailing, inserting documents into and retrieving documents from the file, maintaining order in the file, stamping documents, tabbing sub files and assembling materials.

J. Zurich will make no payments for services if such payment would violate any applicable trade or economic sanctions law or regulation.

III. Disbursement

A. Internal Expenses - Corporate Law will advise external counsel of its Guidelines as to reimbursements of internal expenses (see attached Addendum).

B. External Expenses - Charges for service by outside vendors will be reimbursed at their actual cost. Expenses of over $500.00 may be forwarded to Corporate Law for payment, and the requisite form W-9 must be provided. Disbursements should be itemized on the law firm's statement with the following information, unless back-up documentation is provided: (a) the name of the vendor; (b) the date incurred; and (c) a specific description of the expense. Where back-up documentation is provided, the law firm statement need only set forth a description of the expense and amount incurred.

C. Travel Expenses - External counsel should consult with Corporate Law prior to incurring travel expenses. All expenditures of $25.00 or more must be supported with receipts attached to the law firm's statement. ZNA will only reimburse for the lowest available air fare, but in no event more than coach/economy class fare, unless an unusual circumstance justifies otherwise and only if such arrangements were approved in advance. ZNA does not expect to be billed and will not pay for time spent in such transit except to the extent that external counsel is engaged in substantive work activity on a matter for ZNA while traveling (e.g., preparing for depositions, reviewing pleadings, preparing for a meeting or negotiations).

D. Professional Services - External counsel should consult with Corporate Law prior to incurring expenses for experts, consultants, investigators, temporary attorneys or outside paralegals, or other professional services.

ZNA Corporate Law-Guidelines for External Counsel
Revised  6/10/2014

**ZURICH(2)  003021**

**EXHIBIT 1**



IV. Bill and File Review

Corporate Law reserves the right to audit bills and review all charges for services and disbursements. ZNA reserves the right to conduct on-site audits to review files and/or billing statements.

External counsel agrees to comply with all reasonable requests for information and documents. Corporate Law fully reserves all rights to decline to pay or to seek reductions and/or refunds with respect to charges that fail to comply with the requirements set forth herein, and which are not fully explained or documented by the firm after reasonable inquiry. Corporate Law will allow the law firm to appeal any declination of payment by Corporate Law.

ZNA Corporate Law-Guidelines for External Counsel
Revised  6/10/2014

ZURICH(2)  003022

**EXHIBIT 1**



## Professional Fee and Expense Addendum

I. Professional Fees

    A. Hourly Rates

        The hourly rates for legal services offered by external counsel must be agreed to in advance and confirmed in writing by the responsible Corporate Law attorney. If external counsel is on an approved ZNA external counsel list (for example, the Claim Panel list), external counsel must offer ZNA's Corporate Law hourly rates which are the same or less than the rates negotiated with such other ZNA Department, unless other rates are expressly negotiated with Corporate Law in advance.

    B. Rate Increases

        External counsel must submit requests for hourly rate increases in writing to Corporate Law at least 60 days prior to the proposed effective date of the increase. Hourly rate increases will be honored only if approved in writing. Corporate Law will not be responsible for unilateral rate increases.

    C. Previously Prepared Legal Research, Pleadings and Discovery

        ZNA will not pay for research or any other work that external counsel initially prepared for other files. Only the initial matter for which such research/work was actually performed may be charged. Any charges for the subsequent use of the research is limited to the time spent adapting the research to the current case.

    D. Staffing

        External counsel and the responsible Corporate Law attorney must agree on the particular law firm personnel who will work on the matter. Generally, there should be no more than two outside attorneys assigned to a matter. In addition, Zurich will not pay for summer associate or law clerk time, unless the Corporate Law attorney has agreed in advance to the use of such personnel.

    E. Contract Legal Professionals

        Requests for the use of a contract legal professional should be accompanied by a proposal setting forth the following information:

        1. The purpose for the contract legal professional's involvement;
        2. The nature of the legal work the contract legal professional will undertake;
        3. A detailed budget for the proposed service; and
        4. The actual rate charged to the firm for the contract legal professional and the rate or charge the firm proposes to charge ZNA for the contract legal professional's work.

II. Expenses

    A. ZNA will reimburse the following expense charges:

        1. Internal

            a) Photocopying at up to 10 cents per page. The per-page photocopy rate, the date copies were made and the number of copies made should be noted on the invoice.

ZNA Corporate Law-Guidelines for External Counsel
Revised 6/10/2014

**ZURICH(2)  003023**





b) Actual long distance telephone charges. Invoices should indicate that telephone charges are long distance (v. local) to qualify for payment.

c) Actual long distance telephone charges associated with outgoing facsimiles. ZNA will not reimburse any per-page charges for outgoing or incoming facsimiles.

2. External

a) Reasonable travel expenses, including airline transportation not to exceed coach fares. Actual meal allowance not to exceed $60.00 per day. Reasonable reimbursement for rental car expense, not to include additional insurance.

b) Mileage is reimbursable for round trips greater than 50 miles at the approved IRS rate. Parking is reimbursable.

c) Weekday parking and meals not associated with travel or not directly related to a matter will be disallowed.

d) Messenger delivery and air freight/courier (e.g., Federal Express, Airborne Express, UPS, etc.) expenses only if incurred due to circumstances outside the law firm's control.

e) Court filing fees, jury fees and witness fees.

f) Expenses incurred for the production of litigation exhibits. External counsel must discuss with the assigned Corporate Law attorney in advance the need for and anticipated cost of such exhibits.

g) Expenses for services provided by contractors or other non-employees of the law firm. External counsel must discuss with the assigned Corporate Law attorney in advance the need for and anticipated cost of such contract personnel.

h) Expert and investigator expenses- External counsel must discuss with the assigned Corporate Law attorney all anticipated expenses to be incurred by experts. Requests for the use of an expert should be accompanied by a proposal setting forth the following information:
    i)   The purpose for the expert's involvement;
    ii)  The nature of any examinations, tests, studies or other activities the expert will undertake;
    iii) A detailed budget for the proposed service;
    iv)  The corresponding rates and payment terms the expert expects; and
    v)   The expert's current curriculum vitae.

i) ZNA will not pay for any accrued interest or late charges.

B. Documentation for Internal and External Expenses

1. All invoices for expenses must have available documentation for review upon ZNA's request.
2. Single expenses of $100.00 or more must be accompanied by supporting documentation.
3. All invoices must contain a detailed itemization by category, cost item and date.

III. Administrative Expenses and Overhead

ZNA will not pay for administrative or overhead expenses. ZNA has established a policy in compliance with legal and ethical standards relative to reasonable and appropriate legal expenses. ZNA does not consider the following expenses reasonable or appropriate and will not reimburse external counsel for them. The following sections are intended to be illustrative and not comprehensive.

A. Administrative

1. Preparation of invoices or responses to billing inquiries.
2. Time spent reviewing or analyzing the law firm's conflict issues, opening or closing the file or other administrative activities.

10

ZNA Corporate Law-Guidelines for External Counsel
Revised 6/10/2014

**ZURICH(2)  003024**

**EXHIBIT 1**



3. Clerical work performed by attorneys and/or paralegals.
4. Charges directly related to the departure of a lawyer or paralegal (including start-up work or higher rates for replacement personnel).
5. Fees and expenses for administrative, word processing, proofreading, overtime transportation and meals, collating, velobinding, copying, scanning or uploading of documents, faxing, scheduling, making travel arrangements, charges to open or close a file, organization and management of clerical work, and serving or filing of documents.
6. Time spent performing a conflicts check.

B. Overhead

1. Case management or litigation software or systems.
2. Continuing education for any personnel.
3. Office overhead including: rent, conference rooms, equipment rental, utilities, computer equipment, software, books, publications, seminars, office supplies, routine postage, refreshments during meetings, local telephone charges, fax usage charges, employee courier/messenger services, local or overtime meals and non-attorney or non-paralegal staff (e.g., library staff).
4. Law office staff overtime charges.
5. Cell phone charges.
6. Computerized legal research charges for the use of Westlaw, Lexis or other computerized legal research services or products. ZNA will pay for the time spent researching at the attorney's/paralegal's agreed hourly rate.

ZNA Corporate Law-Guidelines for External Counsel
Revised  6/10/2014

**ZURICH(2)  003025**

**EXHIBIT 1**

| | |
|---|---|
| **From:** | J. Crisman Palmer |
| **To:** | Dawn Wagner; Kristi Wood |
| **Subject:** | RE: Claim 2210134309 / Joseph E. Leichtnam v. Zurich American Insurance Company, et al. |
| **Date:** | Monday, February 27, 2017 1:27:09 PM |
| **Attachments:** | image001.jpg |
| | image002.jpg |
| | image003.jpg |
| | image004.jpg |
| | image005.jpg |
| | image77d58b.JPG |

Thanks.  We have not taken depo.  Discovery deadline is 7-19.  Cris




**J. Crisman Palmer**
**Attorney**
Phone: (605) 342-1078  |  Fax:  (605) 342-9503
506 Sixth Street  |  P.O. Box 8045  |  Rapid City, SD  57709

Gunderson | Palmer | Nelson | Ashmore |
LLP  •  www.gpna.com

CONFIDENTIALITY NOTICE: This email is confidential or privileged. If you are not the intended recipient, you are hereby notified that any retention or distribution of this communication is strictly prohibited. Please reply to the sender that you have received this message in error, then delete this email.

**From:** Dawn Wagner [mailto:dawn.wagner@zurichna.com]
**Sent:** Monday, February 27, 2017 12:28 PM
**To:** Kristi Wood
**Cc:** J. Crisman Palmer
**Subject:** RE: Claim 2210134309 / Joseph E. Leichtnam v. Zurich American Insurance Company, et al.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT

Looks good, thank you.  Have we taken the plaintiff's deposition yet?  What is the deadline for oral discovery completion?

**DAWN M. WAGNER**
*Asst. Vice President & Asst. General Counsel*
*Corporate Law Department*
Zurich North America



EXHIBIT
3/

ZURICH(2)  003763

**EXHIBIT 1**



1299 Zurich Way
Schaumburg, Illinois 60196

**Office:** 847-944-2463
**E-mail:** dawn.wagner@zurichna.com

zurichna.com



---

**From:** Kristi Wood [mailto:kwood@gpna.com]
**Sent:** Monday, February 27, 2017 12:10 PM
**To:** Dawn Wagner
**Cc:** J. Crisman Palmer
**Subject:** Claim 2210134309 / Joseph E. Leichtnam v. Zurich American Insurance Company, et al.
**Importance:** High

Good morning,

Attached please find correspondence from Cris Palmer along with Charles Henderson's draft report.

Thank you.



**Kristi Wood**
**Legal Assistant to J. Crisman Palmer**
Phone: (605) 342-1078 | Fax: (605) 342-9503
506 Sixth Street | P.O. Box 8045 | Rapid City, SD  57709

Gunderson | Palmer | Nelson | Ashmore | LLP  •  www.gpna.com

CONFIDENTIALITY NOTICE: This email is confidential or privileged. If you are not the intended recipient, you are hereby notified that any retention or distribution of this communication is strictly prohibited. Please reply to the sender that you have received this message in error, then delete this email.

******************** PLEASE NOTE ********************
This message, along with any attachments, is for the designated recipient(s) only and may contain privileged, proprietary, or otherwise confidential information. If this message has reached you in error, kindly destroy it without review and notify the sender immediately. Any other use of such misdirected e-mail by you is prohibited. Where allowed by local law, electronic communications with Zurich and its affiliates, including e-mail and instant messaging (including content), may be scanned for the purposes of information security and assessment of internal compliance with company policy.

**ZURICH(2)  003764**

**EXHIBIT 1**