*American Zurich Ins. Co. and Zurich American Ins. Co. v.*
*J. Crisman Palmer and GPNA*

*William P. Fuller*
*December 20, 2022*

*Audrey M. Barbush, RPR*
*audrey@paramountreporting.com*
*605.321.3539*



Min-U-Script® with Word Index

**EXHIBIT**
H

Page 41

1   faith cases in South Dakota and what you've done.
2 A All right.
3 Q Have you defended bad faith cases in which you've
4   submitted an answer without including an affirmative
5   defense?
6 A Yes, I have.
7 Q And why would you do that?
8 A Because there was no applicable affirmative defense to
9   assert.
10 Q Have you defended bad faith cases without pursuing
11   offensive discovery?
12 A I have.
13 Q Again, why would you strategically do that?
14 A In many instances, if I get a bad faith case that comes
15   in and I review it, I review the file, the claim file,
16   and the available information, and I can see at the
17   outset that this is not good, that ultimately if this
18   were tried, we're going to lose and we could lose big,
19   and my goal at the outset is to try to get it settled
20   as quickly as possible. And in that situation, I will
21   talk to plaintiffs counsel about mediation and see if
22   we can mediate it as quickly as possible; and if for
23   some reason mediation is not acceptable to plaintiffs
24   counsel, to try to get it settled without a mediator.
25   And sometimes I'm successful in doing that. But I know

Page 42

1   that if I don't get it settled right away, that in most
2   instances, as more discovery -- and discovery is
3   extensive in bad faith in South Dakota. It takes a lot
4   of time, and it costs a lot of money. And usually it
5   doesn't help me; it helps the plaintiff. And so at the
6   end, we spend a lot of money on discovery, and we end
7   up paying even more money trying to get it settled a
8   year and a half after the lawsuit has been started.
9 Q Based on your experience in defending bad faith cases
10   in front of the federal district court judges in
11   South Dakota, would you have any concerns in pursuing
12   offensive discovery if your client has not responded
13   fully to the discovery requests from the defendant and
14   is facing a motion to compel?
15     MR. HOYT: Objection. Vague, incomplete.
16     THE WITNESS: Yes, I would have concerns. My
17   concern is that I know the federal judges are very
18   aggressive in compelling the insurance companies to
19   open their books, so to speak, and provide
20   broad-ranging information and documents, and I know,
21   and you can read numerous decisions from the federal
22   magistrates and the federal judges, where the judges
23   are not favorably disposed to the insurance company's
24   withholding of documents or information. And so, in
25   many instances, the insurance company loses the motion

Page 43

1   to compel, ends up paying attorneys' fees -- the
2   plaintiffs attorneys' fees on the discovery issue, and
3   in my opinion -- and this is, you know, not a
4   mathematical computation, but I think your stock, my
5   stock goes down in front of that judge if I fight what
6   I know is a losing battle on discovery.
7 BY MR. SUTTON:
8 Q Bill, I'm going to hand you what's previously been
9   marked as Exhibit 58, and I'm going to represent to you
10   that this is a draft answer that -- or excuse me. Let
11   me start over. I'm going to represent to you that this
12   is a proposed amended answer that was filed in the
13   Leichtnam bad faith case, and what I'd like you to do
14   is to turn to page 9 of that document, 9 in the bottom
15   numbers, 10 in the top numbers.
16 A So turn to page 9.
17 Q Correct, where it says "Separate and Affirmative
18   Defenses." Are you there?
19 A Right.
20 Q Now, there is a proposed affirmative defense,
21   paragraph 1, Failure to Exhaust Administrative
22   Remedies. I want to ask you, based on your experience
23   in defending bad faith cases, as well as your knowledge
24   of the defense of the underlying comp case, once the
25   settlement agreement was approved by the department in

Page 44

1   the Leichtnam comp case, do you believe that there was
2   any additional steps that the plaintiff needed to do to
3   exhaust their administrative remedies before pursuing a
4   bad faith claim?
5     MR. HOYT: Objection. Foundation, calls for legal
6   conclusion.
7     THE WITNESS: I don't think there was anything
8   further that needed to be done.
9 BY MR. SUTTON:
10 Q Why do you say that?
11 A Because --
12     MR. HOYT: Same objection.
13     THE WITNESS: Because the settlement agreement --
14   and more importantly, which was approved by the
15   Department of Labor -- in essence, is a final judgment
16   and, in essence, is an exhaustion of administrative
17   remedies.
18 BY MR. SUTTON:
19 Q In order for there to be an exhaustion of
20   administrative remedies, do you have an opinion as to
21   whether there must be a statement in the settlement
22   agreement that benefits were wrongfully denied?
23     MR. HOYT: Same objections.
24     THE WITNESS: I don't believe that's necessary.
25

Page 45

1  BY MR. SUTTON:
2  Q   Have you ever seen a settlement agreement signed in a
3      comp case, in your experience, either defending bad
4      faith cases or defending comp cases, where there was an
5      acknowledgment that benefits were wrongfully denied?
6  A   Not in my experience.
7  Q   Would you anticipate ever recommending your client
8      agree to that language?
9  A   No.
10 Q   Why not?
11 A   Well, it's admitting that you've basically engaged in
12     wrongful conduct.
13 Q   Are you aware of bad faith cases that have proceeded in
14     South Dakota based upon a settlement agreement approved
15     by the Department of Labor rather than an adjudication
16     following a hearing?
17 A   Run that question by again.
18 Q   Yeah. Do you have knowledge of bad faith cases in
19     South Dakota that have been filed when there's only
20     been a settlement of the workers' compensation claim
21     rather than a hearing in which the Department of Labor
22     determines that benefits were denied?
23 A   Yes. I'm aware of cases. Correct.
24 Q   And is that an unusual proposition, that you see a
25     settlement and then the bad faith claim?

Page 46

1  A   No.
2  Q   I'd like you to turn to page 10 of Exhibit 58, please,
3      Bill. There is a third affirmative defense,
4      res judicata. Do you see that?
5  A   I do.
6  Q   Based upon your knowledge of the work comp settlement
7      and your knowledge in defending bad faith cases, do you
8      have an opinion as to whether there was a successful
9      res judicata defense that could be asserted in this bad
10     faith case?
11        MR. HOYT: Objection. Foundation, calls for legal
12     conclusion.
13        THE WITNESS: Yes.
14 BY MR. SUTTON:
15 Q   What is that opinion?
16 A   Res judicata did not apply. The issues in the work
17     comp case are different from the issues in the bad
18     faith litigation.
19 Q   The fourth affirmative defense, release. Based upon
20     your work in defending the work comp case, as well as
21     your other work in other bad faith cases, do you have
22     an opinion as to whether release would have been a
23     successful affirmative defense in this case, the bad
24     faith case?
25 A   I do.

Page 47

1         MR. HOYT: Same objections.
2  BY MR. SUTTON:
3  Q   What's that opinion?
4  A   The release --
5         MR. HOYT: Same objections.
6         THE WITNESS: The release would not have been a
7      valid defense in the bad faith lawsuit.
8  BY MR. SUTTON:
9  Q   Why do you say that?
10 A   Because it was never the understanding in the work comp
11     proceeding that Mr. Leichtnam was releasing a potential
12     subsequent bad faith lawsuit. That was never my
13     intention from the outset, and Denny Finch had concerns
14     about language that could be construed in that way and
15     wanted that language removed. Which I did.
16 Q   The fifth affirmative defense, statute of limitations,
17     identified on page 10 of Exhibit 58. Do you know, off
18     the top of your head, Bill, when the limitations period
19     commences or accrues in a bad faith case based upon
20     denial of work comp benefits?
21        MR. HOYT: Objection. Incomplete, vague.
22        THE WITNESS: I believe it would commence at the
23     time of the wrongful denial.
24 BY MR. SUTTON:
25 Q   Do you know what the limitations period is governing

Page 48

1      bad faith cases in South Dakota?
2  A   I believe it's six years.
3  Q   Now, when the bad faith case was first commenced, did
4      you have a phone call with Cris Palmer?
5  A   I did.
6  Q   And do you recall -- well, what do you recall being
7      discussed during that phone call? Let's do it that
8      way.
9  A   I think I said to him that, you know, obviously it's
10     his call, but advice of counsel would not be a good
11     defense in the bad faith.
12 Q   Why did you communicate to Attorney Palmer that you did
13     not think advice of counsel would be a good defense?
14 A   Because that would open up all of my communications to
15     Zurich about the medical issue and my concerns about
16     the denial of medical benefits.
17 Q   Do you recall anything else from that discussion with
18     Attorney Palmer?
19 A   I really don't. I probably talked to him about
20     something else, but I can't recall what it was.
21 Q   Do you recall having any other conversations with
22     Attorney Palmer at any time about the bad faith case?
23 A   Well, I recall during the bad faith mediation --
24     apparently, there was a mediation that occurred, you
25     know, relatively soon after the lawsuit was started,