UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| AMERICAN ZURICH INSURANCE COMPANY and ZURICH AMERICAN INSURANCE COMPANY,<br><br>                    Plaintiffs,<br><br>        vs.<br><br>J. CRISMAN PALMER and GUNDERSON, PALMER, NELSON & ASHMORE, LLP,<br><br>                    Defendants. | 5:20-CV-05026-KES<br><br><br>ORDER DENYING DEFENDANT'S MOTION TO EXCLUDE CAMPBELL'S EXPERT OPINION, AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

American Zurich Insurance Company and Zurich American Insurance Company (collectively Zurich) brought an attorney malpractice and breach of fiduciary duty claim against J. Crisman Palmer (Palmer) and Gunderson, Palmer, Nelson & Ashmore, LLP (collectively defendants). *See* Docket 33. Defendants move to exclude Zurich's expert's opinion. *See* Docket 53. Defendants also move for summary judgment on both of Zurich's claims. *See* Docket 50. Zurich opposes both motions in their entirety. *See* Dockets 61-62.

The court first recounts the background facts that neither party disputes. Second, the court addresses defendants' motion to exclude Zurich's expert's opinion and then addresses the motion for summary judgment. The court discusses specific facts as they arise in the respective sections.

I.    **Factual Background**

Joseph Leichtnam sustained an injury at work in August 2007. *See*

Docket 63 ¶ 1. Zurich paid Leichtnam workers' compensation benefits after the

injury, including payment of his medical expenses. *See id.* ¶ 3. In February

2015, Leichtnam filed a bad faith insurance claim against Zurich arising out of

Leichtnam's workers' compensation claim. *Id.* ¶ 4. Zurich retained defendants

to represent them in the bad faith claim. *Id.* ¶ 5. Attorney Mike Abourezk

represented Leichtnam in this claim. *Id.* ¶ 6. Dawn Wagner served as Zurich's

associate general counsel, supervised the bad faith claim, and served as

Palmer's point of contact with Zurich. *Id.* ¶ 7.

In September 2015, Abourezk offered to settle Leichtnam's bad faith

claim for $325,000. *Id.* ¶ 8. In October 2016, the parties attempted to mediate

the bad faith claim, but Leichtnam's opening demand was for $2,000,000. *See*

*id.* ¶ 13. Zurich countered with an offer of $10,000 and Leichtnam responded

with a $1,995,000 offer. Docket 55-4 at 13. The mediation failed. *See* Docket

63 ¶ 13. In January 2018, Zurich retained Hinshaw Culbertson Law Firm to

represent Zurich in the bad faith claim. *Id.* ¶ 14. Defendants remained as local

counsel. *Id.* ¶ 15. Eventually, Zurich settled the bad faith claim with Leichtnam

for approximately $2,000,0000. *Id.* ¶ 16. Zurich filed its malpractice and

breach of fiduciary duty claims against defendants on April 20, 2020. *See*

Docket 1.[1]

---

[1] Zurich's initial complaint contained only a breach of fiduciary duty claim against defendants. *See* Docket 1. Zurich eventually filed a Second Amended

## II.    Motion to Exclude

### A. Colin Campbell's Credentials

Zurich submitted an expert report written by Colin Campbell in support of its two claims. *See* Docket 61-3. Campbell has practiced law for 45 years, served as a superior court judge in Maricopa County, Arizona for almost 20 years, and served as the Chair on the State Bar Ethics Committee in Arizona. *See* Docket 61-2 at 9-10; Docket 61-3 at 1. Campbell has been admitted to practice in various federal courts. *See* Docket 61-2 at 2. Campbell is not and has never been licensed to practice law in South Dakota. *See* Docket 55-6 at 2. Campbell has never practiced law in South Dakota, has not spoken with any South Dakota lawyers in preparing his report, and did not conduct any South Dakota specific research. *See id.* at 2, 5, 8.

### B. Discussion

A party who resists summary judgment must rely on admissible evidence, and so the court must determine what opinions, if any, would be admissible from plaintiffs' expert. *See In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011) ("[W]e require district courts to rely only on admissible evidence at the summary judgment stage[.]"). Defendants argue that Zurich's expert, Campbell, is not qualified under Rule 702 of the

---

Complaint, which included an attorney malpractice claim in addition to the breach of fiduciary duty claim. *See* Docket 33. Because the attorney malpractice claim "ar[ises] out of the conduct . . . set out . . . in the original pleading[,]" the Second Amended Complaint relates back to the date of the original pleading. *See* Fed. R. Civ. P. 15(c)(1)(B). Thus, the court uses April 20, 2020 as the date that Zurich filed its claims.

Federal Rules of Evidence to render a relevant opinion with respect to Zurich's two claims. *See* Docket 54 at 1. Specifically, defendants argue that Zurich's claims of legal malpractice and breach of fiduciary duty require expert testimony on the standard of care, and that the relevant standard of care for these claims is the statewide standard of care in South Dakota. *See id.* at 4. Defendants argue that Campbell is unqualified to give an expert opinion on the standard of care in South Dakota and thus the court must exclude his expert opinion. *See id.* at 6, 8.

Zurich bears the burden to prove Campbell's expert opinions are admissible by a preponderance of the evidence. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). Although the court has significant discretion in deciding the admissibility of expert testimony, Rule 702 provides for liberal admission of such testimony because "the rejection of expert testimony is the exception rather than the rule." *See United States v. Perry*, 61 F.4th 603, 606 (8th Cir. 2023) (internal quotation omitted); *Johnson v. Mead Johnson & Co.*, 754 F.3d 557, 562 (8th Cir. 2014).

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skills, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The court must determine whether the expert's testimony is reliable and relevant. *See In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d 995, 1000 (8th Cir. 2019). "To satisfy the reliability requirement, the proponent of the expert testimony must show by a preponderance of the evidence both that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757-58 (8th Cir. 2006). Because determining whether Campbell's expert testimony is admissible turns on South Dakota's substantive law of attorney malpractice,[2] the court looks to South Dakota law. *See Chew*, 754 F.3d at 635.

To succeed on a legal malpractice suit, the plaintiff must prove "(1) the existence of an attorney-client relationship giving rise to a duty, (2) the attorney, either by an act or failure to act, breached that duty, (3) the attorney's breach of duty proximately caused injury to the client, and (4) the client sustained actual damage." *Peterson v. Issenhuth*, 842 N.W.2d 351, 355 (S.D. 2014).

---

[2] The parties appear to only dispute whether a national or state standard of care applies with respect to Zurich's legal malpractice claim. *See* Docket 54 at 4-8 (discussing only the applicable standard of care in a legal malpractice claim); Docket 61 at 3-6 (same). Relatedly, Campbell's expert opinion appears to only opine on Zurich's legal malpractice claim, because Campbell does not mention the duty of care required for lawyers to adhere to their fiduciary duty and whether Palmer breached such a duty. *See* Docket 61-3 at 10 ("In my opinion, Palmer's actions constituted professional negligence and departed from the applicable standard of care."). The court more thoroughly discusses this issue in a later section. *See infra* at 34-37.

To prove the attorney breached his duty in a legal malpractice suit, the plaintiff must prove that the attorney fell below the standard of care that an attorney should exercise. *See Zhi Gang Zhang v. Rasmus*, 932 N.W.2d 153, 162 (S.D. 2019). The standard of care an attorney should exercise is the skill and knowledge ordinarily possessed by an attorney. *Id.* Normally, the plaintiff must prove breach through expert testimony to explain how the attorney's actions fell below such a standard. *See id.* While there may be "certain legal malpractice actions where the question relating to an attorney's negligence is so clear that no expert is required . . . more complex legal malpractice cases require expert testimony 'to establish the parameters of acceptable professional conduct because a jury cannot rationally apply negligence principles to professional conduct absent evidence of what the competent lawyer would have done under similar circumstances, and cannot speculate about what the professional custom may be.' " *See id.* at 162-63 (quoting *Lenius v. King*, 294 N.W.2d 912, 914 (S.D. 1980) (cleaned up)).

Determining the standard of care in a specific case may hinge on local differences such as state customs and practices. *See Hamilton v. Sommer*, 855 N.W.2d 855, 864-65 (S.D. 2014). In *Hamilton*, the South Dakota Supreme reviewed whether the trial court improperly struck the plaintiff's expert testimony. *See id.* at 861. The plaintiff in *Hamilton* sued the defendant-attorney for legal malpractice. *Id.* at 859. The plaintiff's expert submitted expert testimony based on the national standard of care. *See id.* at 861, 863. The trial

court excluded this testimony, finding that the plaintiff's claims required expert testimony based on South Dakota's statewide standard of care. *Id.*

The South Dakota Supreme Court reversed because "there was no showing that locality unique to the jurisdiction had any impact on the standard of care in this case." *Id.* at 866. The South Dakota Supreme Court recognized that locality may be "considered as a factor or special circumstance when determining whether an attorney has met the standard . . . such as where local rules, practices or customs are relevant to claimed breach of duty." *Id.* at 864-65. But "the application of the locality rule is fact specific and will not be an issue in every case." *Id.* at 864-65. Indeed, in finding that the trial court erred in striking the expert testimony, the South Dakota Supreme Court highlighted the "glaring problem" and "trap in applying [a local statewide standard] when locality is not relevant to attorneys' actions." *Id.* at 865. The South Dakota Supreme Court also clarified that when locality is a relevant factor to consider, "a statewide focus would usually be appropriate" because "an attorney's required level of skill and ability is not defined by the individual locality in which he practices." *See id.* at 865 (cleaned up) (quotation omitted).

Here, Campbell is not, and has never been, licensed to practice in South Dakota, has never practiced law in South Dakota before, and has not spoken with any South Dakota lawyers in preparing his opinion. *See* Docket 55-6 at 2, 8. Similarly, Campbell did not conduct any South Dakota specific research. *See id.* at 5. Thus, the court finds Campbell is not qualified to testify about whether

Palmer breached South Dakota's standard of care, if that becomes a relevant consideration.

On the other hand, Campbell has extensive experience as a lawyer and judge. He has practiced law for 45 years, served as a superior court judge in Maricopa County, Arizona for nearly twenty years, and served as the Chair on the State Bar Ethics Committee in Arizona. *See* Docket 61-2 at 9-10; Docket 61-3 at 1. He has also been admitted to practice in various federal courts. *See* Docket 61-2 at 2. The court finds Campbell is qualified to testify about the national standard of care for attorney malpractice and whether Palmer breached the national standard of care.

But as *Hamilton* instructs, these findings begin, rather than end, the inquiry. *See Hamilton*, 855 N.W.2d at 864-65. Indeed, the parties dispute what standard of care applies to Zurich's legal malpractice claim. Zurich argues that the standards to which Palmer should be held "apply nationally" and "are not varied by any South Dakota Rule of Professional Conduct." *See* Docket 62 at 14; *see also* Docket 61 at 5. Defendants argue that the locality rule applies here and that the standard of care is a South Dakota standard of care. *See* Docket 54 at 4. In support, defendants argue that the uniqueness of defending bad faith claims against Abourezk affects the applicable standard of care. *See id.* at 5-6; *see also* Docket 64 at 3, 9. Additionally, defendants point to evidence of the "very broad scope of discovery" in South Dakota. *See* Docket 54 at 5.

Determining whether a national or statewide standard of care applies turns on whether local rules, practices, or customs are relevant to the claimed

breach of duty. *See Hamilton*, 855 N.W.2d at 864-65. This inquiry is "fact specific." *Id.* The court now turns to which standard of care applies to each of Campbell's proposed opinions.

Campbell first opines that Palmer breached his standard of care "by failing to conduct a thorough, timely review of the evidence to evaluate the facts, competently prepare [Zurich's] defenses, and analyze litigation and settlement strategy." *See* Docket 61-3 at 10. Defendants seize on Campbell's admission in his deposition that it would be appropriate to consider the unique South Dakota aspects of the case given the particulars of litigating a case against Abourezk. *See* Docket 55-6 at 8; Docket 54 at 6. Similarly, defendants rely on their expert, Jack Hieb's testimony. *See id.* Specifically, Hieb repeatedly mentions the unique circumstances that come with litigating against Abourezk in a bad faith insurance claim. *See* Docket 55-59 at 17, 19.

But the court is not bound by Campbell's or Hieb's conclusions as to what standard of care applies because that is a legal conclusion for the court, rather than for a witness. *See Hamilton*, 855 N.W.2d at 862. Defendants have not cited any cases that state that the unique circumstances that accompany litigating against a specific lawyer are relevant to determine whether a national or statewide standard of care applies. In fact, *Hamilton* implicitly rejected this theory when it stated that in cases where locality may be relevant, "an attorney's required level of skill and ability is *not defined by the individual locality in which he practices*." *See id.* at 865 (emphasis added)(quotation omitted). If considering the individual locality is not relevant to establishing a

9

statewide standard of care, then it logically follows that it cannot be relevant to determine whether a national or statewide standard of care applies. Thus, the court does not consider any potential uniqueness in litigating against Abourezk when deciding what standard of care applies.

The court now addresses defendants' claims that South Dakota courts allow broad discovery practices and how this uniqueness necessarily impacts the standard of care. *See* Docket 54 at 5. The record does contain support for the proposition that discovery practice in South Dakota is broad. For example, Palmer emailed Wagner multiple times throughout the course of representing Zurich about how lenient the court was in allowing discovery. *See* Docket 55-45; Docket 55-48; Docket 55-50. At one point, Palmer also attached to an email a then-recent decision illustrating the broad nature of the discovery practice in South Dakota. *See* Docket 55-51.

Even if the court accepts the characterization that South Dakota has broad discovery practices, the court finds this observation is disconnected from Campbell's opinion that Palmer breached his standard of care "by failing to conduct a thorough, timely review of the evidence to evaluate the facts, competently prepare [Zurich's] defenses, and analyze litigation and settlement strategy." *See* Docket 61-3 at 10. Palmer repeatedly referenced South Dakota's broad discovery practice to explain why some of the plaintiff's first set of production requests, although seemingly broad, would likely succeed. *See* Docket 55-45; Docket 55-48.

But the broad authorization of discovery afforded to the plaintiff (Leichtman) in this the underlying workers compensation case does not affect Palmer's duty to timely review the evidence, evaluate the facts, prepare defenses, or analyze litigation or settlement strategies. Indeed, the liberal disclosure of discovery that Palmer repeatedly referenced as being the broad discovery practice in South Dakota was from Zurich to Leichtnam. In other words, Palmer should have had the evidence he needed to fulfill his above-mentioned duties because it was documents and evidence that Zurich needed to disclose to Leichtnam. The discovery practices of South Dakota would not impact Palmer's ability to review his client's evidence, evaluate the facts, or analyze litigation strategies. If anything, assuming South Dakota does in fact have broad discovery practices, that fact makes Palmer's failure to serve any written discovery requests or notice any depositions more egregious, which could further support Zurich's theory. *See* Docket 61-3 at 7.

Thus, in context, the broad discovery in South Dakota is insufficiently related to the standard of care Palmer owes with respect to thoroughly reviewing the evidence, evaluating facts, competently preparing Zurich's defenses, and analyzing litigation and settlement strategy. The court finds that nothing about this standard, namely the requirement to conduct a "thorough, timely review of the evidence to evaluate the facts, competently prepare [Zurich's] defenses, and analyze litigation and settlement strategy" is specific to South Dakota. *See* Docket 61-3 at 10. The court finds a national standard of care applies to Campbell's first opinion.

11

The court turns to Campbell's second opinion. Campbell opined that Palmer gave "untimely and misguided advice regarding settlement" because "[w]ithout knowing the weaknesses of [Zurich's] case and advising his clients about those weaknesses, Palmer could not and did not provide [Zurich] with the information needed to enable it to negotiate a more favorable settlement at the earliest possible time." Docket 61-3 at 10. According to Campbell, "[t]he inexcusable delay in reviewing the file and lack of diligence in discussing strategy with Wagner meant that Palmer was unprepared to properly evaluate the initial settlement offer, which could have decreased [Zurich's] eventual payment by more than $1.5 million." *Id.* Finally, Campbell concluded that Palmer's actions "harmed [Zurich's] litigation strategy and settlement position and caused [Zurich] to incur significant losses, as well as unnecessary legal fees and costs." *Id.*

Consistent with the above analysis, the court does not consider any of defendants' arguments about how the standard of care with respect to keeping a client well-informed of the status of the case is impacted by the fact that Palmer was litigating against Abourezk. *See supra* at 6-11. The court also finds that, similar to the above analysis, nothing about the discovery process in South Dakota is sufficiently tied to Campbell's opinion regarding Palmer's failure to properly inform Zurich of the status of the case. This case is not one in which another party's failure to provide discovery resulted in an attorney's inability to inform the client of all the relevant facts given the attorney's lack of access to such information. Rather, Palmer already had the information, or

12

should have requested the information by issuing his own discovery requests, to update Zurich, irrespective of whether Leichtnam's discovery requests to Zurich were overly broad. Thus, the court finds that there is an insufficient connection between the facts of this case and unique practices in South Dakota that would justify using a South Dakota standard of care. The court denies the motion to strike Campbell's second opinion.

In summary, the court finds that a national standard of care applies with respect to both of Campbell's opinions on Zurich's attorney-malpractice claim. Comparing the South Dakota Rules of Professional Conduct with the model American Bar Association Rules of Professional Conduct also support this finding. Rules 1, 1.4(a)(2), 1.4(a)(3), and 1.4(b) of both rules are identical. *Compare* SDCL Rules of Professional Conduct, Appendix, Ch. 16-18 Rule 1.1, 1.4, *with* ABA Model Rule of Professional Conduct 1.1, 1.4. While a violation of a Rule of Professional Conduct does not automatically result in a cause of action for malpractice, the standards are nonetheless helpful guides. *See Behrens*, 698 N.W.2d at 575; *Leonard v. Dorsey & Whitney* LLP, 553 F.3d 609, 628-29 (8th Cir. 2009). That there is no difference between the South Dakota and ABA national Model Rules of Professional Conduct reinforces the court's finding that the national standard of care applies in this case.

And as discussed above, the court finds Campbell is qualified to give a national standard of opinion based on his extensive experience as an advocate and judge both in Arizona and other federal courts in the country. *See* Docket

61-2 at 2, 9-10; Docket 61-3 at 1. Thus, the court denies defendants' motion to strike Campbell's expert report.[3]

## III.   Summary Judgment

### A. Factual Background

Viewing the record in the light most favorable to Zurich and in addition to the above-mentioned facts, the facts are:

When Zurich retained defendants to represent it in the bad faith claim, Zurich sent a litigation guideline to defendants that outlines the terms and Zurich's expectations of defendants' representation. *See* Docket 62-2 at 28-44. The guidelines provided that defendants should send a 90-day report to Zurich that discusses the general allegations of the complaint, the key issues of the case, and the litigation plan and strategy. *See id.* at 36. Palmer could not recall providing the 90-day report. *See id.* at 5-6.

In September 2015, Wagner sent Palmer an email that reads in part:

> Prior to having any discussions with management regarding authority, it would be helpful for you to provide me with an analysis regarding your initial review of the file, including a timeline summary, budget, the requisite standard plaintiff will need to prove in order to establish bad faith in South Dakota and your recommendations on our chance of success given this stage in the process.

---

[3] The court also rejects Zurich's argument that defendants' motion to exclude Campbell's testimony is an inappropriate motion in limine "thinly disguised as a motion for summary judgment." *See* Docket 61 at 6. The admissibility of an expert's proposed testimony, especially in conjunction with a defendant's motion for summary judgment, is appropriately raised at the summary judgment stage because it is ultimately a legal question that in many cases is outcome determinative. *See In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d at 1001.

*See* Docket 55-17. Wagner also stated in the email that she wanted the report and evaluation so that she "can have some internal discussions about potential for an early resolution." *Id.; see also* Docket 62-2 at 20-21.

Throughout the case, Palmer did not send any discovery requests to Leichtnam. *See* Docket 62-2 at 15. Palmer did not take Leichtnam's deposition (or any depositions), even though Wagner had repeatedly asked Palmer whether and when he would do so. *See id.* at 19; *see* Docket 55-24; Docket 55-25; Docket 55-27. In fact, in a February 2017 email exchange between Palmer and Wagner, Wagner asked Palmer "Have we taken the plaintiff's deposition yet? What is the deadline for oral discovery completion?" *See* Docket 55-25. Palmer responded, "We have not taken depo. Discovery deadline is 7-19[,]" even though Palmer had already determined that he would not depose Leichtnam at that point. *See id.*; Docket 62-2 at 25-27. Wagner also asked Palmer to provide updates on the overall defense strategy as late as January 4, 2018. *See* Docket 55-24. In this same January 4, 2018 email, Wagner again asked Palmer when he planned to depose Leichtnam and conduct additional discovery on Leichtnam's medical history. *See id.*

It is Campbell's expert opinion that Palmer's failures, among others, fell below the standard of care. *See* Docket 61-3 at 9-10. Specifically, Campbell opined that Palmer's actions violated South Dakota Model Rules of Professional Responsibility 1.1 and 1.4. *See id.* Campbell concluded that Palmer failed "to conduct a thorough, timely review of the evidence to evaluate the facts, competently prepare [Zurich]'s defenses, and analyze litigation and settlement

strategy." *See id.* at 10. Campbell also concluded that Palmer's "inexcusable delay in reviewing the file and lack of diligence in discussing strategy with Wagner meant that Palmer was unprepared to properly evaluate the initial settlement offer, which could have decreased [Zurich]'s eventual payment by more than $1.5 million." *Id.* at 10. Further, Campbell also opined that Palmer's failures "harmed [Zurich]'s litigation strategy and settlement position and caused [Zurich] to incur significant losses, as well as unnecessary legal fees and costs." *Id.*

### B. Legal Standard

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *Morrow v. United States*, 47 F.4th 700, 704 (8th Cir. 2022) (alteration in original) (quoting *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995)). In reviewing the record, the court views the facts in the light most favorable to the non-moving party. *Lissick v. Andersen Corp.*, 996 F.3d 876, 882 (8th Cir. 2021). While "[t]he mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient[,]" *Turner v. XTO Energy, Inc.*, 989 F.3d 625, 627 (8th Cir. 2021) (quotations omitted), a party moving for summary judgment is not entitled to a judgment just because

16

the facts he offers may appear to be more plausible or because the adversary may be unlikely to prevail at trial, *see Handeen v. Lemaire*, 112 F.3d 1339, 1354 (8th Cir. 1997).

### C. Applicable Law

Federal courts sitting in diversity apply the substantive law of the forum state. *See Chew v. Am. Greetings Corp.*, 754 F.3d 632, 635 (8th Cir. 2014). In doing so, federal courts must follow the decisions of the state's supreme court interpreting the forum's law. *See C.S. McCrossan Inc. v. Fed. Ins. Co.*, 932 F.3d 1142, 1145 (8th Cir. 2019). But if a state's supreme court "has not spoken on an issue, [federal courts] must predict how it would decide the issue[,]" and "may consider relevant state precedent, analogous decisions, considered dicta . . . and any other reliable data." *Olmsted Med. Ctr. v. Cont'l Cas. Co.*, 65 F.4th 1005, 1008 (8th Cir. 2023) (alteration in original) (quoting *Brill as Tr. For Brill v. Mid-Century Ins. Co.*, 965 F.3d 656, 659 (8th Cir. 2020)). Here, the court is sitting in diversity and thus South Dakota substantive law applies. *See* Docket 33.

### D. Statute of Repose

Under SDCL § 15-2-14.2, "[a]n action against a licensed attorney . . . for malpractice, error, mistake, or omission . . . can be commenced only within three years after the alleged malpractice, error, mistake, or omission shall have occurred." The South Dakota Supreme Court held that this statute is a statute of repose, rather than a limitation period. *See Robinson-Podoll v. Harmelink, Fox & Ravnsborg Law Office*, 939 N.W.2d 32, 41-42 (S.D. 2020). As a statute of

17

repose, the starting date that triggers the clock for purposes of timely submission under SDCL § 15-2.14.2 is not when a claim accrues, but rather the date of the last culpable act or omission of the defendant. *See id.* at 40-41.

The South Dakota Supreme Court in *Robinson-Podoll* held that the continuing tort doctrine applies to this statute of repose, so long as the harm is the cumulative effect of a series of negligent actions taken by the defendant and that there was a continuous and unbroken course of negligent actions. *See id.* Importantly, for the continuing tort doctrine to apply, the negligent actions must all contribute to the same harm. *See id.* If these conditions are satisfied, the three-year statute of repose limit begins on the date of the defendant's last culpable act or omission. *See id.* at 47.

The facts in *Robinson-Podoll*'s illustrate the continuing tort doctrine. In *Robinson-Podoll*, the defendant-attorney represented Robinson-Podoll in a personal injury suit arising from a car accident. *See id.* at 36. Robinson-Podoll was the underlying plaintiff in an action, and Robinson-Podoll's attorney (a/k/a defendant-attorney) failed to file Robinson-Podoll's claim within the applicable statute of limitations. *See id.* at 36-37. The statute of limitations for Robinson-Podoll's underlying action expired on April 28, 2010. *See id.* at 36. The defendant-attorney and Robinson-Podoll ended their attorney-client relationship in early 2015. *See id.* at 42. In January of 2016, Robinson-Podoll filed her malpractice lawsuit against the defendant-attorney. *See id.* at 37.

Although Robinson-Podoll's attorney negligently failed to file Robinson-Podoll's personal injury claim within the three-year statute of limitations

18

(which expired in April of 2010) and thus the statute of repose seemingly barred malpractice suits brought after April 2013, Robinson-Podoll argued that the statute of repose should be extended under the continuing tort doctrine until Robinson-Podoll and the defendant-attorney ended the attorney-client relationship. *See id.* at 36-37, 42. In support, Robinson-Podoll argued that the defendant-attorney's failure to disclose this error constituted a continuous and unbroken course of tortious conduct. *See id.* at 42.

The Supreme Court of South Dakota held that Robinson-Podoll's malpractice claim for failing to timely file her underlying personal injury claim was barred by the statute of repose because the harm that flowed from this injury stemmed "from a single act of alleged negligence." *See id.* at 47. The Supreme Court found that the defendant-attorney's failure to notify Robinson-Podoll of the mistake did not extend Robinson-Podoll's malpractice claim for failing to timely commence the underlying lawsuit. *See id.* The Court explained that "[a]ny wrongful conduct by [defendant-attorney] thereafter in failing to disclose the error was not the cause of *that initial injury*. Thus, the continuing tort doctrine did not delay the occurrence of the three-year repose period on the malpractice claim for failing to timely file the personal injury action." *Id.*

In addition though, the South Dakota Supreme Court held that the defendant-attorney also had a duty to disclose the fact that she missed the statute of limitations to Robinson-Podoll. *See id.* at 46-47. This failure, the Court explained, was subject to the continuous tort doctrine because the failure to disclose this alleged error during the representation began in 2010

19

(the day the statute of limitations expired) and continued through 2015 (the day the attorney-client relationship terminated). *See id.* at 47. Robinson-Podoll's alleged damage—the expiration of the repose period for the malpractice claim—arose from "the cumulative effect of [the alleged continuing wrong] rather than the result of a single act." *Id.*

Here, in September of 2015 and prior to the mediation, Abourezk, on behalf of his client Leichtnam, sent Palmer a settlement proposal for $325,000. *See* Docket 63 ¶ 8. But at the mediation in October 2016, Leichtnam's opening demand for settlement was for $2,000,000. *Id.* ¶ 11-13. Zurich countered with an offer of $10,000, and Leichtnam responded with a $1,995,000 offer. Docket 55-4 at 13. The settlement failed at that time. *Id.* Zurich eventually retained a new law firm in January of 2018. Docket 63 ¶ 14. Zurich and Leichtnam eventually settled the claim for $2,000,000. *See id.* ¶ 16.

Zurich now claims it lost an opportunity to accept Leichtnam's settlement offer before the 2016 mediation. *See* Docket 33 at 5-7. In support, Zurich alleges that Palmer failed to provide the litigation plans as set forth in Palmer's agreement to represent Zurich. *See* Docket 62 at 3-4; *see also* Docket 62-2 at 15, 36. Palmer also failed to take any discovery or depose Leichtnam and failed to notify Wagner of this decision. *See* Docket 62-2 at 19; Docket 55-24; Docket 55-25. Instead, in February 2017, when Wagner asked Palmer whether Palmer had taken Leichtnam's deposition yet, Palmer responded "[w]e have not taken depo." *See* Docket 55-25. Viewing this email in the light most favorable to Zurich, Palmer's response was misleading at best, because at that

point in time, Palmer had already decided not to depose Leichtnam. *See* Docket 62-2 at 26-27. Campbell noted Palmer's actions and opined that prior to the 2016 mediation, defendants' failure to discuss possible affirmative defenses, failure to discuss litigation strategy with Wagner, and failure to adequately inform Zurich of the merits of the case, all fell below the standard of care and left Zurich unprepared to properly evaluate the initial settlement offer. *See* Docket 61-3 at 10. This failure, according to Campbell, could have led Zurich to agree to the original $325,000 settlement offer, instead of paying the eventual $2,000,000 settlement to Leichtnam. *See id.*

Defendants argue that Zurich's malpractice claim is barred under the statute of repose because Zurich's alleged harm—the missed opportunity to accept Abourezk's early $325,000 settlement offer—occurred at the latest by October 2016 at the mediation. *See* Docket 65 at 3-6. The court agrees in part. Zurich's claim alleging a lost opportunity to settle early for $325,000 is analogous to the malpractice claim in Robinson-Podoll's case for failing to timely file the underlying personal injury claim. *See Robinson-Podoll*, 939 N.W.2d at 47. In *Robinson-Podoll*, Robinson-Podoll's malpractice claim against the defendant-attorney for failure to file a timely complaint within the statute of limitations was time barred even though the defendant-attorney continued to breach the duty of care to the client because the continued breaches did not cause the initial harm of failing to file a timely complaint. *See id.* Similarly here, prior to the mediation, Abourezk offered to settle for $325,000. *See* Docket 63 ¶ 8. But at the October 2016 mediation, Abourezk opened the

21

mediation with a $2,000,000 demand and only reduced it by $5,000 after Zuirch offered to settle for $10,000. *Id.* ¶ 13; Docket 55-4 at 13. At this point in time, even viewing the record in the light most favorable to Zurich, Abourezk was not going to consider a settlement amount close to $325,000. Thus, the lost opportunity to settle for $325,000 passed in October 2016, and any alleged wrongdoing by Palmer after October 2016 did not, and could not, contribute to Zurich's harm of losing an opportunity to settle with Leichtnam for $325,000. In other words, "[a]ny wrongful conduct by [Palmer] thereafter [the settlement] . . . was not the cause of *that initial injury* [i.e. the lost opportunity to settle for $325,000]." *Robinson-Podoll*, 939 N.W.2d at 47. (emphasis added). Zurich did not file its legal malpractice claim until April 20, 2020. *See* Docket 1. That is more than three years past October 2016, and thus South Dakota's statute of repose bars Zurich's claim for a lost opportunity to settle for $325,000. *See* SDCL § 15-2-14.2; *Robinson-Podoll*, 939 N.W.2d at 47.

Defendants repeatedly argue that Zurich has failed to allege any additional harm other than Zurich's lost opportunity to settle for $325,000. *See* Docket 65 at 3 ("Zurich presents no evidence of any harm allegedly caused by any alleged breach after the October 24, 2016 mediation[.]") (emphasis in original); *id.* at 7 ("Zurich cannot allege any breach after the mediation caused harm because the undisputed evidence proves no harm occurred."); *id.* at 12. But the record shows that Zurich also claims damages with respect to the increased costs it incurred because of a delayed settlement, *regardless of the amount* of such settlement. *See* Docket 61-3 at 10 ("The evidence further shows

22

that [Palmer's actions that constituted professional negligence] harmed
[Zurich]'s litigation strategy and settlement position and caused Zurich to incur
significant losses, as well as unnecessary legal fees and costs."). This delay,
Zurich contends, is the result of Palmer's negligence. *See id.*

The record, viewed in the light most favorable to Zurich, supports this
claim. For example, in September 2015, Wagner sent Palmer an email saying
that

> [p]rior to having any discussions with management regarding
> authority, it would be helpful for you to provide me with an
> analysis regarding your initial review of the file, including a
> timeline summary, budget, the requisite standard plaintiff will
> need to prove in order to establish bad faith in South Dakota and
> your recommendations on our chance of success given this stage
> in the process.

*See* Docket 55-17. Wagner further stated she wanted this information "so that
[Wagner] [could] . . . have some internal discussions about potential for an
early resolution." *Id.* This email shows Wagner relied on Palmer to provide
sufficient updates in order to receive settlement authority from Zurich. *See id.*

Consistent with this reliance, Wagner continued to ask Palmer questions
about the litigation strategy, such as whether Palmer had taken Leichtnam's
deposition, to which Palmer replied he had not yet, despite Palmer knowing
that he was not going to take the deposition at all. *See* Docket 55-25; Docket
62-2 at 26-27. Similarly, Palmer never requested any discovery from
Leichtnam. *See* Docket 62-2 at 15. Even as of January 2018, Wagner still had
to request Palmer to "provide an outline re: [Palmer's] defense strategy going
forward with regard to [Zurich's] discovery requests, key witnesses, etc." *See*

23

Docket 55-24. Wagner also requested copies of Leichtnam's answers to discovery and requested information on when Palmer planned to depose Leichtnam and/or planned to conduct additional investigation into Leichtnam's medical history. *Id.* Zurich eventually retained an outside law firm in January 2018. *See* Docket 63 ¶¶ 14-15 (not disputing that an outside law firm took over as lead counsel for Zurich).

Additionally, Palmer did not research any potential affirmative defenses during his representation of Zurich. *See* Docket 62-2 at 7-9; Docket 62-6 at 2-3. Yet, Palmer signed Zurich's motion to file an amended answer in September 2018, which sought to add affirmative defenses. *See* Docket 62-7 at 2. Palmer did not advise Zurich or the retained counsel, Hinshaw Culbertson, that he found no merit to these defenses. *See* Docket 62-2 at 16-17. Palmer also admitted that he was aware of Federal Rule of Civil Procedure 11's requirements, which requires attorneys to certify that to the best of their "knowledge, information, and belief, formed after an inquiry reasonable under any the circumstances . . . the defenses . . . are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law[.]" *See* Docket 62-2 at 17; Fed. R. Civ. P. 11. A jury could reasonably find that Palmer's failure to research potential affirmative defenses earlier could have led Zurich to settle earlier.

The record, viewed in the light most favorable to Zurich, shows that Palmer failed to adequately keep Wagner and Zurich informed of the status of the case and failed to adequately review the facts and prepare a defense, and

that these failures prevented Wagner and Zurich from settling earlier. Campbell opined that these failures caused Zurich "to incur significant losses, as well as unnecessary legal fees and costs." *See* Docket 61-3 at 10. These continuous failures are analogous to the defendant-attorney's failure to notify Robinson-Podoll about missing the statute of limitations deadline. *See Robinson-Podoll*, 939 N.W.2d at 47. The defendant-attorney in *Robinson-Podoll* had an ongoing duty to disclose her failure to timely commence a suit, and because the failure continued through her representation of Robinson-Podoll, the court found this continued failure resulted in "a continuous and unbroken course of negligent representation" and that the representation "was so related as to constitute one continuing wrong." *See id.* (quotation omitted).

Similarly here, Palmer's failures, when viewed in the context of Zurich's inability to settle earlier (regardless of the amount), resulted in continued litigation costs that could have been reduced had Palmer adequately and timely researched the case, conducted discovery and/or kept Wagner informed of the case's status. Unlike the harm that flows from the lost ability to settle for $325,000—to which Palmer's post-2016 mediation mistakes could not have contributed given Abourezk already raised the settlement demand to $2,000,000 at the beginning of the 2016 mediation—the harm that comes as the result of the lost ability to settle *earlier* flows from Palmer's "continuous and unbroken course of negligen[ce]" because every day that Palmer failed to adequately represent Zurich meant that Zurich was ill-equipped to meaningfully engage in settlement negotiations with Leichtnam, for any

25

amount. *See id.* Delayed settlement means that Zurich had to spend more money on litigation costs. For example, a jury could reasonably find that Zurich would not have incurred the expense of hiring another law firm in 2018 had they been able to settle earlier, even if the settlement would have been for $2,000,000. *See* Docket 63 ¶ 14. The court concludes that Zurich's malpractice claim with respect to the increased litigation costs that Palmer's failures caused is not time-barred because Palmer's failures and omissions continued up until Zurich and Leichtnam settled in 2018, well within three years of Zurich bringing the suit against defendants in April 2020.[4] *See* Docket 63 ¶¶ 16-17.

The parties both discuss *Zoss v. Protsch*, CIV 20-4211, 2021 WL 1312868 (D.S.D. Apr. 8, 2021). *See* Docket 62 at 9-10; Docket 65 at 13-14. This case aligns with the court's analysis here. In *Zoss*, the plaintiff filed a legal malpractice claim and breach of fiduciary duty claim against his attorney and the attorney's law firm. *Zoss*, 2021 WL 1312868, at *1. The plaintiff in *Zoss* alleged that the defendant-attorney failed to properly file financial documents for the plaintiff's sale of cattle and failed to notify the plaintiff of this mistake. *See id.* at *1. The plaintiff filed the lawsuit on December 31, 2020. *Id.* On

---

[4] In its brief in opposition to defendants' motion for summary judgment, Zurich also argues that Palmer improperly admitted certain allegations in Leichtnam's complaint. *See* Docket 62 at 7. The court need not consider this argument at this stage because, for the reasons explained throughout this opinion, the court finds the record is already sufficient to deny summary judgment on Zurich's claimed damages due to the increased costs from a delayed settlement.

December 30, 2017, the defendants prepared and executed the documents, and argued that any alleged negligence occurred on December 30, 2017 or before, which was beyond the three-year statute of repose. *See id.* at *3. But the court rejected this argument, finding that because the defendants filed these documents five days later (in January 2018), and because filing these documents weas part of the same "occurrence" as preparing the documents, the plaintiff's legal malpractice claims were timely. *Id.* Similarly, *Zoss* held that the plaintiff's breach of fiduciary duty claim was timely, because the defendants' failure to notify the plaintiff of their mistake in improperly filing the documents was ongoing and continued until January 2018. *See id.* at *4. In doing so, the court in *Zoss* applied the continuous tort doctrine. *See id.*

Zurich's claim for the lost opportunity to settle for $325,000 is unlike the plaintiff's attorney malpractice claim in *Zoss* for the failure to properly file the financial documents. Zurich lost the opportunity to settle for $325,000 no later than the October 2016 mediation. *See* Docket 63 ¶¶ 8, 13. Any alleged malpractice by Palmer with respect to this lost opportunity to settle for $325,000 could not have occurred after October 2016. The plaintiff in *Zoss*, on the other hand, alleged their harm flowed from his attorney's failure to properly file financial documents. *See Zoss*, 2021 WL 1312868, at *1. Because filing the documents was an "integral part" of representing a client in that context, *Zoss* found that the defendants' act of filing was still part of the same occurrence for purposes of the statute of repose analysis. *See id.* at *3. Thus, the conclusion in *Zoss* with respect to the plaintiff's claim of malpractice for the defendant-

27

attorney's failure to properly file financial documents is consistent with the court's decision today.

But Zurich's legal malpractice claim for the lost opportunity to settle earlier (regardless of the amount of settlement) is analogous to the plaintiff's breach of fiduciary duty claim in *Zoss. See id.* at *3. As discussed above, Zurich submitted evidence that, viewed in the light most favorable to it, shows Palmer breached the standard of care by failing to properly advise Zurich of the status of the case, among other things. *See, e.g.*, Docket 55-24. These failures all contributed to the same harm—excessive legal fees and costs to Zurich—by continuously preventing Zurich from settling the claim earlier. Just like the defendant-attorneys in *Zoss* who failed to disclose their prior mistake of improperly filing the financial documents, Palmer failed to keep Zurich advised of the status of the case on an ongoing basis. Both Zurich and the *Zoss* plaintiffs were continuously prevented from filing a legal malpractice claim. *See Zoss*, 2021 WL 1312868, at *4. In both situations, the continuous tort doctrine applied such that plaintiff's respective claims are timely under South Dakota's statute of repose.

In summary, the court agrees that Zurich's attorney malpractice claim for damages it incurred for the lost opportunity to settle for $325,000 is time barred under South Dakota's statute of repose. But Zurich's attorney malpractice claim for damages it incurred for the delay in settling (regardless of the amount) is not time barred.

### E. Failure to Provide Admissible Testimony

As discussed above, the court finds that Zurich brought forth admissible expert testimony, through Campbell's report, with respect to Zurich's legal malpractice claim.

Defendants argue that Zurich cannot rely on Palmer's failures after the September 2016 mediation to prove that Zurich suffered increased litigation costs because Campbell only opined that defendants' negligent actions caused Zurich to miss out on the opportunity to settle for $325,000. *See* Docket 65 at 6-7. According to defendants, Campbell's expert opinion supports only Zurich's claim that Palmer acted negligently before the October 2016 mediation. *See* Docket 51 at 23; Docket 65 at 16. As such, defendants argue that any of Zurich's arguments that rely on post-mediation conduct must fail because plaintiffs do not have a qualified expert to testify that such conduct fell below the applicable duty of care. *See* Docket 65 at 16.

The following exchange took place during Campbell's deposition:

Q: Now, you understand that a mediation did occur and the settlement offer from plaintiff's counsel went from $325,000 prior to the mediation to $2 million at the mediation. Do you understand that to be the facts?

A: Yes, I believe when they went - - whatever the early settlement offer was that's set out in the letter had moved to $2 million or plus at the actual time of mediation, I think, in October of 2016.

Q: And so the failures of standard of care that you've just testified about that prevented Zurich from properly being able to settle the case - - and I understand there's a myriad of things that you claim Mr. Palmer failed to do - - did those all occur through the time of his engagement up through the mediation?

29

A: Well, certain things happened at particular times. For example, the failure to give a 30-day report or a 90-day report happened at particular times. . . .

Q: Are you opining that there was any failure of the standard of care by Attorney Palmer after the mediation?

A: Well, there are things that happened after the mediation that I think may bear upon his attitude toward the case or his standard of care on the case but not with respect to the case-within-the case element with respect to early settlement, if that makes sense.

Q: Yeah, it does. So I just want to make sure that I understand, because when I read your report, your opinions appear to indicate to me that Attorney Palmer fell below the standard of care on a series of things and that then, in the case within the case, caused harm to the client because it prevented the client from taking advantage of the early settlement offer. Is that a fair synthesis of what your opinions are in this case?

A: It's a fair synthesis of my opinion with respect - - in the context of the case within the case, let's just say.

Q: Are you opining that any of the other conduct by Attorney Palmer after the mediation caused any harm to Zurich?

A: Well, I have the opinion that certain things, like not consulting with the client about affirmative defenses, fall below the standard of care. I do not have an opinion, after the settlement conference, with respect to the case within the case.

Docket 55-6 at 7-8.

The court finds that Campbell's deposition testimony is ambiguous. Campbell's deposition testimony could mean that Campbell did not have an opinion about whether any post-mediation conduct harmed Zurich. *See id.* at 8 ("I do not have an opinion, after the settlement conference, with respect to the case within the case."). But Campbell's use of the language "case within the case" may refer to the alleged harm that resulted from Zurich's inability to take advantage of the early settlement offer of $325,000, based on the question's

30

framing. *See id.* at 7-8 (". . . [Y]our opinions appear to indicate to me that Attorney Palmer fell below the standard of care on a series of things and that then, *in the case within the case, caused harm to the client because it prevented the client from taking advantage of the early settlement offer*. Is that a fair synthesis of what your opinions are in this case?" (emphasis added)). Taking this interpretation, Campbell's testimony simply indicates that Campbell did not have any further opinions about Palmer's representation as it related to Zurich's lost opportunity to settle for $325,000.

At this stage, the court must view the facts and evidence in the light most favorable to Zurich. *See Lissick*, 996 F.3d at 882. On this basis, the court rejects defendants' argument because the court must resolve the ambiguity in Zurich's favor and find that Campbell only testified that he had no opinion about whether defendants' post 2016 mediation conduct constituted a breach of the standard of care in the context of the lost opportunity to settle for $325,000.  *See* Docket 65 at 6-7, 16. In other words, the court must interpret Campbell's deposition testimony to leave open the door to other breaches with respect to a different harm, such as Zurich's inability to settle earlier, regardless of the amount, due to Palmer's alleged failures.

But putting aside Campbell's ambiguous deposition testimony, Campbell's written report explicitly states that it is his opinion that Palmer's failures fell below the standard of care and that they "harmed [Zurich]'s litigation strategy and settlement position and caused [Zurich] to incur significant losses, as well as unnecessary legal fees and costs." Docket 61-3 at

31

10. This written opinion shows that Campbell's opinions are not as narrow as defendants argue because Campbell gave an opinion about the harms Zurich suffered in relation to not settling earlier in general (regardless of the amount) by referencing the "unnecessary legal fees and costs." *Id.* Thus, the court rejects defendants' argument that Zurich failed to identify any evidence that Zurich suffered a harm outside of the lost opportunity to settle for $325,000.

Defendants also argue that Zurich failed to submit any evidence that Palmer's actions after the 2016 mediation caused Zurich any harm. *See* Docket 65 at 6. But Campbell's report explicitly contradicts this claim. In Campbell's report, Campbell opined that Palmer's actions (including actions Palmer did and did not do before and after the 2016 mediation) "harmed [Zurich]'s litigation strategy and settlement position *and caused* Zurich to incur significant losses, as well as unnecessary legal fees and costs." *See* Docket 61-3 at 10.[5]

Defendants next argue that Zurich does not have a viable claim for failure to disclose alleged malpractice because Campbell never opined that Palmer breached the standard of care by failing to disclose Palmer's malpractice and thus Zurich does not have expert testimony on this claim as is

---

[5] The parties both raise the issue of whether South Dakota law requires an expert to opine on whether an attorney's breach of care *caused* the damage the plaintiff alleges. *See* Docket 62 at 11-12; Docket 65 at 6 n.2. The court need not decide this issue, because Campbell gave an expert opinion on causation, opining that Palmer breached the standard of care and that Palmer's failures *caused* Zurich to "incur significant losses, as well as unnecessary legal fees and costs." *See* Docket 61-3 at 10.

required under South Dakota law. *See* Docket 65 at 16. Further, defendants argue that even if Campbell offered this opinion, the failure to disclose the malpractice "neither prevented Zurich from timely suing the Attorney Defendants nor caused any harm" because unlike the plaintiff in *Robinson-Podoll* who lost the opportunity to file a legal malpractice claim against the lawyer within the three-year statute of repose, Zurich knew of the malpractice as of August 2018, meaning Zurich had over a year to file a timely legal malpractice claim. *See id.* at 16-17.

Defendants correctly note that Zurich's response to defendants' motion for summary judgment has language indicating that Zurich believes Palmer also negligently failed to disclose Palmer's mistakes to Zurich. *See* Docket 62 at 10. And if Zurich's arguments relied solely on Palmer's failure to disclose his original malpractice leading up to the 2016 mediation, the court would agree with defendants that Zurich has failed to submit an expert opinion on whether this failure to disclose breached the standard of care and thus it would be improper to submit to the jury. *See generally* Docket 61-3. But as discussed above, Zurich also claimed that Palmer failed to provide a litigation plan, take discovery and depositions, and generally inform Zurich of the status of the case through 2018, which resulted in a delayed settlement. *See* Docket 62 at 9; *see also* Docket 61-3 at 10. Zurich's claim that Palmer failed to timely do these things is related, but distinct, from a claim that Palmer failed to disclose his earlier malpractice. In many instances, there will be factual overlap between these two claims, but such claims differ in that the former claim focuses on an

33

inability to settle the case earlier, whereas the latter claim focuses on an inability to file a legal malpractice suit. The harms are distinct.

Under *Robinson-Podoll*, the statute of repose analysis turns on what harm the plaintiff claims and whether the actions that contributed to such harm fall within the three-year window. *See Robinson-Podoll*, 939 N.W.2d at 47. Although Zurich brings both a legal malpractice and breach of fiduciary duty claim against defendants and although both claims often involve the same type of conduct and damages, "[a]n attorney's fiduciary duty . . . involves a different duty than the standard of care for legal malpractice." *Slota v. Imhoff and Assoc., P.C.*, 949 N.W.2d 869, 876 (S.D. 2020). An attorney's duties under a fiduciary duty are confidentiality and undivided loyalty. *See id.* at 876-77; *see also Behrens v. Wedmore*, 698 N.W.2d 555, 576 (S.D. 2005) (recognizing a wrongful act of an attorney does not alone establish a breach of fiduciary duty unless the wrongful act implicates a breach of confidentiality or loyalty). The court is unaware of any South Dakota Supreme Court decision to explicitly state that expert testimony is required for a breach of fiduciary duty claim against a lawyer. But the South Dakota Supreme Court has repeatedly held that expert testimony is generally required in cases involving the breach of a professional duty unless the subject is "within the common knowledge and comprehension of persons possessed of ordinary education, experience and opportunity." *See Hanson v. Big Stone Therapies, Inc.*, 916 N.W.2d 151, 158 (S.D. 2018) (quoting *Magbuhat v. Kovarik*, 382 N.W.2d 43, 46 (S.D. 1986)). Because a layperson would not ordinarily have experience in or knowledge of a

34

lawyer's fiduciary duty of confidence and loyalty, the court predicts the South Dakota Supreme Court would require expert testimony on whether a lawyer breached his duty of confidentiality or loyalty for a breach of fiduciary duty claim.

Here, Campbell did not provide any opinion (either through his report or deposition testimony) about whether Palmer breached his fiduciary duty. *See generally* Docket 61-3. Instead, Campbell only gave an opinion on whether Palmer breached the standard of care of an ordinary national lawyer in the context of a malpractice case. Thus, the court grants summary judgment in favor of defendants with respect to plaintiffs' claim of breach of fiduciary duty.

Zurich resists this conclusion, arguing that Campbell "testified to acts and omissions of Palmer's breach of fiduciary duty" such as Palmer concealing his intent to take discovery and his determination that there were no meritorious defenses. *See* Docket 62 at 2. This concealment, Zurich argues, "clearly breached Palmer's duty of loyalty to faithfully carry out the client's wishes[,]" and "expert testimony is not necessary to assist the jury in deciding whether Palmer misled or deceived Zurich." *See id.*

But Zurich misframes the inquiry: the inquiry is not whether expert testimony would be necessary to assist the jury in deciding whether Palmer misled or deceived Zurich, but rather whether expert testimony would be necessary to assist the jury in deciding whether Palmer breached his fiduciary duty towards Zurich. *Cf. Hanson*, 916 N.W.2d at 158. As discussed above, the general rule under South Dakota law is to require expert testimony for

35

breaches of professional duties. *See id.*; *Magbuhat*, 382 N.W.2d at 46. Although the jury would be instructed that the breach of fiduciary duty would encompass the breach of the duty of loyalty and breach of confidence, the court predicts the South Dakota Supreme Court would require expert testimony on whether Palmer breached one or two of these duties. The duty of loyalty and confidentiality have specific meanings in the legal profession and are not "within the common knowledge and comprehension of persons possessed of ordinary education, experience and opportunity." *See Hanson*, 916 N.W.2d at 158; *see also* Ronald E. Mallen, 4 Legal Malpractice, § 37:124 (2023) ("Expert testimony usually is necessary to establish a fiduciary breach, because the standards governing loyalty and confidentiality may not be matters of common knowledge."). And simply knowing the applicable standard for breach of fiduciary duty is insufficient for a jury to conclude whether an attorney breached that duty in a specific instance. *See* Mallen, 4 Legal Malpractice, § 37:124 ("The analysis of a rule's *application*, in general, and to the particular conduct, requires the testimony of expert witnesses." (emphasis added)).

Zurich also cites Campbell's deposition testimony, where Campbell testified that he believed Palmer "did not meet the standard of care" because, amongst other reasons, Palmer "had instructions from his client of what his client wanted him to do, none of which he did." *See* Docket 62-4 at 7. Zurich argues that this evidence "clearly raise[s] fact issues about Palmer's loyalty and honesty in not disclosing his intentions to disregard the client's wishes." *See* Docket 62 at 15. But Campbell never discussed the breach of fiduciary duty in

his expert report. *See* Docket 61-3. Nor did Campbell explicitly mention it in his deposition testimony. *See* Docket 62-4. And Campbell did not mention the concepts of loyalty or confidence—the two duties encompassed in a breach of fiduciary duty claim—in his report or at his deposition. *See* Docket 62-4; Docket 61-3; *Slota*, 949 N.W.2d 869, at 876-77. The court finds that based on the context of Campbell's report, when Campbell testified that Palmer "did not meet the standard of care" by not following his client's instructions, Campbell referred to the standard of care in the context of an attorney malpractice claim.

Zurich failed to submit expert testimony with respect to whether Palmer breached his fiduciary duty. Given the circumstances of this case, this failure requires the court to grant summary judgment in favor of defendants on Zurich's breach of fiduciary duty claim.

In conclusion, the court grants in part and denies in part defendants' motion for summary judgment. The court grants summary judgment in favor of defendants on Zurich's attorney malpractice claim, but only with respect to Zurich's claim that it was damaged from losing the opportunity to settle for $325,000, because such a claim is barred by South Dakota's statute of repose. The court also grants summary judgment in favor of defendants with respect to Zurich's attorney malpractice claim alleging that defendants negligently failed to disclose Palmer's earlier malpractice because Zurich has failed to submit required expert testimony on this theory of breach as required under South Dakota law. The court denies summary judgment on Zurich's attorney malpractice claim with respect to the increased litigation expenses and costs

Zurich suffered due to its inability to settle earlier (regardless of the amount), because Campbell's expert conclusions are admissible for this claim and the claim is subject to the continuous tort doctrine, and thus the claim is timely under South Dakota's statute of repose. Finally, the court grants summary judgment in favor of defendants on Zurich's breach of fiduciary duty claim because Zurich failed to provide any expert testimony as required under South Dakota law to show that defendants breached their duty of loyalty or confidence.

For the above reasons, it is ORDERED:

(1) That defendants' motion to exclude Campbell's expert opinion (Docket 53) is DENIED;

(2) That defendants' motion for summary judgment (Docket 50) is GRANTED in part and DENIED in part;

(3) That defendants' motion for summary judgment on Count II (Attorney Malpractice) with respect to Zurich's alleged harm of the lost opportunity to settle for $325,000 is GRANTED;

(4) That defendants' motion for summary judgment on Count II (Attorney Malpractice) with respect to Zurich's allegation that the defendants breached their duty of care by failing to notify Zurich of their earlier malpractice is GRANTED;

(5) That defendants' motion for summary judgment on Count II (Attorney Malpractice) with respect to Zurich's alleged harm of the increased

litigation costs Zurich had to expend due to the inability to settle

earlier (regardless of the amount) is DENIED; and

(6) That defendants' motion for summary judgment on Count I (Breach of

Fiduciary Duty) is GRANTED.

Dated September 8, 2023.

BY THE COURT:

*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE